JUDGE BRIEANT



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK SMSA LIMITED PARTNERSHIP d/b/a VERIZON WIRELESS, NEW CINGULAR WIRELESS PCS, LLC, SPRINT SPECTRUM L.P., and OMNIPOINT COMMUNICATIONS, INC. a wholly owned subsidiary of T-MOBILE USA, INC., | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | Case No. _____ |
| v. | 07 CIV 7637 |
| TOWN OF CLARKSTOWN, and THE TOWN BOARD OF THE TOWN OF CLARKSTOWN, | |
| Defendants. | |

Plaintiffs, New York SMSA Limited Partnership, d/b/a Verizon Wireless ("Verizon Wireless"), New Cingular Wireless PCS, LLC ( "AT&T"), Sprint Spectrum L.P. ("Sprint"), and Omnipoint Communications, Inc. a wholly owned subsidiary of T-Mobile USA, Inc. ("T-Mobile") (collectively, the "Wireless Carriers" or "Plaintiffs") by and through their attorneys as and for their Complaint against Defendant Town of Clarkstown, New York and the Town Board of the Town of Clarkstown, allege as follows:

## I.  **INTRODUCTION**

1.      This is an action for declaratory and injunctive relief to prevent the Town of Clarkstown, N.Y. (the "Town" or "Clarkstown"), and any of its officials from violating federal law by enforcing Chapter 251 of the Clarkstown Town Code, as amended by Local Law No. 14 of the year 2007, enacted July 26, 2007 and entitled "A Local Law to Amend Chapter 251 (Wireless

Communications Facilities) of the Town Code of the Town of Clarkstown" ("Chapter 251").  On

its face, numerous elements of Chapter 251, individually and collectively, violate federal law.

2.       Despite its characterization as land use legislation, Chapter 251 establishes a labyrinthine

set of regulations that encompasses all aspects of wireless network deployment.  Encompassing

twenty-eight pages, single spaced, Chapter 251 goes far beyond traditional land use issues such

as lot size and set backs.  It delves, instead, into every technical and operational aspect of

wireless deployment in Clarkstown.  By attempting to regulate everything from specific network

technologies to the definition of signal strength, Clarkstown has trampled upon numerous areas

that the federal government has reserved to itself.  Simply put, only the federal government has

the authority to develop and enforce the type of comprehensive legislative scheme embodied in

Chapter 251.

3.       Chapter 251 has an immediate an unavoidable effect on the provision of wireless

telecommunications services in Clarkstown.  The retroactivity provisions of Chapter 251 provide

that even existing wireless infrastructure will be subject to the onerous new regulations upon the

renewal of existing permits or, in the case of an existing permit without an expiration date,

within five years.  *See* Clarkstown Town Code § 251.37(c), (d).

4.       As explained more fully below, Chapter 251 impinges upon exclusive federal territory in

every conceivable way.  The overall regulatory scheme embodied in Chapter 251 constitutes a

prohibition on service, in violation of federal law.  Moreover, Chapter 251 contains provisions

that are expressly preempted by federal law, provisions that are preempted because they conflict

with federal law, and numerous provisions that extend into areas of federal field preemption.

5.     First, Chapter 251 prohibits or has the effect of prohibiting the ability of the Wireless

Carriers to provide telecommunications services in Clarkstown in violation of Section 253 of the

Communications Act by:  (i) vesting the Town with unbounded discretion to deny or impose any

conditions on its approval of applications for special permits to construct telecommunications

facilities; (ii) imposing burdensome application requirements and inordinate delay; and (iii) flatly

prohibiting wireless facilities with new structures in portions of the Town.

6.     Second, Chapter 251 violates Section 332(c)(3)(A) of the Communications Act by

regulating the Wireless Carriers' entry into the Clarkstown market and by dictating the

construction and use of certain wireless technologies through a preference system.

7.     Third, provisions of Chapter 251 purporting to vest Clarkstown with the authority to

regulate technological standards for wireless telecommunications services are preempted by the

Federal Communication Commission's ("FCC's") exclusive authority to establish technical

standards for personal wireless services.

8.     Fourth, certain provisions of Chapter 251 violate the Supremacy Clause of the U.S.

Constitution by purporting to regulate the placement of wireless facilities based upon the

environmental effects of radio frequency ("RF") emissions in violation of Section

332(c)(7)(B)(iv) of the Communications Act.

9.     Fifth, provisions of Chapter 251 purporting to vest Clarkstown with the authority to

request detailed information from wireless carriers about radio frequency interference ("RFI"),

and to consider RFI in decisions relating to the placement of wireless facilities, are preempted by

the FCC's exclusive jurisdiction over the field of RFI regulation.

10.    Finally, various individual and collective portions of Chapter 251 run afoul of the federal government's preemption of the entire field of the technical and operational aspects of wireless network deployment and operation.

11.    Plaintiffs respectfully request that this Court enter a declaratory judgment that Chapter 251 is preempted by the Supremacy Clause under both the express and implied preemptions more fully discussed below. Plaintiffs further request that this Court issue preliminary and permanent injunctive relief prohibiting the Town, and any officer, employee, or agent of the Town, from: (a) enforcing or attempting to enforce against Plaintiffs any of the requirements or conditions contained in Chapter 251; and (b) taking any action that would prohibit Plaintiffs from providing wireless telecommunications services to any part of the Town.

12.    This Complaint sets out examples of the numerous flaws in Chapter 251 which render it unenforceable but is not intended to provide an exhaustive account of the infirmities present in Chapter 251.

## II.    **THE PARTIES**

13.    Defendant the Town of Clarkstown is a town in Rockland County, New York, incorporated under New York law. The Town has the capacity under New York law to sue and be sued.

14.    Defendant the Town Board of the Town of Clarkstown is the legislative body of the Town of Clarkstown and is responsible for enacting all legislation, including Chapter 251 of the Clarkstown Town Code.

15.　　Plaintiff New York SMSA Limited Partnership (d/b/a "Verizon Wireless") is a New York Limited Partnership with its principal place of business at One Verizon Center, Basking Ridge, New Jersey, 07920, and provides commercial mobile services and personal wireless services as those terms are defined under federal law in and around Clarkstown, New York.

16.　　Plaintiff, New Cingular Wireless PCS, LLC (known as "AT&T") is a Delaware corporation with a principal place of business in the State of Georgia, an office in the State of New Jersey, 15 East Midland Avenue, Paramus, New Jersey 07652 and provides commercial mobile services and personal wireless services as those terms are defined under federal law in and around Clarkstown, New York..

17.　　Plaintiff, Sprint Spectrum L.P., is a Delaware limited partnership with a principal place of business at 6200 Sprint Parkway, Overland Park, Kansas 66251 is licensed by the FCC and authorized to construct and operate personal communications service facilities in various areas of the United States of American, including the State of New York and specifically the Town of Clarkstown, in order to provide wireless services to the public.

18.　　Plaintiff, Omnipoint Communications, Inc. is a wholly owned subsidiary of T-Mobile USA, Inc., a Delaware Corporation, with a principal place of business at 12920 SE 38th Street, Bellevue, Washington 98006, is licensed by the FCC, and provides commercial mobile services and personal wireless services as those terms are defined under federal law in and around Clarkstown, New York.

## III.    JURISDICTION AND VENUE

19.    This Court has federal question jurisdiction over this action because it arises under the Supremacy Clause of the United States Constitution, *see* U.S. Const. art. VI, cl. 2, and the Communications Act of 1934, as amended (the "Communications Act"), in particular Sections 253 and 332 of Title 47 of the U.S. Code. *See* 28 U.S.C. § 1331. This Court also has jurisdiction over this action under Section 1337(a) of Title 28 of the U.S. Code because the Communications Act is an Act of Congress regulating commerce.

20.    The Court has jurisdiction to order declaratory and injunctive relief. *See* 28 U.S.C. §§ 2201, 2202. There is a live controversy between the parties that includes whether Chapter 251 can be applied to the Wireless Carriers consistent with federal law.

21.    Venue is proper in this district because the Town of Clarkstown is located in this district and because "a substantial part of the events or omissions giving rise to the claim occurred" in this district. 28 U.S.C. § 1391(b)(2); *see id.* § 1381(b)(1).

## IV.    CHAPTER 251 IS PREEMPTED BY SECTION 253 OF THE COMMUNICATIONS ACT.

22.    The Wireless Carriers provide telecommunications services in the Town using wireless facilities, which include base stations, antennae and the ancillary equipment necessary to send and receive wireless signals ("cell sites").

23.    Such cell sites are necessary for a wireless carrier to provide coverage throughout a particular geographic area, such as the area comprising the Town of Clarkstown. Wireless calls

are handed off from one cell site to another as the user moves through the service area (in a car for instance).

24.    Gaps in coverage can create "gaps in service" where wireless calls cannot be initiated or received and where a wireless call in progress will be dropped if the user enters the "gap in service."

25.    Such "gaps in service" pose significant problems for wireless carriers in terms of the ability to market their services, customer goodwill, and even the satisfaction of minimum coverage requirements established by FCC regulation.  Given that many emergency first responder organizations rely upon wireless communications, such "gaps in service" also pose a public safety risk.

26.    In order to eliminate significant gaps in service and fully serve its FCC-licensed area in accordance with the minimum coverage requirements mandated by the FCC, a carrier must locate and upgrade cell sites in the licensed area.

27.    Chapter 251 sets forth mandatory procedures that the Town would use to regulate the placement of facilities necessary to provide the telecommunications services offered by the Wireless Carriers.  *See* Clarkstown Town Code § 251.10-.45.

28.    The text of Chapter 251 is attached to and incorporated into this Complaint as if fully set forth herein.  *See* Exhibit A to Affidavit of John E. Barry, Esq.

29.    Section 253 of the Communications Act, 47 U.S.C. § 253, is entitled "Removal of barriers to entry" and provides that:  "No State or local statute or regulation, or other State or

local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a).

30.    The Wireless Carriers are telecommunications providers within the meaning of Section 253 and they provide both intrastate and interstate telecommunications service to their customers.

31.    Section 253 was enacted as part of the Telecommunications Act of 1996.  Its purpose was deregulatory.  By limiting state and local regulation and prohibiting municipalities from erecting barriers to entry or discriminating among carriers, Section 253 was designed to open local markets to new competition and ensure that all telecommunications carriers operate on a level playing field.

32.    Section 253(a) states a broad rule of federal preemption, and a significant limitation on the ability of local governments to impose regulatory requirements on telecommunications carriers or the services they provide.  Congress's purpose in enacting Section 253(a) is clear—to ensure that certain aspects of telecommunications regulation remain the unique province of the federal government, while narrowly circumscribing the role of state and local governments in this arena. *See, e.g. City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1175 (9th Cir. 2001); *City of Rome v. Verizon Commc'ns, Inc.*, 240 F.Supp.2d 176, 178-79 (N.D.N.Y. 2003), *vacated for lack of subject matter jurisdiction by* 362 F.3d 168 (2d Cir. 2004).

33.    "[T]he plain language of Section 253(a) (removing barriers) permits facial challenges to zoning ordinances" by wireless carriers, as in this case. *Sprint Telephony PCS v. County of San Diego*, 490 F.3d 700, 714 (9th Cir. 2007); *see also Illinois Bell Tel. Co. v. Village of Itasca*, 2007

U.S. Dist. LEXIS 38661, *36 (N.D.Ill. 2007) (finding plaintiff had successfully pled a violation of Section 253(a) in bringing facial challenge to municipal zoning ordinance).

> **A.    Chapter 251 Vests the Town With Standardless Discretion in Violation of Section 253(a).**

34.    Chapter 251 vests the Town with broad, unfettered discretion to accept, accept with conditions, deny, or delay an application for a special permit.

35.    Broad discretion on the part of a municipality to grant or deny access necessary to the provision of telecommunications services "ha[s] the effect of prohibiting [a telecommunications provider] from providing telecommunications service." *TCG New York v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002).

36.    A zoning ordinance that "imposes a permitting structure and design requirements that present[] barriers to wireless telecommunications," including "voluminous" submission requirements and "open-ended discretion" on the part of the decisionmaker, is preempted by Section 253(a). *Sprint Telephony PCS*, 490 F.3d at 716; *City of Auburn*, 260 F.3d at 1175-76.

37.    Chapter 251 imposes different review mechanisms on different types of wireless facilities, depending on certain characteristics of the facilities. Clarkstown Town Code, § 251-15. Based on these criteria, proposed wireless facilities are divided into Category A, B, C, or D facilities. *Id.*

38.    In addition, the complex process created by Chapter 251 creates an entirely new Antenna Advisory Board ("AAB") to "serve in an advisory capacity only." *Id.* § 251-12(B). Though the AAB does not have the authority to make final decisions as to the completeness of a pre-application or application, to assign an application to a particular category, or to approve or

deny an application, the AAB is charged with making recommendations to the Planning Board regarding each of these determinations. *Id.* § 251-12(B), -13(B), -15(A)-(B), -16(A), 17(A)-(B)

39.     The process of "sorting" envisioned by the Ordinance is, itself, the source of limitless discretion on the part of the Town.  Whether a proposed site is assigned to category A, B, C, or D for purposes of review is based on a "score" a proposal receives in a number of subjective categories.  A proposal receiving a score of "90 or greater" is characterized as an "A" site and, therefore, receives the least scrutiny.

40.     Calculation of the "score," for purposes of sorting into categories, is inherently subjective.

41.     For example, the proposed use of "stealth technology" can add 10 points to an application.  *See* Clarkstown Town Code § 251 at "Table 1."  What constitutes stealth technology, however, is left to the Town's discretion.

42.     Similarly, there exists a points category for "Other Potential Impact." *Id.*  In this discretionary catch-all, the Town can evaluate and assign point totals to unspecified types of "impacts."  Compounding this discretion, the Town also can subjectively choose whether the "other" impact is *de minimus* (10 points), "moderate" ( 5 points), or "severe" (0 points). *Id.*

43.     Chapter 251 also makes the use of "preferred alternate technology" a de facto requirement for inclusion in Category A.  To be included in Category A, a pre-application that proposes the use of "preferred" technology, such as an outdoor distributed antenna system ("DAS") need only garner 60 points out of a total 140 points, whereas proposals using other technology must garner 90 points. *Id.* § 251-15(A), ch. 251, Table 1.  Further, the Preliminary

Site Screening Evaluation under Chapter 251 provides that 30 points are assigned automatically to a pre-application if the "Installation Type" uses DAS or a similar preferred technology. *Id.*, ch. 251, Table 1. The most any other type of technology could be assigned for "Installation Type" is 10 points. *Id.* Thus, on its face, pre-applications that propose to use DAS or a similar alternate technology need only obtain 30 points, while proposals using other technology must be assigned 90 out of only a possible 120 points. *Id.*

44. The Town's attempt to make "preferred alternate technolog[ies]" a mandatory part of the application process is further illustrated by the advantage the screening process gives to such technologies over even collocation of a new facility at an existing site, which is the least intrusive installation of all. Applications that utilize DAS must only achieve 60 points in the screening process to be assigned Category A status, but applications for collocation "on existing O&R tower/substation[s]" must receive 90 points, applications for use of a water tower must receive 90 points, and collocation at an "existing [Wireless Telecommunications Facility] or rooftop site" must receive 105 points. *Id.*

45. The Town's heavy regulatory preference for DAS and other "alternate" technologies over collocation at sites where there already are wireless facilities makes it clear that the Town's sole purpose in adopting these requirements is to coerce wireless carriers into adopting specific technologies when providing service in Clarkstown, rather than to achieve any potentially permissible land use objectives.

46. By dictating the technological standards through which the Wireless Carriers may provide service in the Town, the Town has substituted its technological preferences and judgments for those of the FCC, which is the exclusive body authorized to make these decisions.

11

47.     Within the local government of Clarkstown, the Planning Board is the body empowered to approve site plans and make recommendations to the Town and Zoning Boards on zoning and planning matters.  While the Planning Board of the Town of Clarkstown generally only enjoys planning and zoning authority as specified in New York State law, the Town Board has attempted to vest the Planning Board with regulatory authority in Chapter 251 that goes well beyond zoning and intrudes into areas preempted under federal law or otherwise specifically reserved to the jurisdiction of the FCC.

48.     Once an application makes it through the subjective "sorting" process, Chapter 251 gives the Town Planning Board complete discretion simply to deny an application to place Category B, C and D facilities, even after the applicant has complied with the lengthy and onerous pre-application, application and hearing processes.  *Id.* § 251-18(D).

49.     Further, even with respect to category A sites, the Planning Board is entitled to impose unlimited "aesthetic conditions" on such facilities.  *Id.* § 251-16(A).

50.     With respect to Category B, C, and D facilities, Section 251-18(D) states that the Planning Board may "approve, approve with conditions, or disapprove the application for a special permit under the provisions of this chapter within 62 days after a public hearing." *Id.* § 251-18(D).  No provisions in Chapter 251 limit the discretion to be exercised by the Planning Board in making its decision.

51.     Chapter 251 also gives the Planning Board broad discretion to reject "pre-applications" as incomplete, *id.* § 251-13(B), while giving it unlimited authority to require that an applicant "provide more detailed, corrected, or other information," *id.* § 251-13(B)(4).

12

52.     The same broad authority is given to the Planning Board to reject applications for

Category B, C, and D facilities as incomplete, *id.* § 251-17(B), while granting it unlimited

authority to require additional submissions from the applicant to render the application

"complete," *id.* § 251-17(D), -19(G)(10).

53.     Chapter 251 prohibits or has the effect or prohibiting the provision of

telecommunications service by authorizing the Town to exercise standardless discretion in

approving, denying, or placing any conditions upon the construction of wireless facilities.  Thus,

Chapter 251 violates federal law and must be invalidated.

      **B.     Chapter 251 Imposes Burdensome Application Requirements and
           Subjects Wireless Carriers to Inordinate Delays Which Violates Section
           253(a).**

54.     The burdensome application requirements (described in ¶¶ 37-53) are preempted under

Section 253(a) because, "as a whole, the Town's regulations and actions materially inhibit [the

Wireless Carriers'] ability to provide telecommunications services." *TC Systems, Inc. v. Town of

Colonie, New York*, 263 F.Supp. 2d 471, 484 (N.D.N.Y. 2003).  Section 253 requires review of

the cumulative impact of the Town's regulations, and thus even a series of provisions that were

individually non-objectionable could effectively prohibit telecommunications services and

violate federal law.  *See id.*

55.     The burdensome application requirements and potential for inordinate delay created by

Chapter 251 violate Section 253(a) because: (1) the application process requires that the Wireless

Carriers submit an enormous amount of information and contains no limits on the information

that may be requested by the Town; (2) Chapter 251 allows the Town to delay by requesting

additional information which can continually and without any limit restart the clock by which the

deadline for action by the Town is measured; and (3) Chapter 251 engages in impermissible municipal regulation of the services provided by wireless carriers, a phenomenon the FCC has referred to as unlawful "third tier" regulation.

56.     The numerous methods by which the Town can delay a final decision under Chapter 251 constitute the kind of "extensive delays" which have the effect of prohibiting the Wireless Carriers "from providing service for the duration of the delays." *TCG New York*, 305 F.3d at 76.

57.     Section 253 does not permit municipalities to regulate telecommunication services or exercise general regulatory authority over telecommunications providers. The Town's licensing and regulatory requirements amount to "an unnecessary 'third tier' of regulation that extends far beyond the statutorily protected interests in managing the public rights-of-way." *In re TCI Cablevision of Oakland County, Inc.*, 12 F.C.C.R. 21,396, 21,441 (1997).

58.     The overall processes and timelines set out in Chapter 251 are lengthy and convoluted. Chapter 251 imposes a Byzantine "pre-application" and "preliminary screening" process that requires a carrier first to submit a "pre-application" to the Planning Board, which the Planning Board reviews for completeness and can reject for lack of completeness prior to actually beginning its "preliminary screening." Clarkstown Town Code, § 251-13, -14.

59.     The pre-application, which only allows the Planning Board to categorize the type of proposed facility, requires burdensome submissions, particular given that the pre-application process results only in categorization of a facility and allows an applicant to begin the even more onerous application process.

i.  A statement in writing that construction of the facility is legally permissible;

ii.  USGS or topographic map indicating the site location;

iii.  Information related to the property on which the facility will be built, such as: the zoning district; size of the property; location, size and height of all existing structures, proposed and existing antennas, and appurtenant structures on the property;

iv.  The number, type and design of the antenna(s) proposed;

v.  Structural certification letter signed by a N.Y. State Professional Engineer;

vi.  Signal propagation or coverage maps showing existing facilities around the site and the in-vehicle coverage model for the proposed facility; and

vii.  A bulk table listing all proposed equipment measurements. *Id.* § 251-13(A).

60.  Chapter 251 provides that the Planning Board has 30 days to determine whether the "pre-application" is complete. *Id.* § 251-13(B).

61.  The 30-day time limit for determining whether the application is complete is rendered meaningless by another provision of Chapter 251, which creates a loophole which the Town can use to impose limitless additional burdens and delays. That provision states: "A determination

that a pre-application is complete shall not be deemed as a determination that the applicant has provided full and accurate information, and shall not preclude the Planning Board from requiring the applicant to provide more detailed, corrected, or other information at later stages during the application and permit process." *Id.* § 251-13(B)(4).

62.    A request for additional information by the Planning Board can thus render the "completed" pre-application "incomplete" because, under the circular logic of Chapter 251, complete applications must include all information requested by the Planning Board. *Id.* § 251-13(B).

63.    There is no limit on the number of times that the Planning Board can request "additional information." *Id.*

64.    Even after the Planning Board deems the pre-application complete, it then has an additional 45 days to conduct its preliminary screening. *Id.*, § 251-15(B).

65.    After the applicant clears the "pre-application" hurdles – which as explained above in ¶ 59 tilt the scales heavily against placing pre-applications that do not propose the use of DAS or other preferred technologies into the less burdensome Category A – and a category for the site is determined, an applicant then must submit an additional lengthy "application." *Id.* § 251-19,-23,-24.

66.    In addition to all that must be submitted in conjunction with the pre-application, the subsequent application for Category A or B facilities requires submission of a number of items, including:

i.    A statement that the proposed facilities shall be maintained in a safe manner and in compliance with all conditions placed on the permit;

ii.   A statement that construction of the facilities is legally permissible and that the applicant is authorized to do business in New York state;

iii.  A detailed report signed by a licensed Professional Engineer registered in New York, several aspects of which must be certified by the engineer, which must include among numerous other requirements:

(a)   A commitment to co-locate or allow co-location wherever possible on all existing and proposed facilities;

(b)   Type, locations and dimensions of all proposed and existing landscaping, drainage patterns and controls, and fencing;

(c)   The make, model and manufacturer of the tower and antenna(s);

(d)   Numerous maps, drawings and plans;

(e)   A showing setting forth how the applicant will effectively screen from view its proposed facility;

(f)   A variety of information related to the transmission and radiation from the antenna(s), such as:

17

(I)    The frequency, modulation and class of service of radio or other transmitting equipment;

(II)    Transmission and maximum effective radiated power of the antenna(s);

(III)    Azimuth directions of antenna sectors and associated radiation patterns of the antenna(s);

(IV)    Certification that Non-Ionizing Electromagnetic Radition ("NIER") levels at the proposed site will be within FCC threshold levels;

(V)    Calculations of the estimated NIER output of the antenna(s);

(VI)    Cumulative Radio Frequency ("RF") calculations for proposed and pre-existing antennas for ground level exposure points;

(VII)    The maximum exposure level for the facility and the locations at which this occurs;

(VIII)    The estimated RF levels at specific "locations of community interest," such as schools, residences or commercial buildings;

(IX)    A multiple-source exposure-impact assessment if the facility is to be situated on the same site as existing facilities;

18

          (X)     An RF Report providing the methods, calculations, and assumptions (including building heights and topography) for certification of the various calculations;

          (XI)    Certification that the proposed antenna(s) will not cause interference with existing telecommunications devices; and

          (XII)   Propagation studies of the proposed site and all adjoining proposed or existing sites using the "in-vehicle" model threshold and a description of the methods and computer software used to generate coverage maps;

     (g)     Proposed tower maintenance and inspection procedures; and

     (h)     A copy of the applicable FCC license;

   iv.   Copies of required correspondence that has been submitted to divisions of the New York State Office of Parks, Recreation and Historic Preservation and the New York State Department of Environmental Conservation along with copies of any comments received in response regarding the facility.

*Id.* § 251-19(D),-19(F), -23,-24.

67.    For Category C and D sites, the applicant must provide an even greater amount of information, including among other things:

i.   A written report demonstrating efforts to secure shared use of any existing towers;

ii.  A structural analysis and written certification that the facility, foundation, and attachments are designed and will be built to meet various legal requirements;

iii. An Environmental Assessment Form and visual Addendum, including photographs of the existing site as well as photographic renderings of the proposed installation from various vantage points, though the Planning Board "may require submission of a more detailed visual analysis";

iv.  If required by the Planning Board, the applicant must conduct either a so-called "crane" or "balloon" test to supplement the visual assessment;

v.   A report demonstrating the applicant's review of alternate sites and the technological reason to justify why alternate sites cannot be utilized;

vi.  For those facilities for which supplemental capacity is the major objective rather than simply coverage, a capacity analysis describing the need for additional capacity and a technical description of why nearby sites cannot be modified to accommodate the need;

vii.    For Category D sites, a report demonstrating the applicant's review

of alternate technologies and why alternate technologies cannot be

used.  *Id.* § 251-19(G).

68.    Beyond all of the stated requirements, Chapter 251 provides that "[a] determination that

an application is complete shall not be deemed as a determination that the applicant has provided

full and accurate information, and shall not preclude the Planning Board from requiring the

applicant to provide more detailed, corrected, or other information at later stages during the

application review process," *id.* § 251-17(D), and "[n]othing contained herein shall limit the right

or ability of the Planning Board to request additional information or data from the applicant,"

*id.* § 251-19(G)(10).

69.    As with the pre-application process, this loophole allowing the Planning Board to request

additional information with respect to the application review process allows the Town to

circumvent the 62-day deadline supposedly imposed on it for holding a public hearing, *id.* § 251-

18(C), by summarily declaring the application "incomplete" at any point in the process because

"complete" applications must include information requested by the Planning Board,

*id.* § 251-19(C).

70.    Though Chapter 251 purports to require action by the Town within certain time frames,

Chapter 251 allows the Town to avoid deadlines supposedly imposed on it by exercising its

unlimited discretion to determine that a pre-application or application is incomplete, Clarkstown

Town Code, § 251-13(B), -19(C), or by requesting any additional information without any limits

in place, *id.* § 251-13(B)(4), -17(D), -19(G)(10), that would similarly leave either the

pre-application or application "incomplete."

71.    Even if the Town does not exercise its limitless discretion to restart the clock at various points in the process by requesting additional materials from the applicant, the overall process for a Category B, C, or D site will take upwards of a year or more to complete.

72.    Chapter 251 prohibits or has the effect or prohibiting the Wireless Carriers' ability to provide telecommunications services by imposing excessive burdens and delays on permit applications for telecommunications facilities and authorizing the Town to require endless additional submissions before an application will be deemed complete.  As a result, the procedures contained with the entire Chapter 251 violate Section 253 of the Communications Act and should be declared invalid and unenforceable by this Court.

73.    Moreover, Chapter 251 requires that carriers seek recertification for existing cell sites, thereby subjecting even existing network elements to discretionary regulation that vastly exceeds the scope of the Town's authority under federal law.  Clarkstown Town Code, § 251-37.

74.    Further, the comprehensive permitting structure and design requirements collectively amount to a substantial barrier to wireless telecommunications service within the meaning of Section 253, and Chapter 251 should, therefore, be declared invalid and unenforceable in its entirety. *See Sprint Telephony PCS*, 490 F.3d at 716.

C.    **Chapter 251 Erects Absolute Prohibitions in Violation of Section 253(a).**

75.    In addition to the unfettered discretion to deny applications, the ability to delay a final decision indefinitely, and the ability to demand significant submissions beyond the regulatory authority of the Town, Chapter 251 flatly prohibits the construction of wireless facilities with new structures, such as poles or towers, in a number of areas throughout the Town.

76.    Specifically, Chapter 251 prohibits such facilities from being built within 350 feet from "child day care center[s], school[s], camp[s], public park[s] or playground[s]." Clarkstown Town Code, § 251-29.

77.    This provision flatly prohibits such facilities from being constructed in many areas of the Town.

78.    Because cell sites are necessary to provide wireless telecommunications services, the prohibition on construction of these facilities prohibits or has the effect of prohibiting the ability of the Wireless Carriers to provide telecommunications service within the meaning of Section 253.  On that basis, this Court should declare Chapter 251 invalid and unenforceable as preempted by federal law.

**V.    CHAPTER 251 IS PREEMPTED BY SECTION 332(c)(3) OF THE COMMUNICATIONS ACT.**

79.    Section 332(c)(3) of the Communications Act, which is entitled "State Preemption", was enacted in 1993 as part of a sweeping reform of the regulation of wireless service.  In recognition of the inherently interstate and mobile nature of wireless service, Congress sought to provide for a uniform, national scheme of regulation and to preempt piecemeal regulation by state and local governments.

80.    As explained in detail above, the collective weight of the provisions of Chapter 251, the unfettered discretion it vests in the Town to reject or indefinitely delay entry by wireless carriers, and other factors have the effect of prohibiting wireless service in Clarkstown.  Those same flaws constitute barriers to entry under Section 332(c)(3)(A).

23

81.    Section 332(c)(3)(A) states that "no State or local government shall have any authority to regulate the entry of or the rates charged by" commercial mobile service providers. 47 U.S.C. § 332(c)(3)(A).

82.    Moreover, by barring regulation of "entry," Congress divested state and local governments of any authority to impose technical regulations on wireless carriers as a condition precedent to providing wireless service.

83.    Section 332(c)(3)(A) "makes the FCC responsible for determining the number, placement and operation of the cellular towers and other infrastructure, as well as the rates and conditions that can be offered for the new service." *Bastien v. AT&T Wireless Servs.*, 205 F.3d 983, 989 (7th Cir. 2000).  A state or local government that establishes technical parameters for how service is to be offered is thus "tread[ing] directly on the very areas reserved to the FCC." *Id.*

84.    Chapter 251 impermissibly regulates the "entry" of wireless carriers into Clarkstown by establishing criteria for evaluating siting decisions that set forth a preference for certain types of technologies.  *See* Clarkstown Town Code, § 251-10(E) (stating that the use of "alternate technology, including but not limited to, distributed antenna systems (DAS) and microcells, is declared to be preferred over conventional tower sites"); *id.* § 251-15(A) (establishing a streamlined category for those applications that, among other things, use "preferred alternate technology (DAS, microcells)"); *id.* § 251-19(G)(9) (for Category C and D sites, requiring submission of a report demonstrating the applicant's review of alternate technologies such as microcells or DAS, "demonstrating in detail the technological reason to justify why alternate technologies cannot be utilized").

85.     Chapter 251's elaborate screening procedure and substantial preference for certain types of technologies will, in many cases, make it impossible to secure approval for a siting application without using the preferred technologies.  For example, as explained in ¶ 59, above, to be included in Category A, a pre-application that proposes the use of preferred technology such as DAS need only garner 60 points out of a total 140 points, whereas proposals using other technology must garner 90 points.  *Id.* § 251-15(A), ch. 251, Table 1.

86.     In addition to dictating network technologies, Chapter 251 purports to even set what is adequate radio signal strength (equal to or below "-84 dBM.")  *Id.* § 251-13.A.(13).  Clarkstown's attempt to set locally-applicable standards for what is adequate wireless coverage strikes at the core of national wireless networks.  Only the federal government has the ability to develop and enforce technical and operational standards for wireless networks and it does so on a nationwide basis.  Congress and the FCC have reserved to the federal government the authority to set these standards precisely to avoid the type of locally-imposed technical standards that Chapter 251 expressly creates.

87.     Clarkstown's attempt to dictate technical standards usurps the FCC's regulatory authority over the technical parameters for the provision of wireless service and thus violates Section 332(c)(3)(A).

## VI.     **CHAPTER 251 IS PREEMPTED BY FCC RULES AND ORDERS.**

88.     FCC orders and regulations independently preempt large portions of Chapter 251.

89.     The FCC has made clear that state and local governments have no authority to establish technical standards for personal wireless services.  *See, e.g., In re Future Use of Frequency Band*

*806-960 MHZ*, 46 FCC 2d 752, 766-67, ¶¶ 43, 44 (1974) (the FCC's "technical standards and . . .

operational rules are to apply nation-wide . . . without regard to state boundaries or varying local

jurisdictions."); *Use of the Bands 825-845 MHz and 870-890 MHz*, 86 FCC 2d 469, 503-05,

¶¶ 79, 82 (1981) (again "asserting federal primacy over the areas of technical standards and

competitive market structure for cellular service."); *Use of the Bands 825-845 MHz and 870-890

MHz*, 89 FCC 2d 58, 95 ¶ 81 (1982) ("It is imperative that no additional requirements be

imposed by the states which could conflict with our standards and frustrate the federal scheme

for the provision of nationwide cellular service.").

90.     The FCC's administrative orders and regulations have the same preemptive effect as

other federal laws, and its regulations "will pre-empt any state or local law that conflicts with

such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64

(1988).

91.     Only the FCC may create regulatory incentives for the deployment of particular

technologies, and, when it does so, it looks at nationwide interoperability, cost, and coverage

issues.  Municipalities cannot usurp this national role on a piecemeal basis.

92.     Chapter 251 establishes criteria for approving siting applications for wireless facilities

based on the type of technology used by the applicant.  *See* Clarkstown Town Code § 251-10(E)

(expressly stating that the use of "alternate technology, including but not limited to, distributed

antenna systems (DAS) and microcells, is declared to be preferred over conventional tower

sites"); *id.* § 251-15(A) (establishing a streamlined category for those applications that, among

other things, use "preferred alternate technology (DAS, microcells)"); *id.* § 251-19(G)(9) (for

Category C and D sites, requiring submission of a report demonstrating the applicant's review of

alternate technologies such as microcells or DAS, "demonstrating in detail the technological reason to justify why alternate technologies cannot be utilized").

93.     Chapter 251 also purports to create a specific technical threshold for adequate signal strength. *See id.* § 251-13(A)(13).

94.     Clarkstown's attempts to set technical specifications for wireless carriers are expressly preempted by the FCC's valid assertion of its exclusive jurisdiction over all wireless technical standards.

## VII.    CHAPTER 251 IS PREEMPTED BY SECTION 332(c)(7) OF THE COMMUNICATIONS ACT.

95.     In addition to the preemption set forth above, Chapter 251 is preempted by Section 332(c)(7) of the Communications Act.  47 U.S.C. § 332(c)(7)(B)(iv).

96.     Section 332(c)(7)(B)(iv) of the Communications Act states that "[n]o state or local government or instrumentality thereof may regulate the placement, construction and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."  47 U.S.C. § 332(c)(7)(B)(iv).

97.     The plain language of Section 332(c)(7)(B)(iv) thus divests localities of any authority to regulate the placement of wireless facilities on the basis of the health effects of RF emissions as long as the facilities in question meet FCC guidelines.

98.     A local law that requires a zoning board to consider the effects of RF regulation as a gating factor in siting decisions facially violates Section 332(c)(7)(B)(iv) because, under such a

law, there can be no set of zoning decisions that would not violate the statute's prohibition on "regulat[ing] the placement, construction and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions."

47 U.S.C. § 332(c)(7)(B)(iv).

99.     Chapter 251 contains numerous provisions that mandate the submission of evidence and certifications related to RF emissions.

100.    Chapter 251 mandates that carriers certify that RF levels at the proposed site will be within the threshold levels, *and* provide "cumulative [RF] calculations … for the proposed and any pre-existing antennas *for ground level exposure points*," Clarkstown Town Code, § 251-19(F)(23) (emphasis added), whether or not the FCC requires such calculations.

101.    For sites within 100 feet of other sources of RF, Chapter 251 requires estimates of "maximum total exposure from all nearby stationary sources *and comparison with relevant standards*," including "individual and ambient levels of exposure." *Id.* § 251-21(A) (emphasis added).  This goes beyond FCC requirements.

102.    For new towers, Chapter 251 requires a report by an RF engineer, health physicist, or other qualified professional as determined by the Planning Board which calculates "the maximum amount of nonionizing electromagnetic radiation (NIER) which will be emitted from the proposed wireless service facility upon its installation," *id.* § 251-22, regardless of whether such calculations are required by the FCC's rules.

103.    For roof-mounted, co-located, and other public areas, Chapter 251 requires an "assessment of potential public exposure to [RF]," identifying maximum exposure level, the sites

where that occurs, and RF levels at "specific locations of community interest, such as schools, residences or commercial buildings," *id.* § 251-23, again without regard to what is required by the FCC's rules.

104.    Chapter 251 also requires recertification of RF compliance and resubmission of RF evidence when renewal is sought. *See id.* § 251-37.

105.    Each of the above-referenced requirements individually and taken together are unduly burdensome and clearly focused on using RF emissions as a basis for local siting decisions in violation of Section 332(c)(7)(B)(iv)'s express prohibition of the consideration of the effects of RF emissions in zoning decisions.

106.    Each of the above-referenced requirements individually and taken together go well beyond simple inquiries into whether the facilities meet FCC guidelines, and have no practical purpose beyond providing the Town with the means to regulate the placement of RF emitting facilities based on the Town's judgment about the effects of RF emissions.

107.    To the extent that it mandates consideration of the environmental effects of RF emissions as a factor in zoning decisions for wireless facilities, Chapter 251 violates the plain language of Section 332(c)(7)(B)(iv) and should be declared invalid and unenforceable.

## VIII.   **CHAPTER 251 IS PREEMPTED BY THE VAST OVERLAY OF FEDERAL AUTHORITY EVIDENCING CONGRESS'S INTENT THAT THE FEDERAL GOVERNMENT SHOULD OCCUPY THE FIELD.**

108.    Sections 302a and 303 of the Communications Act confer exclusive authority on the FCC to regulate all aspects of the commercial wireless industry.  There is nothing more central to the

federal government's regulation of wireless service than the technical and operational standards for wireless transmission.

109.    The federal government's role in the regulation of radio transmission is thus exclusive. State and local governments have no authority to regulate the transmissions used to provide wireless service.

110.    Over nearly a century, a vast body of law, including statutes, cases, FCC orders, FCC decisions, and Congressional legislative history has established beyond doubt that the federal government's control over the technical and operational aspects of commercial wireless deployment and operation is both complete and exclusive.  Thus, on numerous occasions, courts have found that field preemption exists because the federal government occupies the technical and operational aspects of wireless service.

111.    Chapter 251 impermissibly intrudes into this federally-occupied field in numerous ways.

112.    Taken as a whole, Chapter 251 is a clear regulation of entry.  It creates a pervasive regulatory scheme that defines when, where, and under what circumstances the Wireless Carriers can do business in Clarkstown, and conditions the entry of the Wireless Carriers on meeting technical and operational standards that are different from, and more onerous than, those adopted by the federal government.  There can be no doubt that Chapter 251 specifically usurps the federal government's exclusive control over wireless issues.

113.    In addition to the cumulative impacts of the overall scheme of Chapter 251, there are numerous individual portions that intrude into the field of technical and operational standards that has long been occupied exclusively by the federal government.

114.    As an example, "[t]he Commission and the federal courts have consistently found that the Commission's authority in the area of RFI is exclusive and any attempt by State or local governments to regulate in the area of RFI is preempted." *In re Petition of Cingular Wireless LLC for a Declaratory Ruling that Provisions of the Anne Arundel County Zoning Ordinance are Preempted*, 18 FCCR 13126, 13132, ¶ 13 (2003).   The FCC has determined that *any* use of zoning regulations to curtail RFI is preempted by federal law. *Id.* at 13136.

115.    The Second Circuit has held that "Congress intended that the FCC enjoy exclusive jurisdiction to regulate RF interference phenomena," *Freeman v. Burlington B'casters*, 204 F.3d 311, 321 (2d Cir. 2000), and that as a result "federal law has preempted the field of RF interference regulation," *id.* at 320; *see also Southwestern Bell Wireless Inc. v. Johnson County Bd. of County Comm'rs*, 199 F.3d 1185, 1193 (10th Cir. 1999) ("Congress intended federal regulation of RFI issues to be so pervasive as to occupy the field.").

116.    The field preemption of RFI regulation is entirely separate from either the substantive or jurisdictional provisions of Section 332(c)(7), *Anne Arundel*, 18 FCCR at 13138, and thus provides an independent basis for preempting those provisions of Chapter 251 that consider RFI as a basis for zoning decisions, or require a wireless carrier to provide any information to the Town relevant to RFI considerations.

117.    A locality cannot avoid preemption by claiming that it is enforcing federal RFI standards, because "by asserting authority to prohibit operation that it determines causes public safety interference, the [locality] is effectively regulating federally licensed operation," which it is prohibited from doing. *Id.* at 13136.

118.    Chapter 251 contains a number of provisions that that consider RFI as a basis for zoning

decisions, or require a wireless carrier to provide any information to the Town about RFI.

*See, e.g.*, Clarkstown Town Code, § 251-10(T) (finding that "proximity to . . . sensitive

receptors" was one of the "siting criteria" identified in enacting the recent amendments); *id.* §

251-11(E) (placing of antennae on existing structures contingent on lack of "interference" with

existing equipment); *id.* § 251-19(F)(24) (applications for Category B, C and D sites must

include certification that the proposed antennae "will not cause interference with existing

telecommunications devices"); *id.* § 251-22(A)(3) (for new towers, requiring a demonstration

that the "radio, television, telephone or reception of similar signals for nearby properties will not

be disturbed or diminished").

119.    Each of the provisions described in paragraph 118, and any provision of Chapter 251 that

requires the disclosure of radio frequency interference information, or in any way makes radio

frequency interference a consideration in any decision relating to the placement of wireless

facilities, is field preempted by the Sections 302(a) and 303, the regulatory actions of the FCC,

and the Supremacy Clause of the U.S. Constitution.

120.    Other clear examples of preempted technical and operational limitations established by

Chapter 251 include the DAS preference, the signal strength limitation, the RF emission

limitations and testing requirements, and the onerous antenna siting requirements, all discussed

in greater detail above.

121.    In sum, Clarkstown has created and seeks to enforce a pervasive regulatory scheme

involving all aspects of wireless deployment, in contravention of federal law.

## IX.    THE UNLAWFUL PROVISIONS OF CHAPTER 251 ARE NOT SEVERABLE.

122.    The severability of provisions of a local law is a question of state law. *See City of Lakewood v. Plain Dealer Publishing*, 486 U.S. 750, 772 (1988); *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock,* 93 F.3d 68, 72 (2d Cir. 1996).

123.    Under New York law, whether or not an offending provision may be severed from the remainder of the statute requires an examination of both legislative intent regarding the severability and whether the remaining provisions of the statute can function in accordance with the legislative scheme. *People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 129 N.E. 202 (1920); *Westinghouse Electric Corp. v. Tully,* 63 N.Y.2d 191, 481 N.Y.S.2d 55, 470 N.E.2d 853 (1984).

124.    Chapter 251 contains a severability clause that states: "Should any section, paragraph, sentence, clause, word or provision of this Chapter be declared void, invalid or unenforceable, for any reason, such decision shall not affect the remaining portions of this Chapter." Clarkstown Town Code, § 251-43.

125.    While a comprehensive severability clause may give evidence of the legislative intent regarding severability, a provision will not be severed if "the balance of the legislation is incapable of functioning independently [because] the valid and invalid provisions are so intertwined." *National Advertising Company v. Town of Niagara*, 942 F.2d 145, 148, 151 (2d Cir. 1991) (despite the statute's severability clause, the court invalidated the entire statute because "severance of the invalid sections would create a statute that is confusing and unworkable.").

126.    The preempted provisions of Chapter 251 are so essentially and inseparably connected with, and so dependent upon, the other provisions in Chapter 251 that it cannot be presumed that the Town would have enacted the Chapter without the void provisions, and any valid provisions, standing alone, are incomplete and are incapable of coherent application to accomplish any legislative purpose. *See id.* at 148.

## COUNT ONE

### (Preemption Under 47 U.S.C. § 253 and the Supremacy Clause)

127.    The Wireless Carriers incorporate Paragraphs 1-126 above as if fully restated herein.

128.    Section 253 expressly preempts any "State or local statute or regulation, or other State or local legal requirement, [which] may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a).

129.    Chapter 251, on its face and as applied to the Wireless Carriers, prohibits and has the effect of prohibiting the ability to provide telecommunications services within the meaning of Section 253(a), and is thus preempted by the Supremacy Clause of the U.S. Constitution.

## COUNT TWO

### (Preemption Under 47 U.S.C. § 332(c)(3) and the Supremacy Clause)

130.    The Wireless Carriers incorporate Paragraphs 1-126 above as if fully restated herein.

131.    The scheme established in Chapter 251, as described above, constitutes an affirmative barrier to entry that is flatly prohibited by 47 U.S.C. § 332(c)(3)(A).

132.    Additionally, technical regulation of wireless services as a condition precedent to providing service is "entry" regulation of the type prohibited by Section 332(c)(3)(A), which states that "no State or local government shall have any authority to regulate the entry of or the rates charged by" commercial mobile service providers.  47 U.S.C. § 332(c)(3)(A).

133.    Chapter 251 regulates the entry of wireless carriers into the Clarkstown market within the meaning of Section 332(c)(3)(A) by establishing technology standards for facilities that can be deployed to provide wireless telecommunications services.  Chapter 251 is, therefore, preempted by the Supremacy Clause of the U.S. Constitution.

## COUNT THREE

### (Agency Preemption of Technical Standards and the Supremacy Clause)

134.    The Wireless Carriers incorporate Paragraphs 1-126 above as if fully restated herein.

135.    The FCC has made clear that State and local governments have no authority to establish or enforce technical standards for personal wireless services.

136.    The FCC's administrative orders and regulations have the same preemptive effect as other federal laws, and its regulations "will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof."  *City of New York*, 486 U.S. at 64.

137.    Those provisions of Chapter 251 that mandate a preference for certain technological standards over others in making decisions as to the placement of wireless facilities impermissibly establish technical standards and are thus preempted by the Supremacy Clause of the U.S. Constitution.

## COUNT FOUR

### (Preemption Under 47 U.S.C. § 332(c)(7) and the Supremacy Clause)

138.    The Wireless Carriers incorporate Paragraphs 1-126 above as if fully restated herein.

139.    47 U.S.C. § 332(c)(7)(B)(iv) prohibits any state or local governments from regulating the placement of personal wireless service facilities based on the environmental effects of RF emissions.

140.    Chapter 251, on its face, mandates that the Town consider the environmental effects of RF emissions in wireless siting decisions, and thus the Chapter regulates the placement of personal wireless service facilities based on the environmental effects of RF emissions.

Any provision of Chapter 251 that requires consideration of the effects of RF emissions in making decisions as to the placement of wireless facilities is inconsistent with Section 332(c)(7) and is preempted pursuant to the Supremacy Clause of the U.S. Constitution.

## COUNT FIVE

### (Field Preemption and the Supremacy Clause)

141.    The Wireless Carriers incorporate Paragraphs 1-126 above as if fully restated herein.

142.    Congress has occupied the field of regulation concerning the technical and operational aspects of radio transmission.  Because the technical and operational aspects of radio transmission are subject to field preemption, no state or local government may enact *any* regulations pertaining to these matters.

143.    Indeed, the FCC has specifically determined that *any* use of zoning regulations to curtail RFI is flatly prohibited, even if the zoning regulations seek to do no more than enforce the FCC's Rules.

144.    Further, any other technical and operational limitations—including, but not limited to, DAS preferences and signal strength limitations—are covered by the federal government's broad field preemption.

145.    Any provision of Chapter 251 that requires the disclosure of radio frequency interference information, in any way makes radio frequency interference a consideration in any decision relating to the placement of wireless facilities, or otherwise purports to regulate the technical and operational aspects of the Wireless Carriers' networks therefore intrudes into a field occupied exclusively by the federal government and is preempted by the Supremacy Clause of the U.S. Constitution.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, the Wireless Carriers respectfully request that this Court enter judgment against the Town of Clarkstown as follows:

146.    For a declaratory judgment on Count One that Chapter 251 is facially preempted under Section 253 of the Communications Act and violates the Supremacy Clause of the U.S. Constitution.

147.    For a declaratory judgment on Count Two that Chapter 251 is facially preempted under Section 332(c)(3) of the Communications Act and violates the Supremacy Clause of the U.S. Constitution.

148.    For a declaratory judgment on Count Three that those provisions of Chapter 251 that impose technical standards on the deployment of personal wireless facilities are preempted by the regulatory actions of the FCC and violate the Supremacy Clause of the U.S. Constitution.

149.    For a declaratory judgment on Count Four that those provisions of Chapter 251 that require the Town to consider the environmental effects of RF emissions are facially preempted under Section 332(c)(7) of the Communications Act and violate the Supremacy Clause of the U.S. Constitution.

150.    For a declaratory judgment on Count Five that those provisions of Chapter 251 that regulate the technical and operational aspects of the wireless carriers' network intrude into a field exclusively occupied by federal law and thus violate the Supremacy Clause of the U.S. Constitution and are preempted.

151.    For a declaratory judgment that all of Chapter 251 is invalid based upon the declarations sought in Counts One through Five or, in the alternative, a declaration that any invalid portions of Chapter 251 are so inextricably intertwined with the remaining provisions that Chapter 251 cannot function effectively without the invalid provisions and must therefore be invalidated in its entirety.

152.    For preliminary and permanent injunctive relief on all Counts enjoining the Town of Clarkstown and any of its officers, employees, or agents from taking any action to enforce any part of Chapter 251 and from taking any action that would prohibit Plaintiffs from providing wireless telecommunications services to any part of the Town.

153.    For any further relief at law or equity that the Court deems just and proper, including an

award of costs and attorneys' fees to the Plaintiffs.

**WILEY REIN LLP**

By:    _____

Andrew G. McBride, Esq. (AM1966)
John E. Barry, Esq. (JB 1776)

1776 K Street, NW
Washington, DC 20006
Tel.: 202.719.7000
Fax: 202.719.7049

**Attorneys for Plaintiff**
**New York SMSA Limited**
**Partnership d/b/a**
**Verizon Wireless**

Dated: This _27TH_ day of August, 2007.

**CUDDY & FEDER LLP**

By: _____
Christopher B. Fisher, Esq. (CF 9494)
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel.: 914.761.1300
Fax: 914.761.5372

**Attorneys for Plaintiff**
**New Cingular Wireless PCS, LLC**

Dated: This _____ day of August, 2007.

**PRICE, MEESE, SHULMAN &
D'ARMINIO, P.C.**


By: _____
      Gregory D. Meese, Esq. (GDM 8738)

50 Tice Boulevard
Woodcliff Lake, NJ 07677
Tel: 201.391.3737

**Attorneys for Plaintiff
Sprint Spectrum L.P.**


Dated: This _24th_ day of August, 2007.

**SAUL EWING, LLP**


By: _Michael A. Lampert_ /icov
      Michael A. Lampert, Esq. (ML 1064)

750 College Road East
Suite 100
Princeton, New Jersey 08540-6617
Tel.: 609.452.3123
Fax: 609.452.3125

**Attorneys for Plaintiff**
**Omnipoint Communications, Inc.**


Dated: This 27ᵗʰ day of August, 2007.