**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **NEW YORK SMSA LIMITED PARTNERSHIP d/b/a VERIZON WIRELESS, NEW CINGULAR WIRELESS PCS, LLC, SPRINT SPECTRUM L.P., and OMNIPOINT COMMUNICATIONS, INC. a wholly owned subsidiary of T-MOBILE USA, INC.,** | **Case No. 07-cv-7637 (CLB) (GAY)** |
| **Plaintiffs,** | |
| v. | |
| **TOWN OF CLARKSTOWN, and THE TOWN BOARD OF THE TOWN OF CLARKSTOWN,** | |
| **Defendants.** | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Michael A. Lampert, Esq. (ML 1064)
Karl J. Nelson, Esq. (Pro Hac Vice)
SAUL EWING, LLP
750 College Road East, Suite 100
Princeton, New Jersey 08540-6617
Tel.: 609.452.3123
Fax: 609.452.3125

*Attorney for Plaintiff*
*Omnipoint Communications, Inc.*

Andrew G. McBride, Esq. (AM1966)
John E. Barry, Esq. (JB 1776)
Joshua S. Turner, Esq. (Pro Hac Vice)
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel.: 202.719.7000
Fax: 202.719.7049

*Attorneys for Plaintiff*
*New York SMSA L. P. d/b/a Verizon Wireless*

Gregory D. Meese, Esq. (GDM 8738)
PRICE, MEESE, SHULMAN & D'ARMINIO, P.C.
50 Tice Boulevard
Woodcliff Lake, NJ 07677
Tel: 201.391.3737

*Attorney for Plaintiff*
*Sprint Spectrum L.P.*

Christopher B. Fisher, Esq. (CF 9494)
CUDDY & FEDER LLP
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel.: 914.761.1300
Fax: 914.761.5372

*Attorney for Plaintiff*
*New Cingular Wireless PCS, LLC*

i

**TABLE OF CONTENTS**

INTRODUCTION...................................................................................................... 1

I.    BACKGROUND AND STATEMENT OF FACTS.................................................. 3

    A.    The Scope and Effect of Chapter 251. .................................................... 3

    B.    The Preemption of Local Wireless Regulation Under Federal
          Telecommunications Law...................................................................... 5

        1.    Section 253 of the Communications Act Embodies Congress's Preference for a
              National, Deregulated Telecommunications Industry. ............................... 7

        2.    Section 332 of the Communications Act Prohibits Local Barriers to the
              Uniform, National Provision of Wireless Telecommunications Services. . 7

STANDARD OF REVIEW .......................................................................... 9

ARGUMENT .................................................................................................. 11

I.    CHAPTER 251 PROHIBITS THE ABILITY OF CMRS CARRIERS TO
      PROVIDE TELECOMMUNICATIONS SERVICES. ....................................... 12

    A.    Chapter 251 Imposes Overly-Burdensome Application Requirements and
          Authorizes Limitless Delays in Violation of Section 253. ............................. 13

    B.    Chapter 251 Confers Broad, Standardless Discretion on the Town of Clarkstown
          to Deny Telecommunications Service. .............................................................. 22

        1.    An Ordinance that Vests the Town With Unfettered Discretion to Deny a
              Wireless Services Application is Preempted, Even if the Prohibition Takes
              the Form of a "Zoning" Ordinance. ........................................................ 22

        2.    Chapter 251 Creates Numerous Levels of Unfettered Discretion to Deny
              Wireless Siting Applications..................................................................... 24

    C.    Chapter 251 Erects Absolute Prohibitions of Wireless Telecommunications
          Service. ....................................................................................................... 29

II.   THE ENTIRE REGULATORY SCHEME EMBODIED IN CHAPTER 251 IS
      A FEDERALLY PREEMPTED EFFORT TO CONTROL TECHNICAL AND
      OPERATIONAL ASPECTS OF THE WIRELESS CARRIERS'
      NETWORKS.. ............................................................................................... 30

    A.    The Scope of Federal Preemption Over the Technical and Operational Aspects of
          Wireless Network Deployment........................................................................ 30

B.  The Town Cannot Impose Technological or Operational Standards on Wireless Carriers.................................................................................................. 35

1.  The Town Cannot Control the Network Technologies that the Wireless Carriers Employ. .................................................................................. 36

2.  The Town Cannot Dictate What Qualitative Level of Service Constitutes "Adequate Service." ................................................................................. 39

3.  The Town Cannot Regulate Radio Frequency Interference. ........................... 40

C.  Chapter 251's Consideration of the Environmental Effects of RF Energy Explicitly Violates Section 332(c)(7)(B)(iv) of the Communications Act....... 41

**III.  THE UNLAWFUL PROVISIONS OF CHAPTER 251 ARE NOT SEVERABLE.** .................................................................................................. **47**

**CONCLUSION** ............................................................................................................ **49**

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allis-Chalmers Corp. v. Lueck*,
471 U.S. 202 (1985)..................................................................................9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................9

*Babbitt v. United Farm Workers National Union*,
442 U.S. 289 (1979)................................................................................11

*Bastien v. AT&T Wireless Services, Inc.*,
205 F.3d 983 (7th Cir. 2000) ..................................................................32

*Broyde v. Gotham Tower, Inc.*,
13 F.3d 994 (6th Cir. 1994),
*cert. denied*, 511 U.S. 1128 (1994)........................................................31

*California RSA No. 4 v. Madera County*,
332 F. Supp. 2d 1291 (E.D. Cal. 2003)...................................................43

*Capital Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984)......................................................................30, 33, 34

*Cellnet Communications, Inc. v. FCC*,
149 F.3d 429 (6th Cir. 1998) ....................................................................8

*Cellular Phone Taskforce v. FCC*,
205 F.3d 82 (2d Cir. 2000)..................................................................41, 47

*Cellular Telephone Co. v. Town of Oyster Bay*,
166 F.3d 490 (2d Cir. 1999)..............................................................42, 45, 46

*City of Auburn v. Qwest Corp.*,
260 F.3d 1160 (9th Cir. 2001) ................................................... *passim*

*City of Lakewood v. Plain Dealer Publishing* Co.,
486 U.S. 750 (1988)................................................................................47

*City of New York v. FCC*,
486 U.S. 57 (1988)............................................................................33, 34

*City of Rancho Palos Verdes, California v. Abrams,*
544 U.S. 113 (2005)............................................................................................7

*Committee of Dental Amalgam Manufacturers & Distributors v. Stratton,*
92 F.3d 807 (9th Cir. 1996) ...............................................................................9

*Connecticut Department of Public Utility Control v. FCC,*
78 F.3d 842 (2d Cir. 1996)..................................................................................8

*Downey v. Allstate Insurance Co.,*
638 F. Supp. 322 (S.D.N.Y. 1986)....................................................................47

*EMR Network v. FCC,*
391 F.3d 269 (D.C. Cir. 2004),
*cert. denied*, 545 U.S. 1116 (2005)....................................................................41

*FCC v. Pottsville Broadcasting Co.,*
309 U.S. 134 (1940)..........................................................................................31

*Federal Radio Commission v. Nelson Brothers*
*Bond & Mortgage Co.,*
289 U.S. 266 (1933)............................................................................................6

*Fidelity Federal Savings & Loan Association v. de la Cuesta,*
458 U.S. 141 (1982)..........................................................................................34

*Freeman v. Burlington Broadcasters, Inc.,*
204 F.3d 311 (2d Cir. 2000).................................................................33, 34, 40

*Gary D. Peake Excavating Inc. v. Town Board of Town of Hancock,*
93 F.3d 68 (2d Cir. 1996) .................................................................................47

*Geier v. American Honda Motor Co.,*
529 U.S. 861 (2000).................................................................................38, 39, 42

*Head v. New Mexico Board of Examiners in Optometry,*
374 U.S. 424 (1963).....................................................................................31, 33

*Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,*
471 U.S. 707 (1985)..........................................................................................42

*Illinois Bell Telephone Co. v. Village of Itasca, Illinois,*
503 F. Supp. 2d 928 (N.D. Ill. 2007) ...............................................................10

*Marvel Characters, Inc. v. Simon,*
310 F.3d 280 (2d Cir. 2002)................................................................9

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)................................................................10, 42

*Morales v. Trans World Airlines, Inc.,*
504 U.S. 374 (1992)................................................................30

*New Jersey Payphone Association v. Town of West New York,*
130 F. Supp. 2d 631 (D.N.J. 2001),
*aff'd,* 299 F.3d 235 (3d Cir. 2002) ................................................................24

*New Jersey Payphone Association v. Town of West New York,*
299 F.3d 235 (3d Cir. 2002)................................................................24, 29

*National Advertising Co. v. Town of Niagara,*
942 F.2d 145 (2d Cir. 1991)................................................................48, 49

*National Broadcasting Co. v. United States,*
319 U.S. 190 (1943)................................................................6

*NextG Networks of New York, Inc. v. City of New York,*
No. 03CIV9672, 2006 WL 538189 (S.D.N.Y. Mar. 6, 2006) ................................................................38

*PECO Energy Co. v. Town of Haverford,* No. 99-4766,
1999 U.S. Dist. LEXIS 19409 (E.D. Pa. Dec. 20, 1999)................................................................15, 18, 28

*Qwest Corp. v. City of Santa Fe, New Mexico,*
380 F.3d 1258 (10th Cir. 2004) ................................................................ *passim*

*Qwest Communications Corp. v. City of Berkeley,*
255 F. Supp. 2d 1116 (N.D. Cal. 2003),
*aff'd,* 433 F.3d 1253 (9th Cir. 2006)................................................................10

*Qwest Communications Inc. v. City of Berkeley,*
433 F.3d 1253 (9th Cir. 2006) ................................................................10, 24

*Qwest Communications Corp. v. City of New York,*
387 F. Supp. 2d 191 (E.D.N.Y. 2005) ................................................................22

*RT Communications, Inc. v. FCC,*
201 F.3d 1264 (10th Cir. 2000) ................................................................14

*Southwestern Bell Mobile Systems, Inc. v. Todd,*
244 F.3d 51 (1st Cir. 2001)................................................................43

*Southwestern Bell Wireless, Inc. v. Johnson County*
*Board of County Commissioners*,
199 F.3d 1185 (10th Cir. 1999),
*cert. denied*, 530 U.S. 1204 (2000) ................................................................. 33-34, 40

*Sprint Telephony PCS v. County of San Diego*,
490 F.3d 700 (9th Cir. 2007) ..................................................................... *passim*

*TCG New York, Inc. v. City of White Plains*,
305 F.3d 67 (2d Cir. 2002) ......................................................................... *passim*

*TC Systems, Inc. v. Town of Colonie, New York*,
263 F. Supp. 2d 471 (N.D.N.Y. 2003) ....................................................... 10, 13

*Toy Manufacturers of America, Inc. v. Blumenthal*,
986 F.2d 615 (2d Cir. 1992) .................................................................................9

*Verizon Wireless (VAW) LLC v. City of Rio Rancho, New Mexico*,
476 F. Supp. 2d 1325 (D.N.M. 2007) ........................................................ 10, 24

*XO Missouri, Inc. v. City of Maryland Heights*,
256 F. Supp. 2d 987 (E.D. Mo. 2003),
*aff'd,* 362 F.3d 1023 (8th Cir. 2004) ......................................................... 10, 13

## STATE CASES

*Beckermeyer v. AT&T Wireless*,
69 Pa. D. & C.4th 225 (Pa. Com. Pl. 2004) ........................................................33

*City of Rome v. Verizon of New York, Inc.,*
No. 32-02-0174 (N.Y. Sup. Ct. Jan. 24, 2006), *aff'd*, 34 A.D.3d 1279, *leave to*
*appeal denied,* 37 A.D.3d 1208 ........................................................................38

*Goforth v. Smith*,
991 S.W.2d 579 (Ark. 1999) ...............................................................................43

*Murray v. Motorola, Inc.*,
2001 CA 008479 B (D.C. Sup. Ct. Aug. 24, 2007), *appeals docketed and consolidated*,
Nos. 07-CV-1074 through 07-CV-1079 (Oct. 10, 2007) ................................. 6, 32, 33, 41

*People v. Cull*,
176 N.E.2d 495 (1961) ........................................................................................47

*People ex rel. Alpha Portland Cement Co. v. Knapp*,
129 N.E. 202 (1920) ...........................................................................................47

*Smith v. Calvary Education Broadcasting Network*,
783 S.W.2d 533 (Mo. Ct. App. 1990).............................................................................40

*Westinghouse Electric Corp. v. Tully*,
470 N.E.2d 853 (1984)...................................................................................................47

**DOCKETED CASES**

*Omnipoint Communications, Inc. v. Village of Airmont*,
Case No. 07-Civ-0473 (S.D.N.Y. April 18, 2007) ........................................................19

**STATUTES**

47 C.F.R. § 1.1307 (b)(1)...............................................................................................44

47 C.F.R. § 24.52............................................................................................................32

47 U.S.C. § 151.................................................................................................................6

47 U.S.C. § 151 *et seq*.....................................................................................................6

47 U.S.C. § 152(a)...........................................................................................................31

47 U.S.C. § 157.................................................................................................................6

47 U.S.C. § 253.........................................................................................................*passim*

47 U.S.C. § 253(a).....................................................................................................*passim*

47 U.S.C. § 301..........................................................................................................6, 31

47 U.S.C. § 303(b)...........................................................................................................31

47 U.S.C. § 303(c)......................................................................................................31, 39

47 U.S.C. § 303(e)...........................................................................................................31

47 U.S.C. § 303(g)...........................................................................................................31

47 U.S.C. § 303(r)............................................................................................................31

47 U.S.C. § 309(j)(3)(D)...................................................................................................6

47 U.S.C. § 332...........................................................................................................6, 48

47 U.S.C. § 332(a)(2)...................................................................................6

47 U.S.C. § 332(c)(3).................................................................................24

47 U.S.C. § 332(c)(3)(A) ........................................................................8, 32

47 U.S.C. § 332(c)(7)(B)(iv)............................................................... *passim*

Pub. L. No 106-81, 113 Stat. 1286. ..................................................... 14, 32

## ORDINANCES

Clarkstown Town Code Chapter 251.................................................... *passim*

## LEGISLATIVE MATERIALS

H.R. Rep. No. 103-111 (1993).......................................................................9

H.R. Rep. No. 103-213 (1993).......................................................................8

H.R. Rep. No. 104-204 (1995).....................................................................32

S. Rep. No. 104-230 (1996) ....................................................................9, 21

## ADMINISTRATIVE MATERIALS

*A Local Government Official's Guide to Transmitting
Antenna RF Emission Safety,* FCC, June 2, 2000, *available at*
http://wireless.fcc.gov/siting/ FCC_LSGAC_RF_Guide.pdf ..................... 44-45

*In re Amendment of the Commission's Rules to Establish New Personal Communications
Services,* 8 F.C.C.R. 7700 (1993) ....................................................... 34-35, 39

*In re Future Use of Frequency Band 806-960 MHZ,*
46 F.C.C.2d 752 (1974) ...........................................................................34

*In re Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of
Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in
State Freeway Rights-of-Way,*
14 F.C.C.R. 21697 (1999)...........................................................................29

*In re Petition of Cingular Wireless LLC for a Declaratory Ruling that Provisions of the Anne Arundel County Zoning Ordinance are Preempted,*
18 F.C.C.R. 13126 (2003) .......................................................................................35, 40

*In re Petition of New York State Public Service Commission to Extend Rate Regulation,*
10 F.C.C.R. 8187 (1995) ....................................................................................................9

*In re Petition on Behalf of the Connecticut Department Utility Control,* Report and Order,
10 F.C.C.R. 7025 (1995), aff'd, 78 F.3d 842 (2d Cir. 1996) ...............................................8

*In re Petition on Behalf of the State of California,* Report and Order,
10 F.C.C.R. 7486 (1995) ....................................................................................................8

*In re TCI Cablevision of Oakland County, Inc.,*
12 F.C.C.R. 21396 (1997) ..........................................................................................15, 20

*Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems,* 86 F.C.C.2d 469 (1981) ................................................................33, 34, 39

*Use of the Bands 825-845 MHz and 870-890 MHz,*
89 F.C.C.2d 58 (1982) .....................................................................................................34

## MISCELLANEOUS

Brief of Federal Communications Commission as Amicus Curiae Supporting Defendants, *Murray v. Motorola, Inc.*, CA No. 01-8479 B (D.C. Sup. Ct. Nov. 21, 2005)..................42

Distributed Antenna Systems-DAS,
http://www.steelintheair.com/Distributed-Antenna-Systems-DAS.html..........................45

## INTRODUCTION

The Town of Clarkstown, New York ("Clarkstown" or "Town") has enacted a complex new application and evaluation process for requests to install, modify or renew permits for wireless telecommunications facilities within the town.  *See* Chapter 251 of the Clarkstown Town Code, as amended by Local Law No. 14, enacted July 26, 2007 and entitled "A Local Law to Amend Chapter 251 (Wireless Communications Facilities) of the Town Code of the Town of Clarkstown" ("Chapter 251").  Plaintiffs,[1] four national wireless telecommunications service providers, seek a determination that Chapter 251 impermissibly treads upon exclusive federal interests in regulating the network infrastructure and operations of interstate wireless communication.  Plaintiffs all have existing wireless facilities installed and operating within the Town of Clarkstown and intend to build new wireless facilities within Clarkstown.

Chapter 251 impinges upon exclusive federal jurisdiction in almost every conceivable way.  These trespasses upon exclusive federal jurisdiction fall into two broad categories.  *First*, the procedural framework established by Chapter 251 is so lengthy, so burdensome, and so permeated with unfettered discretion that, under well-settled precedent in this Circuit and others, it constitutes an effective prohibition on the provision of telecommunications services in violation of Section 253 of the federal Communications Act, which provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate

---

[1] New York SMSA Limited Partnership, d/b/a Verizon Wireless ("Verizon Wireless"), New Cingular Wireless PCS, LLC ( "AT&T"), Sprint Spectrum L.P. ("Sprint"), and Omnipoint Communications, Inc. a wholly owned subsidiary of T-Mobile USA, Inc. ("T-Mobile") (collectively, the "Wireless Carriers" or "Plaintiffs").  Counsel for Verizon Wireless file Plaintiffs' Motion for Summary Judgment and this accompanying Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment with the consent of the other Plaintiffs in this case.

telecommunications service." Because the preempted portions of Chapter 251 are central to its operation and suffused throughout the local law, Chapter 251 must be invalidated in its entirety.

*Second*, Chapter 251 dramatically interferes with the exclusive federal regulation of the technical and engineering aspects of wireless service provision. In fact, the entire scheme is designed to dictate fundamental network engineering issues such as the technologies deployed and various technical standards relating to operation of the Wireless Carriers' equipment. Congress has expressly prohibited state and local governments from imposing technical requirements on wireless services. Indeed, the federal government's regulation of the technical aspects of wireless communication is so pervasive that it has demonstrated a clear intent to occupy this field. *Any* state or local intrusion into the equipment used, power levels employed, or quality of service provided in radio communications is prohibited.

Local government cannot impose its own controls on wireless services without running afoul of two independent federal policies: first, the federal government's express preference for a deregulated telecommunications marketplace governed primarily by competition, and, second, the federal government's longstanding primacy in regulating the operation of wireless communications. If each of the more than 40,000 political subdivisions in the United States attempted to regulate the equipment used by wireless networks and the power levels of transmissions, our seamless national wireless infrastructure would quickly disintegrate. To the extent localities are free to stymie network development and regulate technical standards, guaranteed interoperability could be a thing of the past. This potential patchwork is exactly what both Congress and the FCC have tried to avoid through uniform federal regulation promulgated by the body with expertise in radio communication, namely the FCC. In the case of Chapter 251, the Town's efforts to bog down network deployment in a morass of discretionary requirements

and also to regulate wireless networks' equipment, power levels of transmissions, and the placement of infrastructure based on the environmental effects of RF emissions all strike at the heart of the Communications Act's effort to limit local zoning authority and protect the federal interest in a nationwide, uniform, and reliable wireless infrastructure.

For all these reasons, examined in further detail below, Plaintiffs respectfully move this Court to enter a declaratory judgment that Chapter 251 is preempted by the Supremacy Clause of the U.S. Constitution, and further order that the Town of Clarkstown, New York, Town Board of the Town of Clarkstown, and any town official (collectively, the "Town," or "Clarkstown") is forbidden from taking any action to enforce or implement Chapter 251.

## I.     BACKGROUND AND STATEMENT OF FACTS

### A.     The Scope and Effect of Chapter 251.

Chapter 251 comprises twenty-eight single-spaced pages of regulations covering every technical and operational aspect of wireless deployment in Clarkstown, from designating specific network technologies to defining adequate RF signal strength.  It applies to all wireless telecommunications facilities—proposed and existing—that are located within the Town. Chapter 251 sets forth the requirements for applicants seeking to place, modify, or renew permits for such facilities and establishes the responsibilities and authority of various local bodies throughout the application process.  Initially, an applicant for a special use permit for such a facility must comply with a "pre-application" process, which involves submitting a variety of information related to the applicant and the proposal.  That information is then used by the Town to conduct a "preliminary screening" which sorts pre-applications into four classes or categories (A to D). The sorting process is based on a number of discretionary and non-discretionary factors, which heavily favor certain types of "preferred technologies," such as Distributed

Antenna Systems ("DAS") and micro-cells, and establish regulations regarding signal strength. If an applicant completes the pre-application process and is assigned a category, this merely entitles the applicant to an even more burdensome "application" process involving greatly increased requests for information, broad discretionary freedom on the part of the Planning Board, and further opportunities for delay.

The Town's initial decision about the "category" for a "pre-application" then determines the level of scrutiny that will apply to an application as it continues toward the even more rigorous application process. Pre-applications assigned to the least rigorous "Category A" are subject to a public hearing and the Planning Board may place "any" conditions it deems necessary on a construction permit. If an applicant's pre-application is assigned to any other category (B, C, or D), the applicant must provide much more information before the application can proceed, including – among many other requirements – information, calculations, and certifications related to RF emissions and radiation from antennas. An applicant assigned to "Category D" must include, along with all other required information, a report demonstrating the applicant's review of alternate technologies and detailing site-specific technological reasons for not using preferred technologies as defined by Chapter 251. The Planning Board may request additional information at any time, which renders a pre-application or application incomplete until the request is met.

Chapter 251 also requires substantial fixed application fees, and further requires that an applicant place funds into an escrow account to be disbursed to private consultants who, in the Town's absolute discretion, are "deemed necessary" for review of the application. Upon demand, the funds in the account must be replenished, or else the Town will take no further action on an application. No limit is placed on the amount that may be charged for private

4

consultants, nor is any review available to challenge such fees.  After an applicant complies with all these requirements, including any additional information requests, and the Planning Board has held a public hearing, the Planning Board has complete discretion to approve, reject, or approve with conditions a wireless carrier's application for special use permit.

Although the Town characterizes Chapter 251 as "land use legislation" in its Answer, *see* Answer 1 (¶ 2) [Doc. 11], Chapter 251 clearly is not concerned with traditional land use criteria such as lot size and set backs.  Instead, through Chapter 251, the Town has usurped control over virtually every aspect of the deployment and operation of wireless networks within the Town.  In addition to the onerous "pre-application" and "application" processes described above, this assault on federal authority, among other things:

- Imposes a *de facto* technology requirement on federally regulated wireless services in contravention of specific FCC rules;

- Demands that an applicant provide both business and technical justifications for each proposed wireless facility;

- Requires an applicant to demonstrate convincingly why it cannot build in accord with the Town's narrow technical preferences;

- Places no limits on the additional information and documentation that may be requested by the Town;

- Dictates what is an adequate RF signal strength for wireless carriers and punishes deviations from that standard without regard for business needs, customer service concerns, or market competition; and

- Requires consideration of factors, such as RF emissions, that federal law explicitly prohibits the Town from considering.

**B.      The Preemption of Local Wireless Regulation Under Federal Telecommunications Law.**

As the Supreme Court recognized more than 70 years ago, "[n]o state lines divide the radio waves, and national regulation is not only appropriate but essential to the efficient use of

radio facilities." *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 279 (1933). One year after the Supreme Court made that statement, the Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (the "Communications Act" or "Act") was enacted. The Act designates the FCC as the "centraliz[ed] authority" responsible for "execut[ing] and enforc[ing]" federal communications policies. 47 U.S.C. § 151. The Act specifically provides that the federal government shall "maintain . . . control . . . over all the channels of radio transmission," 47 U.S.C. § 301, and establishes an overarching policy goal of making available "to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide . . . radio communication service" and "promoting safety of life and property through the use of . . . radio communication." 47 U.S.C. § 151. The Act also provides that the FCC should encourage "new technologies and services to the public," the "efficiency of spectrum use," and the "efficient and intensive use of the electromagnetic spectrum." 47 U.S.C. §§ 157; 332(a)(2); 309(j)(3)(D). To facilitate the FCC's implementation of these objectives, Congress granted the FCC plenary authority over the construction and operation of radio transmitters. *See National Broad. Co. v. United States*, 319 U.S. 190, 217 (1943) (observing that the FCC is granted "comprehensive powers to promote and realize the vast potentialities of radio").

More recently, Congress expressly adopted the principle of federal primacy in the field of wireless communications, most notably for purposes of this case through Sections 332 and 253 of the Communications Act. Indeed, as one court recently observed, "[i]f ever there were a field in which Congress had mandated the 'primacy' of federal regulation, it is surely the control of radio frequencies. There is no room for argument on this point." *See* Order at 49, *Murray v. Motorola, Inc.*, 2001 CA 008479 B (D.C. Sup. Ct. Aug. 24, 2007), *appeals docketed and consolidated*, Nos. 07-CV-1074 through 07-CV-1079 (Oct. 10, 2007) ("*Murray Order*").

1.    Section 253 of the Communications Act Embodies Congress's Preference
      for a National, Deregulated Telecommunications Industry.

Congress's purpose in enacting Section 253 was emphatically deregulatory and intended to promote national, rather than local, regulation.  The purpose of the 1996 Act, of which Section 253 was a central measure, was to ensure "competition among and reduce regulation of telecommunications providers" and to provide a "national policy framework," *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1170 (9th Cir. 2001), to encourage the "rapid deployment of new telecommunications technologies," *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005), including wireless telephone service.

Section 253(a) states a broad rule of federal preemption, and is a significant limitation on the ability of local governments to impose regulatory requirements on telecommunications carriers or the services they provide.  Congress's purpose in enacting Section 253(a) is clear—to ensure that certain aspects of telecommunications regulation remain the unique province of the federal government, while narrowly circumscribing the role of state and local governments in this arena.  *See, e.g.*, *City of Auburn*, 260 F.3d at 1175.

2.    Section 332 of the Communications Act Prohibits Local Barriers to the
      Uniform, National Provision of Wireless Telecommunications Services.

Although the States traditionally exercised regulatory authority over the so-called "intrastate" portion of wireline communications, wireless communications are inherently different.  First, the handset is mobile, and thus can travel from State to State.  This creates a need for network interoperability—a wireless handset purchased in New York will need to function with a network in California.  Second, as noted above, radio waves themselves transcend any state lines and spectrum management must be placed in the hands of one national authority to be effective.

In 1993, Congress made clear that these differences warranted a distinct regulatory regime for wireless. Congress amended the Communications Act to make clear that States did not have "any authority to regulate the entry of or the rates charged" by wireless carriers. 47 U.S.C. § 332(c)(3)(A). Recognizing that the market for wireless telephone services was, and increasingly would be, national rather than local, Congress also amended Section 2(b) of the Communications Act to remove wireless services from the traditional prohibition on FCC regulation of intrastate telecommunications services. These two federal laws rejected the old state-and-federal dual regulatory system for wireless. Instead Congress adopted a uniform, national approach based largely on exclusivity of federal regulation. *See Connecticut Dep't of Pub. Util. Control v. FCC*, 78 F.3d 842, 845 (2d Cir. 1996) (explaining that the 1993 amendments were enacted "to dramatically revise the regulation of the wireless telecommunications industry, of which cellular telephone service is a part."); *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 433 (6th Cir. 1998) (same).

Through its amendments to Section 332, Congress swept away most of the state and local regulatory barriers that stood in the way of the development of a seamless, nationwide wireless telecommunications system. *See Connecticut Dep't of Public Util. Control*, 78 F.3d at 845 ("Congress enacted section 332 of the Communications Act to replace . . . traditional regulation of mobile services with an approach that brings all mobile service providers under a comprehensive, consistent regulatory framework." (citations and quotations omitted)); *see also Petition on Behalf of the State of California*, Report and Order, 10 F.C.C.R. 7486, 7499 (¶ 24) (1995) (describing congressional intent to "establish a national regulatory policy for CMRS, not a policy that is balkanized state-by-state."); *Petition on Behalf of the Connecticut Department of Public Utility Control*, Report and Order, 10 F.C.C.R. 7025, 7034 n.44 (¶ 14) (1995) ("State

regulation can be a barrier to the development of competition.") (citing H.R. Rep. No. 103-213, at 480-81 (1993) (Conf. Rep.)), *aff'd*, 78 F.3d 842 (2d Cir. 1996).

This shift in wireless regulation also reflected Congress's "general preference in favor of reliance on market forces rather than regulation." *In re Petition of New York State Public Service Commission to Extend Rate Regulation*, Report and Order, 10 F.C.C.R. 8187, 8190 (¶ 18) (1995); *see also* S. Rep. No. 104–230, at 1 (1996) (explaining that Congress sought to foster a "pro-competitive, deregulatory national policy framework"); H.R. Rep. No. 103-111, at 260 (1993) (explaining that the 1993 amendments to the Act were intended to "foster the growth and development of mobile services that, by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure").

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Marvel Characters, Inc. v. Simon, Inc.*, 310 F.3d 280, 285-86 (2d Cir. 2002). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In determining whether a federal statute expressly preempts state law, "[t]he purpose of Congress is the ultimate touchstone." *Toy Mfrs. of Am., Inc. v. Blumenthal*, 986 F.2d 615, 620 (2d Cir. 1992) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985)). "Congress's purpose 'is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it' as well as from 'the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business,

consumers and the law." *Comm. of Dental Amalgam Mfrs. & Distribs v. Stratton*, 92 F.3d 807, 811 (9th Cir. 1996) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)).

The relevant facts regarding Clarkstown's adoption of Chapter 251 are not in dispute. The application of the terms of Chapter 251 to the Wireless Carriers[2] in this case is purely a question of law, and summary judgment is therefore proper. *See, e.g.*, *Sprint Telephony PCS L.P. v. County of San Diego*, 490 F.3d 700, 714 (9th Cir. 2007) ("[T]he plain language of [Section 253(a)] (removing barriers) permits facial challenges to zoning ordinances" by wireless carriers, as in this case.); *Qwest Commc'ns Corp. v. City of Berkeley*, 255 F. Supp. 2d 1116, 1120 (N.D. Cal. 2003) (granting summary judgment that ordinance violates § 253: "[i]t is clear that whether [ordinances] constitute effective barriers to entry [in violation of § 253(a)] or are mere right-of-way management provisions is a question of law." (citing *City of Auburn*, 260 F.3d at 1172)), *aff'd*, 433 F.3d 1253 (9th Cir. 2006); *XO Missouri, Inc. v. City of Maryland Heights*, 256 F. Supp. 2d 987, 994-95 (E.D. Mo. 2003) (granting summary judgment that ordinance had the effect of prohibiting telecommunications services in violation of § 253), *aff'd*, 362 F.3d 1023 (8th Cir. 2004); *TC Systems, Inc. v. Town of Colonie, New York*, 263 F. Supp. 2d 471, 480, 487 (N.D.N.Y. 2003) (invalidating several provisions of local law as preempted by Section 253(a) on cross motions for summary judgment; plaintiff's "claims present[ed] a pure question of law—are Local Law No. 13 and the Draft Franchise preempted by federal or state law"); *see also Illinois Bell Tel. Co. v. Village of Itasca*, 503 F. Supp. 2d 928, 940 (N.D. Ill. 2007) (finding plaintiff had successfully pled a violation of Section 253(a) in bringing facial challenge to municipal zoning ordinance); *Verizon Wireless (VAW) LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1332

---

[2] Plaintiffs are all providers of commercial mobile radio services ("CMRS"), including wireless telecommunications services, over networks consisting of wireless telecommunications facilities distributed in and around the Town of Clarkstown.

(D.N.M. 2007) (concluding facial challenge to zoning ordinance regulating wireless telecommunications facilities under Sections 253 and 332 was ripe where the plaintiffs "challenge[d] the permit requirements themselves, not the application of the requirements"). Like the Plaintiffs in *Rio Rancho*, *supra*, Plaintiffs herein plan to deploy additional wireless facilities within Clarkstown and are deterred from doing so because of Chapter 251.

The matter is also ripe for summary judgment because Chapter 251 applies retroactively, subjecting even existing wireless infrastructure to the onerous new regulations upon the renewal of existing permits or, in the case of an existing permit without an expiration date, within five years. *See* Clarkstown Town Code, § 251-37(c), (d). The Plaintiffs, therefore, face a certain— not merely speculative—threat from Chapter 251. *See City of Auburn*, 260 F.3d at 1171-72 (facial challenge to ordinance was ripe for summary judgment where plaintiff faced "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" and plaintiff's threat of injury was not "speculative or conjectural") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

## ARGUMENT

The Wireless Carriers are entitled to judgment as a matter of law because there are multiple independent bases for federal preemption of Chapter 251. *First*, Chapter 251 has the effect of prohibiting the provision of wireless services in Clarkstown in violation of Section 253 of the Communications Act by: (i) imposing burdensome application requirements and unlimited delays; (ii) vesting the Town with unbounded discretion to deny or impose any conditions on its approval of applications for special permits to construct telecommunications facilities; and (iii) flatly prohibiting new wireless facilities in large portions of the Town.

*Second*, Chapter 251 contravenes the federal government's exclusive authority to regulate the technical and operational aspects of wireless communications. More specifically, Chapter

251 violates the FCC's express prohibition of state and local governments from regulating technical and operational aspects of wireless services by requiring the use of "preferred" wireless technologies, methods of construction, and network design, as well as by regulating infrastructure placement based on radio frequency interference ("RFI"). Congress has confirmed the FCC's primacy in this area and expressly preempted such regulation of wireless entry by state and local governments. Thus, *any* state or local intrusion into the technical aspects of wireless broadcasting is prohibited because the federal government's regulation of the technical aspects of wireless communication is so pervasive that the federal government has demonstrated a clear intent to occupy this field. Chapter 251 also seeks to regulate placement of facilities based on RF emissions, which federal law expressly prohibits.

In sum, whether under the rubric of express statutory preemption, agency preemption, or field preemption, substantial parts of Chapter 251 are preempted. Because the invalid portions of the local law are central to its operation, no part of the law can be salvaged. Instead, this Court should declare all of Chapter 251 void and unenforceable and allow the Town Council of Clarkstown an opportunity to pass a local law based on traditional zoning criteria that comports with federal law.

## I.   CHAPTER 251 PROHIBITS THE ABILITY OF CMRS CARRIERS TO PROVIDE TELECOMMUNICATIONS SERVICES.

Section 253(a) provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Chapter 251 has the effect of prohibiting the ability of wireless carriers to provide telecommunications services and thus constitutes an unlawful barrier to market entry within the Town of Clarkstown because (i) Chapter 251, at best, imposes a grueling, lengthy, burdensome and potentially open-

ended process for securing authorization to provide service, (ii) the approval process set out in Chapter 251 vests the Town with unfettered discretion to deny CMRS providers the ability to provide telecommunications service, and (iii) Chapter 251 excludes large sections of the Town from any construction of wireless facilities whatsoever.

A.    **Chapter 251 Imposes Overly-Burdensome Application Requirements and Authorizes Limitless Delays in Violation of Section 253.**

The burdensome application requirements of Chapter 251 are sufficient, standing alone, to warrant preemption of Chapter 251 under Section 253(a) because, "as a whole, the Town's regulations and actions materially inhibit [the Wireless Carriers'] ability to provide telecommunications services." *TC Systems, Inc.*, 263 F. Supp. 2d at 484. Section 253 requires review of the cumulative impact of Chapter 251's provisions, because even a series of provisions that are individually non-objectionable, may, in combination, effectively prohibit telecommunications services and violate federal law. *See id.*; *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 77 (2d Cir. 2002) ("applying § 253(a) to individual provisions without considering the Ordinance as a whole would neglect the possibility that a town could effectively prohibit telecommunications services through a combination of individually non-objectionable provisions"); *City of Auburn*, 260 F.3d at 1176 (holding that ordinances "include[d] several features that, in combination, have the effect of prohibiting the provision of telecommunications services," that required a lengthy application and, among other things, "[s]uch other and further information as may be requested by the City," and that "authorize[d] the Cities to consider discretionary factors that have nothing to do with the management or use of the right-of-way"); *XO Missouri*, 256 F. Supp. 2d at 992, n.1 ("[A]n onerous application process that is subject to local government decision making has been held to prohibit the provision of telecommunications services."). Moreover, a burdensome regulation need not absolutely deter

the provision of wireless service in order to violate Section 253. *See RT Commc'ns, Inc. v. FCC*, 201 F.3d 1264, 1268 (10th Cir. 2000) ("Nowhere does the statute require that a bar to entry be insurmountable before the FCC must preempt it.").[3]

In *City of White Plains*, for example, the Second Circuit Court of Appeals held that the ordinance at issue "clearly ha[d] the effect of prohibiting TCG from providing telecommunications service" in violation of Section 253(a), and pointed to "the extensive delays in processing TCG's request for a franchise [which] have prohibited TCG from providing service for the duration of the delays" as additional evidence of such a prohibition. *City of White Plains*, 305 F.3d at 76. Similarly, in *City of Auburn*, the court observed that "an onerous application process" coupled with other factors such as delay or discretion on the part of local officials "ha[s] the effect of prohibiting" the provision of telecommunications service. 260 F.3d at 1175-76. The Tenth Circuit also has explained that "broad discretionary language" granting discretion to accept or reject an application and requiring "such other and further information as may be required by the city" is prohibitive. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1270 (10th Cir. 2004).

As in *City of White Plains*, *City of Auburn*, and *City of Santa Fe*, Clarkstown's application requirements violate Section 253(a) because: (1) the application process requires the

---

[3] The public policy considerations behind the 1996 Act were reinforced by Congress in the Wireless Communications and Public Safety Act, the stated purpose of which is "to encourage and facilitate the prompt deployment throughout the United States of a seamless, ubiquitous, and reliable end-to-end infrastructure for communications, including wireless communications, to meet the Nation's public safety and other communications needs." Pub. L. No. 106-81, § 2(b), 113 Stat. 1286. In this connection, Congress specifically found that "the construction and operation of a seamless, ubiquitous, and reliable wireless telecommunications system promote[s] public safety and provide[s] immediate and critical communications links among members of the public; emergency medical service providers and emergency dispatch providers; public safety, fire service and law enforcement officials; transportation officials, and hospital emergency and trauma care facilities." *Id.* at § 2(a)(6). To allow Clarkstown to impose burdensome application requirements, indeterminate delays, and to establish what it believes constitutes an adequate signal level for wireless services directly frustrates this clearly stated intent of Congress.

Wireless Carriers to submit an enormous amount of information and there are *no limits* on the information that may be requested by the Town, *see, e.g.*, Clarkstown Town Code §§ 251-13, -17(B), -17(D), -19 to -27; (2) Chapter 251 allows the Town to delay an application indefinitely by requesting additional information which can repeatedly, and without limit, restart the clock by which the deadline for action by the Town is measured, *see id.* §§ 251-13(B), -17(B), -17(D), -19(G); and (3) Chapter 251 engages in impermissible municipal regulation of the actual wireless services provided by Plaintiffs, a phenomenon the FCC has expressly prohibited as "an unnecessary 'third tier' of regulation that extends far beyond the statutorily protected interests in managing the public rights-of-way." *In re TCI Cablevision of Oakland County, Inc.*, 12 F.C.C.R. 21396, 21441 (¶ 102) (1997).

The overall processes and timelines set out in Chapter 251 are lengthy and convoluted, "[n]or is there any guarantee that applications under this Kafkaesque regime, once submitted, will be processed expeditiously." *PECO Energy Co. v. Town of Haverford*, No. 99-4766, 1999 U.S. Dist. LEXIS 19409, at *26 (E.D. Pa. Dec. 20, 1999) (not reported). Chapter 251 imposes a Byzantine "pre-application" and "preliminary screening" process that requires a carrier first to submit a "pre-application" to the Planning Board, which the Planning Board reviews for completeness and can reject for lack of completeness prior to actually beginning its "preliminary screening." Clarkstown Town Code, § 251-13, -14. This pre-application requires information and other submissions of a type that would, in most circumstances, comprise the entire application process.[4]

---

[4] Among the requirements for the *pre*-application are: (1) a statement in writing that construction of the facility is legally permissible; (2) USGS or topographic map indicating the site location; (3) information related to the property on which the facility will be built, such as: the zoning district; size of the property; (4) location, size and height of all existing structures, proposed and existing antennas, and appurtenant structures on the property; (5) the number, type and design of the antenna(s) proposed; (6) structural certification letter signed by a N.Y. State Professional Engineer; (7) signal propagation or coverage maps showing existing facilities around the site and the in-vehicle

However, under Chapter 251, compliance with these requirements results only in the Town's decision about the *categorization* of a facility, and merely allows an applicant to begin the even more onerous and time-consuming application process. Once the pre-application submissions have been made Chapter 251 gives the Planning Board 30 days to determine whether the "pre-application" is complete. *Id.* § 251-13(B). This apparent deadline, however, is illusory, in that a request for additional information by the Planning Board renders even a "completed" pre-application "incomplete" because, under the circular logic of Chapter 251, complete applications must include all information requested by the Planning Board. *Id.* § 251-13(B)(4). Because there is no limit on the number of times that the Planning Board can request additional information, *id.*, and thereby indefinitely delay action on an application, the 30-day limit is meaningless, and this provision creates a loophole that allows the Town to impose limitless additional burdens and delays in violation of Section 253.

Even after the Planning Board deems the pre-application complete, the Board has an additional 45 days to conduct preliminary screening. *Id.* § 251-15(B). After the applicant clears the "pre-application" hurdles and the proposal is assigned to a category, an applicant must still submit a voluminous and detailed "application." *Id.* § 251-19, -23, -24.

Some of the many excessive informational requirements of the "application" include:

(1) A commitment to co-locate or allow co-location wherever possible on all existing and proposed facilities;

(2) The frequency, modulation and class of service of radio or other transmitting equipment;

(3) Transmission and maximum effective radiated power of the antenna(s);

---

coverage model for the proposed facility; and (8) a bulk table listing all proposed equipment measurements. Clarkstown Town Code, § 251-13(A).

(4) Azimuth directions of antenna sectors and associated radiation patterns of the antenna(s);

(5) Certification that Non-Ionizing Electromagnetic Radition ("NIER") levels at the proposed site will be within FCC threshold levels;

(6) Calculations of the estimated NIER output of the antenna(s);

(7) Cumulative RF calculations for proposed and pre-existing antennas for ground level exposure points;

(8) The maximum exposure level for the facility and the locations at which this occurs;

(9) The estimated RF levels at specific "locations of community interest," such as schools, residences or commercial buildings;

(10) An RF Report providing the methods, calculations, and assumptions (including building heights and topography) for certification of the various calculations;

(11) Certification that the proposed antenna(s) will not cause interference with existing telecommunications devices;

(12) Propagation studies of the proposed site and all adjoining proposed or existing sites using the "in-vehicle" model threshold and a description of the methods and computer software used to generate coverage maps;

(13) A written report demonstrating efforts to secure shared use of any existing towers;

(14) An Environmental Assessment Form and Visual Addendum, including photographs of the existing site as well as photographic renderings of the proposed installation from various vantage points, though the Planning Board "may require submission of a more detailed visual analysis";

(15) If required by the Planning Board, the applicant must conduct either a so-called "crane" or "balloon" test to supplement the visual assessment;

(16) A report demonstrating the applicant's review of alternate sites and the technological reason to justify why alternate sites cannot be utilized;

(17) For those facilities for which supplemental capacity is the major objective rather than simply coverage, a capacity analysis describing the need for additional capacity and a technical description of why nearby sites cannot be modified to accommodate the need;

(18) For Category D sites, a report demonstrating the applicant's review of alternate technologies and why alternate technologies cannot be used. *Id.* § 251-19(G)(9).

Beyond these burdensome requirements, Chapter 251 provides the same loophole for the application process that it creates in the pre-application process—the Board can indefinitely delay action on an application if it renders the application "incomplete" by requesting additional information from the applicant. *Id.* §§ 251-17(D), -19(G)(10). As under the pre-application process, the application may be declared "incomplete" at any point in the process because "complete" applications must include all information requested at any time by the Planning Board. *Id.* § 251-19(C). By allowing the Planning Board to request additional information during the application review process, the Town has reserved for itself the power to circumvent or ignore entirely the deadlines supposedly imposed by Chapter 251 for holding a public hearing. *Id.* § 251-18(C). The procedural safeguards in Chapter 251 are thus illusory, as the Town retains unchecked power to enmesh applicants in this "Kafkaesque regime," *PECO Energy Co.*, 1999 U.S. Dist. LEXIS at *26.

In addition to granting the Town unlimited discretion to delay by declaring a pre-application or application "incomplete," Chapter 251 imposes another burdensome requirement through the fee scheme it puts in place. Beyond the fixed fees for all applications ($500 each), including additional fees for Category C and D sites ($500 and $1000, respectively), Clarkstown Town Code, § 251-40, as well as set fees for appearing before the Antenna Advisory Board ("AAB") ($500 per appearance), *id.* § 251-40, Chapter 251 requires an applicant to "provide funds to an escrow account to allow the Town to retain such *technical experts involving radio frequency* as may be necessary to review the application," (emphasis added) with an initial deposit of either $7,500 or $5,000 depending on the Category to which the applicant's site is assigned. *Id.* § 251-40(c). The Town retains *absolute and unreviewable discretion* to determine

18

which "professional services" by private consultants shall be "deemed necessary to assist in the review and evaluation of the application, including but not limited to review of land use, site plan, legal, technical, scientific and aesthetic issues." *Id.*  Chapter 251 further provides that "[i]f at any time during the review process the balance [of the applicant's escrow account] falls below $2,000, the Town shall so notify the applicant and the applicant shall be required to replenish the account with sufficient funds to bring the account balance to $5,000 before any further action or consideration is taken on the application." *Id.*  Under Clarkstown's scheme, an applicant has no opportunity to contest fees charged to it for the "professional services" of "technical experts involving radio frequency" retained by the Town.  Any attempt to challenge exorbitant fees will only result in delay.[5]  When other towns have tried to impose excessive consultant fees, courts have seen them for what they are, and have not allowed them.  *E.g. Omnipoint Commc'ns, Inc. v. Vill. of Airmont*, Case No. 07-Civ-0473, *3 (S.D.N.Y. April 18, 2007) (Brieant, J.) (stipulation of settlement and order noting that fees charged by private consultants for review of wireless facilities application were "unreasonable and excessive" and that the defendant village, planning board, and various officials therefore "shall not utilize" the private consultant to review further applications).

Although all of the deadlines in Chapter 251 are at best advisory, the delays built into the burdensome regulatory scheme set forth in Chapter 251 for applicants not using the Town's preferred technologies will necessarily be at least as long as those condemned by the Second Circuit in *City of White Plains*.  *See* 305 F.3d at 71 (noting that TCG submitted its application for a franchise in February 1999 and filed suit in June 1999).  For example, even making the

---

[5] Besides allowing the Town to charge excessive fees that are not governed by any standards and are not subject to review, this escrow requirement allows the Town to use its absolute discretion to charge additional fees "deemed necessary" simply to avoid further action on an application.

generous assumptions that an applicant's pre-application and application both are deemed complete by the Planning Board and no additional information at all is requested by the Planning Board – assumptions which seem unfounded given the Board's broad discretion to request *any* additional information at *any* time in the process – and assuming that the applicant submits its application the day it obtains notice of its categorization, the time from submission of a pre-application to a final decision could take 169 days.  *See* Clarkstown Town Code, § 251-15(B) (pre-screening completed within 45 days of filing of pre-application); *id.* § 251-18(C) (must hold public hearing within 62 days of submission of formal completed application); *id.* § 251-18(D) (may approve, approve with conditions or disapprove the application within 62 days after a public hearing).

Chapter 251 also impermissibly regulates the actual wireless services provided by Plaintiffs, for example, by establishing a point at which signal strength is deemed adequate.  *Id.* § 251-13(A)(12), -19(F)(27) (equal to or below "-84 dBM").  Such provisions constitute "an unnecessary 'third tier' of regulation that extends far beyond the statutorily protected interests in managing the public rights-of-way."  *In re TCI Cablevision of Oakland County, Inc.*, 12 F.C.C.R. at 21,441 (¶ 102).  The Town's attempt to regulate "adequate" signal strength, presumably in an attempt to minimize the number of wireless facilities needed to provide service, has a further pernicious effect.  By setting a uniform "adequate" level of wireless service through regulatory fiat, Chapter 251 discourages (and indeed prohibits) wireless carriers from competing to provide the highest level of service possible.  Further, regulation of signal strength could impact the type of services that could be offered now and particularly in the future as more advanced services, such as video services for example, may require higher signal strength.  This strikes at the heart of the 1996 Act, which was decidedly "pro-competitive," S. Rep. No. 104–230, at 1 (1996).  The

Town similarly purports to have the authority to determine the adequacy of wireless networks by evaluating "[d]ocumentation that demonstrates the need for the wireless telecommunications facility to provide service" for Category B sites.  Clarkstown Town Code, § 251-19(F)(4). Rather than leaving technical decisions to competitive market forces as Congress intended, the Town requires an applicant to justify its choice of technology by requiring a report for each Category C and D site "demonstrating the applicant's review of alternate technologies such as the use of microcells or Distributed Antenna Systems (DAS), demonstrating in detail the technological reason to justify why alternate technologies cannot be utilized."  *Id.* § 251-19(G)(9).  These "third tier" regulations of wireless services go far beyond the limited authority reserved for local governments.

    The cumulative operation of these provisions has the effect of prohibiting the Wireless Carriers' ability to provide telecommunications services by imposing excessive burdens and delays on permit applications for telecommunications facilities and authorizing the Town to require endless additional submissions before an application will be deemed complete.  *See City of White Plains*, 305 F.3d at 76 (holding that "extensive delays" prohibited provision of telecommunications service); *Sprint Telephony PCS*, 490 F.3d at 716 (holding that a zoning ordinance is preempted by Section 253(a) where it "add[ed] submission requirements to an already voluminous list . . . in addition to the open-ended discretion" granted to the county); *City of Auburn*, 260 F.3d at 1175-76 ("[A]n onerous application process . . . may constitute a prohibitive effect."); *City of Santa Fe*, 380 F.3d at 1270 (explaining broad discretion to require "such other and further information as may be required by the city" was prohibitive).  For the same reasons expressed by the Second Circuit Court of Appeals in *City of White Plains*, the

permitting scheme established by Chapter 251 must be struck down in its entirety as a barrier to the provision of wireless telecommunications service within the meaning of Section 253.

> **B.      Chapter 251 Confers Broad, Standardless Discretion on the Town of Clarkstown to Deny Telecommunications Service.**

It is well-established that broad discretion on the part of a municipality to grant or deny the access necessary to provide telecommunications services "ha[s] the effect of prohibiting [a telecommunications provider] from providing telecommunications service" in violation of federal law. *City of White Plains*, 305 F.3d at 76 (interpreting Section 253). Moreover, a zoning ordinance that "imposes a permitting structure and design requirements that present[] barriers to wireless telecommunications," including "voluminous" submission requirements and "open-ended discretion" on the part of the decision maker, is automatically preempted by Section 253(a). *Sprint Telephony PCS*, 490 F.3d at 716; *City of Auburn*, 260 F.3d at 1175-76.

> 1.      An Ordinance that Vests the Town With Unfettered Discretion to Deny a Wireless Services Application is Preempted, Even if the Prohibition Takes the Form of a "Zoning" Ordinance.

The Second Circuit has held that vesting broad discretion on the part of a local government to grant or deny access to telecommunications carriers is inconsistent with Section 253. *See City of White Plains*, 305 F.3d at 76; *see also Qwest Commc'ns Corp. v. City of New York*, 387 F. Supp. 2d 191, 193 (E.D.N.Y. 2005) (disapproving city's "unfettered discretion" to approve or disapprove a franchise application). Echoing the concerns first raised by the Ninth Circuit in *City of Auburn*, the Second Circuit in *City of White Plains* determined that where an ordinance vests a municipality with open-ended discretion to grant or deny access, the ordinance "clearly ha[s] the effect of prohibiting TCG from providing telecommunications service." 305 F.3d at 76. Citing *City of Auburn*, the Second Circuit held that "the Ordinance's provisions allowing the White Plains Common Council to consider any factor deemed to be in the public

interest provide precisely the sort of discretion to prohibit telecommunications services that §

253 preempts." *Id.* at 81.

Section 253's broad preemptive sweep extends beyond the "franchise" requirements that

the Second Circuit and Ninth Circuit considered in *TCG New York* and *City of Auburn*,

respectively. The plain text of the statute bars any "state or local legal requirement" that

"prohibit[s] or ha[s] the effect of prohibiting the ability of any entity to provide any interstate or

intrastate telecommunications service." 47 U.S.C. § 253(a). The Ninth Circuit has held that the

broad language of Section 253 reaches zoning ordinances that purport to grant municipalities

unfettered discretion to reject applications to construct wireless facilities. *See Sprint Telephony*

*PCS*, 490 F.3d at 702, 714 ("the plain language of [Section 253(a)] (removing barriers) permits

facial challenges to zoning ordinances" by wireless carriers). Applying the factors from its

seminal *City of Auburn* decision, the court explained that the ordinance "add[s] submission

requirements to an already voluminous list," that "[t]hose requirements are in addition to the

open-ended discretion and  . . . criminal penalties contained in the Zoning Ordinance." *Id.* at

716. The court was particularly troubled by the fact that the ordinance "explicitly allow[ed] *the*

*decision maker* to determine whether a facility is appropriately 'camouflaged,' 'consistent with

community character,' and designed to have minimum 'visual impact.'" *Id.* (emphasis added)

(citation omitted). The court dismissed as "unconvincing" the locality's claim that these

elements of the ordinance should be upheld because they were traditional zoning considerations,

explaining that the ordinance nonetheless raised "largely the same" concerns as in *City of*

*Auburn*. *Id.* For the reasons articulated by the Ninth Circuit Court of Appeals in *County of San*

*Diego*, Chapter 251 cannot escape the prohibitions of Section 253 merely because the Town has

couched its impermissible regulations in the guise of a zoning ordinance. *Id.*; *see also City of*

*Rio Rancho*, 476 F. Supp. 2d at 1339 ("In conclusion, I reject the City's argument that §

332(c)(7) is the exclusive vehicle through which the Companies may challenge the [local zoning

ordinance regulating wireless facilities]. The Companies may bring a facial challenge to the

Ordinance under § 253 and § 332(c)(3).").

> 2. Chapter 251 Creates Numerous Levels of Unfettered Discretion to Deny Wireless Siting Applications.

Here, Chapter 251 vests the Town with broad, unfettered discretion to accept, accept with

conditions, deny, or delay an application for a special permit to install or modify wireless

facilities. Every aspect of the application process set forth in Chapter 251 is rife with broad and

standardless discretion of exactly the sort that has been soundly condemned by both the Second

Circuit in *City of White Plains* and the Ninth Circuit in *City of Auburn* and *County of San Diego*.

*See also Qwest Commc'ns Inc. v. City of Berkeley*, 433 F.3d 1253, 1258 (9th Cir. 2006) (holding

that the power to deny a permit because a telecommunications provider fails "to comply with any

other requirement of the ordinance" gives a locality "significant discretion to deny companies the

ability of providing telecommunications services" in violation of Section 253(a)); *City of Santa

Fe*, 380 F.3d at 1270 (disapproving "broad discretionary language" and "unfettered discretion" to

deny a permit); *New Jersey Payphone Ass'n v. Town of W. New York*, 130 F. Supp. 2d 631, 640

(D.N.J. 2001), *aff'd*, 299 F.3d 235 (3d Cir. 2002) ("Unfettered discretion to deny a permit or a

denial pursuant to such vague standards as the 'public interest' is void as a barrier to entry.").

The complex permitting process created by Chapter 251 creates at least four levels of

broad discretion, which in combination provide even broader discretion than the legislation that

was condemned in *County of San Diego*, *City of Auburn*, and *City of Santa Fe*. Specifically, the

Town is given enormous discretion in determining the completeness of applications, the

assignment of points under the scoring system, the hiring and payment of consultants, and the ultimate rejection of applications.

<blockquote>
a.      The Planning Board and the Antenna Advisory Board Possess Unlimited Discretion to Delay or Effectively Deny an Application by Deeming an Application Incomplete.
</blockquote>

Chapter 251 establishes a new Antenna Advisory Board ("AAB"), *id.* § 251-12(B), which is charged with, among other things, making recommendations to the Planning Board regarding the completeness of a pre-application or application. *Id.* § 251-13(B), -17(B), (D). No qualifications are required of the five AAB members, who are appointed or removed by the Town Board, *id.* § 251-12(B). Chapter 251 gives the Planning Board broad discretion to reject "pre-applications" as incomplete, *id.* § 251-13(B), while also giving it unlimited authority to require that an applicant "provide more detailed, corrected, or other information," *id.* § 251-13(B)(4). The Planning Board is given the same broad authority to reject applications for Category B, C, and D facilities as incomplete, *id.* § 251-17(B), while possessing unlimited authority to require additional submissions from the applicant to render the application "complete," *id.* § 251-17(D), -19(G)(10). This absolute discretion to reject applications as incomplete for any reason (or no reason) and to require *any* additional materials on *any* number of occasions allows the Town effectively to deny or delay an application upon any basis.

In *City of Santa Fe*, the Tenth Circuit Court of Appeals condemned broad discretion to require "such other and further information as may be required by the city," noting that this open-ended regulatory requirement "has been repeatedly held to be prohibitive." 380 F.3d at 1270 (citing *TCG New York*, 305 F.2d at 76). *See also City of Auburn*, 260 F.3d at 1176 (listing features that in combination have the effect of prohibiting telecommunications service, including the requirement to submit "[s]uch other and further information as may be requested by the City"). The unfettered discretion of the AAB and the Planning Board to require "other

information" is no different from the provisions in *Santa Fe* and *Auburn* that prohibited the provision of telecommunications service.

     b. <u>Assignment of Points Under the Scoring System is Profoundly</u>
       <u>Subjective and Provides Further Scope for Unfettered Discretion.</u>

  The AAB is further charged with making recommendations to the Planning Board regarding category assignment and whether to approve or deny an application. Clarkstown Town Code, § 251-12(B), -13(B), -15(A)-(B), -16(A), -17(A), (B). Whether a proposed site is assigned to category A, B, C, or D for purposes of review is based on a "score" a proposal receives in a number of subjective categories. Category "A" sites receive the least scrutiny. Increasing scrutiny accompanies designation to categories B, C, or D.

  Calculation of the "score," for purposes of sorting into categories, however, is inherently subjective. For example, the proposed use of "stealth technology" can add 10 points to an application. *See id.* § 251 at Table 1. What constitutes stealth technology, however, is left to the Town's discretion. Similarly, there exists a points category for "Other potential impacts." *Id.* In this discretionary catch-all, the Town can evaluate and assign point totals to unspecified types of "impacts." Compounding this discretion, the Town also can subjectively choose whether the "other" impact is *de minimus* (10 points), "moderate" (5 points), or "severe" (0 points). *Id.* This process of "sorting" and evaluating applications envisioned by the Ordinance is, by itself, a source of impermissibly broad discretion wielded by the Town. *See, e.g. County of San Diego*, 490 F.3d at 716 (disapproving discretion reserved to zoning authority in that the ordinance "explicitly allows the decision maker to determine whether a facility is appropriately 'camouflaged,' 'consistent with community character,' and designed to have minimum 'visual impact'") (citation omitted).

       c.       <u>The Planning Board Has Broad Discretion to Employ Private</u>
                     <u>Consultants and Require Payment of Consultants' Fees by</u>
                     <u>Applicants on an Absolute and Unreviewable Basis.</u>

Chapter 251 grants the Town broad discretion to determine which "professional services" by private consultants shall be "deemed necessary to assist in the review and evaluation of the application, including but not limited to review of land use, site plan, legal, technical, scientific and aesthetic issues." Clarkstown Town Code, § 251-40(C). Further, an applicant must replenish an escrow account to pay for any services "deemed necessary" by the Town upon notice "before any further action or consideration is taken on the application." *Id.* Under this provision, the Town retains absolute and unreviewable discretion to charge any fees to an applicant without any cap, and may delay the application process for failure to replenish the escrow account, regardless of how many times the Town requires the account to be replenished.

       d.       <u>The Planning Board Retains Final, Unfettered Discretion to Deny</u>
                     <u>Applications.</u>

Even after an application makes it through the subjective "sorting" process, Chapter 251 gives the Town Planning Board complete discretion simply to deny an application to place Category B, C and D facilities and impose unlimited "aesthetic conditions" on such facilities. *Id.* § 251-16(A), -18(D). With respect to Category B, C, and D facilities, Section 251-18(D) states that the Planning Board may "approve, approve with conditions or disapprove the application for a special permit under the provisions of this chapter within 62 days after a public hearing," even after the applicant has complied with the lengthy and onerous pre-application, application, and hearing processes. *Id.* § 251-18(D). No provisions in Chapter 251 limit the discretion to be exercised by the Planning Board in making its decision. Such discretion is similar to that granted by the ordinance struck down in *County of San Diego* in which the decision maker was given the authority to consider "any other relevant impact of the proposed use" and could "impose

27

conditions on the use consistent with the objectives of the Zoning Ordinance."  490 F.3d at 706.

Indeed, Chapter 251's grant of ultimate discretion to City officials and private consultants is

even broader than the ordinance that the Second Circuit found was preempted in *City of White

Plains*.  Unlike that case, Chapter 251 does not even contain the tissue-thin requirement that the

Town consider the "public interest" when exercising its discretion.  *See City of White Plains*, 305

F.3d at 76 (holding that the White Plains ordinance's provision allowing the rejection of

applications "based on any 'public interest factors… that are deemed pertinent by the City'" had

the effect of prohibiting provision of telecommunications services).

        This Court cannot simply assume that the local regulatory body will abide by the

restrictions of the Communications Act where a local regulation grants the regulatory body the

discretion to violate the Act.  *See PECO Energy Co.*, 1999 U.S. Dist. LEXIS 19409 at *24

("Haverford argues that we should read the Ordinance in a way that would not violate the

TCA—in other words, we should assume that the Township Manager and any other local

officials charged with implementing it will do so in a manner consistent with the TCA.  This flies

in the face of the TCA, which preserves very specific authority to local governments. We will

not just assume, based on nothing more than faith in the goodwill of the Township and its

Manager, that Haverford has not overstepped that authority.").  By authorizing the Town to

exercise standardless discretion in approving, denying, or placing limitless conditions upon the

construction of wireless facilities, Chapter 251 already has the effect of prohibiting the provision

of telecommunications services, in violation of Section 253(a).  That regime now hangs over

every existing commercial mobile radio service facility in Clarkstown and acts as a deterrent to

carriers attempting to upgrade or place any new facilities in the town.

C.   **Chapter 251 Erects Absolute Prohibitions of Wireless Telecommunications Service.**

In addition to unfettered discretion to deny applications, the ability to delay a final decision indefinitely, and the power to demand repeated and burdensome submissions—all of which far exceed the regulatory authority of the Town under federal law—Chapter 251 flatly prohibits the construction of wireless facilities with new structures, such as poles or towers, in large areas of the Town.

Specifically, Chapter 251 prohibits new structures from being built within 350 feet from "child day care center[s], school[s], camp[s], public park[s] or playground[s]" without exception. Clarkstown Town Code, § 251-29(B).  This provision, on its face, unequivocally prevents such facilities from being constructed in many areas of the Town, which is itself a prohibition under Section 253.  This will certainly lead to engineering difficulties in ensuring provision of telecommunications services and may lead to gaps in coverage for all the Wireless Carriers— gaps that could affect public safety, public services, and residents.  Because wireless facilities are necessary to provide wireless telecommunications services, the prohibition on construction of these facilities serves as a facial prohibition of the ability of the Plaintiffs to provide telecommunications service within the meaning of Section 253(a).  *See New Jersey Payphone Ass'n v. Town of W. New York*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that an absolute prohibition against siting telephones on public property is a violation of Section 253 even when an alternate private site is available nearby); *see also In re Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, 14 F.C.C.R. 21697 (1999) (denying petition for declaratory ruling where Minnesota's agreement would exclude carriers

from access to freeway rights-of-way).  On that basis alone, this Court should declare Chapter 251 invalid and unenforceable as preempted by federal law.

## II.    THE ENTIRE REGULATORY SCHEME EMBODIED IN CHAPTER 251 IS A FEDERALLY PREEMPTED EFFORT TO CONTROL TECHNICAL AND OPERATIONAL ASPECTS OF THE WIRELESS CARRIERS' NETWORKS.

Chapter 251 regulates all aspects of the Wireless Carriers' network deployment, including the technologies employed and the level of service provided.  Chapter 251 reflects the Town's errant belief that it can control what types of equipment and technologies the Wireless Carriers use, the energy emissions from such equipment, the interference potential of such equipment, and even the qualitative level of service that Wireless Carriers can offer.  However, more than 70 years ago, the federal government asserted primacy over the regulation of wireless devices and services, and the federal government's exclusive control extends to each of the matters that Chapter 251 purports to regulate.

This federal preemption of wireless technical and operational issues is broad and stems from multiple sources.  Whether barred by express preemption (statutory and agency), field preemption, or both, it is clear that the Chapter 251 scheme – which has at its core a local government's attempt to control wireless network deployment – is preempted.

### A.    The Scope of Federal Preemption Over the Technical and Operational Aspects of Wireless Network Deployment.

Federal law preempts state and local laws under the Supremacy Clause when a federal statute or agency regulation "express[es] a clear intent to pre-empt." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992).  And where federal regulation is so comprehensive that it effectively "occup[ies] an entire field of regulation," it leaves no room for local participation in the regulation of the field and *any* state or local regulation is preempted. *Capital Cities Cable Inc.*, 467 U.S. at 699.  There

are few areas where the express and field preemptions are as clear as they are with respect to the technical and operational aspects of the Wireless Carriers' networks.

The Communications Act expressly provides that the federal government, rather than state or local government, shall "maintain . . . control . . . over all the channels of radio transmission," 47 U.S.C. § 301, of which the provision of wireless service is an integral part. From the earliest days of the Communications Act, Congress sought to create a "unified and comprehensive regulatory system" governing the use of radio signals in the United States, *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 137 (1940). It has long been settled that the FCC's regulation of "technical matters" concerning frequency allocation is "clearly exclusive" of state and local regulation. *Head v. New Mexico Bd. of Exam'rs in Optometry*, 374 U.S. 424, 430 (1963); *see also Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 997 (6th Cir. 1994) (noting the "irreconcilable conflict between the FCC's exercise of exclusive jurisdiction over the regulation of radio frequency interference and the imposition of common law standards in a damages action"), *cert. denied*, 511 U.S. 1128 (1994); *see also* 47 U.S.C. § 152(a) (making the FCC responsible for "licensing and regulating" the RF spectrum and all devices that transmit RF signals); *id.* § 303(b), (c), (e), (g), (r) (granting the FCC the power to "[p]rescribe the nature of the service to be rendered by each class of licensed stations," "determine the power which each station shall use," "[r]egulate the kind of apparatus to be used with respect to its external effects," "encourage the larger and more effective use of radio in the public interest," and generally "[m]ake such rules and regulations . . . as may be necessary to carry out the provisions of this Chapter.").

With respect to mobile wireless services such as CMRS specifically, Section 332 of the Act directs that "no State or local government shall have any authority to regulate the entry of . .

. any commercial mobile service or any private mobile service . . . ."  47 U.S.C. § 332(c)(3)(A).
The term "entry" in this context is to be read broadly:

> There is no doubt that "entry" is denoted by the issuance of a federal license which, in turn, is earned when the applicant has established compliance with the "radiofrequency radiation exposure requirements . . . ." 47 C.F.R. § 24.52 (1996). Therefore, any attempt to hold the defendants to a radio frequency standard higher than that required by the FCC is a barrier to entry into the marketplace.

*See Murray Order*, 2001 CA 008479 B at 23.   By expressly barring regulation of "entry," Congress confirmed that state and local governments lack *any* authority to impose technical regulations on wireless carriers as a condition precedent to providing wireless service.   The statute makes "the FCC responsible for determining the number, placement and operation of the cellular towers and other infrastructure, as well as the rates and conditions that can be offered for the new service."  *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000).  A local government that attempts to establish technical parameters for wireless telecommunications service is thus "tread[ing] directly on the very areas reserved to the FCC."  *Id; see also Murray Order*, 2001 CA 008479 B at 21-22 ("[T]he relevant federal statute speaks for itself.   The Telecommunications Act of 1996 could not be more explicit.   Congress, being impressed with the economic value of permitting rapid expansion of cellular technology . . . consciously decided to preclude any State or local government from curtailing or impeding the expansion of the industry.") (citing H.R. Rep. No. 104-204, pt. 1 (1995)); Pub. L. No. 106-81, §2(b), 113 Stat. 1286 (finding that "[t]he construction and operation of [a] seamless, ubiquitous, and reliable wireless telecommunications system promote[s] public safety and provide[s] immediate and critical communications links among members of the public; emergency medical service providers and emergency dispatch providers; public safety, fire service and law enforcement officials; transportation officials, and hospital emergency and trauma care facilities.").

The Second Circuit has recognized the plenary nature of federal preemption over wireless technical and operational issues. Reviewing the FCC's overall authority in the context of an RF interference matter, the Court observed that the FCC's broad statutory grants of authority "make it clear that Congress intended the FCC to possess exclusive authority over technical matters related to radio broadcasting." *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 320 (2d Cir. 2000). The Court further explained that "[t]his authority is embedded in the FCC's broad authority to develop a comprehensive national regulatory system governing telecommunications." *Id.*

Numerous other courts have recognized that federal law occupies the field when it comes to technical and operational aspects of wireless service. *See, e.g., Beckermeyer v. AT&T Wireless*, 69 Pa. D. & C.4th 225, 234-35 (Pa. Ct. Com. Pl. Oct. 22, 2004) (if plaintiff had sought to "modify the technical standards [for wireless service and equipment] set forth by Congress and the FCC . . . plaintiff's claims would be preempted") (citing *Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Commc'ns Sys.*, 86 F.C.C.2d 469 (1981)); *see also Murray Order*, 2001 CA 008479 B at 49 ("If ever there were a field in which Congress had mandated the 'primacy' of federal regulation, it is surely the control of radio frequencies. There is no room for argument on this point. Both the defendants and the FCC, in their briefing, have cited countless authorities to support this conclusion.") (citing *Head*, 374 U.S. at 430 (FCC's "jurisdiction over technical matters . . . is clearly exclusive."); *Capital Cities Cable, Inc.*, 467 U.S. at 702 (FCC has "exclusive jurisdiction over all operational aspects of cable communication, including signal carriage and technical standards."); *City of New York v. FCC*, 486 U.S. 57, 62 (1988) (FCC has "established policy of preempting local regulation of technical signal quality standards for cable television."); *Southwestern Bell Wireless, Inc. v. Johnson County Bd. of County Comm'rs*, 199

F.3d 1185, 1193 (10th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000) ("Congress intended federal regulation of [radio frequency interference] issues to be so pervasive as to occupy the field.")); *Freeman*, 204 F.3d at 320 ("federal law has preempted the field of RF interference regulation").

Moreover, the FCC itself repeatedly has asserted its broad and exclusive control over technical and operational issues in a range of contexts related to wireless services. The FCC's administrative orders and regulations have the same preemptive effect as other federal laws, *see Capital Cities Cable*, 467 U.S. at 699 (citing *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153-54 (1982)), and the FCC's regulations "will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York*, 486 U.S. at 64.

The FCC has admonished state and local governments that they have *no authority* to establish technical standards for personal wireless services. *See, e.g.*, *In re Future Use of Frequency Band 806-960 MHZ*, 46 F.C.C.2d 752, 766-67 (¶¶ 43, 44) (1974) (the FCC's "technical standards and . . . operational rules are to apply nation-wide . . . without regard to state boundaries or varying local jurisdictions"); *Use of the Bands 825-845 MHz and 870-890 MHz*, 86 F.C.C.2d at 503-05 (¶¶ 79, 82) (again "asserting federal primacy over the areas of technical standards and competitive market structure for cellular service"); *Use of the Bands 825-845 MHz and 870-890 MHz*, 89 F.C.C.2d at 95 (¶ 81) ("It is imperative that no additional requirements be imposed by the states which could conflict with our standards and frustrate the federal scheme for the provision of nationwide cellular service."). And in setting its technical standards for personal wireless services, the FCC sought to provide as much flexibility as possible to wireless carriers, rather than impose specific technological preferences. *See, e.g.*, *In the Matter of*

*Amendment of the Commission's Rules to Establish New Personal Commc'ns Servs.*, 8 F.C.C.R. 7700, 7755 (¶ 136) (1993) ("*PCS Service Rule Order*") (explaining that in adopting a "flexible approach" to technical standards for personal communications services and devices "we have tried to provide the maximum flexibility in technical standards so as to allow the new service to develop in the most rapid, economically feasible, diverse manner").

Further, "[t]he Commission and the federal courts have consistently found that the Commission's authority in the area of [radio frequency interference, or "RFI"] is exclusive and any attempt by State or local governments to regulate in the area of RFI is preempted." *In re Petition of Cingular Wireless LLC for a Declaratory Ruling that Provisions of the Anne Arundel County Zoning Ordinance are Preempted*, 18 F.C.C.R. 13126, 13132 (¶ 13) (2003). The FCC has determined that *any* use of zoning regulations to curtail RFI is preempted by federal law. *Id.* at 13136 (¶ 19).

### B.      The Town Cannot Impose Technological or Operational Standards on Wireless Carriers.

Chapter 251 is rife with challenges to this exclusive federal control of wireless services. Indeed, the intent and effect of Chapter 251 is to give the Town control over the ways in which wireless networks in the Town are designed, engineered, constructed, and operated. Accordingly, the entire Chapter 251 scheme is preempted. Specific examples of Chapter 251's pervasive efforts to regulate technological and operational standards are set forth below, including the Town's attempt to: control the network technologies that the Wireless Carriers employ, dictate what qualitative level of service constitutes "adequate service," regulate radio frequency interference, and regulate the level of radio frequency emissions.

1.    The Town Cannot Control the Network Technologies that the Wireless
Carriers Employ.

The Town of Clarkstown has interfered with the exclusive authority of the federal government to create and enforce wireless technical standards.  Chapter 251 creates a "zoning" preference for certain wireless technologies that is so substantial that it amounts to a *de facto* requirement that the Wireless Carriers use such technologies.  Indeed, Chapter 251 expressly establishes criteria for approving siting applications for wireless facilities based on the *type of technology* used by the applicant.  *See* Clarkstown Town Code, § 251-10(E) (expressly stating that the use of "alternate technology, including but not limited to, distributed antenna systems (DAS) and microcells, is declared to be preferred over conventional tower sites"); *id.* § 251-15(A) (establishing a streamlined category for those applications that, among other things, use "preferred alternate technology (DAS, microcells)"); *id.* § 251-19(G)(9) (for Category C and D sites, requiring submission of a report demonstrating the applicant's review of alternate technologies such as microcells or DAS, "demonstrating in detail the technological reason to justify why alternate technologies cannot be utilized").

On the face of its ordinance, the Town has conceded that "DAS," "micro cells" and "stealth technologies" are "alternate technologies" from the Wireless Carriers' traditional infrastructure.  The Town also asserts the right to weigh in on the relative appropriateness of technologies in each particular application.  It is difficult to imagine a more direct attempt by a local government to regulate the technical and operational aspects of wireless network deployment.

The bias towards the Town's "preferred technology" is overwhelming, and readily evident in the site-screening tool used in Chapter 251.  The tool relies on a matrix of eleven (11) evaluation criteria to determine the Category (A, B, C, D) for the proposed wireless site facility.

The objective for the applicant is to have its site classified as a Category A site, since that site receives the least scrutiny by the Town.  Showing its preference for technology such as an outdoor distributed antenna system ("DAS") over other technology choices, the Town set the site-screening tool up so that these "preferred" installations immediately get a score of 30 for "Installation Type," and only need another 30 points, 3 of the 10 remaining criteria, to be included in Category A.  In contrast, if the site consists of antennas co-located on an existing wireless transmission facility,[6] which is the least intrusive of all, or the site consists of antennas co-located on a building rooftop, it only gets a score of 10 for "Installation Type" and needs another 95 points (10 of the 10 remaining criteria) to be included in Category A,. *Id.* § 251-15(A), Table 1.  Indeed, the Town has set it up so that it will be extremely difficult for these co-locations to meet the remaining ten (10) criteria since one of those ten (10) remaining criteria which will need to be fulfilled is not even defined but reads "Other Potential Impacts," and another requires landscaping, which is irrelevant when the applicant is only affecting the rooftop and there may not even be any property available to do so.

In addition, Chapter 251's heavy preference for DAS, which involves placing low power antennas on utility poles and streetlights, may not solve the RF coverage objectives of a site, as DAS does not provide the same type of deep and wide wireless coverage that can be achieved using a monopole.  Using DAS creates other technical challenges for wireless service providers, as well, such as problems getting suitable space on poles and increasing exposure to service

---

[6] Though one section of Chapter 251 purports to create a more streamlined application process for collocation, Clarkstown Town Code, § 251-11(E), that section in fact imposes an amorphous set of requirements that make it unclear (1) when the exemption applies and (2) even if the exemption does apply whether the process will be any less cumbersome.  For example, all of the procedures in Chapter 251 appear to apply to antenna collocation even when the exemption applies: "[t]o the extent antennas are being collocated, the consolidated, shared or co-used antenna facility [must] compl[y] with the conditions set forth in this Chapter."  *Id.* § 251-11(E)(3).  Further, applications for facilities seeking collocation appear subject to the various requirements imposed by Chapter 251 in that the table used for categorization of sites upon pre-application itself assigns points for collocation.  *Id.* § 251, Table 1.

interruptions, as poles and streetlights are more vulnerable to damage by cars, ice and other environmental factors. Further, this preference for DAS may require wireless carriers to build in municipal rights-of-way and use municipally-owned facilities, such as streetlights. Forcing wireless carriers to use public rights-of-way would allow the Town to impose various rights-of-way franchises and fees, thereby subjecting the wireless carriers to numerous additional layers of bureaucracy and burdensome requirements. *See, e.g., TCG New York*, 305 F.3d at 71 (city required provider to apply for franchise in order to use the rights of way, and imposed numerous unlawful conditions as part of franchise process); *NextG Networks of New York, Inc. v. City of New York*, No. 03 CIV 9672, 2006 WL 538189 (S.D.N.Y. Mar. 6, 2006) (city imposed franchise requirement for placing wireless antennas on city-owned poles, and charged substantial fees to successful franchisees); *City of Rome v. Verizon New York, Inc.*, No. 32-02-0174, slip op. at 4 (N.Y. Sup. Ct. Jan. 24, 2006) (city attempted to impose new franchise requirements on incumbent telecommunications provider in order to remain in the rights-of-way, claiming that prior franchise had expired), *aff'd*, 34 A.D.3d 1279, *leave to appeal denied*, 37 A.D.3d 1208.

In addition to running afoul of both express and field preemption, the Town's technological dictates conflict with the FCC's expressed preference to provide carriers maximum flexibility in designing and building their networks. A federal agency's decision to allow regulated entities a range of options in complying with the agency's directives has its own preemptive effect, and precludes state or local governments from regulating in a fashion that would restrict those choices. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (Department of Transportation's decision to allow a mix of technologies in complying with passive restraint requirement implicitly preempted tort suit that would have required the use of airbags).

2.    The Town Cannot Dictate What Qualitative Level of Service Constitutes
"Adequate Service."

Chapter 251 also purports to dictate to the Wireless Carriers what constitutes adequate radio signal strength (equal to or below "-84 dBM").  *Id.* § 251-13(A)(12), -19(F)(27).   The Town's signal strength limitations encapsulate the central theme of Chapter 251:  the Town's attempt to impose its control on wireless deployment.  However, Congress and the FCC have made clear that regulation of wireless services is an exclusively federal endeavor.  Nowhere is this more true than radio frequency signal strength, over which the FCC exercises complete control.  *See*, *e.g.*, 47 U.S.C. § 303(c) (granting the FCC the authority to determine the power of each wireless station).

Moreover, the FCC has established a clear and express policy of allowing carriers to determine the best way to design and build their own facilities, *PCS Service Rules Order*, 8 F.C.C.R. at 7755 (¶ 136), and has expressly prohibited state and local governments from imposing technical regulations of precisely this type. *Use of the Bands 825-845 MHz and 870-890 MHz*, 86 F.C.C.2d at 503-05 (¶¶ 79, 82).  If the Town is allowed to dictate what constitutes "adequate service," the concept of exclusive federal control over technical and operational matters is rendered meaningless.  Such power, if it could be wielded by state and local governments, would gut the federal vision of a deregulated landscape governed primarily by competition.  The Chapter 251 scheme is thus antithetical to the federal regulatory scheme and is preempted. *Geier*, 529 U.S. at 881.

This intrusion on federal policy, particularly when coupled with the equipment and technology-related limitations discussed above, cannot stand in the face of federal law.  It is preempted by federal statute, by express agency action, by the broad field preemption discussed in detail above, and by conflict preemption.

3.     The Town Cannot Regulate Radio Frequency Interference.

"The Commission and the federal courts have consistently found that the Commission's authority in the area of [radio frequency interference, or "RFI"] is exclusive and any attempt by State or local governments to regulate in the area of RFI is preempted." *In re Petition of Cingular Wireless LLC for a Declaratory Ruling*, 18 F.C.C.R. at 13132 (¶ 13).   The FCC has specifically determined that any use of zoning regulations to curtail RFI is preempted by federal law. *Id*. at 13136 (¶ 19).  Similarly, the Second Circuit has held that "Congress intended that the FCC enjoy exclusive jurisdiction to regulate RF interference phenomena," *Freeman*, 204 F.3d at 321, and that as a result "federal law has preempted the field of RF interference regulation," *id.* at 320; *see also Southwestern Bell Wireless Inc.*, 199 F.3d at 1193 ("Congress intended federal regulation of RFI issues to be so pervasive as to occupy the field."); *Smith v. Calvary Educ. Broad. Network*, 783 S.W2d 533, 535 (Mo. Ct. App. 1990) (upholding dismissal of injunction action as preempted finding "that interference caused by radio transmission is . . . a technical matter and that the FCC's control thereof is exclusive").

Despite the clear recognition by both the FCC and the federal courts of the exclusive authority of the FCC, Chapter 251 attempts to impose local regulations on RFI.  *See, e.g.*, Clarkstown Town Code, § 251-10(T) ("proximity to . . . sensitive receptors" was one of the "[s]iting criteria" identified in enacting the recent amendments); *id.* § 251-11(E) (placing of antennas on existing structures contingent on lack of "interference" with existing equipment); *id.* § 251 19(F)(24) (applications for Category B, C and D sites must include certification that the proposed antennas "will not cause interference with existing telecommunications devices"); *id.* § 251-22(A)(3) (for new towers, requiring a demonstration that the "radio, television, telephone or reception of similar signals for nearby properties will not be disturbed or diminished").  Each of these provisions, and any other provision of Chapter 251 that purports to grant the Town the

power to regulate the technical parameters of wireless transmissions, is field preempted under the FCC's long-settled and exclusive jurisdiction over the technical aspects of wireless regulation and must, therefore, be struck down.

### C.    Chapter 251's Consideration of the Environmental Effects of RF Energy Explicitly Violates Section 332(c)(7)(B)(iv) of the Communications Act.

Section 332(c)(7)(B)(iv) of the Communications Act specifically provides that "[n]o state or local government or instrumentality thereof may regulate the placement, construction and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."  47 U.S.C. § 332(c)(7)(B)(iv).  The plain language of Section 332(c)(7)(B)(iv), which serves as a limit on the "preservation of local zoning authority" in Section 332, confirms that local governments have no authority to regulate the placement or operation of wireless facilities on the basis of the health or other effects of RF emissions as long as the facilities in question meet FCC guidelines.  *See Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 95 (2d Cir. 2000) (deferring to the FCC's interpretation of Section 332(c)(7)(B)(iv) as "preempting state and local governments from regulating, based on RF emissions, the operation of personal wireless service facilities that are in compliance with the FCC regulations concerning such emissions"); *EMR Network v. FCC*, 391 F.3d 269, 271, 274 (D.C. Cir. 2004) (upholding FCC's decision not to initiate an inquiry to revise its RF regulations) (citing *Cellular Phone Taskforce*, 205 F.3d at 90-92), *cert. denied*, 545 U.S. 1116 (2005); *see also Murray Order*, 2001 CA 008479 B at 14 ("On its face, [Section 332(c)(7)(B)(iv)] preempts state and local regulation

of wireless telephones that comply with whatever the FCC has promulgated as the radiofrequency standard.").[7]

Further, because, as explained above, the FCC is empowered to license and regulate the RF spectrum and devices transmitting RF signals, the FCC maintains that "it has long been settled that the FCC's regulation of 'technical matters' concerning frequency allocation is 'clearly exclusive' of state and local regulation."    Brief of the Federal Communications Commission as Amicus Curiae Supporting Defendants at 7, *Murray v. Motorola, Inc.*, CA No. 01-8479 B (D.C. Sup. Ct. Nov. 21, 2005) (Attached).  Specifically, the FCC has made clear that its policy judgments regulating RF emissions have preemptive force.  *Id.* at 19.  Because Congress has expressly authorized the FCC to enforce the Communications Act, including the promulgation of RF regulations that balance competing national priorities, the FCC's interpretation of its own regulations, including their preemptive force, is entitled to substantial deference from the courts.  Indeed, the Supreme Court has made clear that the agency's views regarding their preemptive force are entitled to "substantial weight," *Medtronic, Inc.,* 518 U.S. at 496, and can be "dispositive." *Id.* (quoting *Hillsborough County. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 714 (1985)).[8]

A local law, like Chapter 251, that requires a zoning board to consider the effects of RF as a gating factor in siting decisions facially violates Section 332(c)(7)(B)(iv) because, under

---

[7] Although 47 U.S.C. § 332(c)(7)(B)(iv) speaks broadly of the "environmental effects" of RF energy, the Second Circuit Court of Appeals has interpreted this phrase to include concerns about the health effects of RF energy.  *See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490 494, n.3 (2d Cir. 1999) ("[W]e believe that the terms ['environmental effects' and 'health concerns'] are interchangeable . . . .").

[8] The Supreme Court's analysis in *Geier*, 529 U.S. 861, applies squarely to this case.  Here, as in *Geier,* "Congress has delegated to [the agency] authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive." *Id.* at 883.  As a result, "[t]he agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements."  *Id.* (quoting *Medtronic,* 518 U.S. at 496).

such a law, there can be no set of zoning decisions that would not violate the statute's prohibition on "regulat[ing] the placement, construction and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions." *Id.* Courts have routinely applied Section 332(c)(7)(B)(iv) to preempt attempts to regulate federally-licensed wireless facilities on the basis of alleged environmental effects of RF emissions. *See, e.g.*, *Southwestern Bell Mobile Sys. Inc. v. Todd*, 244 F.3d 51, 57-58 (1st Cir. 2001) ("in regulating 'the placement, construction, and modification of personal wireless service facilities,' local authorities may not . . . [deny an application] based on the 'environmental effects of radio frequency emissions'") (citations omitted); *California RSA No. 4 v. Madera County*, 332 F. Supp. 2d 1291, 1302 (E.D. Cal. 2003) (local governments' decisions regarding the placement, construction and modification of wireless facilities must not be "based on the environmental effects of radio frequency emission to the extent that such facilities comply with the [FCC's] regulations"); *Goforth v. Smith*, 991 S.W.2d 579, 585 (Ark. 1999) ("[W]e conclude that the trial court correctly found that Congress has exercised its authority under the Supremacy Clause of the Constitution to preempt consideration of the environmental effects of radio emissions by the state.").

Chapter 251, however, requires wireless providers to submit extensive technical data and certifications related to RF emissions. For example, Chapter 251 requires carriers to certify that RF levels at the proposed site will be within Town-specified threshold levels, and provide "cumulative [RF] calculations … for the proposed and any pre-existing antennas *for ground level exposure points*," Clarkstown Town Code, § 251-19(F)(23) (emphasis added), whether or not the FCC requires such calculations. For sites within 100 feet of other sources of RF, Chapter 251 requires estimates of "maximum total exposure from all nearby stationary sources *and*

*comparison with relevant standards*," including "individual and ambient levels of exposure."  *Id.* § 251-21(A) (emphasis added).

For new towers, Chapter 251 requires a report by an RF engineer, health physicist, or other qualified professional as determined by the Planning Board which calculates "the maximum amount of nonionizing electromagnetic radiation (NIER) which will be emitted from the proposed wireless communications facility upon its installation," *id.* § 251-22, regardless of whether such calculations are required by the FCC's rules.  For facilities that are roof-mounted, co-located, or located in other public areas, Chapter 251 requires an "assessment of potential public exposure to [RF]," identifying maximum exposure level, the sites where that occurs, and RF levels at "specific locations of community interest, such as schools, residences or commercial buildings," *id.* § 251-23, again without regard to what is required by the FCC's rules.  Chapter 251 also requires recertification of RF compliance and resubmission of RF evidence when renewal is sought.  *See id.* § 251-37.

These requirements vastly exceed those imposed by the FCC for determining a facility's compliance with the Commission's Rules.  The Commission only requires that wireless carriers prepare an "Environmental Assessment" in very limited circumstances, such as when the facility is mounted less than 33 feet off the ground or on a building *and* the total power of all channels exceeds 1000 watts.  47 C.F.R. § 1.1307(b)(1).  "All other facilities, operations and transmitters are categorically excluded from making such studies or preparing an EA . . . ."  *Id.*  Cognizant of the concerns that local officials may have in ensuring that wireless facilities are safe, the FCC has promulgated a guide for local officials to use in determining whether proposed wireless facilities may present a compliance concern, or whether such facilities are "categorically excluded" from environmental evaluation under the FCC's Rules.  *See A Local Government*

44

*Official's Guide to Transmitting Antenna RF Emission Safety*, FCC (June 2, 2000), *available at* http://wireless.fcc.gov/siting/ FCC_LSGAC_RF_Guide.pdf ("Local Government Guide"). "Because categorically excluded facilities are unlikely to cause any exposure in excess of the FCC's guidelines, determination that a facility is categorically excluded should generally end the inquiry." *Id.* at 11. In sharp contrast to the complex requirements imposed by Chapter 251 on *all* applicants, the Local Government Guide suggests that municipalities adopt a simple, two page checklist that focuses on only the relevant characteristics (antenna type, height above ground, whether or not the antenna is mounted to a building, power levels and radio service) of the proposed facility. *Id.* at Appendix A.

The Town's requirements thus go well beyond "merely inquiring" about RF safety. *Town of Oyster Bay*, 166 F.3d at 495. The FCC has laid out a simple, easy and straightforward way for local authorities to ensure that there are no RF safety concerns with wireless facilities, which the Town could use if it only wished to make sure that applicants complied with FCC Rules. Chapter 251 goes well beyond this checklist and imposes an affirmative burden on the Wireless Carriers to conduct new and superfluous technical studies that have no purpose beyond making work for private municipal consultants[9] retained by the Town to review wireless applications and providing the Town with the means to regulate the placement of RF emitting facilities based on the Town's own judgment about the effects of RF emissions, in violation of Section 332(c)(7)(B)(iv)'s express prohibition of the consideration of the effects of RF emissions in zoning decisions.

Indeed, Chapter 251 requires that the Town use this information in making siting decisions. For example, the list of criteria for evaluating wireless facility applications under

---

[9] *E.g.*, Distributed Antenna System – DAS, http://www.steelintheair.com/Distributed-Antenna-Systems-DAS.html (advertising private consulting services for municipalities related to the use of DAS).

Chapter 251 includes a category entitled "Potential aesthetic and safety impacts on public assembly," under which a proposed facility is awarded more points based on its increasing "distance from schools, day-care facilities[,] etc."  Clarkstown Town Code, § 251, Table 1.  That the "safety impacts" contemplated by Chapter 251 are related to RF emissions rather than potential physical damage from a facility is clear from the distances involved.  A proposed facility receives maximum points for being more than 1000 feet away, half points for being between 500 and 1000 feet, and no points for being within 500 feet.  These distances are far too large to be concerned merely with potential damage from the collapse of a wireless tower, and in any event are factored into the scoring process regardless of whether a proposed wireless facility is a tower.  *See, e.g.*, *Town of Oyster Bay*, 166 F.3d at 491 ("Height requirements vary due to local topography, but usually fall in the range of 80'-150' above ground level.").  Moreover, the physical impact of wireless facilities is taken into consideration by another screening category entitled "New Towers – Fall Zone."  Clarkstown Town Code, § 251, Table 1.  Similarly, the only possible justification for Chapter 251's absolute prohibition on new structures within 350 feet of "child day-care center[s], , school[s], camp[s], public park[s] or playground[s]" without exception, *id.* § 251-29, is misplaced concern about the environmental effects of RF emissions.  These criteria compel the conclusion that Chapter 251 requires the Town to make decisions regarding "the placement, construction [or] modification of personal wireless service facilities" at least in part "on the basis of the environmental effects of radio frequency emissions,"  in clear violation of 47 U.S.C. § 332(c)(7)(B)(iv).

Even if the information-gathering tasks prescribed by Chapter 251 were not specifically designed to be used in the siting process (which they are), the comprehensiveness of these requirements and the fact that they are mandatory for all current and future applicants amount to

a "regulation" of the operation of wireless service facilities, *see Downey v. Allstate Ins. Co.*, 638 F. Supp. 322, 325 (S.D.N.Y. 1986) ("The New York Court of Appeals has construed the term 'rule or regulation' to embrace '*any kind of* legislative or quasilegislative [*sic*] norm or *prescription* which establishes a pattern or course of conduct for the future.'") (quoting *People v. Cull*, 176 N.E.2d 495 (1961) (emphasis added)), something that the FCC has specifically preempted state and local governments from undertaking pursuant to Section 332(c)(7)(B)(iv). *See Cellular Phone Taskforce*, 205 F.3d at 95.

Because of the long-standing history of federal regulation described above, Chapter 251 intrudes into a field reserved to the federal government and is thus preempted. In addition, each of the substantive requirements imposed by Chapter 251, including the preferences for "alternate" technologies, the regulation of field strength, the regulation of radio frequency interference, and the regulation of RF based on health effects, is specifically preempted by federal action or conflicts directly with federal law. There are thus multiple independent bases for finding each of these requirements preempted under federal law, and for striking down Chapter 251 in its entirety.

## III.    THE UNLAWFUL PROVISIONS OF CHAPTER 251 ARE NOT SEVERABLE.

The severability of provisions of a local law is a question of state law. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988); *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock,* 93 F.3d 68, 72 (2d Cir. 1996). Under New York law, whether an offending provision may be severed from the remainder of the statute requires an examination of both legislative intent regarding severability and whether the remaining provisions of the statute can function as a coherent whole. *People ex rel. Alpha Portland Cement Co. v. Knapp,* 129 N.E. 202 (1920); *Westinghouse Elec. Corp. v. Tully,* 470 N.E.2d 853 (1984).

Chapter 251 contains a severability clause that states: "Should any section, paragraph, sentence, clause, word or provision of this chapter be declared void, invalid or unenforceable, for any reason, such decision shall not affect the remaining portions of this chapter."  Clarkstown Town Code, § 251-43.  While a comprehensive severability clause may give evidence of the legislative intent regarding severability, a provision will not be severed if "the balance of the legislation is incapable of functioning independently [because] the valid and invalid provisions are so intertwined."  *National Adver. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991) (despite the statute's severability clause, the court invalidated the entire statute because "severance of the invalid sections would create a statute that is confusing and unworkable").

In this case, severability is not an issue because Chapter 251 *as a whole* imposes an unlawful approval scheme that violates Sections 253(a) and 332.  It is thus as a whole that Chapter 251 must be declared invalid.  Even if this were not the case, the individual, preempted provisions of Chapter 251 are so extensive and inseparably connected with and dependent upon, the other provisions in Chapter 251, that the remaining provisions cannot operate as a coherent or consistent regulatory framework.  For example, the invalidation of the arbitrary and open-ended process by which installation applications are sorted into Categories A, B, C or D would render the remainder of Chapter 251—which is premised on the division of applications into four categories—nonsensical.  Similarly, the elimination of the unlawful preference for DAS technology (or any other criterion for granting or withholding "points" under the categorization process) would so skew the sorting process that it would make the process inoperable in its current form.  Moreover, the comprehensive—and impermissible—regulation of RF emissions is so central to the purpose of Chapter 251, that it cannot be presumed that the Town would have enacted the Chapter without these and the other invalid provisions.  Finally, any remaining valid

provisions, standing alone, are incapable of meaningful application and do not accomplish the Town's legislative purpose. *See National Adver. Co.*, 942 F.2d at 148. The invalid provisions of Chapter 251 therefore cannot be severed and Chapter 251 must be declared invalid and unenforceable in its entirety.

## **<u>CONCLUSION</u>**

For the reasons set forth above, this Court should grant the Plaintiffs' motion for summary judgment.

Respectfully submitted,

By:      /s/ Andrew G. McBride
         Andrew G. McBride, Esq. (AM1966)
         John E. Barry, Esq. (JB 1776)
         Joshua S. Turner, Esq. (Pro Hac Vice)
         **WILEY REIN LLP**
         1776 K Street, NW
         Washington, DC 20006
         Tel.: 202.719.7000
         Fax: 202.719.7049
         **Attorneys for Plaintiff**
         **New York SMSA Limited Partnership d/b/a**
         **Verizon Wireless**

         Christopher B. Fisher, Esq. (CF 9494)
         **CUDDY & FEDER LLP**
         445 Hamilton Avenue, 14th Floor
         White Plains, New York 10601
         Tel.: 914.761.1300
         Fax: 914.761.5372
         **Attorney for Plaintiff**
         **New Cingular Wireless PCS, LLC**

         Gregory D. Meese, Esq. (GDM 8738)
         **PRICE, MEESE, SHULMAN &**
         **D'ARMINIO, P.C.**
         50 Tice Boulevard
         Woodcliff Lake, NJ 07677
         Tel: 201.391.3737
         **Attorney for Plaintiff**
         **Sprint Spectrum L.P.**

         Michael A. Lampert, Esq. (ML 1064)
         Karl J. Nelson, Esq. (Pro Hac Vice)
         **SAUL EWING, LLP**
         750 College Road East
         Suite 100
         Princeton, New Jersey 08540-6617
         Tel.: 609.452.3123
         Fax: 609.452.3125
         **Attorneys for Plaintiff**
         **Omnipoint Communications, Inc.**

Dated: This 11th day of January, 2008.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing **Plaintiffs' Motion for Summary Judgment** and **Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment** were filed via the Court's electronic filing system on January 11, 2008, with service by operation of the Court's electronic filing system to the following counsel of record:

Christopher B. Fisher, Esq. (CF 9494)
**CUDDY & FEDER LLP**
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel.: 914.761.1300
Fax: 914.761.5372

*Attorney for Plaintiff*
*New Cingular Wireless PCS, LLC*

Michael A. Lampert, Esq. (ML 1064)
Karl J. Nelson (Pro Hac Vice)
**SAUL EWING, LLP**
750 College Road East
Suite 100
Princeton, New Jersey 08540-6617
Tel.: 609.452.3123
Fax: 609.452.3125

*Attorneys for Plaintiff*
*Omnipoint Communications, Inc.*

Gregory D. Meese, Esq. (GDM 8738)
**PRICE, MEESE, SHULMAN &**
**D'ARMINIO, P.C.**
50 Tice Boulevard
Woodcliff Lake, NJ 07677
Tel: 201.391.3737

*Attorney for Plaintiff*
*Sprint Spectrum L.P.*

Megan Frances Carroll, Esq.
Edward M. Ross, Esq.
**ROSENBERG CALICA & BIRNEY LLP**
100 Garden City Plaza
Garden City, New York 11530
Tel.: 516.747.7400
Fax: 516.747.7480

*Attorneys for Defendants Town of Clarkstown and*
*Town Board of the Town of Clarkstown*

  /s/ Andrew G. McBride
Andrew G. McBride