# APPENDIX

# APPENDIX TABLE OF CONTENTS

Tab 1 ........... Order, *Murray v. Motorola, Inc.*, 2001 CA 008479 B (D.C. Sup. Ct., Aug. 24, 2007), *appeals docketed and consolidated*, Nos. 07-CV-1074 through 07-CV-1079 (Oct. 10, 2007).

Tab 2 ........... *Omnipoint Commc'ns, Inc. v. Vill. of Airmont*, Case No. 07-Civ-0473 (S.D.N.Y. April 18, 2007) (Brieant, J.).

Tab 3 ........... *City of Rome v. Verizon New York, Inc.*, No. 32-02-0174 (N.Y. Sup. Ct. Jan. 24, 2006).

Tab 4 ........... Brief of Federal Communications Commission as Amicus Curiae Supporting Defendants, *Murray v. Motorola, Inc.*, CA No. 01-8479 B (D.C. Sup. Ct. Nov. 21, 2005).

# TAB 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION


MICHAEL PATRICK MURRAY, *et al.*

             v.                           2001 CA 008479 B
                                            Calendar 3

MOTOROLA, INC., *et al.*

--------------------------------------------------

DINO SCHOFIELD,

             v.                           2002 CA 001371 A
                                            Calendar 3

MATSUSHITA ELECTRIC CORP. of
   AMERICA, *et al.*

--------------------------------------------------

PAMELA COCHRAN, *et al.*

             v.                           2002 CA 001369 A
                                            Calendar 3

AUDIOVOX COMMUNICATIONS
   CORP., *et al.*

--------------------------------------------------

DAVID KELLER,

             v.                           2002 CA 001372 A
                                            Calendar 3

NOKIA, INC., *et al.*

--------------------------------------------------

RICHARD SCHWAMB,

             v.                           2002 CA 001370 A
                                            Calendar 3

QUALCOMM, INC., *et al.*

-----------------------------------------------

BALDASSARE AGRO, *et al.*

          v.                           2002 CA 001368 A
                                           Calendar 3

MOTOROLA, INC., *et al.*

-----------------------------------------------

### MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS

In the group of cases captioned herein, each lawsuit was filed against a large group of manufacturers, marketers, and distributors of hand-held cellular telephones. The defendants also include professional organizations and unnamed others who are allegedly involved in one or more of the causes of action. In every case, the named plaintiffs are suing for money damages for injuries that they (and their spouses, in all but one case) attribute to the use of such hand-held telephones. The injuries that they allege include brain cancer, related illnesses, and loss of consortium by their spouses.

The purpose of this Memorandum Opinion and Order is to adjudicate the Motion to Dismiss filed by the defendants. These lawsuits do not comprise a class action. However, for purposes of judicial economy, this Court has consolidated the oral arguments because the dismissal issues and the attorneys are identical in all of the lawsuits. Although these cases commenced in the Superior Court, they are now before the Court on remand from earlier removal to the United States District Court. The cases were remanded to the Superior Court by the Hon. Catherine Blake, the United States District Judge to whom the case was assigned by the Judicial Panel for Multi-District Litigation ("MDL").

2

The Motion to Dismiss is based on various doctrines of federal preemption. For reasons of preemption, defendants argue that there is no lawful basis for litigating these claims in the Superior Court. This is an argument that is strictly a legal one, and the Court does not in any fashion attempt to weigh the underlying worth or truth of the claims.[1]

With the permission of the Court, the Federal Communications Commission has participated in this case as *amicus curiae*. It is appropriate for the Court to consider the views of the FCC, because that agency is the regulatory body with jurisdiction over the licensing of hand-held cellular telephones. The expertise of the agency is valuable, for self-evident reasons. The plaintiffs have their own arguments as to why there is no preemption and why they are entitled to litigate their claims in the local trial court. The arguments of the parties are sophisticated and well briefed, and the Court has fully considered them.

Based upon the following analysis, this Court concludes that the Motion to Dismiss has merit and that all of the Complaints must be dismissed with prejudice. There is only one reason for the dismissal, *i.e.* that the claims are preempted as a matter of law. This is not a close question. Having found that multiple alternative preemption doctrines are controlling, this Court has no discretion to allow the claims to proceed any further.

The Court's decision is best set forth by first explaining what the plaintiffs allege and by illuminating in detail what federal preemption law provides.

---

[1] A dismissal on grounds of federal preemption is considered to be a disposition on the merits, although it certainly does not turn on whether cellular phones actually cause cancer or any other health problem.

<u>CAUSES OF ACTION AMONG THE LAWSUITS</u>

All of the plaintiffs have listed the same, discrete causes of action in their

Complaints.  They are:  (1) "intentional fraud and misrepresentation,"  (2) "negligent

misrepresentation," (3) "strict product liability," (4) "failure to warn and defective

manufacture and design," (5) "negligence," (6) "breach of express warranty," (7) "breach

of implied warranty," (8) "conspiracy," (9) violations of the District of Columbia

Consumer Protection Act of 2000," (10) "civil battery," and (11) "loss of consortium."

Without question, the adjudication of preemption defenses requires close scrutiny

of the allegations themselves.  Allowing for certain personal details that vary somewhat

among the plaintiffs,[2] each Complaint is effectively the same. Therefore, to avoid

needless repetition in this opinion, the Court will quote from one Complaint as an

exemplar.  The Court will do so by referring to the Complaint in the case of *Michael*

*Patrick Murray and Patricia Ann Murray v. Motorola, Inc., et al.* Civil Action 01-8479

(hereinafter "Murray Compl.").   The Court's summary of the allegations in *Murray*

applies equally to the other lawsuits in this group.

At the outset of each Complaint, the plaintiff describes what he means by

"cellular wireless hand held telephones referred to as "cell phones."  The plaintiff states,

> Hand-held phones are not to be confused with
> cellular telephones [and/or] other communication devices
> permanently mounted in automobiles, trucks, and other
> public and/or private vehicles of all sorts and descriptions.
> The cell phones at issue in this case are wireless cell
> phones currently in widespread use through [*sic*] the United
> States and the world which are held up to the user's ear and

---

[2] For example, the lawsuit filed on behalf of plaintiff Schofield does not contain a claim for loss of
consortium.  The variations in personal details (such as descriptions of the physical illnesses or injuries) are
not relevant to the legal issues herein.

against the user's head, thereby causing serious, permanent
and debilitating catastrophic injuries to the user.

Murray Compl. at ¶1.

Significantly, the plaintiffs emphasize that the focus of their lawsuits is not
limited to the instruments or personal hardware alone. They say that "depending upon a
particular allegation," the hand held telephone "may also consist of the entire system(s)
used to transmit voice and/or data transmissions from and/or to the cell phone, including,
but not limited to, base stations, antennas, land lines, and switching offices, all of which
are necessary for the operation of a cell phone, as well as connection to and use of cell
phone networks." Murray Compl. at ¶2 (emphasis added).

Plaintiffs have sued the same broad and diverse set of defendants. The defendants
include manufacturers of cell phones, such as Motorola, Inc. and Qualcomm, Inc., as well
as corporations, such as Bell South and Cingular Wireless LLC, that are "engaged in the
sale and/or promotion" of cell phones and related equipment. Murray Compl. at ¶15.
These civil actions are also directed at virtually anyone else connected to the manufacture
and sale of these phones, even if their businesses exist only or primarily for associational
endeavors within the industry. Those defendants include, for example, the Institute of
Electrical and Electronic Engineers, Inc. ("IEEE") and the Telecommunications Industry
Association ("TIA"). Murray Compl. at ¶17, 19. Finally, the plaintiffs have sued
persons and entities whose identities are not even specified, *i.e.* "interlocking
corporations," partnerships and the like whose identities might only be revealed after
completing discovery. Murray Compl. at ¶20. Furthermore, the plaintiffs have sued a
representative "John Doe," denoting one or more unnamed individuals "who otherwise

5

participated with the named Defendants" in the actions described" in the Complaints. Murray Compl. at ¶21.

KEY FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

Understanding the preemption issues first requires dissecting the web of factual allegations that are common to all of the claims. The Court will summarize below the factual contentions underlying the theories of how the plaintiffs were injured. The Court will also illustrate how the plaintiffs characterize the relationships between and among the manufacturers, scientists, and government regulators.

**How the Plaintiff Was Injured**. Murray states that (as of the filing of the Complaint) he was a 34 year-old man suffering from brain cancer. He attributes various adverse health effects to "irradiation of his brain by radio frequency (RF) radiation which was emitted from cell phones to him as a user." Murray Compl. at ¶22. He alleges that he began using a cell phone in 1993 and reports that he underwent surgery associated with brain cancer in 1999, followed by "radiation therapy, chemotherapy and other therapies." Murray Compl. at ¶¶22, 24, 27. Despite such treatments, he alleges that he is "totally disabled." Murray Compl. at ¶23. He states, "As a result of using these cell phones, [he] was exposed to non-ionizing non-heat effect radio frequency radiation (hereinafter referred to as 'RF radiation') which caused the aforementioned adverse health effects and thereby caused the devastation that he and his family has had to bear." Murray Compl. at ¶29.

The plaintiff sets forth his opinion as to how the cell phones injured him. He alleges the following:

The power density of RF radiation from a cell phone is approximately two billion times greater than occurs naturally in the environment.   Because the cell phone [is] used next to the head, the RF radiation penetrates two and one half (2½) inches or more into the brain.  A portion of the brain is enveloped in RF radiation from the front to the back of the skull.  This area is called 'the plume.'

The cellular transmit frequencies are very absorptive and penetrate deep into the tissue where heating effects occur.  Medical equipment used for hypothermia/diathermy treatments use nearby frequencies (750 MHz and 915 MHz) because they are ideally suited for delivering heat deep into the brain without causing any skin heating.

The thermal effects of RF radiation are well established.  These thermal effects are by the specific absorption rate ('SAR'), which represents a value of energy absorption per unit when a human body is exposed to electromagnetic waves.

Murphy Compl. at ¶¶35-37.

The plaintiff also attempts to establish a causal connection between cell phone use and damage to the brain by describing so-called "hot spots."  He surmises:

'Hot spots' are created by the convergence of airwaves by reason of reflection and refraction off of the irregular surfaces of the human head and attenuation by passage through different layers of skin, fat, bone, etc ., much like a magnifying glass can focus the rays of the sun.  These hot spots are as much as 200 times higher [than] the RF radiation level from the cell phone and results in harmful heating of the brain.  Use of a cell phone in a vehicle increases the level of RF exposure, and metal-framed eyeglasses, mental implants, orthodontic braces and metallic jewelry worn about the head may modify the radiation absorption also resulting in 'hot spots' of high energy concentration in the brain.

Murray Compl. at ¶38.

**Workings of the Cell Phone Industry**.  The plaintiff presents his surmise as to how the entire cell phone industry does business – and how all defendants allegedly contributed to his injury.  One defendant that is prominently featured in this theory is the Cellular Telecommunications and Internet Association ("CTIA"), located in the District of Columbia.  According to the plaintiff, CTIA "is engaged in the establishment of safety standards of Cell Phones, cellular telephone equipment and transmission services and represented the safety in the use of Cell Phones to the Plaintiffs and to cellular telephone owners and users nationally and internationally . . . ."  Murray Compl. at ¶18.

The plaintiff states:

> The cell phone market operates in a classic oligopolistic fashion.  Almost all cell phones are purchased directly from cell phone companies or through one of their agents.  Cellular service and cell phones are sold as a package and in the package, the price of the cell phone is fixed below cost in order to discourage any cell phone manufacturers from trying to sell directly to consumers.  Agents are given a rebate to cover the below cost sale of the cell phone.  This tying arrangement gives cell phone companies, together with CTIA de facto control over the cell phone equipment market and the power to accept or reject cell phones that do not meet their specifications.

Murray Compl. at ¶34.

**Allegations Concerning Health Risks**.  In weaving their theories of liability, the plaintiffs recite what the various defendants allegedly knew about safety issues and what they allegedly ignored.  The plaintiffs state:

> The Defendants' testing, both before and after the introduction of cell phones in 1986, revealed that cell phones could not pass the then current SAR safety standards established by independent and government agencies.  The Defendants ignored these safety standards on the absurd and baseless ground that 'the peculiar nature of the electromagnetic energy' in close proximity to the

8

> human head prevented radiation from entering the brain.
> Relatively inexpensive design changes could have been
> made to reduce or eliminate the penetration of RF radiation
> into the brain of the user.  Defendants' [*sic*] elected to
> produce cell phones without addressing the RF radiation
> problem.

Murray Compl. at ¶39.

The plaintiffs accuse the defendants of having longstanding knowledge of the

health risks associated with use of hand-held cell phones, and they accuse the defendants

of ignoring such expert data and opinions.  For the sake of brevity, this Court will not

make a repetitious quotation of such data that is cataloged in the Complaint.  The

Complaint includes a vast enumeration of scholarly articles, summaries of scientific

research, commentary in the scientific press, etc., spanning the period of 1928 to 1997.  It

suffices to say that all of the cohort plaintiffs rely on an identical, lengthy, and detailed

cataloging of such materials.  They are set forth in each Complaint as one paragraph

consisting of 41 sub-paragraphs, engulfing many pages of each Complaint.  *See* Murray

Compl. at ¶42(a)-(oo).

**Plaintiff's Conspiracy Theory**.  The plaintiffs accuse the defendants -- even the

non-manufacturers -- of working together to suppress knowledge of certain health risks,

impliedly to increase their profits and economic success with cell phones.  The plaintiff

states:

> For fear that the findings of adverse health effects
> by use of cell phones might damage market development,
> the Defendants' [*sic*] conspired to alter the results of
> studies to make them more 'market friendly,' and acted to
> conceal and suppress information from the public.
> Researchers who discovered adverse effects associated with
> cell phone use, [*sic*] lost their funding, were fired, found
> their reputation damaged, and had their work denigrated.
> Motorola researchers concealed from the public the

enhancement effects of antennas and the efficiency with
which antennas deposit energy into brain tissue.

Almost all of the research funding concerning RF
radiation comes from the wireless industry. In instances
where there have been adverse findings, the Defendants
have worked to prevent funding to replicate that study.
This is part of Defendants' larger effort to 'create and
control the science' and introduce confounders in the way
of researchers. . . .

Murray Compl. at ¶¶43, 44.

**Plaintiff's Accusations Regarding Manipulation of Regulatory Agencies or**

**Fraud Upon the Agencies**.  The keystone of each Complaint is the allegation that the

defendants attempted to manipulate the federal government, as well as "independent"

entities related to regulation of the cell phone industry.  Plaintiff states:

Defendants simply introduced cell phones into the
market without any prior oversight from any governmental
agency and without testing for environmental or adverse
health consequences from electric fields, magnetic fields
and electromagnetic melds generated by this equipment.
Once done, the Defendants set about to co-op [*sic*] the
federal agencies which had the jurisdiction to force the
industry to prove the safety of cell phones. . . .

Murray Compl. at ¶45 (emphasis added).[3]

Where private research entities are concerned, the plaintiff alleged that one such

defendant, IEEE, effectively manipulated both the Federal Communications Commission

and the private-sector entity known as the American National Standards Institute

("ANSI").  The ANSI, according to the plaintiff, seeks to enhance the "global

competitiveness" of business in the United States by "promoting voluntary consensus

standards." Plaintiff believes that "many of Defendants' officers and employees are

members of the IEEE."   Murray Compl. at ¶45(b).  Plaintiff's specific accusation is that

---

[3] The Court infers that the plaintiff's reference to "co-op" is actually an accusation of "co-opting."

operatives of the "cell phone industry manipulated the research and pressured members of the ANSI Safety Standard Committee to exempt cell phones from regulation and compliance under the ANSI standards." Murray Compl. at ¶45(d) (emphasis added). The underscored language emphasizes plaintiff's theory that IEEE and others duped the United States government by pressuring ANSI, which was the scientific entity on which the FCC relied in setting its RF standards. The plaintiff's use of the phrase "to exempt" is the important link between duping ANSI and duping the Federal Communications Commission. Ostensibly, the link evolved because ANSI, of course, had no independent authority to "exempt" anyone from anything.

The plaintiff alleges that in 1985 the FCC adopted the 1982 ANSI safety standards but exempted cell phones "based on data that they would not cause exposures in excess of the guidelines under normal and routine conditions of use." Murray Compl. at ¶45(c). Plaintiff further alleges that the cell phones introduced in 1986 could not have met those standards, if the FCC had extended them to cell phones. Murray Compl. at ¶45(c). Furthermore, the plaintiff contends that even though the FCC adopted newer ANSI standards issued in 1992, those standards also exempted cell phones "provided that they comply with certain specific absorption rate ('SAW') [*sic*] limits." Murray Compl. at ¶45(e).

Ultimately, the SAR standards for RF emissions are the focus of these lawsuits.

**Plaintiff's Allegations About the Failure to Properly Test Hand-Held Cellular Phones**. Plaintiff accuses the defendants of knowingly failing to conduct what plaintiff believes to be a "reasonable amount of testing" before releasing cell phones for

sale to the public. Murray Compl. at ¶46.  Plaintiff makes a direct attack on the very type

of testing that was mandated by the FCC.  Plaintiff states:

> After the FCC established a maximum SAR
> standard on August 1, 1996 it allowed cell phone
> manufacturers to self certify their cell phones as within the
> SAR limits.

Murray Compl. at ¶47.

Plaintiff alleges that the defendants "are well aware" that SAR test results can be

"easily manipulated" and that they have used certain variables "to report SAR values

which are below actual values and that such actual values exceed the SAR limits

established by the FCC."  Murray Compl. at ¶¶48, 51.

**Allegations Concerning the Ability to Reduce or Eliminate Health Risks**.

Reciting a lengthy description of various scientific patents, the plaintiff alleges that the

defendants "were aware of numerous solutions that could virtually eliminate the health

hazards of radiation from cell phones," that defendants could have used them "at a

minimal cost but instead engaged in a cost benefit analysis balancing human lives and

health against corporate profits . . . ."  Murray Compl. at ¶52.  The patents are described

in 14 subparts of this paragraph of the Complaint.

**Plaintiff's Theories of Misrepresentation**.  The plaintiff postulates that the

defendants engaged in "misrepresentation and failure to disclose" in several ways.  One,

he alleges that their "strategy has been to aggressively market and sell cell phones and

related services by misleading and misinforming potential users about the products and

by failing to protect users from serious dangers, which Defendants knew or should have

known directly to result from the use of their products."  Murray Compl. at ¶55.  Plaintiff

alleges that the defendants accomplished this goal by false advertising that "sought to

create the image and impression that the use of cell phones was safe with no potential for biological harm to the user."  Murray Compl. at ¶57.

Two, plaintiff also accuses the defendants of  "downplaying, understating, and/or not stating the known adverse and serious health effects . . . [and deceiving potential users] through promotional literature . . . testimonials . . . and by manipulating statistics to suggest widespread acceptability . . . Murray Compl. at ¶58.

Three, plaintiff further contends that the defendants "continue to manipulate the science" and intentionally conceal from the public certain facts about SAR testing, such as the fact that it "does not test for non-ionizing radiation or for 'hot spots.' "  Murray Compl. at ¶¶ 60, 61(f).

Following a summary of the concepts of federal preemption, this Court will specifically apply those concepts to the causes of action herein.

<u>THE BASIC CONCEPTS OF FEDERAL PREEMPTION</u>

The United States Court of Appeals for the Seventh Circuit, as one of many circuits to do so, has summarized the fundamentals of what federal preemption involves.

> The principle of preemption arises from the Supremacy Clause of the Constitution which states that 'the Laws of the United States . . . shall be the supreme Law of the Land. . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' U.S. Const. art. VI. 'Pursuant to this authority, Congress may preempt state law.' *Chambers v. Osteonics Corp*., 109 F.3d 1243, 1246 (7th Cir. 1997).  'A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption.'  *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002); *see also Hoagland v. Town of Clear Lake, Ind*., 415 F.3d 693 (7th Cir. 2005).

*McMullen v. Medtronic, Inc*., 421 F.3d 482, 486-87 (7th Cir. 2005).

The defendants rely upon all three distinct theories of federal pre-emption:  (1) "express preemption;" (2) "conflict preemption;" and (3) "federal primacy over the field" of technical regulation of wireless telephones.  Herein below, this Court will summarize the legal authorities that define each type of pre-emption.

One, the "express preemption doctrine" is premised upon the specific decision of the United States Congress to prohibit state or local governments from regulating a particular enterprise or industry.  *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 382 (1992).  Where the cellular phone industry is concerned, there is no doubt that the Congress enacted an explicit statutory provision that preempts the kinds of claims made by the plaintiffs.  In the Telecommunications Act of 1996, the United States Code states:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added).  On its face, this federal law preempts state and local regulation of wireless telephones that comply with whatever the FCC has promulgated as the radiofrequency standard.  The defendants argue that the cellular telephones herein fall into this category.

Two, conflict preemption "comes into play any time a state law allegedly conflicts with federal law.[4]  If such a conflict exists, then the state law is preempted and

---

[4] The District of Columbia Court of Appeals recognizes that "[i]n general federal regulations have the same pre-emptive effect as federal statutes."  *Scarborough v. Winn Residential, L.L.P*.,  890 A.2d 249, 256 n. 5 (D.C. 2006).  The plaintiffs herein do not dispute this well-established principle.

must necessarily give way to federal law." *Vorhees v. Naper Aero Club, Inc*., 272 F.3d 398, 403 (7th Cir. 2001). The Council of the District of Columbia has not enacted local safety standards for cellular phones (hand-held or otherwise). However, the issue of conflict with local laws will be examined herein in light of the potential for a jury verdict that would conflict with federal standards.

Three, for many decades the United States Supreme Court has recognized the doctrine of preemption through legislative primacy. Congress is said to have occupied the field of a certain topic of regulation where the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). The defendants herein argue that the United States government has created "federal primacy over the areas of technical standards and competitive market structure for cellular service." *See In re an Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Sys*., 86 F.C.C.2d 469, 503-05, ¶¶79, 82 (1981) ("*Cellular Communications Systems I*").

<u>PROCEDURAL HISTORY OF THIS LITIGATION</u>

It is useful to describe the procedural history of how the instant group of lawsuits has evolved. All of the parties herein have made references to similar, but distinguishable litigation. Thus, it is helpful to describe similar MDL cases that raised some of the issues differently and in some respects more narrowly.

**The Present Cases**. The litigation of the instant cases commenced in 2001, when plaintiff Murray filed his Complaint on November 15 of that year. The other five

plaintiffs filed their Complaints on February 26, 2002.  They all removed their

Complaints to the United States District Court for the District of Columbia.  Pursuant to a

petition filed by the defendants herein, the Judicial Panel for Multidistrict Litigation

transferred the cases to the Hon. Catherine Blake of the United States District Court for

the District of Maryland on December 11, 2002.

　　　Other groups of plaintiffs from other parts of the United States brought litigation

known as *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 216

F.Supp.2d 474 (D. Md. 2002) ("*Wireless I*") and *In re Wireless Tel. Radio Frequency*

*Emissions Prods. Liab. Litig.*, 248 F.Supp.2d 452  (D. Md. 2003) ("*Wireless II*"), *rev'd*,

*Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir.), *cert. denied*, *Nokia, Inc.  v. Naquin*, 546

U.S. 998 (2005).[5]  For the sake of clarity, the Court will note that *Wireless I* and *Wireless*

*II* are actually two procedural rounds of the same litigation.[6]  The parties herein have

referred to them collectively by the surname of the lead plaintiff, "*Pinney*."

　　　The instant group of cases was addressed separately in the Multi-District

Litigation system in the decision known as *In re Wireless Tel. Radio Frequency*

*Emissions Prods. Liab. Litig.*, 327 F.Supp.2d 554 (D. Md. 2004) ("*Wireless III*").

　　　The fates of the two groups of litigants were different, as this Court will explain

*infra*, in more detail.

　　　**Similar But Distinguishable Cases**. In the *Pinney* litigation, Judge Blake's

merits decision was to dismiss the cases altogether on various grounds of defensive

preemption.  In *Wireless I*, Judge Blake resolved the threshold question of whether the

---

[5] A petition for writ of certiorari from this litigation was also denied in *Cellco P'ship v. Pinney*, 546 U.S. 998 (2005).

[6] They comprise five class actions from Maryland, Pennsylvania, New York, Georgia, and Louisiana.

District Court was the proper forum at all. Judge Blake concluded that it was, because the narrow and specific nature of the claims presented a "federal question" that required a federal forum for adjudication. In *Wireless, II*, Judge Blake then adjudicated the merits of the case by accepting the defendants' substantive arguments on defensive preemption. In comparison to the present cases, the scope of the litigation and the types of claims were much narrower in *Pinney*. It is relevant to parse these differences because the parties in the instant cases sharply debate whether the appellate fate of *Pinney* is controlling or even instructive.

In *Pinney*, all of the plaintiffs raised similar combinations of state law claims such as strict product liability (failure to warn, and design, or manufacturing defect), violations of state consumer protection laws, breach of implied warranties, negligence, fraud, fraud by concealment, and civil conspiracy). Yet, the *Pinney* cases were vastly different from the instant lawsuits. Judge Blake observed in *Pinney*,

> Plaintiffs purport to represent all cell phone purchasers who <u>have not been diagnosed</u> with brain-related diseases, and who were not provided with headsets when they purchased or leased their telephones. They allege that defendants have negligently and fraudulently endangered the consuming public by providing wireless phones without headsets, knowing that these phones emit unsafe levels of radio frequency ("RF") radiation. <u>Rather than seek a traditional tort or contract remedy on behalf of this strangely defined class,</u> however, plaintiffs ask their respective state courts to: (1) declare wireless phones that <u>are</u> in compliance with the FCC's safety regulations on radio frequency emissions 'unreasonably dangerous' under state law when sold without headsets; (2) enjoin defendants from selling FCC-compliant wireless phones without headsets; (3) order defendants to provide free headsets to all wireless telephone users; and (4) order defendants to provide 'warnings' to consumers about the 'dangers' of using FCC-compliant phones.

17

*Wireless I*, *supra*, at 479 (emphasis added).

Judge Blake declined to remand the *Pinney* cases to the state courts because the plaintiffs realistically had "only one goal – to challenge in state court the validity and sufficiency of the federal regulations on radio frequency radiation from wireless phones." *Id.* at 479. Judge Blake exercised federal subject matter jurisdiction over the *Pinney* cases because "plaintiffs' suits are a disguised attack on federal law in an area of national importance." *Id.*

In the second round of *Pinney*, Judge Blake granted the consolidated Motion to Dismiss on grounds of conflict preemption, never having to reach the alternative doctrines of express preemption and field preemption. *Wireless II*, *supra*, at 461.

In *Wireless III* (the instant cases), Judge Blake, rather than reaching the merits, remanded all of the cases in this group to the Superior Court of the District of Columbia, concluding that there were no grounds for exercising federal jurisdiction. The rationale for remanding the cases was that defendants simply had not demonstrated entitlement to a federal forum, even if the lawsuits implicated the federal scheme for regulating RF emissions.

In the present case, the defendants had argued to Judge Blake that removal was proper pursuant to 28 U.S.C. § 1442(a)(1). Under this statute, the defendants could avail themselves of a federal forum in which to defend against common law claims if they could show that their actions or failures to act were compelled or prevented by "color of federal law." They contended that because of the FCC's control over the cellular phone emissions standards, they were "acting under" federal officials. *Wireless III, supra*, at 562. Judge Blake concluded that in order to establish such grounds for removal, the

defendants would have to show "not only that the phones were manufactured according to FCC specifications, but also that the FCC restricted or prohibited them from providing additional safeguards or information to consumers." *Id*. at 563 (emphasis added). Judge Blake ruled that the defendants herein could not establish any such facts and that, for this reason alone, the removal to the United States District Court had been improper. *Id*.

## ANALYSIS OF THE PREEMPTION DOCTRINES AND THE COMMON CAUSES OF ACTION

Consideration of the dismissal arguments can be structured in any number of ways. However, the most practical approach is to examine each cause of action in the light of all three of the preemption doctrines. In some fashion, all three doctrines apply to each cause of action, some perhaps more obviously than others.

The clearest way to explain why all of the causes of action must be preempted is to begin by addressing those that most plainly conflict with the federal regulatory scheme. Thus, the Court will address the causes of action in an order that differs from the order in which they appear in the Complaints.

### A. Strict Product Liability

It is important to clarify that this claim is not a classic product liability claim, *i.e.* it is not an allegation that any defendant manufactured a product that actually did not comply with the existing legal standard that allowed its manufacturer to sell it to the public. Instead, although the plaintiff uses the label "strict product liability," the

necessary gravamen of the claim is an attack on the FCC's regulatory choice to set the safety standards of cellular phone RF emissions.

In the Complaint, the plaintiff states:

> Mr. Murray purchased [defendants'] goods and services from Defendants, without knowledge that the same were defective and dangerous. Had Mr. Murray been aware of the risk of biological damage arising out of the use of cell phones he would not have purchased a cell phone or subscribed to Defendants' cellular service . . . . Mr. Murray was injured as a result of the defective condition of Defendants' goods and services, said defect having existed at the time of manufacture of the products and continuing to exist, through and including the time of injury.

Murray Compl. at ¶¶90, 92.

The allegations quoted above do not stand alone or in a vacuum. Instead, they are specifically founded upon the plaintiff's lengthy theorizing about the FCC's choice to permit the defendants to self certify their compliance with FCC safety standards. The allegations are also based upon plaintiff's advocacy of the technical data that the FCC simply did not credit. These are the allegations set forth in some 49 pages of editorializing that is included by reference as the foundation for each cause of action in the Complaint.

To be sure, this "strict liability" cause of action is not an accusation that the defendants did a botched job of making a particular phone that was otherwise compliant with federal standards. Despite the way in which the cause of action is titled, this claim is nothing more than plaintiff's attacks on the regulatory system itself and the underlying standards that the FCC chose to promulgate. The plaintiff characterizes cell phones as

"defective and dangerous" only because they did not meet standards that he personally contends should have been -- but were not -- imposed by the FCC.

The defendants contend that all three preemption doctrines require the dismissal of this cause of action.  The Court concludes that the defendants are correct, based upon the following legal analysis of each doctrine.

To be clear, this Court incorporates by reference all three of the analyses herein below as to all 11 causes of action.  The Court's analyses need only be stated once.  The Court also, however, will address the causes of action separately, to account for certain nuances that vary from one cause of action to another.

**Doctrine of Express Preemption**.  Conceptually, the "expression" preemption by federal law is something that arises when there is a Congressional directive that precludes states and localities from playing a certain role.   Any claim in this Complaint (or the others) that is dependent upon attacking the FCC's emissions standard is a claim that cannot stand.  The Congress has spoken.  In the Telecommunications Act of 1996, the Congress wrote:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added).

Express preemption arises in more than one way.  The defendants have articulated the express preemption in two ways.

One, the relevant federal statute speaks for itself.   The Telecommunications Act of 1996 could not be more explicit.  Congress, being impressed with the economic value

of permitting rapid expansion of cellular technology and desiring to guard against an "inconsistent and, at times, conflicting patchwork of requirements," consciously decided to preclude any State or local government from curtailing or impeding the expansion of this industry.  H.R. Rep. No. 104-204, pt. 1 (1995).

In other words, Congress decided that the benefit of exclusive federal regulation to the public and to the economy was of paramount importance. The result was a decision to legislate full and exclusive federal authority to regulate the construction, placement and modification of all personal wireless service facilities, including the hand held hardware that is sold for retail use.  The FCC is the exclusive arbiter of what wireless services and equipment could be used and sold in the United States.  Indeed, it was in 1993 that the FCC commenced a rulemaking to decide whether to revise its standards in accordance with the ANSI's issuance of a revised RF exposure guideline in 1992.  See 11 F.C.C.R. 15123, 15127, ¶10 (1996).

The plaintiffs cannot be heard to deny that hand-held cellular phones are an integral part of the "provision of personal wireless services," regulated by the federal government.  47 U.S.C. § 332(c)(7)(C)(ii).  In his Complaint, the exemplar plaintiff explicitly stated:

> [T]he cell phone is not limited to the actual cellular wireless hand held telephone itself, but, depending upon a particular allegation, may also consist of the entire system(s) used to transmit voice and/or data transmissions from and/or to the cellphone, including, but not limited to, base stations, antennas, land lines, and switching offices, all of which are necessary for the operation of a cell phone, as well as connection to and use of the cell phone networks.

Murray Compl. at ¶2 (emphasis added).

Two, separate and apart from prohibiting state and local regulation of the "environmental effects" of radio emissions, the Congress has also specified another layer of federal preemption in the same legislation.  The Communications Act clearly states:

> No State or local government shall have any authority to regulate <u>the entry of</u> or the rates charged by any commercial mobile service . . . .

47 U.S.C. § 332(c)(3)(A) (emphasis added).

As the United States Court of Appeals for the Seventh Circuit has observed, entry regulation is exclusively "the province of federal regulators and courts."  *Bastien v. AT&T Wireless Servs., Inc*., 205 F.3d 983, 987 (7th Cir. 2000).

The meaning of the term "entry" requires a close look, because the depth, breadth or character of what is sought in a lawsuit can effectively prohibit the "entry" of a particular product or service provider.

There is no doubt that "entry" is denoted by the issuance of a federal license which, in turn, is earned when the applicant has established compliance with the "radiofrequency radiation exposure requirements . . . for both fundamental emissions and unwanted emissions."  47 C.F.R. § 24.52 (1996).  Therefore, any attempt to hold the defendants to a radio frequency standard higher than that required by the FCC is a barrier to entry into the marketplace.

Plaintiff effectively creates a barrier to entry into the market by extending this lawsuit to "the entire system(s) used to transmit voice and/or data transmissions from and/or to the cell phone, including, but not limited to, base stations, antennas, land lines, and switching offices . . . ."  Murray Compl. at ¶2.  Indeed, the cast of defendants embraces those who are not manufacturers or distributors of hand-held cell phones at all.

23

These lawsuits reach all facets of the wireless telephone market.  The plaintiffs have sued

persons and entities without even identifying them as having or needing an FCC license

in order to do whatever they do, *e.g.* the "ABC" corporation and "John Doe." Therefore,

the plaintiffs' attempt to create their own standards-based barrier knows no boundaries at

all.

At the risk of stating the obvious, the reason why these lawsuits pose a barrier to

market entry is that the use of potential jury verdicts based upon competing RF emissions

standards would create a new hurdle for participating in the market.[7]

The plaintiffs rely on faulty arguments on express preemption.  The plaintiffs

have filed a response styled as "Plaintiffs' Consolidated Opposition to Defendants'

Motion to Dismiss Plaintiffs' Complaints as Preempted by Federal Law" (hereinafter "Pl.

Brief").  This Court has considered carefully the arguments of the plaintiffs as to why

their claims are not expressly preempted.  Ultimately, their arguments are entirely faulty

and in some respects misleading.  The following problems emerge from the plaintiff's

response to the Motion to Dismiss.

*Plaintiffs attempt to retreat from the breadth of their claims, in an effort to escape*

*the reach of the Act's preemption language.*  The motion filed by the defendants alerted

the plaintiffs to how the sweeping nature of their lawsuit has invited the preemption

defense.  The plaintiffs have reacted by back peddling, *i.e.* seeking to disassociate

themselves from the breadth of their attack on everything and everybody connected to

---

[7] To be clear, a "barrier" is not necessarily an automatic bar to entering the market.  Indeed, the FCC's rules themselves are a barrier in the sense of being a system of requirements.  The point is that <u>competing</u> barriers from non-government sources will create a total lack of certainty as to what is legally permitted or required.  This is enough to thwart the intention of Congress to expedite and spread the availability of cellular phones faster and more simply than what would have occurred in the economy otherwise.

cellular telephones. In their Brief, the plaintiffs flatly deny that their claims pose a "direct challenge" to "the FCC standard based upon the 1992 ANSI guideline." They now attempt to portray the extensive factual allegations as mere "backdrop" or "background" for their claims. Plaintiffs' Consolidated Answer to Defendants' Motion to Dismiss (hereinafter "Pl. Brief") at 7, 40. They cannot remake their claims in their brief.

"It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co*., 745 F.2d 1101, 1107 (7th Cir. 1984). Moreover, because of additional considerations, the Court rejects the belated attempt to reformulate the Complaint. Defensive preemption arguments of the defendants require this Court to identify the realistic character of the claim, rather than relying on self-serving descriptions or labels. The Court must be guided by the familiar principle that "[t]he nature of a motion is determined by the relief sought, not by its label or caption." *Wallace v. Warehouse Employees Union #730*, 482 A.2d 801, 804 (D.C. 1984) (citations omitted). The principle that applies to a motion surely applies to a Complaint as well.

A preemption analysis requires a common sense distillation and categorization of what the plaintiffs state in their claims. This is not a speculative or difficult endeavor for the Court at all. This is because, unlike typical plaintiffs, those herein have bathed their claims in a conspicuous amount of editorializing and speechmaking within their Complaints. The lengthy historical discussion in the Complaint, carefully crafted and incorporated into each claim, leaves nothing to the imagination.

Each lawsuit herein is transparently a direct attack on the regulatory choices made by the Congress and the FCC, and this attack is at the core of each claim. As the Court

has already illustrated, the Complaints contain identical recitations of the scientific data that the plaintiffs assert should have been used by the FCC in promulgating the RF emissions standards.  In going to such lengths to criticize the agency's regulatory decisions, the Complaints gratuitously contain far more detail than what is needed for a safely terse claim.  For obvious reasons, most plaintiffs usually try to say as little as possible in their Complaints, so that they will not be held to their own statement later.

Instead of being a "short and plain statement of the grounds upon which the court's jurisdiction depends,"[8] each Complaint herein is a highly evolved polemic, attacking the agency's safety regulations and the agency's choice of which experts to consult.  In saying too much in their Complaints about the perceived evils of the industry and the duping of the federal government, the plaintiffs have pleaded more than enough to show that their own claims are preempted.  Effectively, they have pleaded themselves out of court.

*The plaintiffs incorrectly argue that the federal government does not in fact regulate the emissions that allegedly harmed them.*  Plaintiffs attempt to dodge the doctrine of express preemption by suggesting that the FCC simply does not regulate the source of the plaintiffs' injuries.  Plaintiffs argue that "their brain tumors and/or cancer stem from the <u>non-regulated</u> portion of RF emissions, specifically the <u>non-ionizing</u> non-heat radio frequency radiation, in addition to RF emissions . . . ." Pl. Brief at 23-24 (emphasis in original).

By making reference to "non-ionizing non-heat radio frequency radiation," the plaintiffs contend that there is no preemption problem of any kind. They are mistaken,

---

[8] Super. Ct. Civ. R. 8.

because the FCC did not fail to consider such emissions in its fundamental, regulatory role.  If anything, the agency consciously retained all of its options relating to regulation of non-thermal emissions.  Both thermal and non-thermal emissions are within the ambit of the FCC's authority.  The following points and authorities illustrate this fact.

In federal jurisprudence, the subject of regulating non-thermal emissions originally was addressed when other litigants complained about why the agency does not currently regulate those emissions. In the year 2000, the United States Court of Appeals for the Second Circuit had occasion to examine why it was not arbitrary or capricious for the FCC not to include non-thermal RF standards along with those that apply to thermal radio frequencies.  The Circuit spoke pointedly about why the agency did not waive its right and obligation to do so. *Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2nd Cir. 2000).  As the Second Circuit noted, the FCC knowingly adopted standards proposed by ANSI and the National Council on Radiation Protection and Measurements ("NCRP"), where such standards explicitly did not include non-thermal RF emissions.  However, it was not a matter of ignoring the non-thermal effects of RF radiation.  Rather, declining to include them in the standards at this point in time was not an accident or an implied waiver of jurisdiction; it was a conscious regulatory decision.

The Second Circuit emphasized the FCC's view that it would be impractical at that time to independently evaluate the significance of certain biological studies.  *Id.* at 90.  The FCC had determined, "This is especially true for such controversial issues as non-thermal effects and whether certain individuals might be 'hypersensitive' or 'electrosensitive.' "  *Id.* (*quoting In re Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 322(c)(7)(B)(v) of the Communications*

*Act of 1934*, 12 F.C.C.R. 13494, 13505, ¶31) ("Second Order").  The FCC followed the conclusions of both ANSI and NCRP, and ANSI had concluded that " 'no reliable scientific data exist indicating that nonthermal . . . exposure may be meaningfully related to human health' and concluded that its exposure standard 'should be safe for all.' " *Id*. For its part, NCRP determined that "the existence of non-thermal effects 'is clouded by a host of conflicting reports and opinions.' " *Id.*

　　The Second Circuit further observed that the way in which the FCC exercised its regulatory discretion was two-fold.  One, the agency chose to rely presently on the recommendations of ANSI and NCRP that separate standards for non-thermal emissions were not necessary.  Two, the agency chose to stay involved in potential regulation, by deciding to " 'consider amending [its] rules <u>at any appropriate time</u> if these [working groups of ANSI and NCRP] conclude that such action is desirable.' " *Id.* (emphasis added).

　　More recently, the fact that the FCC did not waive its authority over non-thermal emissions was highlighted by the United States Court of Appeals for the District of Columbia Circuit.  The District of Columbia Circuit rejected a challenge to the sufficiency of the FCC's RF regulation of non-thermal emissions.  *See EMR Network v. FCC*, 364 U.S. App. D.C. 20, 22-25, 391 F.3d 269, 271-74 (2004). In the litigation of *EMR*, the EMR Network had petitioned the FCC to initiate an inquiry into the need to revise the regulations to specifically address "non-thermal effects" of RF emissions from cellular phones.

　　In *EMR*, the District of Columbia Circuit confronted the question of whether the FCC failed to fulfill its duty to examine the environmental impact of choosing not to

broadly regulate "non-thermal" emissions from radio frequencies of cellular telephones

when allegedly "new" evidence of danger was suggested.  Finding no breach of this

statutory duty, the Circuit observed,

> Section 102(2)(C) of NEPA requires a federal
> agency to prepare an Environmental Impact Statement
> ('EIS') as part of any 'proposals for legislation and other
> major Federal actions significantly affecting the quality of
> the human environment.' In appropriate cases an agency
> can instead prepare an Environmental Assessment followed
> by a Finding of No Significant Impact.

*Id*. at 23, 391 F.3d at 272.

In the decision of *Cellular Phone Taskforce v. FCC, supra*, the Second Circuit

earlier had concluded that the FCC had "functionally" satisfied the NEPA requirements

when it made its latest revision of the RF radiation rules.  *Cellular Phone Taskforce,

supra*, at 94-95.  The District of Columbia Circuit similarly concluded that the FCC

complied with its NEPA responsibilities when it relied on "other government agencies

and non-governmental expert organization with specific expertise on the health effects of

RF radiation."  *EMR, supra*, at 24, 391 F.3d at 273.

While *EMR* is not a decision on the discrete subject of pre-emption, it is important

for two reasons.  One, it highlights the legitimacy of the FCC's affirmative decision to

hold in abeyance -- but not to abandon -- regulation of non-thermal emissions.  Part and

parcel of regulating is the conscious decision to delay issuing specific regulations for a

particular reason.  The District of Columbia Circuit recognized as much when it observed

that

> as the Environmental Protection Agency is 'the agency
> with primacy in evaluating environmental impacts,' the
> FCC's decision not to leap in, at a time when the EPA (and
> other agencies) saw no compelling case for action, appears

> to represent the sort of priority-setting in the use of agency resources that is least subject to second-guessing by courts. Finally, the Commission's determination to keep an eye on developments in other expert agencies suggests that here, as in *Cellular Phone Taskforce*, the Commission has an adequate 'mechanism in place for accommodating changes in scientific knowledge.'

*EMR*, *supra*, at 24, 391 F.3d at 273 (citations omitted) (quoting *Cellular Phone Taskforce*, *supra*, at 91).

Two, the decision in *EMR* is a cogent appellate discussion of the Commission's sophisticated history of "occupation of the field" of the regulating RF emissions. *See* further discussion, *infra*, regarding the doctrine of "field preemption."

In its *amicus* brief before this Court, the FCC confirmed the Second Circuit's explanation as to why there is currently no non-thermal FCC emission standard. Importantly, the FCC points out the following:

> The preemption proposals that the agency rejected in those orders were much broader than the preemption at issue here; they would have encompassed all RF transmitting sources, not just personal wireless service sources. Moreover, preemption was unnecessary in that context because no actual conflict was brought to the agency's attention at that time. Here, by contrast, plaintiffs are bringing claims that conflict directly with the Commission's determination that its regulations reflect the proper balance between the need to protect the health of the public and the need to allow communications services to be provided to the public in an efficient and practical manner.

Brief of FCC at 17 n. 7 (emphasis added) (citations omitted). See further discussion herein, *infra*, regarding field preemption and the lack of any waiver of the FCC's regulatory role.

*Plaintiffs incorrectly assert that the "law of the case" doctrine precludes dismissal of their claims.* The plaintiffs argue that when Judge Blake remanded the

instant cases to the Superior Court in 2004, she ruled against the defendants on their

identical preemption defense.  The core of the plaintiffs' argument is as follows:

> In reviewing the Congressional intent and express
> language of the FCA, Judge Blake held that the instant
> cases clearly are not preempted by federal law.  Indeed,
> Judge Blake rejected Defendants' argument, which is
> exactly the same as raised herein, that the express
> [preemption] provisions of the FCA preempt Plaintiffs'
> claims. Rather, Judge Blake held that the instant cases do
> not fit within the narrowly-drawn provisions of Sections
> 332(c)(3)(A) and 332(c)(7)(B)(iv), the very same Sections
> which Defendants yet again contend in their instant Motion
> expressly preempt Plaintiffs' claims.  Judge Blake further
> held that Sections 332(c)(3)(A) and 332(c)(7)(B)(iv) of the
> FCA do not evidence Congressional intent to completely
> preempt state law claims.  Rather, Judge Blake found that
> the cited provisions of the FCA preserve significant
> authority for state and local governments, which is
> inconsistent with Defendants' suggestions of Congressional
> intent to completely preempt state law claims.  In fact,
> Judge Blake rejected Defendants' arguments that the FCA
> purportedly completely preempts Plaintiffs' claims because
> such claims purportedly seek to avoid the uniform
> determination of RF safety standards in a federal forum by
> bringing substantially similar actions in state court.

Pl. Brief at 11-12 (citations omitted).

Based upon a close analysis of Judge Blake's opinion in *Wireless III*,

understanding it in proper context, this Court is convinced that the plaintiffs have totally

misconstrued that decision and that the principles of "law of the case" do not apply in the

present litigation.

It is important to clarify what the "law of the case" doctrine actually involves, and

then to set forth why it does not apply to the present case.

"The law of the case doctrine prevents relitigation of the same issue in the same

case by courts of coordinate jurisdiction."  *Johnson v. Fairfax Vill. Condo., IV Unit*

*Owners Ass'n*, 641 A.2d 495, 503 (D.C. 1994).  "Generally, the doctrine is applicable

when:  (1) the prior ruling has 'sufficient finality'; and (2) the earlier ruling is not clearly

erroneous considering any new facts or a change in substantive law."  *Jung v. George*

*Washington Univ.*, 875 A.2d 95, 102 (D.C. 2005) (citation omitted) (quoting *Kritsidimas*

*v. Sheskin*, 411 A.2d 370, 372 (D.C. 1980*); see Pannell v. District of Columbia, 829 A.2d*

*474, 478* (D.C. 2003).  An interlocutory ruling, "by hypothesis is not final, and therefore

subject to reconsideration prior to the entry of a final judgment."  *Williams v. Vel Rey*

*Props., Inc.*, 699 A.2d 416, 419 (D.C. 1997) (citation omitted).

Justice Oliver Wendell Holmes observed that the "law of the case" doctrine

"merely expresses the practice of courts generally to refuse to reopen what has been

decided, not a limit to their power."  *Messinger v. Anderson*, 225 U.S. 436, 444 (1912).

The United States Court of Appeals for the Seventh Circuit observed, "Obviously we

cannot be expected to reverse a correct decision by one [trial] judge simply because we

find that it is contrary to a prior ruling by another [trial] judge in the same case, *i.e.*,

contrary to the law of the case*." Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794, 797

(7th Cir.), *cert. denied*, 368 U.S. 944  (1961).  The District of Columbia Court of Appeals

has taken the same approach, stating, "where views of the law expressed by a judge at

one stage of the proceedings differ from those of another at a different stage, the

important question is not whether there was a difference but which view was right."

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 593 (D.C. 2000).

Plaintiffs argue that granting the instant Motion to Dismiss is precluded by Judge

Blake's rejection of the "complete preemption" arguments of the defendants in *Wireless*

*III*.  Upon examination, plaintiffs' "law of the case" argument is legally frivolous.  Before

resolving this issue, the Court must pause to deconstruct what the plaintiffs are saying and to set forth why the plaintiffs are wrong.

It is important to understand precisely how Judge Blake distinguished the instant group of cases from others that were dismissed on "complete preemption" grounds.  First, the *Pinney* cases were not personal injury suits at all – a remarkable distinction from the *Murray* plaintiffs (also referred to as the *Morganroth* plaintiffs in Judge Blake's opinion). Despite having couched their claims in the language of tort and contract law, the *Pinney* plaintiffs made a rather blunt attack on the FCC regulations themselves and were chiefly concerned with injunctive relief and relief other than cash.[9]  For this reason, and others, Judge Blake concluded, "In many respects the arguments in favor of exercising jurisdiction over these complaints are just as strong as in the *Pinney* actions.  The Morganroth complaints involve distinguishable facts, however, requiring remand to state court."  *Wireless III*, *supra*, at 561.

Second, Judge Blake determined that removal to federal court in the *Morganroth* cases had been improper for a very specific reason.  The statute under which the removal was effectuated, 28 U.S.C. § 1442(a)(1), permits removal only by an "officer . . .  of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office."  Defendants are not federal officials.  Judge Blake wrote:

> In order to establish removal jurisdiction under this provision, the defendants must (1) raise a colorable federal defense to the plaintiffs' claims; (2) show that they were acting under the direction of a federal officer; and (3) demonstrate a causal nexus between plaintiffs' claims and acts they performed under color of federal authority.  As in the prior remand decision, the defendants have failed to meet the last two requirements.

---

[9] They demanded new headsets to use with their phones.

*Wireless III*, *supra*, at 562 (citations omitted).

Third, Judge Blake rejected the argument that the *Morganroth* lawsuits must be dismissed on the "complete preemption" theory.  This particular theory of preemption has no connection to the arguments now made by the defendants before the Superior Court. Judge Blake recognized, "The complete preemption doctrine serves as an exception to the well-pleaded complaint rule, allowing removal of a state claim 'when a federal statute <u>wholly displaces</u> the state-law cause of action.' "  *Id.* at 564 (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003) (emphasis added).  More precisely, Judge Blake focused on the all-important fact that the " 'proper inquiry focuses on whether Congress intended the federal cause of action to <u>be exclusive</u> rather than on whether Congress intended that the cause of action be removable.' "  *Id.* (quoting *Beneficial Nat'l Bank*, *supra*, at 9 n.5) (emphasis added).   In other words, the linchpin to "complete preemption" is proof that "a federal statute 'provide[s] the <u>exclusive</u> cause of action' for the claim."  *Id.* (quoting *Beneficial Nat'l Bank*, *supra*, at 8 n. 5) (emphasis added).

Judge Blake concluded, "The need for national uniformity in the regulation of cell phone RFR emissions <u>undoubtedly provides a strong argument for ordinary conflict preemption</u>, . . . but this factor is not sufficient to overcome the lack of Congressional intent and other factors weighing against a finding of <u>complete</u> preemption."  *Id.* at 565 (emphasis added).

It is not in any way surprising to this Court that Judge Blake rejected the "complete preemption" theory of dismissal and that Judge Blake remanded the instant cases to the Superior Court.  The Complaints in the *Murray* group not only involve common law torts, they involve one claim made pursuant to the District of Columbia

Code.  Obviously, there is no basis for saying that the instant cases involve "exclusively" federal causes of action.  For this reason alone, the "complete preemption" argument of the defendants was not going to prevail.

In retrospect, the instant cases clearly were appropriate for remand to the Superior Court, but not because the present dismissal arguments have no merit.  The realistic crux of Judge Blake's decision in *Wireless III* is that the parties were simply in the wrong courthouse.[10]  Fully recognizing that the present cases involve myriad common law claims and a local statutory claim, Judge Blake clearly left the litigation of "non-complete" preemption issues to the Superior Court of the District of Columbia.

The law of the case doctrine does not apply, and this is not a close question.  Judge Blake's ruling, when clearly understood and not taken out of context, was not a "final" determination of the preemption arguments set forth in the instant Motion to Dismiss.  Defendants do not in any way repeat before this Court their reliance on the "complete preemption" theory argued to Judge Blake.

The plaintiffs have twisted Judge Blake's ruling altogether, to use it in a manner that the District Judge most certainly did not intend.  The plaintiffs may or may not be purposely misstating the conclusions of Judge Blake, for strategic reasons.  At best, however, plaintiffs are utterly confused about the difference between "complete preemption" and what are called the "ordinary preemption" defenses herein.[11]

---

[10] For what it is worth, this Court would have reached the same conclusion.

[11] In *Wireless I,* Judge Blake provided a compact explanation of such possible confusion.  Judge Blake wrote:

> Due to its infrequent usage, the precise rules for finding complete preemption are unclear.  'The evolution of the doctrine . . . has been one of fits-and-starts and zig-zags and has, not surprisingly, occasioned both confusion and disagreement among the federal circuit and district courts.'  'The inclusion of the term 'preemption' within the

On balance, taking into account the full sweep of *Wireless I*, *Wireless II*, and *Wireless III*, it is clear that there is no reason under the "law of the case" doctrine to deny the instant Motion to Dismiss.

*Plaintiffs Are Not Persuasive in Relying Upon the Fourth Circuit's Reversal of the Dismissal in Wireless II.*  The plaintiffs insist that the appellate ruling in favor of the plaintiffs in *Pinney* should support denying the Motion to Dismiss in the present case. In *Pinney*, the Fourth Circuit reversed Judge Blake's dismissal of all five of the class actions on grounds of express preemption.  This Court is well aware of *Pinney* and the Court has considered whether that appellate decision must drive the disposition of the instant Complaints.  For several reasons, this Court concludes that the appellate decision in *Pinney* is not controlling herein.  In comparison to the other case law on federal preemption, the Fourth Circuit's decision is a jurisprudential oddity.  The following analysis compels that conclusion.

The keystone of the reversal was what the Fourth Circuit described as "a matter of first impression, whether a wireless telephone constitutes a 'facility' for purposes of § 332(c)(7)(B)(iv)."  *Pinney, supra*, at 454.  The Fourth Circuit concluded that it does not, writing that a wireless telephone "only accesses a wireless service provider's network of

---

doctrine's label, while not inaccurate, has enkindled a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption.' <u>Complete preemption is not triggered merely because a defendant successfully raises a federal preemption defense</u>.  To support an argument for removal based on complete preemption, a defendant must show not only that the plaintiff's claim is preempted under principles of federal law, but also that Congress intended to allow him to litigate the equivalent of his state claim in a federal forum.

*Wireless I*, *supra*, at 494 (citations for internal quotations and other citations omitted) (emphasis added).

coverage; a wireless telephone itself is not part of the underlying infrastructure." *Id*. at 455.

In *Pinney*, the Court Circuit recognized that the Federal Communications Act defines "personal wireless service facilities," as "facilities for the provision of personal wireless services." *Pinney*, *supra*, at 454, citing 47 U.S.C. § 332(c)(7)(C)(ii). Deeming this definition to be "circular," the Fourth Circuit initially observed that a dictionary definition "might arguably include a wireless telephone." *Id*. at 455. Nonetheless, the panel adopted a definition of "facilities" that only included "a structure or object, such as a base station or a mobile telephone switching office (MTSO) that falls within the states' zoning or land use authority." *Id*. It appears that the Fourth Circuit made this choice only because a passage in the Act entitled, "Preservation of local zoning authority" provides generally that "nothing [in the statute] shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." *Id*. at 455, quoting 47 U.S.C. § 332(c)(7)(A).

The language quoted above certainly allows states to regulate such matters as physical construction and land use. Nonetheless, the wording that follows the reference to "local zoning" also includes a reference to "personal" wireless service facilities. Moreover, such references cannot supplant the more specific language in the Act forbidding states and localities from predicating regulatory actions "on the basis of the environmental effects of radio frequency emissions" as is stated in the same Act. 47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added).

For several distinct reasons, this Court cannot agree with the analysis used by the Fourth Circuit in concluding that hand-held wireless cellular phones are not "facilities" within the meaning of the Federal Communications Act.

One, whether or not the *Pinney* plaintiffs did so in their own Complaints, the plaintiffs herein plainly do regard the hand-held phones as part of the overall cellular phone "facilities" regulated by the FCC. They are estopped from arguing otherwise, because the Fourth Circuit's interpretation of the term "facilities" cannot be reconciled with the definition that is specifically advocated by the plaintiffs. In the plain words of their own Complaints, the *Murray* plaintiffs have defined "the cell phone" to include "base stations, antennas, land lines, and switching offices, all of which are necessary for the operation of a cell phone, as well as connection to and use of cell phone networks." Murray Compl. at ¶2. This definition eliminates the relevance of the Fourth Circuit's definition of "facilities." In fact, the plaintiffs' theories of liability are dependent upon carefully woven assertions that the entire industry is inseparable from the cell phones themselves. The plaintiffs have said it to be true and in doing so, they have swept themselves into the preemption language of the Communications Act. They are hoisted by their own petard.[12]

---

[12] The familiar phrase "hoisted by his own petard" is an idiom denoting a person who is hurt by his or her own device or plot that was aimed at another. The phrase is often used by courts to recognize a party who is ensnared by his own admissions or whose claims are foreclosed by his own evidence. *See, e.g., Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 131 (1st Cir. 2006) (plaintiffs could not sustain claims for civil conspiracy and contract interference where they also alleged that the defendants and the corporate entities of the plaintiffs constituted one enterprise; appellate court rejected the notion that the defendants could interfere with their own contract if the plaintiffs' characterization were credited); *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997) (defendants' claim of a *Brady* violation was "defeated" by the ease with which they obtained on their own the evidence allegedly withheld by the prosecution).

Two, the Fourth Circuit (seemingly without briefing from the FCC) presumed that the term "facilities" only refers literally to buildables, such as towers. This Court rejects such a constricted definition of "facilities," not only because the plaintiffs have articulated a different definition of the term in their own Complaints, but also because the FCC, as *amicus*, has confirmed that the term is broader.

The agency confirms that physical components of the cellular telephone industry simply cannot operate except through interaction with the wireless phones. According to the FCC:

> Wireless telephone systems use RF emergency to provide subscribers a two-way communications service. Low-power radio transmitters <u>embedded in wireless telephones</u> enable callers to transmit a signal (containing a voice or other message) to 'base stations,' which then send the signal through the wireless network and often on to other telephone networks, to the person on the other end of the call. Base stations also transmit return message that are delivered through the network <u>and then pick up 'off the air' by the radio receivers embedded in wireless phones</u>.

Brief of the FCC at 5 (emphasis added).

Regulation of bricks and mortar "facilities" is not limited to where they are constructed. Their actual operation goes beyond the purely local issues of construction, etc. In this Court's view, the definition of "facilities for the provision of personal wireless services," embraces the standards by which the wireless phones operate.

Three, another underlying fault in the Fourth Circuit's opinion is that it ignores a larger and pivotal principle in the express preemption analysis. The trial court is obligated to recognize the bedrock mandate that Congress gave to the FCC, *i.e.* the directive to "maintain . . . control . . . over <u>all</u> the channels of radio transmission." 47 U.S.C. § 301 (emphasis added). All means all, not some or sometimes. It is not possible

to "maintain control" over wireless telephones as an entire "channel" of radio transmission if the point of usage is not totally under federal control.  The onus is not on the agency to continually hunt for statutory language that literally covers exemption issues from one detail of its operations to another.

There are even more reasons to reject the Circuit's decision in *Pinney*, on grounds that are not connected to its interpretation of the term "facilities" in the Federal Communications Act.

Significantly, the definitional debate between the parties about the term "facilities" is an unnecessary distraction (if not a red herring).  This is because the Federal Communications Act is not the only statute under which the FCC regulates the RF emissions in hand-held cellular phones.  In its Amicus Brief, the FCC points out that its more immediate mandate to regulate these emissions is the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq*.  Regulating RF emissions is not optional for the agency; it is an independent statutory duty.  The Commission states,

> In addition to implementing the policies underlying the Communications Act, the FCC is required under [NEPA] to evaluate the environmental effects of 'major' regulatory actions 'significantly affecting the quality of the human environment.'  In accordance with that obligation, the FCC has issued regulations to ensure that users of wireless telephones and the general public are not exposed to excessive levels of RF energy.  The FCC's regulations set RF exposure limits that are well below the levels that laboratory studies have shown can produce potentially harmful biological effects.  A wireless telephone provider cannot obtain the FCC's approval to sell or distribute telephones in the United States unless it complies with the FCC's RF safety standards or otherwise demonstrates on the basis of a detailed environmental analysis that FCC authorization is warranted.

40

Brief of FCC at 8-9 (citations and quotation omitted, emphasis added).

In this litigation of the Motion to Dismiss, the agency's separate authority -- and duty -- under NEPA is significant. This is because the NEPA basis for FCC regulation of cellular phones is obviously not dependent upon an interpretation of wireless "facilities" in the Communications Act. See further discussion, *infra*, regarding conflict preemption and field preemption.

Furthermore, in *Pinney*, the Fourth Circuit's discussion of preemption is limited to its interpretation of the doctrine of express preemption, and the opinion is silent on the other two, alternative preemption doctrines. Defendants are entitled to have this Court consider all of their preemption theories, not merely the one that was rejected in *Pinney*.

Finally, the Supreme Court's denial of the petition for writ of certiorari in *Pinney* is not fatal to the instant Motion to Dismiss. Plaintiffs argue that it is, but their argument falls flat. This Court cannot inflate the denial of the writ to a reliable affirmation of the correctness of the Fourth Circuit's decision. Petitions for writs of certiorari can be denied for a host of reasons that are not necessarily driven by the merits of the case or the depth of error that may have occurred.[13]  Indeed, the Supreme Court itself has warned that the denial of a petition for a writ of certiorari "imparts no implication or inference concerning the Court's view of the merits" of a case that it has chosen not to review. *Hughes Tool Co. v. Trans World Airlines, Inc*., 409 U.S. 363, 365 n. 1 (1973). To suggest that the preemption analysis in *Pinney* is controlling in the instant litigation is remarkably shallow.

---

[13] Typically, the Supreme Court does not publish the reason for denial of a Petition for Writ of Certiorari. Thus, the reason is left to speculation.

**Doctrine of Conflict Preemption**.  All of the claims are precluded because of the doctrine of conflict preemption.  This is especially clear where the claim on grounds of "strict liability" is concerned.  The conflict problem is manifested in the use of local tort claims and local consumer protection laws to reach a policy decision reserved to the FCC.

Local Jury Verdicts as a Form of Conflict with Federal Regulatory Law.   In the District of Columbia, neither the Legislative Branch of the local government nor the local Public Service Commission has ever purported to enact its own standards for radio frequency safety.  Nonetheless, the conflict with federal authority would come from a jury verdict in any one of these lawsuits.

Without question, the law recognizes local jury verdicts as a prohibited form of conflict with federal authority.  Appellate courts have made it quite clear that state or local tort claims whose underlying basis falls within a federal agency's scope of regulation cannot be maintained.  *See, e.g., Broyde v. Gotham Tower, Inc.*, 13 F.3d 994 (6th Cir. 1994) (nuisance claim for radio frequency interference preempted); *Fetterman v. Green*, 689 A.2d 289 (Pa. 1997) (same).

One of the most instructive articulations of conflict preemption was set forth by the United States Supreme Court in *Geier v. Am. Honda Motor Corp*., 529 U.S. 861 (2000).  The Supreme Court reiterated that local claims for damages, if successful, would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id*. at 873.  Certain aspects of the facts in *Geier* are relevant and helpful to the analysis herein.

In *Geier*, a plaintiff brought certain state law claims alleging that the lack of an airbag in her automobile constituted a "defect" in the vehicle as a product. However sympathetic this case may have been, the plaintiff could not overcome the fact that the relevant federal motor vehicle standard specifically permitted automakers to choose among different kinds of passive restraint systems. There, as here, no minimum standard was established but instead a single, uniform standard was adopted that balanced safety with the Nation's need for certain technology. In other words, the plaintiff in *Geier* sought, through a jury verdict, to impose upon car manufacturers an explicit duty to install airbags when in fact the regulating agency had decided not to impose such a requirement. The Supreme Court held that this lawsuit was prohibited under the doctrine of conflict preemption. *Id*. at 881.

Even before its opinion in *Geier,* the Supreme Court had repeatedly emphasized why it is impermissible to use state or local litigation as a platform for attacking federal regulatory choices. In a one pre-*Geier* case, Justice Breyer noted:

> The effects of the state agency regulation and the state tort suit are identical. To distinguish between them for pre-emption purposes would grant greater power (to set state standards 'different from, or in addition to,' federal standards) to a single state jury than to state officials acting through state administrative or legislative lawmaking processes.

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 504 (1996) (Breyer, J. concurring).

Justice Breyer's articulation of the problem was entirely consistent with the Supreme Court's earlier observation that local "regulation can be as effectively exerted through an award of damages as through some form of preventive relief." *Cipollone v. Liggett Group, Inc*., 505 U.S. 504, 521 (1992).

Here, the plaintiffs seek to impose (through jury verdicts) a standard for the RF emissions in hand-held cell phones that exceeds or is different from the existing federal standard.  The real character of these lawsuits is underscored not only by the internal breadth and detail of the allegations but also by what the Complaints do <u>not</u> include. They are not founded upon harm caused by telephone instruments that were bungled on the production line (such as a cane that is designed to be straight but which was crooked or bent when manufactured and sold).

Without doubt, the plaintiffs would ask juries to award damages for harm caused by telephones that should not have been on the market at all even if they met the prevailing federal emission standard.  No jury could make this decision without first finding fault with the FCC itself.  Juries cannot weigh the value or merits of public policy.  The law is clear that juries (whether federal or local) have no authority to render equitable relief or to decide questions of equity.  *See Nat'l Life Ins. Co. v. Silverman*, 147 U.S.App.D.C. 56, 61, 454 F.2d 899, 904 (1971).  Thus, any monetary verdict premised upon a jury's assessment of emission standards is a verdict that cannot stand.

As part of the oral argument, this Court asked both sides to address whether a jury, lacking equitable powers, would be competent to weigh and judge the public policy contentions that are suggested in the Complaint. For example, the Court pointed to the plaintiffs' suggestion (in Paragraph 47 of the Murray Complaint) that the FCC simply should not have permitted the manufacturers of the phones to "self-certify" that the phone met the prescribed RF standards.  The argument of the plaintiffs was non-responsive to the real issue because they merely offered a broad, disingenuous disclaimer that they are not in fact attempting to attack the FCC's regulatory system.   In their oral argument, the

plaintiffs retreated to declaring that they are simply avenging the "individual rights" of citizens by bringing these lawsuits.  This is an argument that evades the real issue, *i.e.* that local jury verdicts clashing with federal safety standards are an elegant example of conflict preemption.

Plaintiffs can find no shelter from dismissal in the statute's boilerplate savings clause and survival clause.  The plaintiffs have no effective counterweight of any kind to the doctrine of conflict preemption.  Essentially, the best argument they can muster is a reliance on two rather standard boilerplate passages in the Federal Communications Act.

First, they point to the so-called "savings clause" that appears in the Federal Communications Act of 1996.  That clause states:

> No state or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a state from regulating the other terms and conditions of commercial mobile services.

47 U.S.C. § 332(c)(3)(A) (emphasis added).

What constitutes "terms and conditions" of providing service is easy to determine.  As part of the legislative process itself, the relevant House Committee defined "terms and conditions" to embrace such bread-and-butter local matters as customer billing practices, zoning, and determining wholesale capacity.  H.R. Rep. No. 103-111, pt. 3 (1993).  Several federal courts have concluded that this is the very kind of state litigation that is broadly permitted.  *See, e.g., Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069, 1072-74 (7th Cir. 2004) (billing dispute); *Russell v. Sprint Corp*., 264 F.Supp.2d 955, 962 (D. Kan. 2003) (complaint about the amount charged to the customer); *Moriconi v. AT&T Wireless PCS*, 280 F.Supp.2d 867, 869-70 (E.D. Ark. 2003) (claims for consumer fraud in the

form of advertising and marketing deceptive calling plans).  The claims herein do not include gripes about poor reception, dropped calls, overbilling, etc.  Ultimately, the plaintiffs cannot cite even one case in which any form of attack on any radio frequency standard was deemed to be only a challenge to "terms and conditions" of service.

Second, the plaintiffs rely on what they describe as the catch-all "survival clause" of the Federal Communications Act, which states:

> Nothing in this Act contained [*sic*] shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C. § 414.

The "survival clause" quoted above cannot remotely serve as a basis for permitting the kinds of civil actions filed herein.  Elevating this clause to such a level would be to turn the entire concept of conflict preemption on its head.  Moreover, the reference therein to "remedies" denoted statutory "remedies" enacted by Congress for violations of the Communications Act.  Remedies "existing at common law or by statute" are all potentially subject to the various preemption doctrines anyway.  Indeed, this is the source of nearly all preemption jurisprudence.

Ironically, almost every case in which a court finds that a suit is preempted is one in which the federal statute in question had some type of savings clause or survival clause.  Therefore, the existence of such clauses is an inadequate and superficial basis for responding to a Motion to Dismiss.  See further discussion, *infra,* regarding the doctrine of "field preemption" and why no form of a "savings clause" or "survival clause" can neutralize the Commission's occupation of the field.

The federal agency that controls all radio frequencies has identified a conflict that invokes preemption of all claims herein.  The Federal Communications Commission, in its brief, fully recognizes that the present claims are in conflict with the agency's control of the entire system of operating cellular phones.  The agency's interpretation of conflict preemption is entitled to substantial weight and can be dispositive of the dismissal issue. As in *Geier*, "Congress has delegated to [the agency] authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive."  *Geier*, *supra*, at 883.  Herein, the agency has articulated very plainly that it regards the instant civil actions as invoking a direct conflict with the Commission's fundamental authority.

The Commission has stated on this record its interpretation of why the instant Motion to Dismiss must be granted.  The FCC contends:

> [T]he FCC respectfully disagrees with – and this Court should not follow – the Fourth Circuit's conclusion that the RF emissions from wireless phones that are sold in compliance with current FCC rules nevertheless may be deemed 'unreasonably dangerous' under state law, so that wireless carriers and equipment manufacturers potentially may be subject to civil liability on that basis.

Brief of FCC at 3.

The FCC emphasizes exactly where the conflict lies.  The agency states that its decision "on where to set 'safety margins' is a 'policy question,' in connection with which the agency legitimately took into account the objective of facilitating the efficient delivery of communications services."  Brief of FCC at 19.[14]  Whether the conflict

---

[14] Irrespective of the debate about the Fourth Circuit's application of the express preemption doctrine in *Pinney*, it is clear that the Fourth Circuit continues to apply the doctrine of conflict preemption in a manner fully consistent with the arguments of the defendants herein.  This is yet another reason why *Pinney* is not controlling on whether some form of preemption ultimately supports granting the instant Motion to

involves a potential jury verdict or a local regulation or statute, this Court will accord

persuasive weight to the FCC's interpretation of its statutory role. As the United States

Court of Appeals for the Eighth Circuit has reiterated, "the FCC's conclusions regarding

the conflicts between state regulation and federal policy deserve 'weight' – the agency

has a 'thorough understanding of its own [regulatory framework] and its objectives and is

uniquely qualified to comprehend the likely impact of state requirements.' " *Minn.*

*Public Utilities Comm'n v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007) (quoting *Geier v. Am.*

*Honda Motor Corp.*, *supra*, at 833) (internal quotations and citations omitted).

The strict liability claim, like all of the other claims, must be dismissed on

grounds of conflict preemption.

**Doctrine of Field Preemption or Preemption by Federal Primacy**. A third,

well-established doctrine of federal preemption is known as "field preemption" or

preemption by the agency's "primacy" on the regulatory topic in question. Courts are to

infer such preemption where a court finds a "scheme of federal regulation . . . so

pervasive as to make reasonable the inference that Congress left no room for the States to

supplement it," or where the regulations and statutes "touch a field in which the federal

interest is so dominant that the federal system will be assumed to preclude enforcement

---

Dismiss. The Fourth Circuit has spoken on conflict preemption most recently in the case of *Nat'l City Bank of Ind.. v. Turnbaugh*, 463 F.3d 325 (4th Cir. 2006). In *Turnbaugh*, the Fourth Circuit held that a lawsuit to prevent bank "visitation" and the limitation of adjustable rate mortgage loan penalties was preempted by the federal regulations promulgated under the National Bank Act. In affirming dismissal of this lawsuit, the Fourth Circuit reiterated the very points emphasized by the defendants herein, *i.e.* (1) that as long as an agency acts within its authority, federal law preempts any conflicting state law; (2) that an assumption of nonpreemption is not invoked when a state regulates in an area where the federal government has had an historical, significant presence; (3) that an agency's regulations have no less of a preemptive effect than its statute; and (4) that even if a federal statute is silent or ambiguous as to its reach, courts will defer to the agency's interpretation of its own statute as long as that interpretation is permissible and reasonable in light of the statute's text. *Id*. at 329-332.

of state laws on the same subject." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

If ever there were a field in which Congress had mandated the "primacy" of federal regulation, it is surely the control of radio frequencies. There is no room for argument on this point. Both the defendants and the FCC, in their briefing, have cited countless authorities to support this conclusion. *See, e.g.*, *Head v. N.M. Bd. Of Exam'ers in Optometry*, 374 U.S. 424, 430 n.6 (1963) (FCC's "jurisdiction over technical matters . . . is clearly exclusive."); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 702 (1984) (FCC has "exclusive jurisdiction over all operational aspects of cable communication, including signal carriage and technical standards."); *City of New York v. F.C.C.*, 486 U.S. 57, 62 (1988) (FCC has "established policy of preempting local regulation of technical signal quality standards for cable television."); *see also Southwestern Bell Wireless, Inc. v. Johnson County Bd. Of County Comm'rs*, 199 F.3d 1185, 1193 (10th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000) ("Congress intended federal regulation of [radio frequency interference] issues to be so pervasive as to occupy the field.")

Furthermore, a pervasive regulatory scheme is confirmed and highlighted where, as here, "various federal agencies have coordinated their power . . . in a uniform approach to the problem." *Cosmetic, Toiletry & Fragrance Ass'n v. State of Minnesota*, 440 F.Supp. 1216, 1223 (D. Minn. 1977), *aff'd*, 575 F.2d 1256 (8th Cir. 1978). It is clear that the FCC issued its RF emission standards only after consulting with the Food and Drug Administration. Judge Blake observed that "the FCC and the FDA share significant responsibility for the regulation of environmental, health, and safety matters related to [wireless phones]." *Wireless II*, *supra*, at 460. Indeed, the FCC affirmatively decided to

continue monitoring the views of other federal agencies on the safety of non-thermal emissions. *See EMR Network v. FCC, supra.*

The plaintiffs do not effectively articulate a reason for this Court not to apply the doctrine of field preemption. As a response to this aspect of the Motion to Dismiss, the plaintiffs rely upon confused and inapposite arguments. Certain prominent examples are highlighted as follows.

First, plaintiffs contend that there is a presumption against preemption where product liability is the issue. *See* Pl. Brief at 25. The plaintiffs are mistaken. The United States Supreme Court has stated that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000).[15] Rather, it is the opposite concept. The presumption against preemption is triggered where the field that Congress is said to have preempted has been traditionally occupied by the states. The presumption does not apply to the instant lawsuits, because it is obvious that no states or localities purport to regulate the safety standards for cellular phones.

Plaintiffs attempt to evade the defense of field preemption by recasting the entire issue as to whether the federal government has "occupied the field" of "product liability" in general. Pl. Brief at 25. This argument falls flat. Referring to products liability cases, plaintiffs argue that there is a "presumption against preemption" where the case involves an issue "traditionally occupied by state law." Pl. Brief at 25. In support of their position, the plaintiffs rely on the Fourth Circuit's opinion in *Worm v. Am. Cyanamid*

---

[15] In a post-*Pinney* decision, the Fourth Circuit most certainly recognizes and applies this principle from *Locke*. *See Nat'l City Bank of Ind. v. Turnbaugh, supra*, at 330.

*Co.*, 970 F.2d 1301 (4th Cir. 1992).  That appellate decision, however, does not actually

support the plaintiff's assertion of any such "presumption."

In *Worm*, the plaintiffs brought suit for damage to their corn crops, ostensibly

caused by certain pesticides.  The trial court dismissed the suit based upon the defense of

federal preemption.[16]  The United States Court of Appeals for the Fourth Circuit reversed

the lower court.  The reason for the reversal is quite understandable, but it is not critical

to the instant cases.  In *Worm*, the federal statute in question regulated something that

was not necessarily the basis for the lawsuit, *i.e.* it regulated what the manufacturers were

required to include in the labeling and packaging of the pesticides.  The labeling of the

pesticides in question provided timing instructions for applying the pesticide to certain

kinds of crops.  *Id*. at 1303.  The plaintiffs in *Worm*, however, may or may not have been

complaining about the labeling in the narrow sense of the term.  Rather, the practical

issue dissolved into whether the defendant adequately tested and manufactured the

product to avoid the "carryover effect" of the product remaining in the soil longer than

what was predicted.  *Id*. at 1304.

The Fourth Circuit, in *Worm*, remanded the case for further examination of the

character of the claims, as it would bear upon the preemption issue.  It was not entirely

clear that the gravamen of the lawsuit was purely a labeling dispute, as such.  A verdict

might or might not have intruded into the federal government's regulation of label

content.

The appellate decision in *Worm* does not drive the preemption debate in the

instant cases.  In contrast to the uncertainty of the claim in *Worm*, there is no claim herein

---

[16] The federal statute in question was the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136-136y (1988).

that does not rest upon the plaintiffs' dissatisfaction with the federal RF emission standards. Ultimately, nothing in *Worm* suggests that the relevant field of occupation is "products liability" in general. The argument of the plaintiffs is illusory.[17]

Plaintiffs cite numerous court decisions emphasizing that "the Communications Act should not supplant state law regarding claims that do no bear directly on rates or entry into the field of mobile telecommunication*." Union Ink Co. v. AT&T Corp*., 801 A.2d 361, 374 (N.J. 2002). Standing alone, this concept is a worthy one, but it does not apply to what the plaintiffs herein are actually seeking to do. The cases cited by the plaintiffs are easily distinguishable from the present scenario, and they offer no basis for denying the Motion to Dismiss.[18]

Where "field preemption" is concerned, the plaintiffs are not justified I relying upon the general savings clause of the Federal Communications Act, 47 U.S.C. § 332(c)(3)(A). Plaintiffs argue that "by providing the Savings Clause, Congress specifically provided for the preservation of existing statutory and common law claims, such as Plaintiffs' state law tort claims here." Pl. Brief at 29. However, in *Locke*, *supra*,

---

[17] Plaintiffs also attempt to fend off the field preemption doctrine by citing to the case of *Silkwood v. Kerr-McGee Corp*., 464 U.S. 238 (1984). There, the Supreme Court held that the award of punitive damages for injuries due to unintended exposure to nuclear material was not preempted under the rubric of field preemption. Writing for the majority, Justice White based the decision on unmistakable legislative history showing a Congressional assumption that state-law remedies "were available to those injured by nuclear incidents" and that Congress "was quite willing to accept" whatever "tension" might develop between State damage awards and the "exclusive" federal regulation of nuclear safety. *Id.* at 256. Such is not the case in the instant litigation, because there is no legislative history of a similar kind where the FCC is concerned. Thus, the *Silkwood* case offers no support for the plaintiffs.

[18] For example, in *Union Ink,* the plaintiff sued because of the provider's alleged misrepresentations about the "reliability" of its phone service. More precisely, the plaintiffs therein complained that the defendant had falsely advertised that its "Digital One Rate" would yield the "same quality of cellular phone service as [consumers] had with conventional, land-line phone service." *Id.* at 365. This is a retail service issue that surely has no connection to whether the type of phone involved should or should not be allowed "entry" into the marketplace. Consumer service gripes are all "post-entry" issues. In *Union Ink*, the problem was whether the service was as good as it was touted to be. This is entirely irrelevant to the kinds of claims in the instant cases, and this appellate decision is useless in a preemption debate.

Justice Kennedy has firmly debunked the notion that a mere savings clause can eliminate the application of field preemption in an area that is heavily and thoroughly regulated by a federal agency.  For good reasons, the Supreme Court is dismissive of reliance upon a savings clause to fend off a defense of federal preemption.  The Supreme Court's approach is worth a close look.

In *Locke*, a case that developed after the famous oil spill from the supertanker *Exxon Valdez,* lawsuits were filed for declaratory and injunctive relief from new state regulations covering tanker design, operating requirements, and the like.  The state of Washington had enacted legislation in the very same areas where the federal interest had been manifest.  The plaintiffs relied upon two savings clauses, found in Title I of the federal statute commonly known as the Oil Pollution Act of 1990.  Title I of the OPA specifically authorizes lawsuits for damages caused by tanker spills. In a nutshell, the savings clauses provided that nothing in the Act could 'be construed or interpreted as pre-empting the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to . . . the discharge of oil or other pollution by oil within such State . . . [or] to impose additional liability or additional requirements."  33 U.S.C. § 2718 (emphasis added).   Notably, the other Titles following Title I embraced the federal regulation of licensing, tanker construction, and other subjects that go beyond ordinary suits for damage to property and persons after a spill has occurred.  *Id.* at 105, 106.  Justice Kennedy concluded that the text of the statute "indicates no intent to allow States to impose wide-ranging regulation of the at-sea operation of tankers."  *Id*. at 106 (emphasis added).   Justice Kennedy explained "if Congress had intended to disrupt national uniformity in all of these matters, it would not

have done so by placement of the savings clauses in Title I." *Id*. The upshot of the Supreme Court's observation is that courts must not inflate a savings clause beyond its internal, rational purpose.

In the instant litigation, it is likewise prudent for this Court to interpret the cited savings clause and survival clause of the Federal Communications Act in a practical context. The Court must reject both clauses as an antidote to field preemption. This Court must do so because if Congress had intended to disrupt or balkanize the carefully crafted national uniformity of safety standards (while enacting them at the same time), it surely would not have done so by a routine savings clause or survival clause. Doing so in the Communications Act would have rendered the entire enterprise of regulating cellular phones a colossal waste.

Significantly, the United States Supreme Court already has rejected a claimant's reliance upon Section 414 of the Communications Act to neutralize a preemption defense. This Section, the so-called "survival clause," was touted by the plaintiffs as a loophole for filing these lawsuits. Congress rejected the loophole theory where a claimant sought to legitimatize local tort and contract claims that conflict with a tariff imposed by the Act. *Am. Tel. & Tel. Co. v. Central Office Tel., Inc*., 524 U.S. 214, 227 (1998). In concluding that Section 414 did not legitimize the lawsuits, the Supreme Court observed that Section 414  "preserves only those rights that are not inconsistent with the statutory . . . requirements [and] 'the act cannot be held to destroy itself.' " *Id*. at 228 (quoting *Texas & Pacific R. Co. v. Abilene Cotton Oil Co*., 204 U.S. 426, 446 (1907).

Finally, the concept of field preemption certainly applies where the agency in question not only uses its organic statute to regulate but also where Congress requires the

agency (under a separate statute) to account for the environmental impact of the regulatory choices.  Here, the appellate decision of *EMR Network v. FCC*, *supra*, is instructive.  Since this Court has highlighted it for a somewhat different purpose already, the Court will not quote from it repeatedly.  What is important is that *EMR* illustrates that the FCC has "occupied the field" of regulating RF emissions under two statutes (NEPA and the Federal Communications Act), not just one.

The FCC has consciously kept the "field" occupied where regulation of non-thermal emissions is concerned.  The FCC has explicitly left the door open to include – at any time it sees fit to re-open the rulemaking process – standards that reach non-thermal emissions.  This much is very clear from the appellate decisions in *EMR* and *Cellular Phone Taskforce.*   For these additional reasons, this Court must reject plaintiff's reliance on the "savings clause" and the "survival clause" as a refuge from dismissal.[19]

Plaintiffs make an unpersuasive attempt to shift the character of the claims, to avoid the effect of conflict preemption and preemption generally.  In their Brief filed in opposition to the Motion to Dismiss, the plaintiffs categorically assert, "Plaintiffs allege that Defendants' product was also defective inasmuch [as] such cell phones emitted RF radiation far in excess of the SAR standard. Complaint at ¶¶34, 47, 57."  Pl. Brief at 34 (emphasis in original).  This Court has scrutinized all three of the cited paragraphs of the Complaint, and the Court finds no such allegation at all.[20]  It is clear that the present

---

[19] While it is true that the Environmental Protection Agency is the ultimate federal authority on NEPA issues, it should not matter whether it is the EPA or the FCC that has "occupied the field" of making environmental policy decisions on RF emission standards.  It does not matter because they are both federal entities.  A defense of federal preemption should not pivot on which of several federal agencies has (or have) occupied the field in question, as long as the field is federally occupied.  Indeed, the Congress itself is the proverbial "occupier" of the field.

[20] Defendants have discovered the same misstatement, and they note it on page three of their reply pleading.

lawsuits are not based upon instances of <u>non-compliance</u> with existing federal standards or regulations.[21]

To summarize:  the strict product liability claim is preempted on grounds of express preemption because the Federal Communications Act expressly forbids state and local government from creating different emissions standards in the cellular phone industry.  This claim is also preempted on grounds of conflict preemption, because the law does not permit local juries to impose liability based upon safety standards that are different from those mandated or permitted by the FCC.  The strict liability claim is likewise preempted on grounds of field preemption because the FCC has occupied the field of regulating the safety standards for and the operation of hand-held cellular telephones.  This is done as occupying the broader field of regulating all radio frequency communication.

B. <u>Express Warranty</u>

All three preemption doctrines justify dismissal of the claim of breach of "express warranty."  This particular claim is that the plaintiffs' hand-held cellular phones were all inherently unsafe.  The link to "warranty" is the allegation that merely by offering and advertising the phones, the defendants "warranted" that the phones were safe.  The plaintiff articulates the claim as follows:

> Defendants expressly warranted, orally and in
> writing, that cell phones were safe for human usage.

---

[21] Ironically, it is the non-compliance with government standards that is a classic basis for tort litigation. *See, e.g., Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993) (a design defect can be established if the product fails to meet government or industry standards).

> Defendants' warranties constitute affirmations of fact, promises and descriptions regarding the quality and safety of their products and services.
>
> Defendants breached these warranties in that they failed to eliminate or minimize health hazards from the radiation fields by failure to incorporate safeguards in cell phones and failure to provide protective equipment and by inadequately training users as to the appropriate method of using a cell phone.
>
> The cell phones sold to and used by Mr. Murray do not conform to Defendants' express representations because they are not safe and have high potential for causing serious biological and health effects, including life threatening diseases.

Murray Compl. at ¶¶ 107-110.

Without doubt, the reference to failure to "eliminate or minimize health hazards" is nothing more than an allegation that the defendants marketed phones that did not conform to the scientific data described by the plaintiffs in their extensive editorial portion of their Complaints. The references to "failure to provide protective equipment" and "inadequate training" are an attempt to impose duties upon the defendants that are barriers to entry into the marketplace. The FCC most certainly does not require the defendants or anyone else to "train" citizens on how to use a cellphone. This claim, if successful, would impose on defendants requirements that are different from or in addition to applicable federal requirements. For this reason alone, the claim must be dismissed. *See McMullen v. Medtronic, Inc*., *infra,* in the discussion of the claim of "failure to warn."

The whole discussion of breach of warranty collapses into an impermissible invitation to a jury to trump the Federal Communications Commission. The scientific opinions (or speculation) rejected by the federal regulators – and supported by the

57

plaintiffs – are directly in conflict with the federal government's regulatory choices. Plainly, this presents a preemption defense in many respects.

## C. Breach of Implied Warranty

Here, as with the claim of breach of express warranty, the plaintiffs seek a jury verdict based upon an allegation that the defendants "marketed, sold, distributed and/or promoted cell phones and cellular services . . . [that were] not fit for their intended purpose and are unreasonably dangerous and unfit for that purpose."  Murray Compl. at ¶¶114, 117.  This claim is, like the express warranty claim, a rather obvious charge that the FCC should have adopted RF standards that are different from what the agency accepted.  The plaintiffs cannot transform this claim into one that does not implicate a preemption defense by asserting that the plaintiffs "relied upon the skill and judgment of Defendants as to whether the cell phones were of merchantable quality and safe and fit for their intended us[e]."  Murray Compl. at ¶115.  The defendants were not the final arbiters of the standard for "merchantable quality" at the point at which the products were licensed for entry into the marketplace.  The final arbiter, of course, was the Federal Communications Commission.

Because this claim cannot exist without evading and clashing with the decisions of the FCC, all three preemption doctrines ultimately apply.

## D. Intentional Fraud and Misrepresentation

No matter how it might be masked, fraud on the Agency is a preempted claim. The concept of "fraud on the agency" permeates the entirety of each lawsuit herein, not

merely the one claim of "Intentional Fraud and Misrepresentation."  The plaintiffs insist that they are only accusing the defendants of defrauding the plaintiffs personally.  Pl. Brief at 40-42.  However, this attempt to redesign their claims to respond to this Motion to Dismiss cannot withstand scrutiny.  For example, the plaintiffs argue in their Brief that they only included the extraordinary details of the history of the safety standards in their Complaints because "claims for fraud must be pleaded with particularity."  Pl. Brief at 41.  However, the fraud claims are not the only claims that explicitly rely upon the editorial attack on the FCC.  For better or for worse, the plaintiffs have carefully incorporated all of this material by reference as to each, individual claim.

Furthermore, in decrying how the defendants allegedly "introduced cell phones into the marketplace without any prior oversight from any governmental agency," etc., the plaintiffs bluntly charge:  "Once done, the Defendant set about to co-op[t] the federal agencies which had the jurisdiction to force the industry to prove the safety of cell phones . . . ."  Murray Compl. at ¶45.  Herein lies the charge of "fraud on the agency," whether or not the plaintiffs are willing to acknowledge the true nature of this allegation.  As far as the Motion to Dismiss is concerned, the plaintiffs pled the allegation; therefore, they own it.

To boot:  as the defendants argue in a Supplemental Memorandum, the plaintiffs have included more than one theory of "fraud on the agency."[22]  One, the plaintiffs charge that defendants intentionally manipulated certain scientific information considered by both the FCC and the FDA during the period surrounding the 1996 rulemaking. Murray Compl. at ¶45(a)-(e). Two, the plaintiffs allege that the defendants intentionally

---

[22] "Defendants' Supplemental Memorandum Regarding Denial of Certiorari by the Supreme Court in *Nokia, Inc. v Naquin*, No. 05-198" at 6-7.

manipulated certain test results in a way that hid actual SAR levels from the FCC – true levels that actually exceeded the RF standard that was promulgated.  Murray Compl. at ¶¶51, 64.  For all of these reasons, the plaintiffs cannot argue convincingly that their Complaints do not include allegations of "fraud on the agency."

The Supreme Court has held that federal law preempts any local tort claim based on allegedly fraudulent data being submitted to a federal agency regarding a consumer product.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001).  The opinion in *Buckman* was a case involving an industry regulated by the Food and Drug Administration ("FDA"), *i.e.* the manufacture of surgical screws.  There, the Supreme Court paused to elucidate the obvious, *i.e.* why state and local tort litigation cannot be used as a platform for attacking or rejecting federal regulatory standards.

The Court in *Buckman* observed that applying state tort concepts to product approval filings at the FDA distorts or compromises the entire filing process.  This is so because the disclosures of the applicants "although deemed appropriate by the Agency, will later be judged insufficient in state court."  *Id.* at 351.  The same principle must apply to the regulation of radio frequencies.

The law's treatment of "fraud on the agency" is unmistakable; it requires dismissal of the lawsuits herein on grounds of preemption.

E. <u>Negligent Misrepresentation</u>

The fatal preemption problem with this claim is actually no different from the problem with the warranty claims.  This claim is only another version of the same

determination to sue the defendants based upon disagreement with federal standards. The plaintiffs assert that defendants had a "duty to exercise ordinary and reasonable care when making representations as to the safety and usage of cell phones." Murray Compl. at ¶83. The reference to "making representations" undoubtedly alludes to advertising and marketing phones that were deemed to comply with FCC standards. The plaintiffs state: "In making misrepresentations of fact to the public, including Mr. Murray, Defendants failed to fulfill their duty to disclose all the material facts in a true and correct manner." Murray Compl. at ¶84.

The mention of a "duty to disclose" is an allegation that despite meeting FCC emissions standards the defendants nonetheless had some other "duty" to disclose to the public "material facts" now advocated by the plaintiffs. Holding defendants liable for failing to reveal these so-called "facts" is precisely a conflict that preemption law disallows.

The ever-present theme of suing defendants because their products do not comply with the scientific views of the plaintiffs is a firm basis for applying all three preemption doctrines.

F. <u>Negligence</u>

The claim of simple "negligence" has the dubious distinction of being the most obvious instance of suing the defendants as if they are the collective surrogates of the FCC. The exemplar plaintiff states:

> Defendants owed Mr. Murray the duty of ordinary
> and appropriate care in the testing, manufacture, quality
> assurance, quality control, distribution, advertising, sale,

provision of operating instructions and provision of the cell
phones.

Murray Compl. at ¶103.

According to the plaintiff, the failure to fulfill the "duty" took several forms.  For

example, the plaintiff charges that the defendants failed to disclose "health risks from cell

phones radiation fields which was already known at the time of marketing the product"

and by selling the phones "without adequate safeguards to protect the user."  Murray

Compl. at ¶103(b) and (c).

The wording of the claim is unmistakably an attack on the agency's decision to

accept the testing and research that was done in support of the RF standards that were

promulgated.  The very reason for preempting such claims is that Congress, through the

FCC, intended for the manufacturers and marketers of cellular phones to rely upon

compliance with federal standards as a green light to proceed without the interference of

exposure to liability.  Permitting these claims to go forward to trial would be to thwart the

fundamental intent of Congress.

The plaintiff's reference to allegedly inadequate "testing" is enough to reveal and

justify the preemption defense.  The FCC will not permit a manufacturer of a wireless

phone to bring that product to market unless and until that entity successfully complies

with a comprehensive testing requirement.  The agency publishes SAR regulations and

provides guidelines to the industry for executing the testing and submitting the data to the

FCC.[23]  The plaintiffs are foreclosed from quibbling about adequate testing where the

defendants are concerned.  Any claim based on testing that allegedly should have been

---

[23] Judge Blake has summarized all of this.  *Wireless III*, *supra*, at 561 n. 12.  This Court need not repeat that summary.

done is a mask for attacking the decision of the FCC to accept and mandate certain

testing.  Such attacks are preempted when made through lawsuits.

### G. Failure to Warn and Defective Misrepresentation

Essentially, the plaintiffs seek money damages based upon the defendants' failure

to "warn" plaintiffs about the dangerous nature of their hand-held phones.  Plaintiff states

in pertinent part:

> Despite the known risk of harm to consumers,
> Defendants failed to equip their cell phones with safeguards
> and protection against the RF radiation, which safeguards
> were available, and Defendants failed to provide protective
> devices such as, but not limited to, a headset or speaker
> phone adapter which should have been furnished as apart of
> the cell phone.
>
> The cell phones were defective in that they were
> marketed and sold without adequate testing and/or with
> knowledge that the test information was unreliable,
> inadequate or in error.
>
> Defendants failed to provide and include proper and
> necessary warnings regarding the potential adverse health
> effects associated with the use of cell phones that they
> knew, or should have known, posed the risk of injury to
> Mr. Murray.  Moreover, despite such knowledge,
> Defendants failed to properly instruct Mr. Murray
> concerning the use of cell phones so as to minimize the
> risk.

Murray Compl. at ¶¶96-98 (emphasis added).

The underlined passages quoted above contain giveaways to the preemption

problem that infects the entire claim.

First, the reappearing complaint about inadequate testing is certainly preempted as

a basis for this claim, for all the reasons previously set forth herein.

Second, the reference to "failure to instruct" is realistically a claim that the product should only have been marketed with certain labeling or instructions as part of the overall retail, packaged product.  In the present litigation, neither party has briefed the issue of what, if anything, the FCC requires or permits in terms of labeling or internal product instructions for hand-held cellular phones.  The Court is not stymied in any way by the absence of such briefing.  If in fact the FCC does not mandate any particular labels or warnings at all, the preemption problem is even worse than the problem presented by warnings that would be different from federally mandated warnings.  The same issue arises with respect to "instructions" that allegedly should have been included with the product itself.

One thing is clear:  even if the agency does not mandate certain labels or instructions – or if such required material does not say what the plaintiffs want it to say – all three preemption doctrines still apply.  Looking at another "failure to warn" claim (involving a medical device), one federal court observed,

> A claim that a manufacturer failed to provide an adequate warning at the time of sale would be based on the assertion that the manufacturer should have provided a different warning than the one approved by the [agency]. Such a state-law claim would impose a requirement that was different from, or in addition to, the applicable federal requirements and would be preempted.

*McMullen v. Medtronic, Inc.*, 421 F.3d 482, 488 (7th Cir. 2005).

As for "protective devices," the preemption doctrines all apply to this claim.  The plaintiffs have not disputed that the RF safety requirement is but one of the various "equipment authorizations" involved in the licensing process of the FCC.[24]  To the extent that the FCC does not require a retail sales package to include "devices" urged by the

---

[24] Defendants describe the authorizations on page 25 of their reply pleading.

plaintiffs, no local entity or local jury can legislate such a requirement. The imposition of liability based upon the failure to include specific extra devices for the operation of the phones would be a graphic and obvious intrusion upon the FCC's authority. *Id.*

In none of its facets can this claim survive the preemption defense. It runs afoul of express preemption because under the plaintiffs' very broad definition of the cell phone (as including the entire system), the requirements for the use of certain hardware would clearly constitute a barrier to entry into the marketplace. The claim violates the doctrine of conflict preemption because such additional requirements are either different from what is required by the agency or they conflict with the agency's decision to license the phones without any such additional equipment or instructions. Finally, the FCC has occupied the field of regulating what actually must or constitute a licensed, hand-held phone.

### H. <u>Violations of the District of Columbia Consumer Protection Act of 2000</u>

The local consumer protection statute is cited in the Complaint as a separate basis for suing the defendants for the identical conduct that is alleged in the other 10 causes of action. In fact, the plaintiff states that he incorporates by reference all 131 paragraphs of his Complaint. Murray Compl. at ¶132. Effectively, this statement confirms that the consumer protection complaint does not actually raise new issues at all, despite the liberal repetition of statutory terms of art such as "unfair methods of competition," "unfair or deceptive acts or practices."

For the sake of brevity, the Court will not pause to quote the entirety of this claim. It suffices to say that it sweeps together all of the accusations heretofore described, from

"making false [claims]" about the product's "standard, quality, or grade," to generally "misleading consumers." Murray Compl. at ¶134(b), (n). The only difference between filing suit under this statute and filing only the common law claims is that the local statute provides a basis for seeking attorneys' fees. Plaintiffs specifically do include such a demand in their Complaints. Murray Compl. at ¶135.

The use of statutory terms such as "unfair methods of competition," does not render the underlying allegations less vulnerable to dismissal. The factual underpinnings of the claims are all the same, even when tied to this statute.

Whatever preemption doctrines apply to any of the other claims, they apply equally to this Consumer Protection Act claim.

## I. <u>Conspiracy</u>

The plaintiff claims that the defendants "formed confederacies . . . to . . . market unreasonably dangerous and defective cell phones by collective means, including their collective conduct of suppressing their knowledge of the health hazards from exposure to radiation fields from cell phones, and of placing into the stream of commerce dangerously defective cell phones . . . without first proving that such cell phones were safe for public use, with an intent to defraud the public, including Mr. Murray." Murray Compl. at ¶120.

According to the plaintiff, the conspiracy included a number of overt acts, such as marketing phones "without proper tests or warnings," and "suppressing, discouraging and/or retarding appropriate research, testing, regulation and public dissemination of information concerning the radiation fields and the effects those emissions would have on

66

Mr. Murray." Murray Compl. at ¶121(a), (b). The claim includes a very pointed allegation that the conspirators "lobbied, pressured, deceived and mislead various government officials and standard setting bodies to prevent regulation and control of cell phones." Murray Compl at ¶124.

There is no doubt that this claim is nothing more than an unsubtle rehash of "fraud on the agency" and the ubiquitous, continuing criticism of the FCC's acceptance of certain testing. For these reasons, based upon the Court's overall analysis of the three preemption doctrines, this claim must be dismissed.


## J. <u>Civil Battery</u>

This claim is a catch-all allegation that the plaintiff has been injured by the entire range of contentions in the Complaint. The plaintiff incorporates by reference all of the paragraphs of the Complaint except for the claim of loss of consortium. Murray. Compl. at ¶141. There are no new facts alleged. The plaintiff states that the defendants "inflicted harmful or offensive contact to Mr. Murray by exposing him to radiation fields which they knew could cause biological changes and had the potential to cause permanent and significant health risks and effects." Murray Compl. at ¶142. This claim must be dismissed because it is subject to the same preemption defenses that apply to all preceding claims.

## K. <u>Loss of Consortium</u>

If, under any one preemption doctrine, the various personal injury claims herein must be dismissed, then the related "loss of consortium" claims on behalf of the various spouses also must fail as a matter of law.

Without question, a claim for loss of consortium is an independent cause of action.  Yet, it is equally beyond doubt that "[c]laims for loss of consortium are collateral to a spouse's claim for injuries; the two claims are tied together and the one (consortium) is dependent on the other (injuries)."  *Romer v. District of Columbia*, 449 A.2d 1097, 1101 (D.C. 1982).  The District of Columbia Court of Appeals has recognized the following important principle:

> It is clear . . . that a loss of consortium claim depends on whether the underlying claim of negligence against the defendant has been proven. *See Prins-Stairs v. Anden Group*, 655 A.2d 842, 843 (D.C. 1995) (holding that jury could reasonably have found that neither plaintiff's chronic back pain nor her husband's loss of consortium were proximately cause by the collision with defendant's employee*); Casper v. Barber & Ross Co*., 109 U.S. App. D.C. 395, 396 n.1, 288 F.2d 379, 380 n. 1 (1961) (spouse's damage claim for loss of consortium is dependent on plaintiff establishing that defendant was negligent).

*Massengale v. Pitts*, 737 A.2d 1029, 1033 (D.C. 1999).

The claims that underlie the consortium claims will never be "proven" since they are preempted altogether.  Having concluded that all of the tort claims are legally preempted, this Court likewise concludes as a matter of law that the loss of consortium claims are preempted.

<u>CONCLUSIONS</u>

There are three, distinct doctrines of federal preemption, any one of which would be sufficient to preclude each and every claim in these cases.  This Court is fully convinced that the defendants have established the grounds for preemption of all claims,

under all three of the doctrines.  Thus, all of the Complaints must be dismissed with

prejudice.

WHEREFORE, it is by the Court this 24th day of August 2007

ORDERED that the Motion to Dismiss filed on behalf of all defendants in each

civil action captioned herein is granted; and it is

FURTHER ORDERED that all causes of action in each civil action captioned

herein are dismissed with prejudice.

_____
Cheryl M. Long
Judge

Copies served electronically by Bearing Point (vendor) to all
    counsel registered in this case for service of orders

**TAB 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**OMNIPOINT COMMUNICATIONS, INC.,**

                        Plaintiff,

        -against-

**THE VILLAGE OF AIRMONT,** THE VILLAGE OF
AIRMONT PLANNING BOARD, PLANNING BOARD
CHAIRMAN DENNIS COHEN, THOMAS GULLA,
ED KENNEDY, DOUG WHIPPLE, KIRK BUDNICK,
and JACK BLUMENTHAL, constituting the Village
Planning Board, THE VILLAGE OF AIRMONT
BOARD OF TRUSTEES, and IAN SMITH in his
official capacity as building inspector,

                        Defendants.

**STIPULATION OF
SETTLEMENT AND ORDER**

**CIVIL ACTION NO.**
07 CIV 0473 (CLB)(LMS)
**ECF CASE**

**WHEREAS**, the above named plaintiff ("Plaintiff"), commenced this action on January 22,

2007, against the above named defendants ("Defendants"), seeking *inter alia* a Judgment and Order

finding that Plaintiff's application for a wireless communications facility at 53A Airmont Road

South, Village of Airmont, New York ("Property") had been unreasonably delayed and effectively

denied in violation of Plaintiff's rights under the Federal Telecommunications Act of 1996 ("TCA"),

as codified at 47 U.S.C. §332(c)(7)(B)(ii), and directing defendants to immediately issue any and all

local approvals necessary, including without limitation site plan approval and a building permit,

required to install and operate the federally licensed wireless communication facility which is the

focus of this action; and

1

WHEREAS, Plaintiff alleged that the fees charged to Plaintiff by the Defendants for review of Plaintiff's application by the Village's consultant, the Center for Municipal Solutions ("CMS"), are excessive and violate New York state law; and

WHEREAS, the parties to this action have agreed to settle this action, pursuant to the terms and conditions set forth herein; and

WHEREAS, all parties, intending to be legally bound, have consulted with their counsel and the undersigned counsel have the requisite authority and approval to enter this Stipulation of Settlement and Order; and

WHEREAS, the parties have agreed to resolve this matter pursuant to the following procedure and alternative solution.

## NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED BY THE PARTIES AND ORDERED BY THE COURT THAT:

1. Defendant Planning Board hereby adopts a negative declaration under the New York State Environmental Quality Review Act and unconditionally approves the site plan for Plaintiff's wireless communication facility (the "Facility") consisting of a stealth "flagpole" tower with antennas therein located therein at a centerline height one hundred feet (100') with the total height of the stealth flagpole, including the gold ball, not to exceed one hundred six (106') feet above ground level, and related equipment cabinets at the base thereof, and all findings required by the Airmont Village Code are hereby deemed made by the Planning Board. The flagpole tower shall be painted Bolt Brown, Sherwin Williams SW 4001. An American flag shall not be flown on the flagpole at night and night lighting of the flagpole shall not be permitted. An American flag may be flown during the day on regular federal, State and local holidays.

2. In addition to the screening shown on the site plan, Plaintiff agrees to screen the stealth "flagpole" tower with four (4) Norway Spruce coniferous trees, approximately twenty (20) to twenty-five (25) feet in height at the time of planting. Plaintiff shall maintain such plantings for a period of three (3) years.

3. No further municipal approvals, permits, or zoning applications, other than a building permit which shall be issued within ten (10) days of Plaintiff filing a building permit application

2

with the Village of Airmont Building Department, shall be required. If the building permit is not issued within ten days, it is deemed issued and no further permits shall be required.

4.  In light of the fact that the fees charged by CMS in connection with the review of Plaintiff's application are unreasonable and excessive, Defendants shall not utilize CMS or any person or entity affiliated with CMS to review any future applications in which Plaintiff is an applicant or co-applicant in the Village of Airmont.

5.  Defendants acknowledge that New Cingular Wireless ("Cingular") currently has an application before the Village Planning Board for a wireless communications facility in the Gates of Zion Cemetery ("Cingular Application"), which application has not been fully processed due to the existence of a moratorium ("Moratorium") which prohibits the Planning Board from accepting, processing, reviewing or granting site plan approval for any non-residential commercial use.

6.  Defendants acknowledge that Plaintiff has a need to remedy a significant gap in reliable service in the Village, that Plaintiff, at its discretion and with Cingular's approval, will be permitted to co-locate on the Cingular facility in the Gates of Zion Cemetery, and that Plaintiff's application for such co-location ("Omnipoint Co-location Application") will be processed by Defendants within a reasonable period of time.

7.  Defendants intend to extend a pending moratorium for at least an additional three (3) months. The Village Board hereby grants, without further application, all relief necessary under the pending moratorium, and any extension thereof or enactment of a new moratorium, for the processing of and decision upon the Cingular Application and Omnipoint Co-location Application.

8.  ~~The Cingular Application and Omnipoint Co-location Application will be decided within six~~ ~~(6) months from the date that the Omnipoint Co-location Application is filed.~~

9.  The parties acknowledge that this Stipulation was the product of negotiation by all parties through their counsel, including negotiation as to the language set forth herein, and, as such, to the extent there is any issue with respect to any alleged, perceived or actual ambiguity in this Stipulation, the ambiguity shall not be resolved on the basis of who drafted the Stipulation.

10. The Court shall retain jurisdiction over this matter until: (i) all permits and approvals required to install and operate Facility have been issued, including, without limitation, all building permits and certificates of occupancy; (ii) the Facility has been fully constructed; (iii) all permits and approvals required in connection with the Omnipoint Co-location Application have been issued, including, without limitation, all building permits and certificates of occupancy; (iv) the facility in connection with the Omnipoint Co-location Application has been fully constructed; and (v) the time for any legal challenge to the

3

approvals for the Facility and the Omnipoint Co-location Application has expired. Upon the last of the foregoing to occur, this action, including all counter-claims, will be dismissed with prejudice, and without fees, costs, disbursements, damages, interest or attorneys' fees against any party.

_____

Joel Grossbarth, Esq. (JG 2153)
Attorney for Defendants
50 Route 9W
Stony Point, NY 10980
(845) 429-5607

_____

Robert D. Gaudioso, Esq. (RG 3829)
Snyder & Snyder, LLP
Attorney for Plaintiff
94 White Plains Road
Tarrytown, NY 10591
(914) 333-0700

Dated: Tarrytown, New York
       April 18, 2007

SO ORDERED: and the action is discontinued with leave to reopen on notice if necessary to enforce the agreement

_____
Charles Brieant
HON. CHARLES BRIEANT
United States District Judge
White Plains, NY 10601
Date: April 18, 2007

Z:\SSDATA\WPDATA\SS3\RDG\voicestream\Airmont\Litigation\Stipulation of Settlement.doc

4

LAW OFFICES OF

# SNYDER & SNYDER, LLP

94 WHITE PLAINS ROAD
TARRYTOWN, NEW YORK 10591
(914) 333-0700
FAX (914) 333-0743

WRITER'S E-MAIL ADDRESS

e mail to RGaudioso@Snyderlaw.net

NEW YORK OFFICE
445 PARK AVENUE, 9TH FLOOR
NEW YORK, NEW YORK 10022
(212) 749-1448
FAX (212) 932-2693

DAVID L. SNYDER*
LESLIE J. SNYDER
ROBERT D. GAUDIOSO

FREDERICK W. TURNER, COUNSEL

*ADMITTED NY, NJ AND DC

NEW JERSEY OFFICE
ONE GATEWAY CENTER, SUITE 2600
NEWARK, NEW JERSEY 07102
(973) 824-9772
FAX (973) 824-9774

REPLY TO:

Tarrytown office

April 18, 2007

BY TELECOPY (914-390-4085)

Honorable Charles Brieant
United States Courthouse
300 Quarropas Street
Room 533
White Plains, NY 10601-4150

        Re:    Omnipoint Communications, Inc.
               v. Village of Airmont, et al.
               07 Civ. 0473 (CLB)(LMS)

Dear Judge Brieant:

        I am the attorney for Omnipoint Communications, Inc. ("Omnipoint") in connection with the above captioned matter.

        I am pleased to report that the parties have agreed to settle this matter, and have signed the attached Stipulation of Settlement and Order ("Order"). It is respectfully requested that Your Honor sign the Order, if acceptable.

        Please let me know if Your Honor has any questions or would like to meet with counsel. Thank you for your consideration.

        Very respectfully yours,

        Robert D. Gaudioso, Esq.
        (ID# RG 3829)

RDG/dac
cc:    Joel Grossbarth, Esq. (simultaneously by telecopy to 845-429-2576)
       Omnipoint Communications, Inc.

Z:\SSDATA\WPDATA\SSYR\Gwoicestream\Airmont\Litigation\Letter to Judge Brieant.wpd

LAW OFFICES OF

# SNYDER & SNYDER, LLP

94 White Plains Road
Tarrytown, New York 10591
(914) 333-0700
Fax: (914) 333-0743

| | | | |
|---|---|---|---|
| **To:** | Honorable Judge Brieant | **Date:** | April 18, 2007 |
| **Fax #:** | 914-390-4085 | **Pages:** | 6,  including this cover sheet. |
| **From:** | Robert D. Gaudioso | | |
| **Subject:** | Omnipoint Communications, Inc. v. Village of Airmont, et al. 07 Civ. 0473 (CLB)(LMS) | | |

COMMENTS:

Thank you.

cc:     Joel Grossbarth, Esq. (simultaneously by telecopy to 845-429-2576)

CONFIDENTIALITY NOTICE: THIS COMMUNICATION CONTAINS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE ADDRESSEE. IF YOU ARE NOT THE INTENDED RECIPIENT, BE ADVISED THAT THE UNAUTHORIZED DISSEMINATION OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, KINDLY NOTIFY SENDER BY COLLECT-CALL FOR FURTHER INSTRUCTIONS.
Z:\SSDATA\WPDATA\SSY\RDG\FAX\brieant judge.wpd

# TAB 3

STATE OF NEW YORK
SUPREME COURT              COUNTY OF ONEIDA

---

**THE CITY OF ROME, NEW YORK,**

                              Plaintiff,

                                                    Index No. <u>CA2002-00421</u>
          v.                                        RJI No.    <u>32-02-0174</u>

**VERIZON NEW YORK, INC.,**

                              Defendant.

---

**APPEARANCES:**

CORPORATION COUNSEL'S OFFICE, CITY OF ROME
By: TIMOTHY A. BENEDICT, ESQ.
Attorneys for Plaintiff
City Hall
198 North Washington Street
Rome, New York 13440

HANCOCK & ESTABROOK, LLP
By: JOHN G. POWERS, ESQ.
Attorneys for Defendant
P.O. Box 4976
Syracuse, New York 13221-4976

WILEY REIN & FIELDING LLP
By: ANDREW G. McBRIDE, ESQ.
Attorneys for Defendant
1776 K Street NW
Washington, D.C. 20006

---

**SIEGEL, J.**

## D E C I S I O N

### *Procedural History*

        In 2002 the City of Rome commenced a declaratory judgment action against

defendant Verizon New York, Inc.  Specifically, the City of Rome (hereinafter referred to

either as "Rome" or "City") seeks:

> a judgment of this Court determining, construing and declaring the legal rights and liabilities of the parties hereto with respect to the Franchise granted to Defendant, pursuant to §27 of the New York State Transportation Corporation Law and §33 of the City of Rome Charter, and, particularly, whether, by reason of said Franchise expiring on December 19, 1999, Plaintiff City has the right to demand that Defendant renew said Franchise to utilize the public streets and rights-of-ways to transact its business within the City of Rome, New York, and Defendant avail itself to and participate in good faith negotiations to renew said Franchise... .

(Plaintiff's complaint).

Following commencement of the action, defendant Verizon New York, Inc. (hereinafter referred to as "Verizon") removed the action to federal court and there filed a motion to dismiss. The district court, in *City of Rome v. Verizon Communs., Inc.*, 240 F Supp 2d 176 (US Dist Ct, ND NY 2003) converted the motion to one for summary judgment, granted summary judgment in favor of Verizon and dismissed the complaint. The district court found that numerous provisions of the City's proposed franchise agreement violated Section 253 of Telecommunications Act of 1996 (47 USC § 253). The court found it unnecessary to determine whether the parties' 1949 agreement was enacted pursuant to New York State Transportation Corporations Law § 27 and subject to the City's Charter § 33, since, in any event, the relief sought by the City was in violation of the federal Telecommunications Act of 1996, which preempts the state and local law provisions.

The City appealed the district court's judgment to the United States Court of Appeals for the Second Circuit. The appellate court vacated the district court's

2

judgment for lack of subject matter jurisdiction and remanded the case back to New York State Supreme Court (*City of Rome v. Verizon Communs., Inc.*, 362 F 3d 168 [2004]).  The court found that the City's complaint did not assert any federal claim, having relied solely upon state and local law.  The federal Telecommunications Act was raised in the defense of the action, not in the complaint, and the court concluded that it did not have subject matter jurisdiction (*City of Rome v. Verizon Communs., Inc.*, 362 F 3d 168, 183).

Following remand to New York State Supreme Court, defendant Verizon moved to dismiss the City's complaint, and contends that the City's franchise process violates state law, that the franchise has not expired, and that any attempt by the City to seek compensation is in violation of the state's "special franchise scheme."  Lastly, Verizon asserts that in any event, even if the City's requested relief comports with applicable state and local laws, the City's demands are in contravention of Section 253 of Telecommunications Act of 1996 (hereinafter referred to as "§ 253"), which preempts such laws.

In opposition, the City argues that its local franchising requirements are consistent with applicable state law, that the current franchise has expired and is subject to renewal, and that the City's "standard franchise agreement" does not violate § 253.

Following oral argument of the motion to dismiss, the parties were notified that this Court was, *sua sponte*, converting the motion to dismiss to a motion for summary judgment.  The parties were offered the opportunity to submit additional materials to the Court, and opted to rely upon their original submissions.

3

*Facts*

The underlying facts are undisputed.  Verizon, originally known as New York Telephone Company, has maintained telecommunications facilities throughout the state since 1896, in accordance with New York State Transportation Corporation Law Section 27.

On May 11, 1912 the City, by ordinance,  granted New York Telephone (hereinafter referred to as "Verizon") permission to construct, lay, and use lines over or under Washington Street, Dominick Street, and James Street in the City of Rome.  The City refers to this as the "1912 Franchise".  This original ordinance required a bond, indemnity and the payment of a $25.00 annual charge for liquidated damages.

In 1913, the New York legislature enacted General City Law § 23, which prohibits cities within New York State from granting franchises for longer than fifty years.  In 1921 the City of Rome amended its charter to limit the duration of franchises granted within the City to fifty years.   This charter provision is now titled Section 33 of the Rome City Charter.

In 1949, the City passed an ordinance granting Verizon "permission to use all of the public streets, highways, roads, avenues, lanes and alleys, or parts thereof, in the City ... for the purpose of ... constructing, laying, maintaining, repairing and operating" telecommunications facilities underneath said public rights-of-way (Ordinance No. 985).

The City maintains that, pursuant to both state and local law, the "franchise" expired in 1999, and thus, Verizon, to continue operating in Rome, is obligated to renew its franchise.  Verizon disputes this, maintains its right to use of the City's rights-of-way is derived from Transportation Corporation Law Section 27, and asserts that any

4

attempt by Rome to impose fees or restrictions is an improper attempt to regulate telecommunications under § 253.

***Law***

**State and Local Franchise Law:**

Verizon contends that Transportation Corporation Law § 27 (hereinafter referred to as "TCL § 27) is paramount within New York, and supercedes the rights of any locality to impose a "municipal franchise".

The plain language of the statute provides, in relevant part, that while a corporation is authorized to lay lines below or above municipal streets, under the state statute (which, it should be noted, does not refer to its own grant of rights, or to the retention of rights by the municipality, as a "franchise"):

> such corporation shall, before laying any such line in any
> city, village or town of this state, first obtain from the
> common council of cities, or other body having like
> jurisdiction therein, ... permission to use the streets within
> such city, village or town for the purposes herein set forth.

(Transportation Corporation Law § 27).

Municipalities are not prohibited by the terms of TCL § 27 from entering into agreements with individual telecommunications providers. In *Marx v. Edison Elec. Illuminating Co. of Brooklyn*, 201 AD 607 (2nd Dept 1922), a case involving the erection of telecommunications poles on private property, the court discussed Transportation Corporation Law § 102 (which was subsequently renumbered as Transportation Corporation Law § 27). The court noted that while a telegraph or telephone corporation is

5

> authorized in some cases to erect poles or wires in a public
> highway, ... even such corporation must obtain the consent
> of the municipality and make compensation if easements are
> interfered with.

(*Marx v. Edison Elec. Illuminating Co. of Brooklyn*, 201 AD 607, 610 [2nd Dept 1922]).

The concern raised by Verizon has relevance because if such grant of rights by the municipality is a "franchise", then the grant is subject to review under the fifty year expiration provisions of both the Rome Charter and the General Cities Law § 23, and Verizon's rights under the 1912 and 1949 agreements would have terminated.

The case law developed under both the former TCL § 102 and the current TCL § 27 uses the term "franchise" indiscriminately. The parties to this action have availed themselves of the case law on each side of this issue. But there has been no case law offered, nor has this court found, which supports both steps of the City's argument - that is, no case in which the court characterized the municipality's right to control and regulate the placement of the telecommunications equipment as a "franchise", and then applied the fifty year limitation to the "franchise".

Black's Law Dictionary defines "franchise" in many contexts. Most germane here is its definition of franchise as "the right conferred by the government to engage in a specific business or to exercise corporate powers." (Black's Law Dictionary 668 [7th ed 1999]). In this simplest of contexts, the City does not *confer* a "franchise". The right, or "franchise", to construct telecommunications lines is conferred by TCL § 27. The City's only power is in the siting of the actual placement of lines and in the regulation of the manner in which rights are exercised on the public rights-of-way by the telecommunications provider. This principle has been affirmed by the Court of Appeals

6

on numerous occasions (*see N.Y. Cent. & Hudson River R.R. v. City of N.Y.*, 202 NY 212 [1911]; *Ghee v. Northern Union Gas Co.*, 158 NY 510, 513 [1899]). In *City of N.Y. v. Bryan*, 196 NY 158 (1909), the Court of Appeals stated that:

> the consent of the municipal authorities was not the grant of an independent franchise.... Not only the franchise to be a corporation, but the franchises granted to a corporation when formed, spring from the state. It is the elementary definition of a franchise that it is a grant from the sovereign power.

(*City of N.Y. v. Bryan*, 196 NY 158, 165). The court went on to note that the grant of permission by the municipality is but "a step in the grant of a single, indivisible [state] franchise." (*City of N.Y. v. Bryan*, 196 NY 158, 166).

The City of Rome has not issued a "franchise" to defendant Verizon for the conduct of its telecommunications business. It has, however, by ordinance and subsequent agreement by Verizon, granted "permission" for Verizon to exercise its state franchise, pursuant to TCL § 27. And, in accordance with such statute, the City is entitled to control and regulate the use of its public rights-of-way and to be reimbursed for costs related thereto. All of this has been set forth, in great detail, in the City's ordinance of 1949. As defendant noted, the ordinance itself characterized its own action as "permission" granted in accordance with authority conferred by Transportation Corporation Law § 27. The ordinance stated no date of expiration, and, as it is not a franchise, it is not subject to the fifty year limitation set forth in General Cities Law § 23 or the Rome City Charter. Thus, the ordinance and subsequent agreement thereto by Verizon are still in full force and effect.

7

**State v. Local Tax Issue:**

Inasmuch as the City's permission, granted in the 1949 ordinance pursuant to TCL § 27, is in full force and effect, the court need not reach defendant's claim that the gross revenue charges contained in the City's new contract proposal are superceded by "the State's special franchise scheme". However, defendant's argument, as expressed, presupposes that the City's fee would exceed the state's franchise tax. First, this is unnecessary conjecture at this point. Second, both parties conceded at oral argument that any tax imposed by the City would be offset by a credit against the franchise payment to the locality.

**Preemption by United States Telecommunications Act of 1996:**

Again, the Court need not reach this issue, since the 1949 ordinance is still in force, and no argument is made that the existing agreement violates the federal Telecommunications Act of 1996, and in particular, Section 253.

Assuming arguendo, that the City had a right to impose a new agreement upon the defendant, significant portions of the City's proposed "boilerplate" agreement are in clear violation of Section 253.

Section 253 (a) provides that:

> [n]o State or local statute or regulation, or other State or
> local legal requirement, may prohibit or have the effect of
> prohibiting the ability of any entity to provide any interstate or
> intrastate telecommunications service.

(47 USC § 253 [a]).

However, the statute goes on to provide a "safe harbor" provision for state and

8

local authorities:

> [n]othing in this section affects the authority of a State or
> local government to manage the public rights-of-way or to
> require fair and reasonable compensation from
> telecommunications providers, on a competitively neutral
> and nondiscriminatory basis, for use of public rights-of-way
> on a nondiscriminatory basis, if the compensation required is
> publicly disclosed by such government.

(47 USC § 253 [c]).

It is apparent that Rome's proposed agreement, by its overly broad and onerous

terms, effectively prohibits the defendant's ability to provide telecommunications

service.  As a result, under the federal law, Rome's only authority to regulate the use of

the rights-of-way or to seek compensation, arises out of any retained authority under §

253 (c)'s safe harbor provision, which has been narrowly interpreted by the courts.

Yet the City's proposed "boilerplate" agreement has many provisions which

appear to fall outside the limitations of § 253 (c). A sampling of these contract terms is

set forth below:

> • "The Company agrees to comply with any
> telecommunications policy or ordinance that is properly
> enacted by the City during the terms of this Agreement".

(Adelphia agreement, Section III).

Since the City's authority is so tightly regulated by § 253, the aforementioned

provision, which would bind the defendant to compliance with unknown future policies

or ordinances, amounts to unfettered power to the municipality, clearly outside the

scope of the safe harbor. (*Quest Communications Corp. v. City of N.Y.,* 387 FSupp2d

9

191 [US Dist Ct, ED NY 2005]).

- "The Company shall adopt standards aimed at maintaining a high level of customer service and agrees to comply with all federal and state customer service and universal service standards and any federal or state rules or regulations applicable thereto."

(Adelphia agreement, Section V[a]).

- "[the Company] shall endeavor to make its services available at competitive rates to all segments of the community regardless of income, geography, educational institutions and governmental entities."

(Adelphia agreement, Section V[b]).

Both of the aforementioned proposed provisions exceed the scope of the City's power to regulate its own rights-of-way. These provisions afford the City power to regulate and oversee public interest factors. This again amounts to the right to prohibit Verizon from providing telecommunications services in violation of § 253 (*TCG New York, Inc. v. City of White Plains*, 305 F3d 67 [2d Cir 2002].

- "The Company shall pay to the City one percent (1%) of gross income from its provisions of Telecommunications Services utilizing the Company's Network and/or Facilities within the City's Public Right-of-Way."

(Adelphia agreement, Section VI[b]). Additionally, the boilerplate agreement would provide for a "Right-of-Way Annual fee" of four percent of the gross revenues of the Company derived from "utilizing its telecommunications system or facilities." (Adelphia

10

agreement, Section V[i]).

The federal courts are divided on whether "fair and reasonable compensation" under the Telecommunications Act is limited to actual cost recovery or may extend to a reasonable rent (*TCG New York, Inc. v. City of White Plains*, 305 F3d 67 [2d Cir 2002]. While the United States Court of Appeals for the Second Circuit has not specifically ruled on a municipality's right to collect a fee calculated upon a percentage of revenues, the terms of the proposed agreement are inconsistent with the intent of the Act. These revenue-related provisions are not limited to services provided to users within the City of Rome or to communications emanating from users within the City of Rome. Rather the terms are so broad as to include any telecommunications which pass through telecommunications lines located within the City, even though the communications may neither originate nor terminate within the City. This pass-through fee is not a "fair and reasonable compensation" to the City for its costs in maintaining the public right-of-way.

Defendant Verizon is granted summary judgment dismissing the plaintiff's complaint and is directed to submit order accordingly.

ENTER:
DATED:    January 24, 2006.
          Utica, New York.

HON. NORMAN I. SIEGEL
Acting Justice of the Supreme Court

11

**TAB 4**

# SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| Michael Patrick Murray, et al., | ) |
| Plaintiffs, | ) |
| v. | ) C.A. No. 01-8479 |
| | ) Calendar No. 3 |
| Motorola, Inc., et al., | ) Judge Brook Hedge |
| Defendants. | ) |

| | |
|---|---|
| Dino Schofield, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 02-1371 |
| | ) Calendar No. 3 |
| | ) Judge Brook Hedge |
| Matsushita Electric Corporation Of America, et al., | ) |
| Defendants. | ) |

| | |
|---|---|
| Pamela Cochran, et al., | ) |
| Plaintiffs, | ) |
| v. | ) C.A. No. 02-1369 |
| | ) Calendar No. 3 |
| Audiovox Corporation, et al., | ) Judge Brook Hedge |
| Defendants. | ) |

(caption continued on next page)

# BRIEF OF THE FEDERAL COMMUNICATIONS COMMISSION
## AS AMICUS CURIAE

(caption continued from previous page)

| | |
|---|---|
| David Keller, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 02-1372 |
| | ) Calendar No. 3 |
| Nokia, Inc., et al., | ) Judge Brook Hedge |
| | ) |
| Defendants. | ) |
| | ) |

| | |
|---|---|
| Richard Schwamb, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 02-1370 |
| | ) Calendar No. 3 |
| Qualcomm Incorporated, et al., | ) Judge Brook Hedge |
| | ) |
| Defendants. | ) |
| | ) |

| | |
|---|---|
| Baldassare Agro, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 02-1368 |
| | ) Calendar No. 3 |
| Motorola, Inc., et al., | ) Judge Brook Hedge |
| | ) |
| Defendants. | ) |
| | ) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT AND STATEMENT OF INTEREST ......................................... 1

STATEMENT ................................................................................................................. 4

ARGUMENT ................................................................................................................. 12

CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767 (1947)....................................................19

*Broyde v. Gotham Towers, Inc.*, 13 F.3d 994 (6th Cir.), *cert. denied*, 511 U.S. 1128 (1994) ......................................7

*Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341 (2001) ........................................................................20

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984)..............................13

*Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2d Cir. 2000), *cert. denied*, 531 U.S. 1070 (2001)..........................3

*City of New York v. FCC*, 486 U.S. 57 (1988) ...............................13

*EMR Network v. FCC,* 391 F.3d 269, 364 U.S. App. D.C. 20 (D.C. Cir. 2004), *cert. denied,* 125 S. Ct. 2925 (2005) ...................................................................... 3, 12, 16

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940) .......................................7

*Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141 (1982) ..................................................13

*Geier v. American Honda Motor Co.,* 529 U.S. 861 (2000) ......................................................... 2, 13

*Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424 (1963) ...................................................7

*Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707 (1985) .................................................2

*Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363 (1973) ...................................................12

*Maryland v. Baltimore Radio Show, Inc.,* 338 U.S. 912 (1950) ...................................................12

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996)......................................... 2, 19

*National Broad. Co. v. United States*, 319 U.S. 190 (1943) .......................................................... 6, 19

*Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005), *cert. denied*, 74 U.S.L.W. 3269 (U.S. Oct. 31, 2005)1, 5, 13, 14, 15, 16, 17, 18, 19, 21

*Wireless Tel. Radio Frequency Emissions Products Liability Litigation, In re*, 248 F. Supp. 2d 452 (D. Md. 2003) .......................................................................................15

## Administrative Decisions

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd 15123 (1996) ................................................. 10, 11, 14, 15, 16, 18

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 12 FCC Rcd 13494 (1997) .....................................................................10, 11, 16

*Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 8 FCC Rcd 2849 (1993) ......................................................................................9

*Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, 2005 WL 2429714 (2005) ........................................................................8

*Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems*, 86 FCC 2d 469 (1981) ................................................. 7, 18

*Responsibility of the Federal Communications Commission to Consider Biological Effects of Radio Frequency Radiation when Authorizing the Use of Radio Frequency Devices*, 100 FCC 2d 543 (1985), *on recon.*, 58 Radio Reg. (P&F) 2d 1128 (1985) ......................................................................................9

## Statutes and Regulations

42 U.S.C. § 4332(2)(C) ...................................................................9

47 C.F.R. § 1.1306(b)(3)..................................................................9

47 C.F.R. § 1.1307(b) ..................................................................3, 9

47 C.F.R. § 1.1307(b)(2)...................................................................3

47 C.F.R. § 1.17 .......................................................................20

47 C.F.R. § 2.1091 ..................................................................................3

47 C.F.R. § 2.1093 ..................................................................................3

47 C.F.R. § 2.803(a) ...............................................................................9

47 C.F.R. § 2.939(a)(1) .........................................................................20

47 U.S.C. § 151 ............................................................................. 5, 6, 17

47 U.S.C. § 151 et seq. ...........................................................................2

47 U.S.C. § 152(a) ..................................................................................6

47 U.S.C. § 152(b) ..................................................................................7

47 U.S.C. § 157 .......................................................................................6

47 U.S.C. § 301 .......................................................................................5

47 U.S.C. § 302(a) & (b) .........................................................................7

47 U.S.C. § 303(b) ..................................................................................6

47 U.S.C. § 303(c) ..................................................................................6

47 U.S.C. § 303(e) ..................................................................................6

47 U.S.C. § 303(g) ..................................................................................6

47 U.S.C. § 303(r) ...................................................................................6

47 U.S.C. § 309(j)(3)(A) .......................................................................17

47 U.S.C. § 309(j)(3)(D) .........................................................................6

47 U.S.C. § 332 .......................................................................................3

47 U.S.C. § 332(a) ............................................................................ 6, 17

47 U.S.C. § 332(a)(2) ..............................................................................6

47 U.S.C. § 332(c)(3) ........................................................................ 7, 18

47 U.S.C. § 332(c)(7) ........................................................................ 8, 18

47 U.S.C. § 332(c)(7)(B)(iv) ........................................................8, 11, 14

47 U.S.C. § 503(b)(1)(B) ......................................................................20

47 U.S.C. §§ 303(a)-(c) ........................................................................6

National Environmental Policy Act of 1969 (NEPA), 42
    U.S.C. § 4321 *et seq.* ................................................... 8, 14

Telecommunications Act of 1996, Pub. L. No. 104-104,
    110 Stat. 56 ................................................................. 8, 9, 17

§ 704(a), 110 Stat. 152 ........................................................10

§ 704(b), 110 Stat. 152 ..................................................... 9, 15

## **Others**

FCC, Office of Engineering and Technology, *Questions
    and Answers about Biological Effects and
    Potential Hazards of Radiofrequency
    Electromagnetic Fields*, OET Bulletin No. 56 (4th
    ed. Aug. 1999) ...............................................................5, 9

H.R. Rep. No. 104-204(I) (1995) ......................................... 15, 17

**PRELIMINARY STATEMENT AND STATEMENT OF INTEREST**

In this litigation, plaintiffs allege that they incurred injuries as a result of exposure to radiofrequency (RF) radiation emitted by the handheld wireless telephones they used. They filed suit against numerous parties, including manufacturers of handheld wireless telephones and providers of wireless telephone service. Plaintiffs seek relief on the basis of various causes of action, including: intentional fraud and misrepresentation; negligent misrepresentation; strict product liability; failure to warn and defective manufacture and design; negligence; breach of express warranty; breach of implied warranty; conspiracy; civil battery; loss of consortium; and violation of the District of Columbia Consumer Protection Act of 2000. To support their claims of intentional fraud and misrepresentation, plaintiffs allege that defendants made misrepresentations to federal regulators concerning the safety of handheld wireless telephones. In addition, in asserting their claims of failure to warn and defective manufacture and design, plaintiffs allege that the handheld wireless telephones manufactured and sold by defendants – telephones that have been approved under the federal RF testing and emission standards for nationwide distribution and use – are nonetheless "unreasonably dangerous" and defective products under local tort law.

By order dated November 2, 2005, the Court directed the parties to file memoranda of law regarding the significance of the Supreme Court's denial of certiorari in *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir.), *cert. denied,* 74 U.S.L.W. 3269, 3274 (U.S. Oct. 31, 2005). In response to that order, the Federal Communications Commission (FCC or Commission) respectfully submits this

brief as amicus curiae to provide the Court with the agency's views concerning the preemption analysis conducted in *Pinney* by the United States Court of Appeals for the Fourth Circuit.

The FCC is responsible for implementing the Communications Act of 1934, 47 U.S.C. § 151 *et seq*., which grants the FCC broad authority to regulate radio communications and devices such as handheld wireless telephones that use RF energy. Because the FCC has explicit authority to enforce the Communications Act, including the promulgation of RF regulations that balance competing national priorities, its interpretation of its own regulations, including their preemptive force, is entitled to substantial deference from the courts. Indeed, the Supreme Court has made clear that the agency's views regarding conflict preemption are entitled to "substantial weight," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 496 (1996), and can be "dispositive." *Ibid.* (quoting *Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 714 (1985)). The Supreme Court's analysis in *Geier v. American Honda Motor Co.,* 529 U.S. 861 (2000), applies squarely to this case.  Here, as in *Geier,* "Congress has delegated to [the agency] authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive." *Geier,* 529 U.S. at 883. As a result, "[t]he agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements." *Ibid.* (quoting *Medtronic,* 518 U.S. at 496). Thus, in a case such as this one, the agency's interpretation of its own rules should be given substantial weight by this Court.

2

As explained herein, the FCC respectfully disagrees with – and this Court should not follow – the Fourth Circuit's conclusion that the RF emissions from wireless phones that are sold in compliance with current FCC rules nevertheless may be deemed "unreasonably dangerous" under state law, so that wireless carriers and equipment manufacturers potentially may be subject to civil liability on that basis.

The FCC has issued federal RF exposure standards to protect users of wireless telephones from harmful levels of RF emissions. *See* 47 C.F.R. §§ 1.1307(b)(2), 2.1091, 2.1093. The FCC's standards also preserve the important federal policy of facilitating the development of wireless communications services. The FCC's RF standards have been upheld by the United States Court of Appeals for the Second Circuit as a reasonable exercise of the agency's congressionally delegated policymaking discretion. *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 91 (2d Cir. 2000), *cert. denied*, 531 U.S. 1070 (2001).  *See also EMR Network v. FCC,* 391 F.3d 269, 364 U.S. App. D.C. 20 (D.C. Cir. 2004), *cert. denied,* 125 S. Ct. 2925 (2005).

In *Pinney*, the Fourth Circuit determined that state courts may deem RF emissions from wireless phones that comply with FCC requirements "unreasonably dangerous" under state law and, on that basis, impose civil liability on wireless carriers and equipment manufacturers. The Fourth Circuit supported that result by reading 47 U.S.C. § 332, which promotes the development of wireless services by, *inter alia*, confining state and local authority over wireless services to specific,

3

statutorily-designated areas, to allow state regulation of the RF emissions from wireless handsets. But the Fourth Circuit failed to consider the preemptive effect of the FCC's regulatory actions. *See* 402 F.3d at 456-58. As a result, *Pinney* essentially allows state law to override both the FCC's determination that its RF standards protect wireless phone users from harmful levels of RF emissions, and the nationwide balancing of federal communications policy objectives that the FCC undertook in setting its RF exposure standards. That result cannot be squared with the federal government's longstanding primacy over the regulation of RF transmissions, or with the significant federal interest in implementing a uniform national communications policy.

The Supreme Court's denial of certiorari in *Pinney* has no precedential significance; and of course, this Court is not bound to follow the Fourth Circuit's decision in that case. Indeed, for the reasons discussed below, there are compelling reasons for this Court to reject the Fourth Circuit's preemption analysis in *Pinney*.

## STATEMENT

A. *The Use of RF Energy in Communications.* The term "radiofrequency" or "RF" refers generally to the portion of the electromagnetic spectrum that is used in "over the air" communications. Every form of wireless communications – from television, radio, cellular telephones, and pagers to garage door openers, remote-controlled cars, and cordless phones – uses RF energy to send and receive the

electromagnetic signals that make radio communication possible.[1] Certain types of communications (such as television broadcasting) generally require high-power RF signals to be effective. Other communication devices (such as cordless phones) use relatively low-power RF signals.

Wireless telephone systems use RF energy to provide subscribers a two-way communications service. Low-power radio transmitters embedded in wireless telephones enable callers to transmit a signal (containing a voice or other message) to "base stations," which then send the signal through the wireless network and often on to other telephone networks, to the person on the other end of the call. Base stations also transmit return messages that are delivered through the network and then picked up "off the air" by the radio receivers embedded in wireless phones. *See generally Pinney*, 402 F.3d at 439-40.

B. *The FCC's Authority over Radio Communications and Devices that Emit RF Energy.* The Communications Act designates the FCC as the "centraliz[ed] authority" responsible for "execut[ing] and enforc[ing]" federal communications policies. 47 U.S.C. § 151. The Act provides that the federal government shall "maintain . . . control . . . over all the channels of radio transmission" (*id.* § 301) and establishes an overarching policy goal of making available "to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide . . . radio

---

[1] *See* FCC, Office of Engineering and Technology, *Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields*, OET Bulletin No. 56 (4th ed. Aug. 1999), at 2-3, available at http://www.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet56/oet56e4.pdf>.

5

communication service" and "promoting safety of life and property through the use of . . . radio communication." *Id.* § 151. The Act also provides that the FCC should encourage "new technologies and services to the public," the "efficiency of spectrum use," and the "efficient and intensive use of the electromagnetic spectrum." *Id.* §§ 157; 309(j)(3)(D); 332(a)(2).

To facilitate the FCC's implementation of those broad objectives, Congress granted the FCC expansive authority over radio transmissions. *National Broad. Co. v. United States*, 319 U.S. 190, 217 (1943) (observing that the FCC is granted "comprehensive powers to promote and realize the vast potentialities of radio"). The FCC is responsible for "licensing and regulating" the RF spectrum and devices that transmit RF signals. 47 U.S.C. § 152(a). The Act grants the FCC the power to "[p]rescribe the nature of the service to be rendered by each class of licensed stations," "determine the power which each station shall use," "[r]egulate the kind of apparatus to be used with respect to its external effects," "encourage the larger and more effective use of radio in the public interest," and generally "[m]ake such rules and regulations . . . as may be necessary to carry out the provisions of this Act." *Id.* § 303(b), (c), (e), (g), (r). The FCC carries out its duties by, among other things, allocating spectrum for specific uses and granting licenses authorizing the use of RF signals for wireless communications. *See*, *e.g.*, *id.* §§ 303(a)-(c), 308, 309. In addition, the Act authorizes the FCC to regulate the manufacture and distribution of all devices that emit RF energy, including wireless phones, to

ensure that the RF signals they emit do not interfere with other forms of radio communications. *Id.* § 302(a) & (b).

In enacting the Communications Act, Congress sought to create a "unified and comprehensive regulatory system" governing the use of radio signals in the United States, *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 137 (1940), and it has long been settled that the FCC's regulation of "technical matters" concerning frequency allocation is "clearly exclusive" of state and local regulation. *Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 430 n.6 (1963); *see also Broyde v. Gotham Towers, Inc.*, 13 F.3d 994, 997 (6th Cir.) (noting the "irreconcilable conflict between the FCC's exercise of exclusive jurisdiction over the regulation of radio frequency interference and the imposition of common law standards in a damages action"), *cert. denied*, 511 U.S. 1128 (1994).

With respect to wireless telephone service in particular, the FCC has for many years preempted state and local regulation in order to promote the achievement of federal policy objectives.[2] More recently, Congress expressly adopted the principle of federal primacy in the emerging area of wireless communications. Although the states have traditionally exercised regulatory authority over intrastate communications (*see* 47 U.S.C. § 152(b)), Congress in 1993 preempted state and local regulation of "the entry of or the rates charged by" wireless telephone service providers. *Id.* § 332(c)(3). In the Telecommunications Act of 1996, Pub. L. No.

---

[2] *See*, *e.g.*, *Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems*, 86 FCC 2d 469, 504-05 ¶ 82 (1981) (*Cellular Order*) (preempting state "technical standards" in order to preserve "federal primacy" and to promote the "rapid implementation of cellular service").

104-104, 110 Stat. 56 (1996 Act), Congress further preempted states and localities

from, *inter alia*, independently regulating wireless telephone facilities "on the basis

of the environmental effects of radio frequency emissions" (47 U.S.C.

§ 332(c)(7)(B)(iv)), notwithstanding the traditional authority of state and local

governments to regulate zoning within their jurisdictions, *id.* § 332(c)(7).

The pro-competitive, deregulatory framework for wireless service prescribed by

Congress and implemented by the FCC has enabled wireless competition to

flourish, with substantial benefits to consumers. Wireless phone subscribership

continues to increase at a rapid and steady rate. During 2004, for example, the

number of subscribers to mobile telephone service increased from 160.6 million to

184.7 million, so that roughly 62 percent of the U.S. population now subscribes to

such service.[3] Intense price competition has resulted in affordable rates as well as

innovative pricing plans such as free night and weekend minutes and free mobile-

to-mobile calling. Wireless carriers' average revenue per minute has fallen

consistently, from 44 cents in 1993 to 9 cents in 2004. Consumers continue to

increase the use of their wireless phones.[4]

C. *The FCC's Regulation of RF Emissions from Wireless Telephones.* In

addition to implementing the policies underlying the Communications Act, the

FCC is required under the National Environmental Policy Act of 1969 (NEPA), 42

U.S.C. § 4321 *et seq.*, to evaluate the environmental effects of "major" regulatory

---

[3] *Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, FCC 05-173, 2005 WL 2429714, ¶ 5 (2005).

[4] *Id.* at ¶ 5, Table 8.

actions "significantly affecting the quality of the human environment." *Id.*

§ 4332(2)(C). In accordance with that obligation, the FCC has issued regulations to

ensure that users of wireless telephones and the general public are not exposed to

excessive levels of RF energy. The FCC's regulations set RF exposure limits that

are well below the levels that laboratory studies have shown can produce

potentially harmful biological effects. OET Bulletin No. 56, *supra* note 1, at 13

n.10. A wireless telephone provider cannot obtain the FCC's approval to sell or

distribute telephones in the United States unless it complies with the FCC's RF

safety standards or otherwise demonstrates on the basis of a detailed environmental

analysis that FCC authorization is warranted. *See* 47 C.F.R. §§ 1.1306(b)(3),

1.1307(b), 2.803(a).

The FCC first established RF exposure standards in 1985, when it adopted the

RF guidelines that had been developed by the American National Standards

Institute (ANSI), a non-governmental standards-setting body.[5] In 1993, the FCC

initiated a proceeding to revise those standards in light of newer standards that had

been developed by ANSI. *Guidelines for Evaluating the Environmental Effects of*

*Radiofrequency Radiation*, 8 FCC Rcd 2849, 2849 ¶ 1 (1993). That proceeding

was still pending before the agency when Congress enacted the 1996 Act. In

Section 704(b) of the 1996 Act, Congress directed the FCC to "complete action" to

"prescribe and make effective rules regarding the environmental effects of radio

---

[5] *Responsibility of the Federal Communications Commission to Consider Biological Effects of Radio Frequency Radiation when Authorizing the Use of Radio Frequency Devices*, 100 FCC 2d 543 (1985), *on recon.*, 58 Radio Reg. (P&F) 2d 1128 (1985).

frequency emissions." 110 Stat. 152. As discussed above, Congress also provided that states and localities may not regulate "personal wireless service facilities on the basis of the environmental effects of radio frequency emissions" that do not exceed the FCC's RF standards. § 704(a), 110 Stat. 152.

As directed by Congress, the FCC released a Report and Order in August 1996 to revise its RF exposure standards. *Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 FCC Rcd 15123 (1996) (*RF Order*), *on recon.*, 12 FCC Rcd 13494 (1997) (*Second RF Order*). The *RF Order* established the current federal safety standards for RF emissions from wireless phones. *RF Order*, 11 FCC Rcd at 15147 ¶ 63. In issuing its new standards, the FCC explained that it was relying "substantially on the recommendations" of the Environmental Protection Agency, the Food and Drug Administration, and other federal health and safety agencies. *Id.* at 15124 ¶ 2. The FCC also concluded that its standards "represent[ed] the best scientific thought" on the RF limits necessary "to protect the public health," *id.* at 15184 ¶ 168; *see also id.* at 15146-47 ¶¶ 62-64, and "provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands," *Second RF Order*, 12 FCC Rcd at 13505 ¶ 29. The FCC committed to revisiting its RF exposure standards if future scientific research demonstrates that those standards are inadequate to protect the public. *Id.* at 13506 ¶ 32.

As part of the 1996 Act, Congress expressly preempted state and local regulation of "the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of [RF] emissions." 47 U.S.C. § 332(c)(7)(B)(iv). When the FCC adopted new RF guidelines, it rejected a proposal to adopt "a broad-based preemption policy to cover all transmitting sources," including facilities other than those covered by the statute. *RF Order,* 11 FCC Rcd at 15184 ¶ 168; *see also Second RF Order,* 12 FCC Rcd at 13529 ¶ 88. The agency expected that after states and localities had had an opportunity to review the new FCC guidelines, they would "agree that no further state or local regulation is warranted." *RF Order,* 11 FCC Rcd at 15184 ¶ 168. The FCC made clear, however, that if its expectations should "prove to be misplaced," and if "FCC licensees encounter a pattern of state or local activities which constitute an obstacle to the scheme of federal control of radio facilities set forth in the Communications Act," the agency reserved the right to revisit the preemption issue. *Ibid.*

On judicial review, the Second Circuit rejected arguments that the FCC's RF exposure standards were inadequate to protect the public against unhealthy levels of RF emissions. *Cellular Phone Taskforce*, 205 F.3d 82. The court noted that "[a]ll of the expert [federal] agencies consulted . . . found the FCC's approach to be satisfactory." *Id.* at 90. Observing that setting "safety margins" is "a policy question, not a legal one," the court held that the FCC acted reasonably in setting RF standards that, while protecting the public, also were calibrated to preserve "the

11

requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *Id.* at 91-92 (internal quotation marks omitted). Further, the Second Circuit determined that, to the extent new information was developed that suggested a need for stricter regulation, the FCC was satisfied that there was a "mechanism in place for accommodating changes in scientific knowledge." *Id.* at 90-91 (internal quotation marks omitted). Last year, the D.C. Circuit similarly recognized the FCC's continuing "determination to keep an eye on developments" to ensure that the agency is able to take account of new scientific evidence concerning RF safety. *EMR Network*, 391 F.3d at 273, 364 U.S. App. D.C. at 24.

## ARGUMENT

It is "well-settled" that the Supreme Court's denial of a petition for a writ of certiorari "imparts no implication or inference concerning the Court's view of the merits" of a case that it has declined to review. *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 365 n.1 (1973) (citing *Maryland v. Baltimore Radio Show, Inc.,* 338 U.S. 912, 919 (1950) (opinion of Frankfurter, J.)). Consequently, this Court should not construe the Supreme Court's denial of certiorari in *Pinney* as an endorsement of the Fourth Circuit's preemption analysis in that case. In any event, this Court is not bound to follow decisions of the Fourth Circuit; and as we explain below, there are compelling reasons for this Court to reject the Fourth Circuit's preemption analysis in *Pinney*.

1. Federal law generally preempts state law under the Supremacy Clause in three situations. First, state law is preempted when a federal statute "express[es] a

clear intent to pre-empt." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984). Second, state law is preempted when a comprehensive federal statute "occup[ies] an entire field of regulation," leaving no room for state participation. *Ibid.* Third, when federal and state law conflict because compliance with both is impossible or state law "stands as an obstacle to the accomplishment and execution" of a valid federal policy, federal law must prevail. *Ibid.* (citation and internal quotation marks omitted); *see also Geier*, 529 U.S. at 874.

   Federal agency regulations that are validly promulgated have the same preemptive effect as federal statutes. *Capital Cities Cable*, 467 U.S. at 699 (citing *Fidelity Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 153-54 (1982)). The statutorily authorized regulations of an agency therefore "will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988). In situations involving agency preemption, the relevant inquiry thus is "whether the federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised the legislative power." *Ibid.* The Fourth Circuit's *Pinney* decision incorrectly applies those principles. Rather than allowing state-law tort actions to proceed on the theory that RF emissions from wireless telephones are unreasonably dangerous, the court of appeals should have held that such suits are preempted because they conflict with, and prevent execution of, the FCC's

judicially approved policies concerning RF emissions from wireless communications devices.[6]

2. The Communications Act vests in the FCC exclusive federal authority to regulate the use of radio communications in the United States and grants the FCC broad regulatory powers over the technical aspects of RF transmissions. *See supra* pp. 3-7. Consistent with its obligations under NEPA and the Communications Act, including a specific Congressional directive in Section 704(b) of the Telecommunications Act of 1996, the FCC has provided that, in the absence of a detailed environmental analysis, it will not authorize the sale or distribution of any wireless telephone in the United States that does not comply with its RF safety standards. Conversely, the FCC has determined that wireless phones that do comply with its RF standards are safe for use by the general public and may be sold in the United States. *See RF Order*, 11 FCC Rcd at 15147-48 ¶¶ 63-66. In light of this regulatory framework, the Fourth Circuit in *Pinney* erred in failing to recognize that the FCC's establishment of national RF exposure standards, and its determination that wireless phones that comply with those standards are safe for

---

[6] In analyzing the preemption question, the Fourth Circuit in *Pinney* held that handheld wireless telephones fall outside the scope of 47 U.S.C. § 332(c)(7)(B)(iv), which preempts state and local regulation of "the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of [RF] emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions." *Pinney,* 402 F.3d at 454-55. Even assuming that this reading of the statute is correct, the *Pinney* court's preemption analysis is nonetheless flawed because that court failed to take account of the preemptive force of the FCC's regulations. Under Supreme Court precedent, the absence of express statutory preemption cannot be read to create any "special burden" on the agency to demonstrate conflict preemption by agency rule. *See Geier*, 529 U.S. at 872-73.

14

sale to the general public, preempted the *Pinney* plaintiffs' attempts to obtain a contrary judicial ruling under state law.

As the district court in *Pinney* correctly noted, a judicial determination of plaintiffs' claims under state law would "necessarily require a judge and jury to usurp the regulatory function entrusted by Congress to the expertise and discretion of federal agencies." 248 F. Supp. 2d 452, 463 (D. Md. 2003). When directing the FCC to "complete action . . . to prescribe and make effective rules regarding the environmental effects of radio frequency emissions" (§ 704(b), 110 Stat. 152), Congress in the 1996 Act contemplated that the FCC's RF standards would "contain adequate, appropriate and necessary levels of protection to the public." *See* H.R. Rep. No. 104-204(I), at 95 (1995). The FCC issued its current RF standard for wireless phones after a lengthy and comprehensive rulemaking in which interested parties on all sides participated. Federal agencies that have specialized expertise in health matters also participated in the FCC's rulemaking and endorsed the agency's RF standards as adequate to protect the public against harmful RF emissions. *RF Order*, 11 FCC Rcd at 15129-31 ¶¶ 15-20. On judicial review, the Second Circuit rejected arguments that the FCC should have adopted stricter RF standards, concluding that the FCC had acted within the scope of its policymaking discretion in establishing its RF standards and in relying on the recommendations of other expert federal agencies. *Cellular Phone Taskforce*, 205 F.3d at 90-92. Further, as both the Second and D.C. Circuits have recognized, the FCC has a "mechanism in place" through its ongoing coordination with other

federal agencies and other expert bodies for accommodating changes in scientific knowledge. *See Cellular Phone Taskforce*, 205 F.3d at 90-91; *EMR Network*, 391 F.3d at 273, 364 U.S. App. D.C. at 24.

By permitting the *Pinney* plaintiffs' claims that wireless telephones are unreasonably dangerous devices to go forward, the Fourth Circuit condoned what is essentially a back-door challenge to the FCC's decision to allow the sale of those phones to the public and to the adequacy of the RF standards the FCC adopted. Because a state-law action that seeks to overturn federal agency determinations inherently "stands as an obstacle to the accomplishment and execution" of a valid federal policy, such an action conflicts with federal law and is therefore preempted. *See*, *e.g.*, *Geier*, 529 U.S. at 874-75.

In adopting its RF regulations, the FCC made a finding that those regulations "represent the best scientific thought and are sufficient to protect the public health." *RF Order,* 11 FCC Rcd at 15184 ¶ 168. Plaintiffs' claims that handheld

wireless telephones are "unreasonably dangerous" conflict with that FCC finding. Those claims are therefore preempted.[7]

3. The *Pinney* court also erred when it concluded that it was permissible for state courts to undertake what is an exclusively federal responsibility for evaluating the utility of RF transmissions used in wireless telephone service. As the majority decision in *Pinney* noted, adjudication of the plaintiffs' claims in that case would require some courts to engage in a "risk/utility" analysis to evaluate whether RF emissions from wireless phones are "unreasonably dangerous." *Pinney*, 402 F.3d at 446-47.  The *Pinney* court suggested that the FCC's policy judgments, as embodied in its RF standards, would carry little, if any, weight in that analysis. *Id.* at 447. Thus, under the Fourth Circuit's analysis, a state court could strike a balance different from, and inconsistent with, the policy decisions that the FCC made in issuing its RF regulations. That result cannot be squared with the uniform federal regulatory framework for the provision of wireless telephone services, or

---

[7] No negative inference should be drawn from the FCC's decision not to expressly preempt "state and local regulation of RF emissions in non-personal wireless services situations." *RF Order,* 11 FCC Rcd at 15183 ¶ 167; *see also Second RF Order,* 12 FCC Rcd at 13529 ¶ 88. The preemption proposals that the agency rejected in those orders were much broader than the preemption at issue here; they would have encompassed *all* RF transmitting sources, not just personal wireless service sources. *RF Order,* 11 FCC Rcd at 15183-84 ¶¶ 167-168. Moreover, preemption was unnecessary in that context because no actual conflict was brought to the agency's attention at that time. *Id.* at 15184 ¶ 168. Here, by contrast, plaintiffs are bringing claims that conflict directly with the Commission's determination that its regulations reflect the proper balance between the need to protect the health of the public and the need to allow communications services to be provided to the public in an efficient and practical manner.

the primacy that the Communications Act gives the FCC in technical matters relating to RF transmissions.

The Communications Act establishes a broad policy of promoting the development of an "efficient . . . radio communication service" in order to "promot[e] safety of life and property," among other objectives. 47 U.S.C. § 151; *accord id.* §§ 309(j)(3)(A), 332(a). As expressed in the legislative history of the 1996 Act, "[a] high quality national wireless telecommunications network cannot exist if each of its component[s] must meet different RF standards in each community." H.R. Rep. No. 104-204(I), at 95. Thus, the FCC has preempted state authority over the technical aspects of cellular service in order to promote "rapid implementation" of the service. *Cellular Order*, 86 FCC 2d at 504-05 ¶ 82. Congress likewise has sought to promote the development of wireless services by limiting the regulatory authority of state and local governments – notwithstanding the traditional role that those governments have had in regulating matters such as intrastate communications and zoning. *See*, *e.g.*, 47 U.S.C. § 332(c)(3)(A), (c)(7).

The *Pinney* court did not discern in Section 332 (or other provisions) of the Communications Act any "congressional objective of achieving preemptive national RF radiation standards for wireless telephones." *Pinney*, 402 F.3d at 457. That court, however, failed to consider the conflict that adjudication of plaintiffs' state-law claims would create with the FCC's valid policies implementing the Act. In developing its RF standards for wireless phones, the FCC considered not only the need to protect the public from the risks associated with excessive RF

18

exposure, but also the effect that its standards would have on achievement of federal communications objectives. The FCC concluded that the particular RF standards it had adopted were "appropriate" because they "addressed specific safety concerns" and "at the same time, allow [providers] to meet the growing marketplace demand for communications services." *Second RF Order*, 12 FCC Rcd at 13508 ¶ 39; *see also id.* at 13505 ¶ 29. In the agency's considered judgment, its RF guidelines "provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." *Id.* at 13496 ¶ 2.

The FCC's decision on where to set "safety margins" is a "policy question," in connection with which the agency legitimately took into account the objective of facilitating the efficient delivery of communications services. *Cellular Phone Taskforce*, 205 F.3d at 92. The FCC's resolution of that policy question constitutes "a ruling that no such [stricter] regulation is appropriate or approved pursuant to the policy of the statute" and, therefore, has the effect of preempting any state law that would impose such regulation. *Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 774 (1947).

The Fourth Circuit also erred in relying on a "presumption against preemption" because plaintiffs' claims relate to the health effects of wireless telephones, and health is a traditional area of state regulation. *Pinney*, 402 F.3d at 453-54 (citing *Medtronic*, 518 U.S. at 485). No such "presumption" applies "where there has been

19

a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). The federal government's presence in the regulation of radio transmission has been predominant for nearly a century. *See generally National Broad. Co.*, 319 U.S. at 210-14 (summarizing federal regulatory history). Moreover, that federal presence is not just "significant," it is exclusive. The states have no authority to regulate the RF transmissions used to provide wireless telephone service. *See supra* pp. 4-5. By failing to recognize this, the *Pinney* court erred.[8]

---

[8] For similar reasons, the Supreme Court has held that there is no presumption against preemption of claims that a defendant defrauded a federal agency when the agency has its own established procedures for detecting, deterring, and punishing fraud. *See Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 348 (2001). In this case, if plaintiffs are correct that defendants have made false statements to the FCC concerning the safety of handheld wireless telephones, the FCC has the authority to take enforcement action against defendants. *See* 47 C.F.R. § 1.17 (requiring regulated entities to make truthful and accurate statements to the FCC); 47 U.S.C. § 503(b)(1)(B) (authorizing the FCC to impose monetary forfeitures on regulated entities that violate FCC rules); 47 C.F.R. § 2.939(a)(1) (authorizing the FCC to revoke the equipment authorization of an entity that has made false statements or misrepresentations to the agency). Therefore, insofar as plaintiffs' claims in this case rest on allegations that defendants misled the FCC about the safety of handheld wireless phones, those claims would be preempted.

## CONCLUSION

For the foregoing reasons, this Court is not bound by, and should not adopt, the Fourth Circuit's preemption analysis in *Pinney* in addressing the question whether the plaintiffs' claims in this case are preempted by federal law.

Respectfully submitted,

OF COUNSEL:

SAMUEL L. FEDER
ACTING GENERAL COUNSEL

FEDERAL COMMUNICATIONS
COMMISSION
WASHINGTON, D.C. 20554

STUART E. SCHIFFER
ACTING ASSISTANT ATTORNEY GENERAL

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

_____/S/_____
THEODORE C. HIRT, DC BAR # 242982
ATTORNEY, CIVIL DIVISION
ROOM 7106
(202) 514-4785
THEODORE.HIRT@USDOJ.GOV

ERIC R. WOMACK, ILLINOIS BAR # 6279517
ATTORNEY, CIVIL DIVISION
ROOM 7218
(202) 514-4020

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL PROGRAMS BRANCH
20 MASSACHUSETTS AVENUE, N.W.
WASHINGTON, D.C.  20530
(202) 616-8470(FAX)

November 21, 2005

# CERTIFICATE OF SERVICE

I, Theodore C. Hirt, hereby certify that on November 21, 2005, I caused a copy of the foregoing Motion of the Federal Communications Commission for Leave to file Amicus Brief, accompanying Memorandum of Points and Authorities, and proposed Order, and accompanying Brief of Federal Communications Commission as Amicus Curiae, to be delivered electronically via the CaseFileXpress eFiling system to the parties on the attached service list:

Jeffrey B. Morganroth, Esq.
Mayer Morganroth, Esq.
Morganroth & Morganroth
3000 Town Center, Suite 1500
Southfield, MI 48075

Sheldon L. Miller, Esq.
Lopatin, Miller, Freidman, Bluestone & Herskovic
3000 Town Center, Suite 1700
Southfield, MI 48075

Joanne L. Suder, Esq.
The Suder Law Firm, P.A.
210 E. Lexington St., Suite 100
Baltimore, MD 21202

*Counsel for Plaintiffs*

Andrew McBride, Esq.
Joshua Turner, Esq.
Wiley Rein & Fielding LLP
1776 K St., N.W.
Washington, D.C. 20006

*Lead Counsel for Defendants*

_____/S/_____
Theodore C. Hirt