UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
NEW YORK SMSA LIMITED PARTNERSHIP d/b/a
VERIZON WIRELESS, NEW CINGULAR WIRELESS          Case No. 07 CV 7637
PCS, LLC, SPRINT SPECTRUM L.P., and OMNIPOINT    (Brieant, J.)
COMMUNICATIONS, INC., a wholly owned subsidiary  (Yanthis, M.J.)
of T-MOBILE USA, INC.,

                        Plaintiffs,

                                                 **MELE DECLARATION**

        -against-

THE TOWN OF CLARKSTOWN and THE TOWN
BOARD OF THE TOWN OF CLARKSTOWN,

                        Defendants.
-----------------------------------------------------------------------X

        AMY MELE, declares under penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

        1.      I am the Town Attorney for the Town of Clarkstown.  I submit this declaration in

support of the cross-motion of the defendants, the Town and its Planning Board (collectively, the

"Town"), for summary judgment dismissing in its entirety the complaint of the plaintiffs-

carriers ("Carriers") challenging the Town's recently amended Wireless Telecommunications

Facilities Law ("Wireless Law").  A copy of the law, Chapter 251 of the Clarkstown Code, is

appended as Exhibit A.

        A.      **TOWN OF CLARKSTOWN**

        2.      The Town of Clarkstown is located in Rockland County, New York, 25 miles

north from midtown Manhattan.  The 2000 Census reported its population at just over 82,000

residents.  The Town encompasses approximately 41 square miles and includes the hamlets of

Bardonia, Central Nyack, Congers, Nanuet, New City (the location of both the Town and

Rockland County seat), Rockland Lake, Valley Cottage, West Nyack, all of the Village of Upper

Nyack, and portions of the Villages of Nyack and Spring Valley.

3.      Clarkstown has an extensive park system that continues to expand as the Town

acquires additional lands for preservation under an "Open Space" program.  Indeed, as explained

in the wireless Facilities Siting Plan further discussed below, Section II:

> The Town of Clarkstown's Park system incorporates
> approximately 700 acres of park land, four Community Centers,
> three outdoor pools, several picnic areas, twelve ballfields, one
> soccer field, tennis courts, four outdoor basketball courts, several
> playgrounds, and use of various school facilities.  Town
> park/preserve lands include Germonds Park, Lake Nanuet Park,
> Congers Lake Memorial Park, Kings Park, Tennyson Park,
> Davenport Preserve, Twin Ponds Park, Zukor Park, West Nyack
> Hamlet Green, and Congers Station Park.  In addition, the Town
> includes several other recreational areas and has county and state
> parks within its boundaries. County Park/recreation areas of note
> include Kennedy Dells Park (179 acres; New City), Dutch Garden
> (3 acres; New City), Demarest Kill Park (30 acres; New City),
> Mountain View Nature Park (83 acres; Central Nyack), Buttermilk
> Falls Park (West Nyack), and Sean Hunter Ryan Memorial Park
> (West Nyack).   The Town is also moving to preserve its
> undeveloped land. Since 2000, the Town Board purchased nearly
> 100 acres of land. These acquisitions range from unused farm
> fields in Congers to wetlands in West Nyack and mountainsides in
> Valley Cottage. The town holds conservation easements for 458
> acres of land around and/or near the Lake DeForest reservoir.

Exhibit B, Wireless Siting Plan, Part II.

4.      A map identifying parks, waterbodies, and historic sites within the Town is

provided as Exhibit 1 to the Siting Plan.  In addition to the extensive Town and County park

system, several New York State parks are situated within the Town: High Tor State Park is

located along the north Town line, Hook Mountain State Park is located in the east part of the

Town, Nyack Beach State Park is located near the Hudson River, and Rockland Lake State Park

is located in the eastern part of the Town.

5.      Situated as it is well-outside of the densely populated New York City area, but

still within a short comminuting distance to Manhattan, the Town and its residents have made a

concerted effort to maintain the Town's predominantly suburban residential character.  Its Town

Board has actively employed its zoning and land use powers to preserve the Town character

while accommodating the necessities of modern life.  One highly publicized example of the

Town's commitment to preserving community character is its determination over the past several

election seasons to prohibit election candidate placards and advertisements along public rights-

of-way, so as to stem the unsightly proliferation of such placards throughout the Town.  The

Town's even-handed enforcement of its anti-placarding zoning law was found to be fully

consistent with controlling U.S. Supreme Court authority by this Court, in Brady-Amoon v.

Gromack, et al., Case No. 05 Civ. 9052 (S.D.N.Y. 2005) (McMahon, J.) (denying a preliminary

injunction for lack of merit to the lawsuit; plaintiff then promptly voluntarily withdrew his

complaint).

6.     Similarly, at a referendum held on November 7, 2000, the residents of the Town

of Clarkstown voted to authorize the issuance of public expenditures of up to $22 million for the

purchase of open space within the Town, further underscoring the Town's and its constituents'

commitment to the preservation of open space within the Town.

7.     The proliferation and potential proliferation of unsightly and immense cell phone

towers, wireless antennas, and other such wireless facilities, and *"the potential cumulative*

*impact of these facilities on its landscape and character"* of the Town has similarly raised

legitimately serious zoning, aesthetic and land use concerns.  Clarkstown Code  §251-10(R).

8.     The Town's Wireless Law was first enacted in 1997, in response to the

Telecommunications Act of 1996.

3

9.      However, since its original enactment, and during the past several years in particular, siting applications became increasingly more complex.  In addition, the Town was faced with ever-changing market forces and rapid changes and deployments of networks and technologies.

10.     Over the past several years, it became increasingly apparent that the Town's existing Wireless Law was ill-equipped to address these changing conditions.  In addition, as set forth in the accompanying declaration of Town Planner Jose C. Simoes ("Simoes Decl."), this necessarily led to delays and complications in the processing of siting applications under the 1997 version of the law.  See generally Simoes Decl., ¶¶6-11.

11.     Against this background, the Wireless Law was substantially revamped and updated in 2007.  The extensive Legislative Intent published in §251-10 of the Wireless Law (2007), summarizes the Town Board's concerns respecting the proliferation of wireless telecommunications facilities, and the Town's commitment to addressing applications and the deployment of wireless telecommunications facilities in a fair and consistent manner, through clear and objective criteria and processes, and subject to reasonably short deadlines to process and determine applications, so as to ensure that the needs of wireless carriers are fully met, while properly balanced against the competing goals and interests of minimizing potentially adverse aesthetic and other and land use impacts:

> § 251-10. Background; legislative intent. A. This chapter is to be known
> as the "Wireless Telecommunications Facilities Law."
>
> B.  The purpose of this chapter is to provide the Town of Clarkstown the
> authority to accommodate and regulate necessary utility infrastructure for
> the provision of wireless telecommunications facilities within the Town in
> a fair and consistent manner in accordance with federal and state laws, to
> encourage the siting of wireless telecommunications facilities in

nonresidential areas on existing structures, to address the safety, visual and aesthetic aspects of wireless telecommunications facilities and to provide for public input in the process of siting wireless telecommunications antenna towers. The purpose of this chapter is also to establish clear standards for the review and siting of wireless telecommunications facilities.

C.  The Town Board finds the regulation of wireless communication facilities is necessary to protect the predominantly suburban residential character of the Town and the property values of the community. Such regulation is needed to protect the character of schools, parks, churches, playgrounds, historic districts, sites and structures; to preserve scenic areas; to minimize aesthetic impacts; to preserve the health and safety of residents; and to respect the need of wireless telecommunications service providers to relay signals without electronic interference from other service providers' operations, while not unreasonably limiting competition among them.

D.  The Town Board declares that the protection of residential areas of the Town from the proliferation of unsightly and otherwise intrusive wireless telecommunications facilities to be of paramount importance and that any local regulations of wireless telecommunications facilities must furnish all possible protection for residential areas and further declares that the provisions of this chapter are to be interpreted to favor protection of residential areas. The Planning Board shall, before issuing a special permit for a wireless telecommunications facility in a residentially zoned area, satisfy itself that all other alternatives have been exhausted.

E.  In general, consolidations, shared use and co-location of antenna and antenna-mounting structures is preferred to the construction of new facilities. The use of alternate technology, including, but not limited to, distributed antenna systems (DAS) and microcells, is declared to be preferred over conventional tower sites.

F.  Congress adopted the Telecommunications Act of 1996 (hereinafter, the TCA) in order to encourage the national use and development of telecommunications and wireless communications.

G.  The TCA has had a significant effect on the deployment of telecommunications and wireless services.

H.  The TCA preempts certain state, local laws and regulations, but reserves some authority of a state or local government or instrumentality thereof over decisions regarding the placement, construction and

modification of wireless telecommunications facilities.

I.  The TCA contains provisions which affect state and local taxation, land use, zoning, public rights-of-way, and general police power.

J.  Developments in telecommunications and wireless technology and regulatory actions by the Federal Communications Commission (hereinafter, the FCC) have resulted in the deployment and proposed deployment of new and changing wireless telecommunications networks throughout New York State, the County of Rockland and the Town.

K.  Significantly increased demands for wireless communications capacity and other developments in telecommunications and wireless technology, as well as regulatory actions by the FCC will likely place additional and continuing demands on the use of the Town's public rights-of-way, public property and private property.

L.  Prior to enactment of amendments to this chapter in 2007, this chapter contained limited provisions regulating the processing, approval and construction of wireless communications facilities in the Town.

M.  The Town first enacted this chapter in 1997, and it had not been revised, changed, updated or amended for the past approximately nine years.

N.  It has become apparent, based on intervening and rapid changes in technologies, FCC regulatory actions and from applications filed with the Town for such facilities, that prior to enactment of amendments to this chapter in 2007, the Wireless Telecommunications Facilities Law did not adequately address, in a comprehensive plan or fashion, the impact of new and emerging technological changes and developments upon the Town's local zoning, powers and interests.

O.  In addition, despite efforts for shared used and co-location of facilities, the threat exists for the proliferation of facilities in residential areas which may alter the residential character of those areas. (emphasis added)

12.     As further set forth in §251-10, the Town commissioned a comprehensive Site

Plan Study in 2006, prepared by a recognized engineering firm, and the 2007 Amendments at

issue are largely the outcome of that detailed and comprehensive study:

P. In 2006 the Town issued a moratorium pursuant to FCC guidelines for the purpose of studying and reviewing issues concerning the current and anticipated deployment and siting of wireless communications facilities in the Town, and related issues and concerns.

Q. The Town commissioned a study to formulate, in consultation with the Town and its professional staff, a wireless telecommunications siting plan. The amendments to the Wireless Telecommunications Facilities Law are intended to adopt and implement those aspects of the plan which the Town Board, following public hearings and opportunities for comment by the telecommunications industry, has determined to approve.

R. The Town is concerned about the potential proliferation of wireless telecommunications facilities throughout the Town and the potential cumulative impact of these facilities on its landscape and character.

S. The goals of the amendments to the Wireless Telecommunications Facilities Law which are being enacted are to develop a process for consistently and fairly evaluating proposed sites for locating wireless telecommunications facilities (WTFs), and to determine how future WTFs can be constructed so that they present the least impact cumulatively as possible which still rendering reliable service.

T. The amendments are, in part, the result of an evaluation of existing WTFs within the Town; coverage maps associated with WTFs located in and around the Town; and land uses. Siting criteria, such as topography, proximity to residential areas and sensitive receptors, and possibility of co-location were identified.

U. The Town has determined that effective means of consistently and fairly evaluating proposed WTF sites while at the same time evaluating the cumulative effects of site applications are: (1) To create an antenna advisory Board whose sole responsibilities shall be to monitor developments in wireless telecommunications, including new technologies and changes in capacity requirements, monitor the cumulative effects of WTFs upon the landscape and character of the Town, and to advise the Planning Board concerning individual WTF site applications, including the aesthetic aspects of proposed facilities, the identification of potential

alternate sites that may be considered, and other items;

(2)  To vest the Planning Board with the authority to rule upon special permit applications for WTFs, as well as related matters;

(3)  To require applicants for such special permits to provide the Planning Board with sufficient data and information to allow it to render an informed decision upon applications;

(4)  To promulgate a preliminary site screening tool to assist the Planning Board in evaluating future applications for WTFs on a consistent and fair basis. This will be achieved by the use of a preliminary screening matrix (Table 1) *Editor's Note: Table 1 is included at the end of this chapter*. as described in §§ 251-14 and 251-15. The matrix identifies site categories for proposed wireless facilities, based on the nature of the applications and 11 evaluation criteria which the Town hereby declares to be important indicators of whether the application should be approved; and

(5)  To promote and encourage comprehensive consideration and understanding of the potential impacts associated with each WTF application, including at a preapplication stage, and potential mitigation measures and alternative technologies that could be implemented to minimize adverse effects on the community. Proposed mitigation would include the use of stealth technology, alternative technology, and/or landscaping and other approaches such as co-location. Proposed alternative technology includes the deployments of distributed antenna systems (DAS) or microcells that are smaller in physical dimensions and that can be mounted on existing utility poles or other structures at relatively low elevations. DAS has been used successfully in many areas of the U.S. as a means to provide additional coverage or capacity in lieu of conventional cell towers.

V.  The Town has further determined that Town-owned property will undergo internal review outside of the permitting process before any wireless telecommunications facilities will be allowed to be placed thereon, and that accordingly Town-owned property shall be exempt from the special permit process.  (emphasis added)

**B.     THE WIRELESS SITING PLAN AND THE WIRELESS SITING LAW**

13.     The Wireless Siting Plan (Exhibit B) was prepared by noted engineering firm

HDR/LMS, Senior Project Engineer Michael P. Musso, P.E., and was filed with the Town Board

in the Fall of 2006.  The Siting Plan studied and examined: existing Town settings, physical

conditions, and demographics; existing wireless carriers; existing wireless sites and coverage

provided; and the 1996 version of the Wireless Law.  It further discussed the

Telecommunications Act of 1996, provided an overview of wireless communications

technologies, and highlighted various issues related to wireless transmission facility siting.  It

additionally discussed wireless siting plan methods, and proposed that the permitting process

should be established to recognize, at the earliest stage, that certain applications implicate

substantially less adverse impacts and warrant less review.  Moreover, the Plan examined and

addressed co-location, less intrusive antennas without immense towers, "stealth" antennas

having little aesthetic impact, and less intrusive technologies which allow for wireless service

without the necessity of large and imposing towers or structures.

14.     As Town Attorney, I together with the Town Attorney's office, and working with

the Town's outside counsel, and with the assistance of the Wireless Siting Plan of HDR/LMS,

reworked and drafted proposed amendments to the Wireless Law.  The process was undertaken

to ensure that the Wireless Law fully complies with the Telecommunications Act of 1996 (TCA),

and specific provisions were included to provide that if denial of any individual application, or

requiring that any particular criteria, would result in an unlawful "prohibition" of wireless

service under the TCA, then application <u>shall</u> be granted or the criteria deemed satisfied.

§251-32(B).

15.     The proposed amendments further recommended a "pre-application" process lasting no more than 45 days, where the carrier-applicant provides limited information concerning its request (i.e. identifies what it is it wants to erect, the proposed location, an engineer's certification regarding any structures, and a reception coverage map, §251-13). This allows the Planning Board to identify the application as bearing a Category A, B, C, or D designation. (Category A designations posing the least anticipated adverse impacts, and Category D designations posing the greatest anticipated adverse impacts). §251-13.

16.     Moreover, so that category designations are made in a fair and consistent and objective manner, the Planning Board is provided a "Screening Matrix" which assigns specific impact factors and points, with the point totals corresponding to one of the four categories (Categories A through D). The Screening Matrix is published as an addendum to the Wireless Law.

17.     The result of the short initial categorization means that those requests which do not seek to erect highly intrusive facilities or structures in sensitive areas such as those near homes or parks, avoid the scrutiny warranted for the more intrusive ones in more sensitive areas. Thus, once an application is found to fall into Category A, the pre-application is deemed to constitute an application, and the site is exempt from the Special Permit requirements. § 251-16. A prompt hearing, scheduled within 14 days, is held concerning only those limited conditions applicable to the issuance of a building permit. Id. A building permit is then promptly issued in the same manner as all building permits. Id.

18.     With respect to Category B, C, and D designations, the Wireless Law requires the

applicant to show that it actually needs the structure and antenna it desires to erect.  The actual

existence of a "gap" in the carrier's coverage is shown through reception coverage maps.

§251-13(12).  For the sake of consistency and objectivity, and so that differing applications can

be compared in a meaningful fashion, the coverage maps must at least show where the carriers

have a level of reception of at least -84 dBm.  Notably, this limited submission requirement is

only what the maps must show, not what the Planning Board may determine is a genuine "gap."

Id.

19.    With respect to the application itself for Category B, C, and D sites, aside from

ordinary descriptive information and a certification of structural soundness, the items to be

included consist almost entirely of items which an engineer will include in a single report.

§251-19(F) (indicating that the enumerated items are satisfied when merely included as part of

an "engineer['s] ... report").  Specifically, under § 251-19(F) the engineer's report is to include:

(a)    General information such as the name of the applicant and the person

preparing the report, and a description of the site and proposed structure and antennas (see items

(5) through (17));

(b)    Information to allow meaningful review of whether an actual gap in

coverage exists, to determine whether denial of an application may constitute a "prohibition" of

wireless services.  See Items (1) (requiring identification of the location and type of existing

wireless facilities in the area), (4) (requiring documentation that the applicant actually needs the

structure and antenna); (27) (a signal strength study of the area (a/k/a "propagation" study)

showing in-vehicle reception);

(c)    Additional quintessentially zoning-related information to allow

meaningful review of the aesthetic and other impacts of the application, as well as "the potential

proliferation of wireless telecommunications facilities throughout the Town and the potential

cumulative impact of these facilities on its landscape and character" (§ 251-10(R) (Legislative

intent)).  See Items (2) (a statement of the carrier's plan for future wireless facilities in the area);

(3) (a commitment to co-locate or allow co-location "wherever possible"); (12) (the location of

the nearest residence or places of public assembly); (14) (description of existing and proposed

landscaping, whether any trees will be removed, drainage controls, and fencing); (18) (a plan for

"effective[] screen[ing]" of the facility "so as to mitigate potential visual impacts"); (22) (a

statement of how he tower will be maintained and inspected); (26) (a certification as to structural

integrity of the tower or other facility); and (28) (notice to New York State environmental, parks,

and preservation agencies and their comments on the application); and

        (d)     The Wireless Law does not regulate radio frequency (RF) transmissions or

emissions.  What it does do is require the applicant to show that it is complying with applicable

FCC regulations and other laws by identifying the radio or transmitter, identifying its radiation

pattern and maximum power, and certifying that these levels "will be within the threshold levels

adopted by the FCC," along with supporting data for the certification, and provide a copy of its

FCC license to operate the facility.  See Items (19) though (21), (23) through (25); these

requirements are supplemented with § 251-21(A) (when a facility is proposed to be placed

within 100 feet of another facility, the other facilities emissions should also be identified); §251-

22(B) (the engineer preparing the report should be a radio frequency engineer or the like); §

251-23 (providing that radiation levels cannot exceed federal and state standards, and describing

the type of assessment information to be provided); § 251-24 (describing how radiation

calculations must be made in accordance with FCC and other federal and generally accepted manners).

20.    The remaining provisions of the Wireless Law are all similarly aimed at lessening potential adverse impacts associated with aesthetics, property values, zoning, and other potentially adverse land use impacts of wireless facilities to the extent feasible.

21.    The application fee is only $500 for Category A and B sites, $1,000 for Category C site ($500 of which is the pre-application fee, and $500 for application fee), and $1,500 for Category D sites ($500 pre-application, $1,000 application).  §251-40.

22.    Even when an application seeks to erect a large metal cell phone tower as high as tall buildings near surrounding residences, the only bond required to ensure maintenance of the tower is a $50,000 bond (e.g., assuming a bonding company charges 1% for such a bond, the carrier's bonding cost is $500).  §251-41.  The bond for non-tower applications is only $12,000 (or $120 per 1% charged by a bonding company).  Id.

23.    The Wireless Law provides that the applicant must pay for such outside technical professionals as may be required for the Planning Board to meaningfully consider the application.  §251-40(C).  Importantly, the exact cost charged by the outside consultant is directly passed on to the applicant; this is not a money-making provision for the Town.  Id.  Under New York Town Law §§118 and 119, because the consultant's fees are charged initially to the Town, they are subject to audit for reasonableness.

**C.    THE PUBLIC HEARINGS AND EXTENSIVE CARRIER INPUT**

24.    On November 14, 2006, the Town Board requested the Town Planning Board to comment upon proposed amendments to the Wireless Law.  Such proposed amendments were

provided to the Planning Board by the Town Attorney on December 15, 2006.

25.     The Planning Board reviewed the proposed changes at its January 8, 2007 workshop meeting, where it heard engineer Michael Musso of HDR/LMS, who additionally presented supporting research.

26.     On January 11, 2007, the Planning Board recommended to the Town Board that the proposed amendments be accepted, with specified recommended revisions, including the specification that coverage maps be required to at least indicate where reception levels are at least -84 dBm.  Exhibit C.

27.     At the same time, the Town convened ad hoc inter-municipality meetings with several other Rockland County municipalities, including several work sessions and a detailed work session held on December 14, 2006, where the proposed Wireless Law was discussed.  A presentation at that meeting was also made by Michael Musso of the engineering firm that drafted the Wireless Siting Plan.

28.     The proposed Wireless Law was presented to the Rockland County Planning Board at its meeting of December 20, 2006.

29.     The Town Attorney and the Town's outside counsel additionally involved the carriers themselves in the process, including by arranging an in-person "Work Session" meeting with lawyers for the various interested wireless carriers held on or about March 14, 2007 during which the Wireless Law was extensively discussed.

30.     In addition, copies of the proposed amended Wireless Law were distributed to various lawyer representatives of wireless carriers, and the Town Attorney asked and encouraged the carriers to provide comments on the proposed amendments so that such comments could be

considered and those deemed warranted could be added to the proposed amendments before the legislation was voted upon by the Town Board.

31.     During the legislative review process, and in connection with the numerous work sessions identified above,[1] several lawyers for a number of carriers submitted to the Town Attorney various letter comments on the proposed amendments.  Exhibit D.   Although most of the comments were made in conclusory and blunderbuss fashion, the Town, with the assistance of its outside counsel, extensively investigated and analyzed each comment.

32.     Several comments resulted in the proposed amendments being changed to accommodate the carriers' concerns.  See Exhibit E, Letter of May 29, 2007 to Carriers' attorneys forwarding "the latest revisions incorporating certain of the carriers' objections and concerns."  Notably, a significant addition made at the request of the carriers, was to allow the Planning Board the authority to "deem" any criteria set forth in the Wireless Law as having been satisfied even if it is not satisfied, in circumstances where a carrier cannot reasonably meet specific criteria, such a relaxation is warranted, or to comply with the dictates of the Telecommunications Act.  §251-18.

33.     Another change made at the request of the carriers was that the provision in §251-34(A) respecting existing towers, antennas or other such facilities was significant relaxed.[2]

---

[1] Annexed as Exhibit F are copies of Town Resolutions which chronicle many of the numerous and extensive public hearings and work sessions that were held in connection with the proposed amendments.

[2] The sub-section as initially proposed read as follows:

> § 251-34 Existing installations.  A.  The operator of any wireless communication facility existing at the time that the 2007 amendments to this chapter take effect shall be permitted to remain

34.     Also at the request of the carriers, the proposed §251-26 was reworded because

the prior version appeared not to allow co-location if an additional antenna would render the

facility non-conforming with existing approvals.  Moreover, at the carriers' request, the

definition of "WTF" was amended to reflect that an entire antenna system constitutes a single

wireless telecommunications facility, not individual "nodes" of a system.

35.     Still another clarification made at the request of the carriers, is that the newly

appointed Antenna Advisory Board (AAB) – which functions entirely as an <u>advisory</u> board and

purely in an <u>advisory</u> capacity – largely replaces the role formerly occupied by the Town's

Technical Advisory Committee (TAC), which up until the recent 2007 Amendments, was

responsible for certain facets of review and processing of applications for wireless

telecommunications facilities.

---

> in operation, <u>provided that the operator submits proof, within six
> months of the enactment of such amendments, that a valid building
> permit has been issued for the facility and that the facility complies
> with the standards adopted by the Federal Communications
> Commission and all requirements of this chapter, as certified by a
> professional engineer with qualifications acceptable to the Town of
> Clarkstown. Operating antennas or towers that are legally
> nonconforming with respect to area regulations of this chapter</u>
> shall be permitted to remain until such time as a request is made to
> modify the antenna or tower.

Responding to the carriers' requests, the proposed Wireless Law was changed, the above-
underlined text was removed, and the newly proposed and adopted language now provides:

> § 251-34. Existing installations. A. The operator of any wireless communications
> facility existing at the time that the 2007 amendments to this chapter take effect
> shall be permitted to remain in operation, subject to the provisions of their
> existing permits and the provisions of this chapter relating to recertification and
> renewal of permits. Operating antennas or towers that are legally nonconforming
> with respect to area regulations of this chapter shall be permitted to remain until
> such time as a request is made to modify the antenna or tower.

36.     Indeed, although it is easy to get lost in the doomsday and overblown rhetoric of the carriers, it is unassailable and indisputable that certain prior and inherent delays associated with TAC review under the prior version of law have now been eliminated and streamlined in favor of the strict time limits and deadlines imposed by the 2007 Amendments.  For example, under the 2007 Amendments, if an application meets the criteria for favorable Category A classification, then a Special Permit is not even required, and the application shall be granted forthwith with virtually no further review or processing whatsoever.  See also Simoes Decl., ¶¶3-14.

37.     Following extensive public hearings and carrier input concerning the proposed amended Wireless Law, the Town Board unanimously enacted the law on July 24, 2007.  Exhibit A.

38.     After due inquiry, it appears that no applications have been filed under the Wireless Law since its enactment in July, 2007.

**D.    CONCLUSION**

39.    Based on the foregoing, and for the additional reasons set forth in the Town's accompanying Memorandum of Law, it is respectfully submitted that the plaintiffs-carriers' motion for summary judgment should be denied, and the Town's cross-motion for summary judgment should be granted.


Dated:    Clarkstown, New York
             March 11, 2008


_____/s/_____
AMY MELE