FEB.06'2007 15:05 914-333-0743          SNYDER & SNYDER                    #3627 P.002

LAW OFFICES OF

# SNYDER & SNYDER, LLP
94 WHITE PLAINS ROAD
TARRYTOWN, NEW YORK 10591
(914) 333-0700
FAX (914) 333-0743

WRITER'S E-MAIL ADDRESS
LSnyder@snyderlaw.net

NEW YORK OFFICE
445 PARK AVENUE, 9TH FLOOR
NEW YORK, NEW YORK 10022
(212) 749-1448
FAX (212) 932-2693

DAVID L. SNYDER*
LESLIE J. SNYDER
ROBERT D. GAUDIOSO

FREDERICK W. TURNER, COUNSEL

*ADMITTED NY, NJ AND DC

NEW JERSEY OFFICE
ONE GATEWAY CENTER, SUITE 2600
NEWARK, NEW JERSEY 07102
(973) 824-9772
FAX (973) 824-9774

REPLY TO:

Westchester Office

February 6, 2007

<u>Via Facsimile & Hand Delivery</u>

Hon. Supervisor Gromack and
Members of the Town Board
10 Maple Avenue
New City, New York  10956

RE:  Proposed Local Law to Amend Chapter 251
     <u>Entitled "Wireless Telecommunications Facilities Law" ("Proposed Law")</u>

Dear Honorable Supervisor Gromack and Members of the Town Board:

As requested by the Board, these are the principal comments and objections of New York SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon Wireless") to the Proposed Law.  These comments address the Proposed Law from practical, state law and federal law perspectives.[1]  Although not an exhaustive statement, we offer these comments as the most constructive contribution we can make at this time, given the schedule set by the Board.

As a threshold matter, we believe it is important that the Board understand that we and the Board are pursuing the same goals.  For example, we support the Town of Clarkstown ("Town") seeking to accommodate telecommunication facilities within the Town in a fair and consistent manner in accordance with federal and state laws.   As you will see in more detail below, one of the issues with the Proposed Law is that it will not further those goals.

Further, we support the Town exercising its authority to pass lawful zoning laws. Verizon Wireless has been a part of the Clarkstown community for many years. Residents of Clarkstown are our customers.   Verizon Wireless employees live in Clarkstown. Beyond that, Verizon Wireless is committed to working with the

---

[1] At the January 23, 2007 hearing, it was noted by Amy Mele, the Town attorney, that the Proposed Law being considered is the version she circulated to the Town Board on January 12, 2007.  That is the Proposed Law to which we refer in this letter.

Town Board
Page 2

community. For example, just last December, the Town of Clarkstown presented Verizon Wireless with a Certificate of Merit "[I]n recognition of [its] continued support and dedication to the Rockland Family Shelter." As stated at the public hearing on January 23, 2007, Verizon Wireless wants to work with the Board and its consultants to develop a law that advances the Town's goals in line with sound siting policy consistent with its stated purposes, state law and federal law.

## Practical Comments and Objections to the Proposed Law

The Town drafted the Proposed Law to influence the behavior of applicants for wireless telecommunications facilities ("WTF")[2] sites in a manner which meets its goals, and directed the preparation of the Town Wireless Telecommunications Siting Plan ("Siting Plan") to work hand-in-hand with the Proposed Law. For this reason, it is essential that both be crafted with the benefit of the knowledge and experience of those who build and operate wireless networks, so that the Proposed Law can achieve its intended effects. No one has more relevant experience than Verizon Wireless, a leading national wireless service provider with experience regarding all types of sites throughout the nation. That is why we expressed our interest in participating in the development of the Proposed Law. Unfortunately, the opportunity to participate was not provided to us or, to our knowledge, the other major national carriers licensed by the FCC to serve the Clarkstown area. As shown below, the lack of that input has resulted in a draft law and Siting Plan that is not a product of "public hearings and opportunities for comment by the telecommunications industry" as contemplated by Section 251-10Q of the Proposed Law.[3] We welcome the opportunity to submit these comments, but they are only the start of the real dialogue required to transform the Proposed Law into one that will achieve the Town's goals.

For example, a major goal of the Town is to incent the provision of wireless service in what it deems to be the most unobtrusive places. More specifically, a stated purpose of the Proposed Law is to encourage "the siting of wireless telecommunication facilities in nonresidential areas on existing structures." [Proposed Law Section 251-10B.] Focusing on this preference for non-residential uses, the Town should want the Preliminary Site Screening Tool (Table 1) (the "Matrix") to rank a WTF on an office building in Category A. However, based upon the Siting Plan, the Matrix would give an installation on an office building such as 25 Smith Street a score of 90, which is less than the 105 required for Category A. [Siting Plan at 4-5.] This would exclude the office building – a nonresidential structure – from the preferred Category A under the Proposed Law. [Siting Plan at 4-5.] This undermines the Town's goal of placing sites on non-residential structures. The Proposed Law also imposes requirements – such as a landscaping and a new tower fall zone -- that have no bearing on certain sites, such as a

---

[2] As used in the Proposed Law, the term "WTF" refers to facilities for the receiving or transmitting of wireless signals for commercial purposes. [Proposed Law Section 251-42.]

[3] As acknowledged at the January 23rd public hearing, the Siting Plan, on which the Proposed Law is based, was first presented to the Town Board, the general public and representatives of the telecommunications industry on January 23rd. By that time, the Town had invested significant resources in the Proposed Law, and believed it was ready to be passed at the hearing.

Town Board
Page 3

rooftop – but yet will prevent the site from becoming a Category A site. The Matrix is, therefore, inherently flawed as a system for identifying appropriate WTF sites.

Similarly, the Town clearly intends the Proposed Law to encourage applicants who need WTF sites to place them at "preferred locations," and intends to accomplish this by making the approval process less burdensome for such locations in the Town. The Siting Plan states that "this document is intended to assist the Town of Clarkstown in identifying the more desirable sites and configurations for WTFs based on locations and impacts." [Siting Plan at 2-1.] It further states that "when an applicant appears before the Planning Board with an application for a facility in a location identified in the Wireless Siting Plan as a preferred location having lesser impacts, a portion of the review will already have been considered and the Planning Board's function is then limited." Siting Plan at 2-2.] But the preferred locations are not defined, despite an extensive Siting Plan. Thus, applicants cannot benefit from the more limited Planning Board review and the Town's goal will not be achieved.

The above examples show that the Proposed Law is not meeting its stated purpose "TO ESTABLISH CLEAR STANDARDS FOR THE REVIEW AND SITING OF WIRELESS TELECOMMUNICATIONS FACILITIES." Proposed Law Section 251-10B. They also show that the Proposed Law does not further the Town's desire that it be an "EFFECTIVE MEANS OF CONSISTENTLY AND FAIRLY EVALUATING THE PROPOSED WTF SITES..."

Another fundamental flaw in the Siting Plan is that it is based upon inaccurate information. For example, it fails to accurately depict Verizon Wireless' sites and coverage gaps. We suspect that the same is true regarding the other wireless carriers licensed to serve the Clarkstown Area. We do not know the source of the information in the Siting Plan, but it is not accurate. For example, in at least one instance, the Siting Plan mistakenly attributes an existing WTF to Verizon Wireless, indicating that the company has coverage that Verizon Wireless does not in fact have. In addition, in an internal contradiction, the Siting Plan describes the coverage currently being provided by Verizon Wireless by depicting it on a map which has written on it "coverage parameters were not available." Siting Plan, Map Exhibits, Exhibit 14. The inaccurate description of Verizon Wireless sites and coverage cannot form the basis for a fair siting decision.

Another Town goal is the placement of WTF sites on existing structures. [Proposed Law Section 251-10B.] But the Proposed Law also discourages this goal. Utilization of existing structures is a key factor in achieving the Town's goal of minimizing "THE PROLIFERATION OF UNSIGHTLY AND OTHERWISE INTRUSIVE WIRELESS COMMUNICATIONS FACILITIES." Proposed Law Section 251-10D. Yet, the Proposed Law requires antennas to be located to the rear of the roof center line, and limits the antenna height to 10 feet above the roof line in a residential district and 15 feet in a non-residential district. [Proposed Law Section 251-25.] Placing the antennas further back on the roof will very likely require them to have additional

Town Board
Page 4

height to clear the roof line of the building to provide coverage to customers. In addition, this requirement limits the number of WTF sites that can go on the existing structure.

Similarly, although the Town wants to limit proliferation of WTFs, the Proposed Law inhibits co-location, which is the basic method for limiting such proliferation. If antenna deployments can be concentrated on one site, then the number of sites needed is minimized. However, Section 251-56 of the Proposed Law prohibits co-location if the site or installation is nonconforming, or if the site or installation becomes nonconforming or increases in nonconformity. This approach is neither realistic nor effective in furthering the Town's goal. If the Town wants to reduce the proliferation of WTFs, co-location should be permitted in all instances, especially where the nonconformity is minimal or of no consequence.

Perhaps most disturbing is the Proposed Law's approach to distributed antenna systems ("DAS"). With no technical basis, the Proposed Law declares: "DAS AND MICROCELLS IS DECLARED TO BE PREFERRED OVER CONVENTIONAL TOWER SITES." Proposed Law Section 251-10E. There is no basis or value in mandating that DAS is the preferred solution for all wireless coverage in the Town. Moreover, it is not clear that the Town itself understands what a DAS network would bring to its doorstep. For example, the use of DAS conflicts with the Town's alleged concern "about the potential proliferation of wireless communications facilities." [Siting Plan, at 2-1, Proposed Law Section 251-10R.] It takes many DAS WTFs to cover the same area covered by one cell site. For example, Attachment J to the Siting Plan prepared by the Shpigler Group assumes that a certain area in the Town could be covered by 5 WTFs. Even at 5 WTFS, they are underestimating the number of WTFs required to cover that area. Further, they failed to recognize that a single tower already exists in Germonds Park that covers most of that coverage need. In short, a DAS preference will promote a proliferation of WTFs. A DAS preference also conflicts with other public policy concerns, possibly limiting E911 capabilities and undermining critical network redundancies. These issues must be given a full airing before the Town commits to the Proposed Law or any similar plan.

As the above shows, the Siting Plan and the Proposed Law are seriously flawed, and require further discussion and revision to be able "TO ESTABLISH CLEAR STANDARDS FOR THE REVIEW AND SITING OF WIRELESS TELECOMMUNICATIONS FACILITIES" and further the Town's goals.

## The Proposed Law Is Inconsistent With State Law

In addition to practical objections to the Proposed Law, we have numerous objections under state law.[4]

---

[4]    These objections under state law, and the objections under federal law that follow, are not intended to be exhaustive or to limit the arguments that Verizon Wireless may make in the future with regard to the Proposed Law.

Town Board
Page 5

First, the Proposed Law has been improperly cast as a standard local law under Municipal Home Rule Law ("MRL") rather than as a zoning law under New York State Town Law. This is significant because the Proposed Law is not authorized under the MRL, and the process for enacting a zoning law serves to ensure that landowners are put on notice as to the zoning requirements applicable to a particular district. Here, the Proposed Law is clearly a zoning law "since its intent and effect is consistent with that of a zoning law in that it regulates, among other things, setback distances, tower heights and aesthetic impact of telecommunications towers." *Independent Wireless One Corporation v. Town of Maryland Planning Board,* 191 Misc. 2d 168 (2002). Therefore, the Proposed Law should be made part of Chapter 290, the Town of Clarkstown's zoning code, and its enactment should follow the required procedures for a zoning law.

Second, the Proposed Law prescribes an impermissibly vague process for the ranking and review of WTFs. For example, the Matrix used to rank WTFs contains criteria so ambiguous and arbitrary that it provides no objective standards for the Planning Board to apply. Once categories are assigned, the Proposed Law states that Category A sites require a site permit from the Building Inspector and "Planning Board approval on the aesthetic considerations." [Proposed Law Section 251-15C. The Proposed Law also demands that the Planning Board hold a public hearing on a Category A application and place any conditions on the Category A site permit issued by the Building Inspector. However, there is no provision for when the Planning Board must hold the public hearing or criteria upon which the Planning Board must base its decision. Further, under state law, a Planning Board's authority is limited to the review and approval of certain types of applications, none of which are called for under Section 251-16 of the Proposed Law. *See McEnroe v. Planning Bd. of Town of Clinton,* 307 N.Y.S.2d 302 (1969).

Third, the Proposed Law provides an unlawful exemption for town properties. The Proposed Law's exemption is contrary to state law because there is no legitimate governmental purpose for treating town properties different from others. *Countryman v. Schmidt, 673 N.Y.S 2d 521 (1998).* If the Town wishes to make its properties available for WTFs, it should list them as "preferred locations" and allow the Building Inspector to issue a building permit when a site is proposed on these locations.

Finally, the Proposed Law violates state law to the extent that Section 251-34 requires existing WTFs to comply retroactively with "all requirements of this chapter." Retroactively applied laws are not favored by New York Courts. *People v. Miller,* 304 N.Y. 105 (1952); *Green v. Bd. of Zoning Appeals,* 700 N.Y.S.2d 299 (N.Y. App. Div. 1999). Moreover, it is clear that an amendatory zoning regulation cannot be applied so as to require destruction, removal, or abatement of pre-existing structures or uses. *Ilasi v. Bd. of Zoning Appeals,* 359 N.Y.S.2d 372 (N.Y. App. Div. 1973). Therefore, the prevailing law in New York State makes it unlawful for the Town to enact a zoning regulation that applies retroactively to WTFs and antennas that were already lawfully in operation.

Town Board
Page 6

## Objections to the Proposed Law under Federal Law

In addition to the practical operational and technical issues, and the state law issues described above, Verizon Wireless is concerned because the Proposed Law, as written, violates federal law. As with all the comments in this letter, in the interest of ensuring a satisfactory resolution that meets the Town's needs while avoiding protracted controversy, Verizon Wireless takes this opportunity to outline its concerns and will be happy to discuss solutions that would better align the Proposed Law with federal telecommunications law.

Because "[n]o state lines divide the radio waves, and national regulation is not only appropriate but essential to efficient use of radio facilities," the Supreme Court has long recognized the strong, and exclusively federal, interest in the regulation of radio transmissions. *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 279 (1933). Consistent with this principle, Congress created the Federal Communications Commission ("FCC" or "Commission") to oversee a standardized, national policy framework governing communications by wire or radio. *See* 47 U.S.C. § 151. In the 1990s, endeavoring to mitigate tensions between this federal interest, on the one hand, and state and local authority over land use and zoning concerns, on the other, Congress enacted several new provisions relevant to this matter. In what became section 253 of the Federal Communications Act, 47 U.S.C. § 151 *et seq.* ("FCA"), Congress provided that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Section 332(c)(3)(A) states that "no State or local government shall have any authority to regulate the entry of . . . any commercial mobile service." Section 332(c)(7)(B)(i)(II) of the FCA precludes local siting decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." Finally, Section 332(c)(7)(B)(i)(I) precludes a state or locality from "unreasonably discriminat[ing] among providers of functionally equivalent services."

These provisions and others reflect Congress's attempt to reconcile municipal zoning powers with the general legal principle that a state or local requirement is "nullified" to the extent that it "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," "actually conflicts with federal law" or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Electric Co.*, 496 U.S. 72, 79 (1990); *Fidelity Federal Sav. & Loan Ass'n*, 458 U.S. at 153, *quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Among other things, they preclude state and local regulations that impinge on the Commission's core regulatory functions or unduly burden carriers in the provision of service. In the FCC's words, these provisions prohibit localities from enacting an additional layer of telecommunications regulation that extends far beyond the statutorily protected municipal interests in managing the public rights-of-way and protecting public safety and welfare." *TCI Cablevision of Oakland County, Inc., Petition for Declaratory Ruling, Preemption and Other Relief Pursuant to 47 U.S.C. §§ 541,*

Town Board
Page 7

*544(e), and 253*, 12 FCC Rcd 21396, 21399 para. 8 (1997). Even requirements meant to
further legitimate local prerogatives will fall where they are inconsistent with federal
telecommunications policy. *See MetroPCS, Inc. v. City and County of San Francisco*,
400 F.3d 715, 736 (9th Cir. 2005) (section 332(c)(7)(B)(i)(II) "represents a congressional
judgment that local zoning decisions harmless to the FCC's greater regulatory scheme –
and only those proven to be harmless – should be allowed to stand").

        In light of this background, Verizon Wireless is concerned that the Proposed Law
conflicts in several respects with the FCA. We highlight some of the most pressing areas
of concern below. Specifically, the Proposed Law is not technologically neutral, instead
creating a sharply discriminatory regime favoring proposals relying on DAS. This
approach contravenes federal decisions preserving carriers' discretion to choose the
technologies and architectures they use to provide service. It would also unfairly exempt
proposals for deployment on Town property, violating express statutory prohibitions
against unreasonable discrimination in siting decisions. Moreover, the Proposed Law
would impose unlawfully severe burdens on all providers, contravening statutory
prohibitions against burdens that may undermine a carrier's ability to provide service.
Further, it would flout the federal government's exclusive authority – not to mention the
FCC's specific decisions – regarding issues such as E911, radiofrequency ("RF")
regulation, and the technical aspects of coverage needs.

        As an initial matter, the Proposed Law would create a steeply slanted playing
field, discriminating against carriers proposing to use traditional architectures and
technologies. The proposed site-screening tool accords 30 points for use of DAS – more
points than are available for any other characteristic, and half of the total number of
points necessary for the avoidance of numerous draconian requirements. Proposals not
relying on DAS are almost certain to fall into "Category D," which requires submission
of "a report … demonstrating in detail the technological reason to justify why alternate
technologies cannot be utilized." Non-DAS applicants will also be subject to a host of
other burdensome mandates. They must, for example, submit in-building and outdoor
coverage maps for the proposed site and adjoining sites; perform and submit a "visual
influence analysis; and, where "supplemental capacity is the major objective for the
applicant…," must include a detailed "capacity analysis" evaluating existing coverage.
They must also submit proof of prior efforts to collocate their facilities on existing
towers. By increasing costs, delays, and procedural hurdles, these intrusive requirements
effectively mandate the use of a DAS solution in virtually all cases, even when that
architecture is not appropriate or in the public interest as defined by federal law.

        This effective DAS mandate is inconsistent with the FCC's flexible regulatory
regime. The Commission has repeatedly and consistently championed "technological
neutrality," the proposition that "all providers of the same service must be treated in a
similar manner *regardless of the technology that they employ*," and that "[r]egulation
must not have the effect, unintended or otherwise, of favoring the adoption of certain
technologies over others." Remarks of FCC Chairman Kevin J. Martin, TELECOM 05
Conference, United States Telecom Association, Las Vegas, NV; Delivered via Satellite

Town Board
Page 8

from Washington, DC, 2005 FCC LEXIS 5797 (October 26, 2005) (emphasis added).
Time and again, the Commission has left choices regarding network technology and
architecture to carriers themselves. *See, e.g., Amendment of the Commission's Rules to
Establish New Personal Communications Services, Second Report and Order*, 8 FCC
Rcd 7700 paras. 136-137 (1993) (declining to impose detailed technical standards on
PCS licensees in part because "imposition of a rigid technical framework at this time may
stifle the introduction of important new technology"); *Promotion of Competitive
Networks in Local Telecommunications Markets* et. al, 14 FCC Rcd 12673, 12686 paras.
24-25 (1999) (explaining that "[i]n order for competitive facilities-based networks to
develop and flourish," providers "must be free to provide services in the manner that will
enable them most efficiently to offer the services, or combinations of services, that
consumers desire"); *Amendment of Part 2 of the Commission's Rules to Allocate
Spectrum Below 3 GHz for Mobile and Fixed Services to Support the Introduction of New
Advanced Wireless Services, including Third Generation Wireless Systems* et al., 16 FCC
Rcd 596 para. 21 (2001) ("The Commission traditionally has taken a flexible approach to
standards and generally does not mandate a particular type of technology, leaving such an
outcome to the marketplace.").

The Proposed Law would eliminate this carrier choice, in violation of FCA
section 253. That section -- designed precisely to ensure that siting decisions were not
used to countermand FCC policy decisions – "bars state or local requirements that restrict
the means or facilities through which a party is permitted to provide service." *The Public
Utility Commission of Texas et al., Petitions for Declaratory Ruling and/or Preemption of
Certain Provisions of the Texas Public Utility Regulatory Act of 1995*, 13 FCC Rcd 3460,
3496 para. 74 (1997). If enacted as written, of course, the Proposed Law would do just
this, substantially circumscribing (if not eliminating) carriers' flexibility in selecting
network architectures and technologies. It therefore would run afoul of federal law.
Simply put, DAS cannot and should not be the only solution effectively available for
Clarkstown deployments.

Even if the Proposed Law's discriminatory preferences did not constitute effective
"mandates," the additional burdens placed on providers seeking to deploy traditional
technologies also substantially impair the ability of such applicants to provide service,
and are therefore incompatible with sections 253(a) and 332(c)(7). A local requirement
need not be "insurmountable" to violate section 253(a); what matters is whether the
regime "materially inhibits or limits the ability of any competitor or potential competitor
to compete in a fair and balanced legal and regulatory environment." *TCG New York,
Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (internal citations omitted).
In the case of Category C and D applicants, the Proposed Law does just that. As
described above, such applicants would face tremendous burdens under the Proposed
Law. Those burdens themselves violate federal law, even if they do not outright preclude
the use of traditional architectures. Moreover, the fact that such applications might still
be granted is immaterial; these requirements will subject applicants to unlawful burdens
*even if they are ultimately surmounted.*

Town Board
Page 9

Furthermore, the "escape hatch" for carriers proposing to build on Town property renders the scheme *more* troubling, not less so. The Proposed Law would discriminate not only in favor of "wireless telecommunications facilities upon town owned property," but also in favor of the Town itself, *vis-à-vis* other potential tower site landlords. The Town's exemption would direct revenues to the Town, and away from private landowners subject to requirements the Town would decline to apply to itself. This regime would be entirely inconsistent with section 332(c)(7)(B)(i)(I)'s prohibition against discrimination in siting decisions – a provision designed, in Congress's words, "to ensure that a State or local government does not in making a decision regarding the placement, construction and modification of facilities of personal wireless services … unreasonably favor one competitor over another." H.R. Rep. 104-458, 208 (1996).

The Proposed Law would trample on federal prerogatives and conflict with federal policy in other ways as well. First, to the extent the Proposed Law pressures carriers to utilize DAS networks, it is inconsistent with federal policies regarding wireless carriers' E911 capabilities. FCC rules compel wireless licensees to offer geolocation solutions that meet certain accuracy requirements, *see* 47 C.F.R. §§ 20.18(e), (h), and permit carriers to choose between "network-based" solutions and "handset-based" solutions, *see id.* §§ 20.18(f), (g). However, DAS can significantly undermine the accuracy of network-based E911 solutions, potentially jeopardizing public safety, and undercutting federal E911 policy.

Second, the Proposed Law would inappropriately regulate siting on the basis of RF emissions. Section 332(c)(7)(B)(iv) of the Communications Act expressly prohibits localities from considering these issues in making siting decisions. Interpreting this provision, the FCC has concluded that "State and local governments are broadly preempted from regulating the operation of personal wireless service facilities based on RF emission considerations. Thus, for example, a local government … may not restrict how a facility authorized by the Commission may operate based on RF emissions or any other cause." *See Procedures for Reviewing Requests for Relief From State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934,* 15 FCC Rcd 22821, 22828 para. 17 (2000). The Proposed Law's RF compliance requirements purport to do just this, and therefore violate federal law.

Third, the Proposed Law appears to dictate specific levels of RF coverage, certain capacity thresholds, and interference issues which violate federal policy. Specifically, the draft requires applicants to provide "signal propagation [sic] or coverage maps, showing (a) the existing facilities around proposed site, and (b) the in-vehicle (-84 dBm or lower) coverage modeled for the proposed facility." [Proposed Law Section 251-13A(12).] It also mandates evidence of non-interference being presented to the Planning Board. [Proposed Law Section 251-22(A)(3)]. The apparent assumption here is that the Town will decide what coverage characteristics warrant deployment of new facilities, and might reject applications on this basis. However, the FCC has long "assert[ed] federal primacy over the areas of technical standards … for cellular service," *Use of Bands 825-845 MHz and 870-890 MHz,* 86 F.C.C.2d 469, 504-05, para. 82 (1981), and has expressly declared

Town Board
Page 10

that its technical standards for wireless services preclude additional state or local regulation: "It is imperative that no additional requirements be imposed by the states [or their political subdivisions] which could conflict with our standards and frustrate the federal scheme for the provision of nationwide cellular service." *An Inquiry Into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems*, 89 F.C.C. 2d 58, 95 para. 81 (1982). To the extent the FCC has exercised its exclusive authority, it has worked to *preserve carrier discretion*, as described above. Thus, any reliance on specific coverage metrics to deny a siting request would regulate in an area reserved to federal authority, and would do so in a manner inconsistent with federal policy.

\*         \*         \*

As noted above, Verizon Wireless raises these issues not to obstruct the Town's efforts but rather to foster constructive dialogue. Such dialogue, in Verizon Wireless's view, can ensure that the Town's interests are satisfied in a manner consistent with coverage needs, carrier operations and applicable legal requirements. The Town must also ensure that its requirements – however well intentioned – do not impermissibly tread on core regulatory concerns reserved to the FCC, by eliminating requirements that turn on RF exposure or coverage needs as well as those that might undermine a carrier's ability to comply with the FCC's E911 rules and other federal mandates. Steps such as these would ameliorate some of the legal difficulties discussed above, without sacrificing the Town's stated policy objectives.

We are hopeful that upon your review of the concerns noted above, the Town will work with Verizon Wireless and have the meaningful discussion necessary for the Town to develop a law that advances the Town's goals in line with sound siting policies and applicable law. We look forward to working with the Town.

Sincerely yours,

Leslie J. Snyder

cc:    Amy Mele, Town Attorney
       Edward Ross, Clarkstown counsel
       Mike Haberman
       Alison Brotman
       Sheryl Stoessel
       Michael Holden
       Bryan Tramont

FEB-06-2007 TUE 01:31 PM CUDDY&FEDER LLP          FAX NO. 9147616327              P. 02/07



445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel 914.761.1300  Fax 914.761.5372
www.cuddyfeder.com

February 6, 2007

<u>BY HAND</u>
Hon. Alexander Gromack, Supervisor and Members of the Town Board
Town of Clarkstown Town Hall
10 Maple Avenue
New City, New York 10956

Re:   Town of Clarkstown Wireless Siting Plan, January 2007 &
      <u>Town of Clarkstown Proposed Local Law Amending Chapter 251 of the Town Code</u>

Dear Supervisor Gromack and Members of the Town Board:

As you will recall, we appeared at your January 23, 2007 initial public hearing with respect to
the above referenced matters on behalf of our client, New Cingular Wireless PCS, LLC
("Cingular"). At that time, we advised you of Cingular's desire to have a meaningful opportunity
to review the Wireless Siting Plan prepared and assembled by Mr. Michael Musso of HDR/LMS
(the "Wireless Plan") and comment on the Town's proposed local law to amend Chapter 251 of
the Town Code ("Wireless Amendment"). In response to that and other comments from wireless
carriers, your Board held the hearing open and we thank you again for your consideration in this
regard.

Since that time and in the past two weeks, we have received copies of Mr. Musso's Wireless Plan
and correspondence from the Town Attorney requesting that our comments on the Wireless
Amendment be directed to your Board by February 6th. We have also had an opportunity to go
over the contents of both the Wireless Plan and Wireless Amendment with our client. This letter,
while no means exhaustive, is intended to provide you and your consultants with comprehensive
comments on the contents of the Wireless Plan and both practical and legal considerations with
respect to the Wireless Amendment. We trust that upon reviewing same, your attorneys will
acknowledge the utility of having a face to face meeting with wireless carrier representatives
prior to any adoption of the Wireless Plan as the Town's formal policy or any further
consideration of the Wireless Amendment as new legislation in the area of wireless facility
siting.

<u>Ten Years of Wireless Siting in the Town of Clarkstown</u>

Since the Town's mid 1990's moratorium and adoption of the existing wireless siting law in
1996, as set forth in Chapter 251 of the Town Code ("Existing Wireless Law"), our client has
worked with the Planning Department, Technical Advisory Committee ("TAC"), Planning Board
and even the Town Board to try and come up with practical solutions to wireless siting in the
Town. While such constructive efforts were not always expedient and many times resulted in a
period of years to get an application to the point of approval, Cingular worked towards such

FEB-06-2007 TUE 01:31 PM CUDDY&FEDER LLP          FAX NO. 9147616327          P. 03/07



Page 2

solutions that both the Town and its constituents could get behind and which met the letter and spirit of the law set out in Chapter 251. These conciliatory efforts were made despite requirements under federal law requiring timely review and decision making on any specific application for a wireless facility and which could have been fairly challenged in many prior siting matters in the Town. Indeed, it is fair to say that cooperation, and not litigation, was the tool of choice by wireless carriers in approaching siting issues within the Town.

<u>The Town's Existing Wireless Law - Substance & Process</u>

The Existing Wireless Law encourages siting on existing structures in commercial areas by permitting them by-right and otherwise requires a special permit for all other sites including towers. With respect to residential areas, the Existing Wireless Law discourages any such siting and already requires the Planning Board to evaluate alternatives in such circumstances. Simply put, the Existing Wireless law implements an overall Town policy with respect to wireless siting which provides appropriate incentives to the wireless industry and puts the industry on notice of special concerns in the community.

The current process of appearing before TAC, with its Planning Board representatives and professional staff advising wireless carriers from the Town's perspective, has worked well to head off issues before getting to the Planning Board and a public hearing on any special permit application. Thereafter, the public has always had a full and fair opportunity to comment on any special permit application and participate fully prior to any decision by the Planning Board to either approve or deny an application. Indeed, the Planning Board is well versed in all the site specific issues by the end of the process and fully equipped by its professional staff to adopt resolutions supporting a special permit decision one way or the other.

In our experience, the Existing Wireless Law has really only been problematic where it is inflexible requiring variances from the Zoning Board of Appeals to accomplish something that is otherwise appropriate from the Planning Board's perspective in terms of a new wireless site and for which it thinks a special permit should be granted. Moreover, we've never seen the Existing Wireless Law interpreted in a way which led to approval of an "unsightly" tower in a residential area. As such, other than the need to delete a few provisions that violate federal law (emissions testing, etc.), we believe the Existing Wireless Law already provides a regulatory framework for the Town's substantial oversight and control of wireless facility development in the Town of Clarkstown.

<u>Status of Wireless Service in the Community</u>

Carriers have tried to exhaust siting in commercial areas and have long avoided, to the extent possible, siting in residential areas. In fact, as is evident from the inventory of existing wireless sites set forth in the Wireless Plan, siting efforts by the wireless industry over a ten year period have resulted in service along portions of I-287, the Palisades Interstate Parkway, NYS Route 59, and portions of other heavily traveled State Routes such as Route 303 and 304. Unfortunately, there are still large areas of the Town where wireless services are wholly inadequate to non-



Page 3

existent. That coupled with increased demand for wireless services exacerbates the existing gaps in service, a fact which your consultant Mr. Musso readily acknowledges in the Wireless Plan. Indeed, given the Town's Existing Wireless Law, it is not surprising that many of the areas with poor service are residential in nature as documented in the Wireless Plan.

<u>Solutions to Providing Service in Areas of Town Without It?</u>

The Town must recognize the need for its residents to have access to wireless services for personal, professional and public safety purposes. Even without revision, the Existing Wireless Law has had the effect of delaying the provision of state-of-the art technology to the residents of Clarkstown in contrast to the efforts of other cities and municipalities to "get connected" ubiquitously as quickly as possible to participate in all aspects of global commerce. Legally and factually, wireless services are a vital utility which all residents should have access to whether they are at home, in their car, or at the office. Accordingly, the question is not whether such services should be provided to the public, but how and in what manner.

When we read the Wireless Plan prepared for the Town, we looked for specific recommendations on siting in areas already known by the Town to be a problem. Indeed, we expected that Mr. Musso would have identified specific sites in his report and recommended that the Town further investigate them with the carriers so that we could work with the Town collaboratively on solutions that would provide service and do so in a way which protects the character of the community. Unfortunately, the Wireless Plan contains no real siting recommendations or solutions in these areas of Town.

Instead the Wireless Plan contains photos of "stealth" options the industry developed and has even deployed in Clarkstown. The Wireless Plan also attaches a business consulting firm's "report" that distributed antenna systems are the wave of the future and economically viable in Clarkstown including a purported "feasibility" study for one area of the Town. These ideas and technologies provide no real news to the wireless industry and the information presented in the Wireless Plan is less than complete and fully accurate.

For example, Cingular's RF engineers have previously evaluated the Lake De Forest area of Town and believe much of it can be served with the recently approved tower in Germonds Park and a well concealed tower at the Town's composting site at French Farms, a project which we tried to pursue in 2004. This alternative is preferable as compared with the multiples of DAS nodes it would realistically take to provide comparable coverage, many more than that identified in the Wireless Plan, and many of which would be in residents' front yards and would not be practically feasible to implement in this area of Town for any number of reasons. Unfortunately, your DAS consultant was apparently not even aware of the coverage that will be generated from the Germonds Park site which is on Town owned property and is under the impression that a DAS network could be implemented with a mere 5 nodes, the supporting facts for which can not be found in the Wireless Plan itself. Moreover, from Cingular's own site searches in 2004, we already know that St. John's Episcopal Church is not interested in leasing its building to host antennas of any kind, a site identified by your consultants as a possibility for DAS.

C&F: 714164.1



Page 4

Ultimately, the Wireless Plan concludes with a 28 page draft Wireless Amendment which we view as anything but constructive and which would make the siting process in areas of Town without service that much more likely to be the subject of litigation for the reasons more specifically set forth below.

<u>Specific Comments on the Town's Proposed Wireless Amendment</u>

As requested, we are providing comments on the specifics of the Town's proposed Wireless Amendment. In lieu of going through the law line by line and addressing every infirmity, we have highlighted many for your consideration. For ease of use they have been grouped into three categories as set forth below.

<u>Federal Law</u>

- The entire scheme of regulation creates barriers to entry for carriers and effectively prohibits the provision of wireless services in contravention of the Communications Act as amended by the Telecommunications Act of 1996. <u>See</u> 47 U.S.C. § 253 and 332.
- Sections 251-13A(12) and 251-19G(8) of the Wireless Amendment seek to establish a technical standard and definition for "wireless service" in Town (in-vehicle only) that is in contravention of the Communications Act as amended by the Telecommunications Act of 1996 and FCC rules and regulations. <u>See</u> 47 U.S.C. § 332; 47 C.F.R. Parts 22 and 24
- The Existing Wireless Law and Sections 251-23 and 24 of the Wireless Amendment seek to regulate the environmental effects of emissions from wireless facilities in violation of Federal Law. <u>See, Cellular Phone Taskforce v. FCC</u>, 205 F.3d 82 (2d Cir. 2000).
- Section 251-22A(3) of the Wireless Amendment seeks to regulate interference, an area preempted under Federal Law. <u>See</u> <u>Freeman v. Burlington Broadcasters, Inc.</u>, 204 F.3d 311 (2d Cir. 2000).
- Section 251-13B(2) seeks to invalidate a wireless carrier's right to seek redress in Federal Courts as provided for in Section 332 of the Communications Act as amended by the Telecommunications Act. <u>See</u> 47 U.S.C. § 332

<u>State Law</u>

- Section 10 of the New York State Municipal Home Rule does not authorize this type of legislation in addition to zoning which is properly the subject of Sections 264, 265 and 274-b of the New York State Town Law and Chapter 290 of the Town Code. As such, the entire regulatory scheme would need to be reworked into Chapter 290 of the Town Code, inconsistencies in its application with Chapter 290 resolved and special permit criteria developed that are allowed under New York State law.

C&F 714164.1

CUDDY &
FEDER

Page 5

- Section 251-11D of the Wireless Amendment should be revised. The exemption is a municipal preference that violates New York State Constitutional requirements associated with other property owners in the Town. See Countryman v. Schmitt, 176 Misc.2d 736 (Monroe Co. 1998).
- The Wireless Amendment's "Site Screening Tool" is vague, subject to arbitrary interpretations and contains criteria that are not legitimate planning and zoning objectives authorized under New York State enabling legislation.
- The Wireless Amendment illegally delegates to an Antenna Advisory Board and the Planning Department the interpretation of what is zoning and must be administered by a zoning enforcement officer with a right of appeal to the Zoning Board of Appeals.
- The Wireless Amendment seeks retroactive application to existing wireless sites in contravention of New York State zoning enabling legislation and property rights protected under the New York State Constitution.

Practical Considerations

- Creation of an Antenna Advisory Board made up of political appointees to administer "completeness" and a "points matrix" under the Town's Wireless Siting Law is inappropriate and the existing TAC based system as utilized for all other development in the Town should continue to be utilized for assessment of wireless facility special permit applications.
- The multi-stepped completeness and points scoring procedural process is rigid and will further complicate constructive communication between applicants and the Town which currently takes place at TAC. This will no doubt result in miscommunication and a delay in getting to the "heart" of any application which is intended to provide service in the community.
- The point's matrix is so vague and arbitrary in its application that it will not achieve the intended result which is presumably to provide applicants a regulatory roadmap at finding "A" sites. Indeed, many of the Town's purported preferences as stated in the Wireless Plan could be "D" sites including DAS nodes that might require a new distribution pole in a residential area next to a school and which can't meet setback requirements.
- Section 251-26 irrationally prohibits co-location opportunities on non-conforming sites. Why would the Town want to prohibit a carrier from putting antennas or upgrading same on an existing 150' tower?
- Instead of requiring variances, the Planning Board should be empowered to grant waivers where it makes an appropriate finding that the waiver would be in furtherance of the goals and objectives of the Wireless Siting Law and not contravene the public's health safety or welfare. One prime example includes the new rooftop setbacks which might require antennas to be mounted higher and be more visible in contravention of the stated purposes of the Wireless Amendment.

C&F: 714104.1



Page 6

Conclusion

Your consultants and advisors have obviously worked hard over the past several months to put forward draft documents for your consideration on this important topic. Given that our client and the wireless industry were not consulted with prior to public introduction of the Wireless Plan and Wireless Amendment, we find ourselves in the unenviable position of being both critical of what we have read and at the same time asking for the Town to work with us to come up with practical solutions to the needs of the community when it comes to the facilities required to provide the public with wireless services. We nevertheless find that many of the statements contained in the Wireless Plan (specifically as it relates to DAS) are erroneous and provide a faulty premise upon which to regulate by way of the Wireless Amendments. Moreover, the Wireless Amendments contain numerous legal deficiencies under Federal and New York State Law and are simply not practical in their potential application to real world siting issues the Town and industry face.

As such, having now had an opportunity to review these documents, Cingular recommends that the Town utilize the Wireless Plan's contents as talking points with the wireless industry and invite us and Cingular's technical staff to work with you further on practical solutions in areas where the Town is devoid of service. Some potential solutions that Cingular has explored previously should no doubt be revisited including use of Town owned property such as the composting site in the Lake De Forest area of Town. In the interim, the Town should simply trust that the Existing Wireless Law more than adequately protects the residents of the Town of Clarkstown from the "proliferation of unsightly towers in residential areas", that there simply is no compelling need for the Wireless Amendments and that spending any more time and resources on legal issues associated with it fails to serve the interests of the community.

On behalf of Cingular, we thank you for your consideration of this letter and its enclosures and would welcome the opportunity to work with your advisors further on these matters.

Very truly yours,

Christopher B. Fisher

CBF/jv
cc:    Thomas Ambrosino, Cingular
       Jay Perez, Esq., Cingular
       Amy Mele, Esq., Town Attorney
       Edward Ross, Esq., Clarkstown Counsel

C&F: 714164.1

FEB-06-2007  12:58      FROM-                                    T-965  P.002/010  F-248

# FACSIMILE COVER SHEET



SAUL
EWING
Attorneys at Law
A Delaware LLP

Lockwood Place
500 East Pratt Street
Baltimore, MD 21202-3171

**From:**  KARL J. NELSON, ESQUIRE          **Date:**     February 5, 2007
**Pages (including cover):**  9                **Direct Phone:**   410-332-8663
**Client/Matter #:**  946899.78               **Direct Fax:**    410-332-8184
**User #:**  4461        *T-Mobile USA, Inc.*   **Sender's Floor:**
                        *Re: Wireless*

| **To:  Name** | **Fax Number** | **Phone Number** |
|---|---|---|
| Honorable Supervisor Gromack and Members of the Town Board | 845-639-2189 | |

| **CC:  Name** | **Fax Number** | **Phone Number** |
|---|---|---|
| | | |

**Comments:**

Note the attached

☐ The Original will be sent by regular mail.
☐ The Original will be sent by overnight delivery.
☐ No Original will be sent.

**IMPORTANT NOTICE**

This transmission is intended only for the addressees named above and may contain information that is privileged, confidential, or otherwise protected from disclosure to anyone else.  Any review, dissemination or use of this transmission or its contents by persons other than the addressees is strictly prohibited.  If you have received this facsimile in error, please telephone us immediately at (410) 332-8640 and return the original to us by mail at the address stated above.

FEB-06-2007 12:59    FROM-              T-965  P.003/010  F-248

Karl J. Nelson

Phone: (410) 332-8663

Fax: (410) 332-8184

knelson@saul.com

www.saul.com

# SAUL EWING
### Attorneys at Law
A Delaware LLP

February 5, 2007

<u>**VIA FEDERAL EXPRESS AND FACSIMILE**</u>

Alexander J. Gromack, Supervisor
and Town Board Members
Town of Clarkstown
10 Maple Avenue
New City, New York 10956

Dear Supervisor Gromack and Town Board Members:

        T-Mobile USA, Inc. ("T-Mobile") submits the following comments in response to the Town Attorney's January 26, 2007 letter. While T-Mobile welcomes the opportunity to offer comments, it is disappointing that Clarkstown proposed expansive amendments to the wireless telecommunications regulations without any apparent substantive input from the wireless carriers. There are, as explained in detail below, numerous structural and other problems with the proposed amendments that reflect the lack of industry participation in the process. Accordingly, while T-Mobile recognizes that the amendment process is well underway, the company believes strongly that the Town should take a step back and re-commence the process with industry involvement. Only through participation by all interested parties can a workable siting ordinance be crafted.

        Should the Board decide not to accept direct wireless carrier participation in the amendment process, T-Mobile asks that you give consideration to the comments set forth below. Those comments are divided into two basic types: (1) overarching and structural concerns relating to the ordinance as a whole; and (2) text-specific concerns.

## <u>OVERALL CONCERNS</u>

        Before turning to the specific ordinance provisions, it is productive to examine the scheme as a whole. T-Mobile operates in every major market across the United States. It is intimately familiar with siting practices throughout the country, and has analyzed the proposed scheme in that context. In sum, the burdens and restrictions associated with the proposed legislation will far exceed those present in most jurisdictions. Indeed, from a holistic perspective, the ordinance as amended will be among the most restrictive of any that T-Mobile has encountered. The nature of the review contemplated, its two-tiered structure, the types and

Lockwood Place – 500 East Pratt Street – Baltimore, MD 21202-3171

Phone: (410) 332-8600 – Fax: (410) 332-8262

915289.1  02/05/07 BALTIMORE   CHESTERBROOK   HARRISBURG   NEWARK   PHILADELPHIA   PRINCETON   WASHINGTON   WILMINGTON

A DELAWARE LIMITED LIABILITY PARTNERSHIP

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 2

quantities of materials requested, the costs associated with related field work, etc. far exceed the burdens typically associated with wireless ordinances. Taken together, the ordinance's provisions and restrictions are so onerous that they constitute a deterrent to T-Mobile's activities in Clarkstown.

By way of specific example, the application process is, in reality, two separate application processes. The pre-application procedures contemplated by § 251-13 are, themselves, equivalent to or greater than the filing requirements imposed by most jurisdictions. The time and expense associated with the pre-application procedure leads only to the designation of the proposal's "category" based on the factors set forth in Table 1. Once the category is established, a separate and distinct application process commences with its own filing requirements and the additional time and costs associated therewith.

As explained below, nearly all new sites will fall within categories B, C and D. Compliance with the filing and proof requirements relating to those categories will be unusually expensive and time-consuming. The sheer volume of regulation itself will act as a deterrent to wireless deployment in the area.

While the Town certainly possesses the right to address basic zoning concerns, the collective weight of the ordinance's provisions will go far beyond typical zoning. It will extend into so many areas and create so many hurdles that it will act as a barrier to the provision of reliable communications in the Clarkstown area. Federal law contemplates a deregulated environment in which the carriers may operate, subject to typical zoning requirements. The ordinance, as a whole, goes far beyond typical zoning requirements and contemplates many obstacles and restrictions that do not apply to even the most deleterious other uses. Such restriction rises to the level of a barrier entry and runs contrary to the federal government's mandate that wireless networks should be deployed rapidly and in a pro-competitive environment.

## SPECIFIC CONCERNS

Aside from the overall burden caused by the proposed scheme, there are numerous individual provisions that are either practically or legally problematic. These issues are addressed below in the order in which they appear in the ordinance.

Town-Owned Property (§251-11.D) The extensive "background and legislative intent" set forth in § 251-10 repeatedly references the primary purpose of the amendments to be reduction of purported tower proliferation. As explained above, the process required for any but the most minimal wireless construction is unusually onerous. For reasons that remain unclear, however, § 251-11.D exempts Town-owned property from the review requirements.

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 3

As an initial matter, the exemption of Town-owned land runs afoul of existing case law. *See, e.g., Countryman v. Schmidt*, 176 Misc.2d 736, 673 N.Y.S.2d 521 (Sup. Ct. 1998).

Moreover, all of the negative impacts associated with private tower placement apply equally to tower placements on public ground. There seems to be no logical reason to treat public and private placements differently. Further, the exemption appears to apply only to Town-owned property. If there is some aesthetic reason why Town-owned property is preferable to private placement, such rationale should apply equally to all other forms of government property. Given the extensiveness of the filing requirements for private property, the Town-owned property preference creates an active incentive for wireless carriers to seek Town property placements. This appears to be inconsistent with the ordinance's overall goals and may violate both federal and state law.

Town-mandated definition of adequate service (§251-13.A(12)). In order to meet the pre-application filing requirements, a carrier must submit "signal propagation or coverage maps" showing, among other things, "in-vehicle coverage modeled for the proposed facility (including a map showing estimated coverage at -84dbm or lower)." This provision is troublesome for several reasons. First it assumes that all sites are designed for in-vehicle coverage objectives. It is well known that wireless service has become critical both for in-business and in-home uses, in addition to in-vehicle uses. Indeed, in 2006 we witnessed a historical watershed as the absolute number of new land line connections for the regional Bell operating companies suffered a decline as more and more consumers chose wireless and other alternatives to traditional wireline telecommunications services. Accordingly, many wireless sites are designed to meet the higher signal strength levels required for in-building wireless coverage.

Additionally, the ordinance defines a single and specific signal strength level which the Town contemplates as sufficient for in-building coverage. Each carrier's network is different, and the carriers are entitled to compete freely to provide the best service to their customers. Any attempt to set a universal definition of what constitutes adequate service is inherently anti-competitive. Moreover, only the federal government has the right to define what is adequate service for purposes of the wireless carriers' licenses.

Preliminary screening (§251-14) The screening and "scoring" concepts are subjective and do not provide guidance to the carriers' site acquisition personnel. In order for a wireless ordinance to work effectively, the carriers must be able to understand what a township views as "good" or "bad" from an overall siting perspective. The screening evaluation criteria set forth at § 251-14.B, along with the criteria and points described in Table 1 are too general and subjective to provide real guidance to the carriers' site acquisition personnel.

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 4

Aside from creating confusion for the carriers during their site selection processes, it is unclear how the categorization/screening process will work. For example, Category A sites receive preferential treatment and do not require special use approval. It is unclear, however, what sorts of facilities are covered in Category A when all of the aspects of Category A are read together. For example, Category A seems to contemplate that rooftop installations could be approved without special use approval, so long as the rooftop achieves a "screening value greater than 105." Applying the criteria set forth in Table 1, however, it is difficult to conceive how any rooftop could score any higher than 70 or 80 points under the most generous scenario. It is, therefore, unclear whether rooftops are, or are not, contemplated by Category A.

Similarly, with respect to "DAS" and "micro cell" installations, how are such facilities to be judged? According to §251-15.A, such "preferred alternative technologies" will not require special use approval if they achieve a "screening value of 60 or greater." How is this to be measured? A DAS system requires the presence of numerous nodes and some base equipment. Does the screening analysis set forth in Table 1 apply to each individual node, or to some consideration of the system as a whole? Is each micro cell a "WTF" for purposes of Category A consideration, or is a micro cell grouping to be considered? There are no answers to these simple questions, yet the very process required is dependent on such answers.

Even if the specific definitions of categories A through D were clearer, the categorization methodology set forth in Table 1 would remain unclear. For example, Table 1 provides a point incentive to locate facilities away from "Special Areas." There is no meaningful definition of the term "Special Areas" in the ordinance. Rather, "Special Areas" appears to be a subjective term that can be applied differently in different contexts. Also troubling with respect to the Special Area category (along with the "Public Assembly" category) is the required consideration of "potential aesthetic and safety impacts" on those areas. Presumably, as the ordinance covers every sort of wireless installation and not just towers, "safety impacts" in the context of Table 1 refers to radio frequency emission levels. It is beyond dispute that consideration of emission safety issues is beyond the Town's authority and is exclusively preempted by federal law.

The table contains numerous other subjective elements. For example, there is an incentive for "Stealthing Proposed." What constitutes "stealthing" is, itself, subjective. Is a monopole with internally mounted antennas a "stealth" facility? If the exact same structure is outfitted with a flag, does it become a "flagpole" for stealthing purposes? Again, the Town is given complete discretion to decide these sorts of issues. Similarly, there is an "Other Potential Impact" category that effectively provides the Board with discretion to assign points for any other sort of impact that it deems important.

917259.1 _02/05/07

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 5

Taken together, the Table 1 points scheme provides no guidance to the wireless carriers. Its inherent subjectivity creates a scenario where identical proposals could receive materially different "scores," depending on the Town's determination of a variety of subjective factors. In sum, it creates a nearly entirely subjective process.

DAS/ Preference   Through all of the screening and scoring processes, Clarkstown has expressed a very strong preference for use of "alternative technologies" such as "DAS." DAS deployments are strongly encouraged by materially reduced filing requirements and processes (subject to the confusion discussed above). In some instances, traditional wireless installations cannot be advanced unless DAS or other "alternative technologies" have been demonstrated to be impracticable. Both through its preferences and procedures, the Town is creating DAS encouragements, and in some cases, requirements.

DAS is a materially different deployment technology from traditional macro cell architecture. Only the carriers and the federal government have the right to make decisions relating to the operational and technical aspects of the licensed carriers' networks. The DAS preferences and requirements contemplated by the ordinance and amendments purport to make operational and technical choices for the licensed carriers. Such direct control over operational and technical aspects of the carriers' network deployment goes far beyond typical zoning, and strays into the range of exclusive federal control.

Special Use Procedures (§251-18 et seq.)  It seems that nearly all sites will fall within the category B, C and D designations. Accordingly, the extensive additional filing requirements contemplated by §251-19 will apply to virtually every wireless installation proposed. Taken together, the application requirements are unusually onerous, particularly as they are effectively a second set of application requirements.

While the entire scheme contemplated by §251-19 is burdensome, several particular requirements are worthy of note. Subparagraph F(18) appears to require that any new facility be "effectively screen[ed] from view." Read literally, this seems to mean that any new facility should not be visible, presumably from off-site. As a practical matter, this is impossible in many applications. Moreover, subparagraph 18 appears to require that any new structure be built to resemble something "aesthetically pleasing" and that it not exceed the height of surrounding trees, etc. These limitations, collectively, will make it difficult, if not impossible, to provide coverage in certain circumstances. Simply put, no carrier will be willing to invest the funds necessary to construct a multitude of 50 foot tree-type structures in certain areas as contemplated by subparagraph 18.

NIER Requirements and Certifications (§251-19.F(23))  Subparagraph 23 requires "certification that non-ionizing electromagnetic radiation . . . levels at the proposed site will be within the threshold levels adopted by the FCC." The provision further provides that the certifications must be "cumulative," presumably contemplating any emissions from other carriers

915239.1_02/03/07

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 6

in the area. The certification requirements are further referenced in §251-23 and 24. They reappear in §251-37.A(5) in terms of five year recertification. Finally, they are applicable to all existing installations by operation of §251-34.

In sum, these provisions. read together, require wireless carriers to perform actual field testing of RF emission levels, both from their sites and from other sites in the area. Proof of these cumulative RF analyses are prerequisites to maintaining approval to operate. In the event that the field testing is not conducted and the certification is not maintained, the ordinance provides that the Town may take an operating site off of the air.

There are a few areas where federal preemption of local authority is more clear than those involving radio frequency emission ("RFE") levels. Only the federal government can make and enforce emission guidelines. The ordinance's provisions relating to RFE certification, and its attempts to impose local police power to enforce them, are clearly preempted by federal law.

Lighting (§251-25.D and §251-27.A)  The provisions relating to lighting appear to be inherently inconsistent. Specifically, § 251-25.D provides that a tower may not exceed a height that would require lighting. Section 251-27.A, however, provides a "wireless telecommunications facility shall not be artificially lighted or marked, *except where required by law* . . . ." (emphasis supplied). Thus, § 251-27.A contemplates that a structure could be lighted and/or tall enough to be lighted, while such a structure is prohibited under § 251-25.D.

Application To Existing Facilities (§ 251-34)  Section 251-34.A provides that all aspects of the ordinance, including the proposed amendments, apply to all wireless facilities within the Town's jurisdiction. This section further states that "all requirements of this chapter" including the amendments, apply to all existing facilities. All operators must demonstrate within six months of the amendment date that all of its facilities comply. Read literally, this provision requires additional screening, RF certifications (including field testing), visual impact analyses, and all of the things contemplated by the ordinance and its amendments for wireless installations in operation today. Section 251-34.B takes the issue a step further by providing that any facility which is not retroactively brought into compliance with the labyrinthine theme regulations contemplated by the ordinance and the amendment shall "cease operations within six months . . . and be immediately removed thereafter . . . ." As a practical matter, it is likely impossible to bring most existing facilities within the literal language of §§ 251-34A and B because much of what is contemplated by the amendments cannot be made applicable to existing sites. Perhaps more troubling, however, is the assertion that the Town can take off air legally existing and functioning wireless facilities. Such power rests only with the federal government.

FEB-06-2007  13:01    FROM-                                     T-965  P.009/010  F-248

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 7

<u>Five Year Permit Window (§ 251-37)</u>  As written, the ordinance only allows a carrier to operate its facility for five years after enduring all of the application and approval requirements contemplated by the amended ordinance.  Prior to expiration of the five year special use permit, a wireless carrier must request recertification, and the recertification will be viewed as, in effect, a new application by operation of §251-37.B.  If the Planning Board, applying the subjective criteria discussed above, determines that the heretofore legally operating facility fails to meet one or more of the subjective components contemplated by the ordinance and its amendments, the Board has the power to refuse renewal and, effectively, take the site off the air.  Again, such a process, aside from being inherently subjective, runs afoul of federal law.  There is no legal basis for a local jurisdiction to terminate the operation of a lawfully functioning wireless facility.

<u>Conclusion</u>

        T-Mobile has worked cooperatively with jurisdictions across the country to create wireless siting ordinances that take into account both the interest of local government and its citizenry and the technological needs of the carriers' network.  These goals are far from mutually exclusive.  We must not forget that accommodating the carriers' technological needs also enures to the benefit of local government and its citizenry.  An effective ordinance is one that allows citizens to enjoy an aesthetically pleasing environment, while simultaneously allowing them to enjoy the many benefits of effective wireless service.

        While the existing ordinance and its proposed amendments were apparently intended to protect aesthetic concerns, they do not contemplate the costs, technical difficulties and other realities of wireless infrastructure siting.  The only way for the interests of all parties to be accommodated in a piece of legislation is for all parties to participate in the creation of that legislation.

        T-Mobile recognizes that it is not a popular thing to ask a local government to step back from a piece of legislation.  In this case, however, if Clarkstown seeks to create a level playing field for wireless carriers while simultaneously protecting the aesthetic interests of its citizens, T-Mobile believes that a fresh start is the most logical course.  The present ordinance with its amendments is simply too cumbersome and treads upon too many areas regulated by federal law to be softened in a meaningful fashion.  Rather, the logical course of action, if Clarkstown wishes to enact wireless legislation that is both effective and legal, is for all affected parties – including the wireless carriers – to participate in the process from the beginning.  As T-Mobile expressed in its prior correspondence, the company is ready, willing and able to participate in such a meaningful process, and would welcome the opportunity to do so.

912239.1_02/05/07

Alexander J. Gromack, Supervisor
and Town Board Members
February 5, 2007
Page 8


     T-Mobile asks only that it be able to provide service to its customers under reasonable circumstances, while simultaneously recognizing Clarkstown's aesthetic concerns. T-Mobile believes that this balance can be struck by a collaborative process involving all of the key parties.  We look forward to your response.

Very truly yours,

Karl J. Nelson

cc:  Tim Sullivan, Esquire
     Gregory D. Meese, Esquire