UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NEW YORK SMSA LIMITED PARTNERSHIP d/b/a
VERIZON WIRELESS, NEW CINGULAR WIRELESS           Case No. 07 CV 7637
PCS, LLC, SPRINT SPECTRUM L.P., and OMNIPOINT     (Brieant, J.)
COMMUNICATIONS, INC., a wholly owned subsidiary   (Yanthis, M.J.)
of T-MOBILE USA, INC.,

                              Plaintiffs,

        -against-

THE TOWN OF CLARKSTOWN and THE TOWN
BOARD OF THE TOWN OF CLARKSTOWN,

                              Defendants.
------------------------------------------------------------------------X


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT


ROSENBERG CALICA & BIRNEY LLP
Attorneys for Defendants
100 Garden City Plaza, Suite 408
Garden City, New York 11530
516-747-7400


March 14, 2008

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

POINT I

      THE VAST MAJORITY OF PLAINTIFFS' CLAIMS ARE NOT
      AMENABLE TO A FACIAL CHALLENGE AND ARE UNRIPE . . . . . . . . . . . . . . . . 7

POINT II

      THE CARRIERS RELY UPON INAPPOSITE CASE LAW DERIVED
      FROM JURISPRUDENCE WHICH ADDRESSES RIGHT-OF-WAY
      FRANCHISE AGREEMENTS WITH "COMMON CARRIERS" (TCA §253);
      HOWEVER,  THIS COURT SHOULD APPLY BINDING PRECEDENT
      FROM THE SECOND CIRCUIT AND OTHER PERSUASIVE
      AUTHORITIES UNDER TCA §332(c)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Even If §253 Applies To A Facial Challenge To A Wireless Siting
           Law, The Specific Provisions Applicable To Wireless Siting
           Determinations Under §332(c)(7) Still Apply In Pari Materia . . . . . . . . . . . . . 18

      B.    §253 Cannot, And Should Not, Be Applied To The Exclusion
           Of §332(c)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      C.    The Wireless Law Does Not Violate §253 Or Cases Decided Under
           Inapposite Franchise Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

POINT III

      THE WIRELESS LAW SETS STRICT AND SHORT TIME LIMITS
      FOR FINAL DETERMINATIONS, AND IS ENTIRELY LAWFUL
      AND PROPER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

POINT IV

     THE FEES CHARGED ARE LIKEWISE REASONABLE,
     LIMITED AND LAWFUL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT V

     THE REMAINING APPLICATION REQUIREMENTS
     ARE SIMILARLY REASONABLE AND LAWFUL . . . . . . . . . . . . . . . . . . . . . . . . . 34

     A.     The Required Proof Of A Genuine "Gap," Including Relevant
             Criteria And Appropriate Details Regarding Coverage
             Maps, Is Entirely Proper and Lawful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     B.     The Requirements for Compliance with Federal Law Respecting
             RF Emissions And The Like Are Likewise Proper and Lawful . . . . . . . . . . . 39

     C.     The Requirement Of More Intensive Review Depending on the Site
             Category Is Likewise Proper and Lawful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

     D.     The Preference For Less Invasive And Less Intrusive Technologies,
             Including Alternate Technologies, Does Not Amount to "Prohibiting"
             Or "Effectively" Prohibiting Wireless Services . . . . . . . . . . . . . . . . . . . . . . . . 43

     E.     The Requirement Of A Willingness To Co-locate Is Likewise
             Proper and Lawful . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

     F.     The Requirements For General Information Regarding Aesthetic And
             Other Zoning and Land Use Impacts Is Proper and Lawful . . . . . . . . . . . . . . 46

     G.     Preservation Of Property Values Is A Proper Siting Criteria . . . . . . . . . . . . . . 47

     H.     The Planning Board's Determination Is Subject to Strict Statutory
             Controls And Is Neither "Open-ended" Nor Subject to
             "Unfettered Discretion" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

     I.     The Carriers' Suggestion That A Zoning Law May Not Provide That A
             Wireless Facility Must Be "Inaccessible To Children" And Not In Areas
             Where Children Will Have Access To Them (i.e., in or adjacent to child
             day care centers, schools, camps, public parks or playgrounds),
             Is Specious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

POINT VI

ALTERNATIVELY, IF ANY PORTION OF THE WIRELESS LAW IS
FOUND UNLAWFUL, THEN THIS COURT SHOULD ENFORCE
THE SAVINGS CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# TABLE OF AUTHORITIES

**Federal Cases**

American Tower LP v. City of Huntsville
    295 F.3d 1203 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

APT Pittsburgh Ltd. Partnership v. Penn Tp. Butler County of Pennsylvania
    196 F.3d 469 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 26

Cal. Coastal Comm'n v. Granite Rock Co.
    480 U.S. 572 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Cellular Phone Taskforce v. F.C.C.
    205 F.3d 82 (2d Cir. 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-41

Cox Communications PCS, L.P. v. City of San Marcos
    204 F.Supp.2d 1260 (S.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Freeman v. Burlington Broadcasters, Inc.
    204 F.3d 311 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

Green Mountain R.R. Corp. v. Vermont
    404 F.3d 638 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

In re Petition of State of Minnesota for Declaratory Ruling Regarding Effect of Section
253 on Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway
Rights-of-Way
    14 F.C.C.R. 21697 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Masterpage Communications v. The Town of Olive
    418 F.Supp.2d 66 (N.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Metropcs Inc. v. City and County of San Francisco
    2006 WL 1699580 (N.D.Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

National Telecommunication Advisors, LLC v. Board of Selectmen of Town of
West Stockbridge
    27 F.Supp.2d 284 (D.Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 30-31

New Jersey Payphone Ass'n v. Town of West New York
    299 F.3d 235 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

New York SMSA Ltd. Partnership v. Town of Clarkstown
    99 F.Supp.2d 381 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 23, 41, 45

Nextel Communications of Mid-Atlantic, Inc. v. Town of Hanson
    311 F.Supp.2d 142 (D.Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Nextel Communications of Mid-Atlantic, Inc. v. Town of Randolph
    193 F.Supp.2d 311 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

Nextel Partners of Upstate New York, Inc. v. Town of  Town of Canaan
    62 F.Supp.2d 691 (N.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 31, 45

Nextel Partners v. Kingston Township
    286 F.3d 687 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board of Easttown Township
    331 F.3d 386 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Omnipoint Communications v. City of White Plains
    430 F.3d 529 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Omnipoint Communications v. Port Authority of  N.Y. & N.J.
    1999 WL 494120 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Omnipoint Communications v. Village of Airmont
    Case No. 07-Civ-0473 (S.D.N.Y. Apr. 18, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33

Omnipoint Communications v. Village of Tarrytown
    302 F.Supp.2d 205 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Peco Energy Co. v. Township of Haverford
    1999 WL 1240941 (E.D.Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Pittsburgh LP v. Penn Township, Butler County
    196 F.3d 469 (3d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Smart SMR of New York, Inc. v. Zoning Com'n of Town of Stratford
    995 F. Supp. 52 (D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Sprint Spectrum L.P. v. Mills
    283 F.3d 404 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 25, 40

Sprint Spectrum L.P. v. Willoth
176 F.3d 630 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Sprint Spectrum, L.P. v. City of Carmel
361 F.3d 998 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sprint Telephony PCS v. County of San Diego
490 F.3d 700 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 48-49

TCG New York, Inc. v. City of White Plains
305 F.3d 67 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20, 26

Telecommunication Advisors, LLC v.  Board of Selectmen of Town of West Stockbridge
27 F.Supp.2d 284 (D.Mass. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 30-31

Things Remembered, Inc. v. Petrarca
516 U.S. 124, 116 S.Ct. 494 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S. Cellular Telephone of Greater Tulsa L.L.C. v. City of Broken Arrow, Oklahoma
340 F.3d 1122 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 36

United States v. Salerno
481 U.S. 739, 107 S.Ct. 2095 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9

Vertical Broadcasting, Inc. v. Town of Southampton
84 F.Supp.2d 379 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

**State Cases**

Town of Chester v. Republic Insurance Company
89 A.D.2d 959, 454 N.Y.S.2d 107 (2d Dept. 1982) . . . . . . . . . . . . . . . . . . . . . . . 33

Twin Lakes Development Corp. v. Town of Monroe
1 N.Y.3d 98, 769 N.Y.S.2d 445 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Wright v. Town of LaGrange
181 Misc.2d 625, 694 N.Y.S.2d 862 (Sup. Ct., Dutchess Co. 1999) . . . . . . . . . . . . . 33

**Federal Statutes**

47 U.S.C. § 253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

47 U.S.C. §332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Telecommunications Act of 1996, Pub. LA. No. 104-104, 110 Stat. 56 (1996) . . . . . . . . . *passim*

**State and Local Statutes**

Code of City of Riverside, California, § 16.36.040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Code of Concord, Massachusetts, § 7.8.2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Code of Town of Brandon, Vermont . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Code of Town of Clarkstown, N.Y. Chapter 251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Code of Town of Stockbridge, Massachusetts, § 6.25.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

N.Y. Town Law §118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

N.Y. Town Law §119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

N.Y. Town Law §274-b(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 50

N.Y. Town Law §277 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

Town of Westminster, VT, § 980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Zoning Law of the Town of Denning, New York, § 10.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Other Authorities**

FEDERAL LAND USE LAW & LITIGATION § 10:10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## PRELIMINARY STATEMENT

This memorandum of law is respectfully submitted in support of the cross-motion for summary judgment by defendants, the Town of Clarkstown and the Town Board of the Town of Clarkstown (collectively, the "Town"), and in opposition to the motion for summary judgment brought by the plaintiff-carriers, all of whom are wireless communications carriers (the "Carriers"). At issue is the Carriers' facial challenge to the Town of Clarkstown's Wireless Telecommunications Facilities Law ("Wireless Law"). As detailed below, the Carriers' shotgun attack on the Town's entire Wireless Law is devoid of merit, and should be firmly and soundly rejected by this Court.

At the outset, however, we are compelled to point out that the Carriers' entire motion, and their principal memorandum of law, in particular, read more like a wireless industry manifesto – i.e., advocating the abolishment of virtually <u>any</u> local controls over wireless facilities[1] – as if the Telecommunications Act of 1996 (the "TCA") did not <u>expressly</u> preserve local zoning and land use controls over the siting of wireless facilities. <u>See</u> 47 U.S.C. §332(c)(7) (entitled "***Preservation of local zoning authority***"). Astoundingly (and unacceptably given both the litigants' and counsels' duty of candor to this Court), the Carriers barely address the controlling federal statute and the controlling federal cases concerning the preservation of local controls of wireless facilities siting. Instead, the Carriers resort to a barrage of inapposite and non-binding cases having little or nothing to do with wireless siting laws.[2] In fact, it appears that the only

---

[1] For instance, the Carriers boldly and erroneously contend that "*Any* state or local intrusion into the equipment used, power levels employed, or quality of service provided in radio communication is prohibited" (Pls.' Mem. of L. at 2) (emphasis in original).

[2] The Carriers' lengthy Appendix consists primarily of materials involving franchise and tort cases, including a 69-page decision from the Superior Court of the District of Columbia, Civil Division and an FCC amicus brief in the same case involving federal preemption of state tort claims, and a

specific citations to the controlling subdivision of the federal statute concerning the <u>preservation</u>

of local controls over wireless facilities siting – <u>47 U.S.C. § 332(c)(7)</u> – are contained in a single

internal case citation on page 24 of the Carriers' brief to a non-binding and wrongly decided

Ninth Circuit decision, discussed <u>infra</u>, and then again in passing at page 41 of the Carriers'

memorandum of law; and even then, the specific language and provisions of <u>47 U.S.C. §</u>

<u>332(c)(7)</u> are not even addressed or confronted.

    The Carriers' brief similarly ignores the Second Circuit's seminal and binding ruling

regarding <u>wireless facilities siting</u> – <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630 (2d Cir. 1999)

– which is the seminal case regarding wireless siting, which case is relied upon by essentially

every Circuit Court of Appeals addressing the issue of wireless siting, and which controlling case

is not even cited, let alone addressed, in the Carriers' brief.  Advocacy is one thing.

    The Carriers' refusal to meaningfully confront or address the controlling federal statute or

the controlling federal case law on wireless facilities siting is not acceptable advocacy, especially

where, as here, this is not the first time the Carriers have resorted to such tactics.  In fact, the

Carriers apparently have not learned their lesson, despite their having been taken to task by this

Court for such tactics in a case involving the very same lead plaintiff.  <u>New York SMSA Ltd.</u>

<u>Partnership v. Town of Clarkstown</u>, 99 F.Supp.2d 381, 389 (S.D.N.Y. 2000) ("In its zeal to call

my attention to dozens of cases inapposite to the instant facts, Plaintiffs have failed to cite the

---

decision from the Supreme Court of the State of New York, County of Oneida, in a franchise case.  The
only materials in the Appendix which even superficially bear on the issues presented is the Carriers'
citation to a recent Stipulation reached in <u>Omnipoint Communications v. Village of Airmont</u>, Case No.
07-Civ-0473 (S.D.N.Y. Apr. 18, 2007) (Brieant, J.), which stands for the unremarkable proposition that
specific consultants may charge unreasonable and excessive fees on an "as applied" basis.  <u>See</u> Point IV
at 31-32 below (discussing <u>Village of Airmont</u>).

most recent Second Circuit opinion that is actually on point[,][] *Sprint Spectrum v. Willoth*, 176 F.3d 630 (2d Cir. 1999)").

In the case at bar, the Carriers' glaring omission to address the specific language and plethora of case law decided under 47 U.S.C. §332(c)(7) (<u>preservation</u> of local controls over wireless siting) – including the seminal <u>Sprint Spectrum L.P. v. Willoth</u> case, discussed <u>infra</u>, and the Second Circuit's more recent decision in <u>Omnipoint Communications v. City of White Plains</u>, 430 F.3d 529 (2d Cir. 2005),[3] also discussed <u>infra</u> – is both alarming and fatal to the Carriers' position.  It is alarming because 47 U.S.C. §332(c)(7) is controlling and directly on point, and because <u>Willoth</u> and <u>Omnipoint</u> are likewise controlling and directly on point.  It is fatal because despite the Carriers' relentless assertion that local municipalities supposedly cannot consider or prefer alternate or less intrusive technologies, and despite the Carriers' equally relentless assertion that local municipalities supposedly cannot inquire into or require the submission of data as to signal levels and other data, the Second Circuit has <u>squarely</u> held that municipalities and local boards are permitted to rest their wireless siting determinations on those <u>precise</u> same considerations, provided only that the ultimate determination, on an as applied basis, is supported by substantial evidence.  <u>See</u> <u>generally</u> Points I-V below.

As detailed below, the Carriers' facial challenge to the ordinance is unfounded and devoid of merit.  For one, the vast majority of plaintiffs' claims are unripe.  Indeed, although the challenged amendments to the Town's Wireless Law have been in effect for approximately seven

---

[3] The Second Circuit's decision in <u>Omnipoint Communications v. City of White Plains</u> should not be confused with <u>TCG New York, Inc. v. City of White Plains</u>, 305 F.3d 67 (2d Cir. 2002).  Although both cases involved the City of White Plains, the <u>TCG New York, Inc.</u> case, which the Carriers repeatedly cite throughout their brief as the *City of White Plains* case, is inapposite, and does <u>not</u> involve a wireless siting decision, let alone a facial challenge to a wireless siting ordinance.

months, the Carriers apparently have not filed a <u>single</u> application under the newly amended law. Thus, even putting aside whether or not the Carriers' decision to eschew even a single "test case" filing under the new law has been intentional and strategic on the Carriers' part, the reality is that the Carriers' complaints regarding alleged "undue burdens," "Byzantine" requirements, and a supposed "morass of discretionary requirements," are entirely speculative, untested, rhetorical, and unfounded at best.

Moreover, and in any event, careful scrutiny of the Carriers' overblown objections to the Town's Wireless Law reveals that the Carriers: (a) distort the actual scope and import of the <u>limited preemption</u> afforded by the Telecommunications Act of 1996, Pub. LA. No. 104-104, 110 Stat. 56 (1996), including by emphasizing and relying on the wrong legal standards and inapposite case law; (b) eschew binding Second Circuit precedent in favor of inapposite and non-binding case law, including a recent decision from the Ninth Circuit that was wrongly decided; (c) misstate and misconstrue the strict and short time limits for hearing and deciding wireless siting applications under the Town's Wireless Law; (d) improperly take issue with the reasonableness of the specific fees which are imposed; and (e) ignore that the Second Circuit has already endorsed and approved of a Town's consideration of the very items and specific criteria to which the Carriers now object. Indeed, the Town codified these criteria as part of the law itself for the very reason that the Town desires to ensure that all wireless applications and siting decisions are reviewed on the basis of detailed and objective criteria endorsed by the Second Circuit as entirely lawful and proper considerations for Towns to address and consider as part of their wireless siting decisions.

We address these matters more fully below.

4

<u>STATEMENT OF FACTS</u>

The Court is respectfully referred to the accompanying Declarations of Amy Mele, Town Attorney ("Mele Declaration" or "Mele Decl."), Jose C. Simoes, Town Planner ("Simoes Declaration" or "Simoes Decl."), Michael P. Musso, P.E., Senior Project Engineer of HDR, Inc. ("Musso Declaration" or "Musso Decl.") and the defendants' Local Civ. R. 56.1 Statement,[4] which are respectfully incorporated herein by reference.

Briefly summarized, the undisputed record demonstrates the Town's well-founded concerns regarding the proliferation of wireless transmission facilities and their cumulative impacts on local land use; the Town's prior experience and problems in having to address wireless communications applications which contained sparse or sometimes conflicting and subjective technical data and criteria; a prior moratorium that was enacted by the Town during which an extensive study and findings were commissioned by the Town, and which resulted in a comprehensive Wireless Siting Plan (Mele Decl., Ex. B thereto); an extensive legislative drafting and review process during 2006 and 2007; numerous meetings, public hearings and work sessions with neighboring municipalities, and with attorneys and representatives from the Carriers themselves, the latter which resulted in several changes to the proposed law at the Carriers' behest; and the finished product, namely, the Town's Wireless Law itself.  <u>See generally</u> Mele Decl. and accompanying exhibits; Simoes Decl.; Musso Decl.

---

[4] The Carriers opted not to file a Rule 56.1 Statement.  In any event, the Carriers recognize that this case is clearly amenable to summary judgment as a purported facial challenge to the statute.

SUMMARY OF ARGUMENTS

In Point I, it is shown that the vast majority of the Carriers' objections are not even amenable to a facial challenge, and are unripe.

In Point II, it is demonstrated that the Carriers' entire lawsuit herein is premised upon the wrong legal standards, derived primarily from case law analyzing franchise laws, and a municipality's obligation to openly allow use of its telephone poles or other "public rights-of-way," and to charge equal fees on all its franchise agreements.  That case law is manifestly not what is required or applicable under 47 U.S.C. § 332(c)(7) for wireless siting decisions.  Little wonder that the Carriers' brief does not even mention the Second Circuit's dispositive rulings in Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 639 (2d Cir. 1999), and Omnipoint Communications v. City of White Plains, 430 F.3d 529 (2d Cir. 2005), discussed infra.

In Point III, it is shown that the Wireless Law imposes strict and short time limits for hearing and deciding wireless siting applications (only 45 days to categorize the request; 62 days to hold a public hearing; and 62 days to issue a final decision).  These periods are plainly reasonable and lawful, and fully comply with the TCA's requirement that determinations be made within a "reasonable" time depending on the circumstances.

In Point IV, it is likewise shown that the fees imposed by the Wireless Law are fully reasonable and lawful.  The most complex applications are charged only a $1,500 application fee (less complex applications are charged even less).  Similarly, it has always been lawful for a Planning Board to require the applicant to pay the Board's outside engineer or other technical consultant fees.  Finally, a maintenance "bond" of $12,000 or $50,000 respecting large metal structures as high as buildings, is plainly reasonable, particularly in light of the actual cost of

6

securing a bond (e.g., if the bond company charges 1%, the cost is $120 or $500).

In Point V, it is demonstrated that the remainder of the Wireless Law is lawful and proper, is not unduly burdensome, and applies the very same factors and criteria which have been squarely upheld as lawful and proper considerations for wireless siting decisions by the Second Circuit.

Finally, in Point VI, it is shown that if any portion of the Wireless Law is found to be unlawful – but see Points I-V – the proper remedy is to enforce the savings clause, and to sever only that portion.

**ARGUMENT**

**POINT I**

**THE VAST MAJORITY OF PLAINTIFFS' CLAIMS ARE
NOT AMENABLE TO A FACIAL CHALLENGE AND ARE UNRIPE**

The Carriers have chosen to mount a facial challenge to a legislative enactment, even before they have filed a single siting application, much less been denied one. The statute here plainly survives a facial challenge, as further delineated in the remaining Points of this Brief. Beyond the rhetoric, however, most of plaintiffs' actual arguments boil down to the Carriers' untested and doomsday assertion that individual applications potentially could be delayed through abuse of the Wireless Law, or that other abuses conceivably could result in unduly costly fees to carriers or other undue burdens. However, such claims are not cognizable upon a facial challenge. Simply stated, virtually the entirety of plaintiffs' complaint is based on overblown worst-case scenarios and sheer speculation, and is not ripe for review. This is especially true where, as here, the law itself expressly recognizes the dictates of the Telecommunications Act

7

and specifies that: "In the event a denial of an applicant's request for a special permit would

constitute an unlawful prohibition of cellular service under applicable federal or state law, the

Planning Board shall grant the special permit and shall have the authority to impose conditions

upon such granting consistent with this chapter and such federal or state law."  §251-32(B)

(emphasis added).

Specifically, and at a minimum, the following claims and objections levied by the

Carriers are unripe: (1) the Carriers' objections concerning potential delays or the number of days

an application might take; (2) the Carriers' objections concerning the cost of an application and

their potentially having to pay for the Planning Board's outside technical consultants; (3) the

Carriers' objections concerning the items required to be included in the pre-application or

application process as being too burdensome, especially given that the Planning Board can waive

any specific requirements if compliance with any required item of compliance would be unduly

burdensome; (4) the Carriers' objections concerning wireless siting requirements and criteria as

being too burdensome or prohibitory, especially since the law itself allows for a request for a

waiver of any unduly burdensome or prohibitory requirements or criteria; and (5) the Carrier's

misplaced objections that the law prohibits or tends to prohibit the provision of wireless services,

especially since the law itself specifically requires the issuance of a special permit if any specific

denial would amount to unlawful prohibition.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount

successfully, since the challenger must establish that no set of circumstances exists under which

the Act would be valid.  The fact that the [statute] might operate unconstitutionally under some

conceivable set of circumstances is insufficient to render it wholly invalid."  United States v.

Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100 (1987) (emphasis added).

Both the Supreme Court and the Second Circuit have held that this heavy standard applies to facial challenges claiming a state or local statute is preempted by federal law.  Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 580 (1987); Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 643-644 (2d Cir. 2005) (citing Cal. Coastal Comm'n).  Moreover, in Green Mountain, the Second Circuit recognized that while this "most difficult" burden could be satisfied when the claim is that state law is completely preempted from even requiring a permit (preemption of "*the act of regulation itself*"), this heavy burden is not satisfied when the state or locality is allowed to regulate the matter and the challenge merely asserts that federal law preempts "the length or outcome of that process in particular cases."  Green Mountain, supra.

The TCA's federal preemption regarding the siting of wireless telecommunications devices is expressly limited, and the TCA clearly preserves local zoning and land use authority over wireless siting matters.  47 U.S.C. §332(c)(7); Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 420 (2d Cir. 2002) ("Congress meant preemption to be narrow and preservation of local governmental rights to be broad").  Moreover, the vast majority of plaintiffs' complaint consists of doomsday predictions and scenarios that will not necessarily occur once an application is actually filed, let alone will always happen, as is required to maintain a legitimate facial challenge.

Thus, for example, the Carriers object that the application process under the Wireless Law is "open-ended" and could take too long to complete.  However, in addition to being flatly wrong and based upon an actual misreading or misapplication of the Wireless Law (see Point III below), there is nothing in the law which requires the application process to be lengthy.  Thus, in

9

addition to this factor not being a legitimate basis for a facial challenge, the claim is plainly not ripe. Sprint Spectrum, L.P. v. City of Carmel, 361 F.3d 998, 1002 (7th Cir. 2004); Nextel Partners v. Kingston Township, 286 F.3d 687, 692 (3d Cir. 2002).

Similarly, the Carriers object that an applicant must provide co-location information, and other information which the Carriers complain is supposedly burdensome to them to gather. However, again, and wholly in addition to the fact that the Carriers are simply wrong (see Point V below), it is at the very least conceivable that the information requested may already be in the applicant's possession and/or that satisfying these submission requirements is as easy as copying existing data in an applicant's files and/or otherwise gathering the requested data without undue burden or effort.

The same holds true for the Carriers' complaint that the fees charged potentially could be high because the applicant must pay for outside technical experts needed to assist the Planning Board. However, yet again, it is certainly conceivable that a wireless siting application may not require significant expense, especially where, as here, the application fee itself is limited to $1,500 for Category D sites and less for other categories. See also Point IV below (addressing the lawfulness and reasonableness of the fees).

Moreover, as to any of the individual requirements to which the Carriers purport to wholesale object, and with respect to any specific conditions in the statute which might conceivably become problematic on an as applied basis, the Wireless Law contains an express provision which allows the Planning Board to grant individual applicants a "waiver" or "exception" respecting any specific provision or condition which an applicant demonstrates persuasive grounds therefor, including for the purpose of complying with the TCA. § 251-18

10

(Planning Board is "authorized to ... deem individual requirements and conditions satisfied by issuing a waiver or relaxation in relation thereto ... [if] <u>reasonably necessary for the provision of wireless communications services consistent with the interests of both this chapter and the TCA</u>").  This authority to "deem" any unsatisfied requirements or conditions as satisfied on an as applied basis, applies to all requirements or conditions, including application requirements.  <u>Id</u>.  Moreover, as quoted above, the Wireless Law expressly provides that if denying a siting application would constitute an unlawful prohibition of telecommunication services under the TCA, the Planning Board must grant the application.   § 251-32(B).

Contrary to the Carriers' assertions, these waiver and exceptions do not impart unbridled or undue discretion.  <u>See</u> Point V(H) below.

## POINT II

### THE CARRIERS RELY UPON INAPPOSITE CASE LAW DERIVED FROM JURISPRUDENCE WHICH ADDRESSES RIGHT-OF-WAY FRANCHISE AGREEMENTS WITH "COMMON CARRIERS" (TCA §253); HOWEVER, THIS COURT SHOULD APPLY BINDING PRECEDENT FROM THE SECOND CIRCUIT AND OTHER PERSUASIVE AUTHORITIES UNDER TCA §332(c)(7)

There is no other way to say it: the Carriers pervasively rely on the <u>wrong</u> legal principles and upon the <u>wrong</u> legal standards.  In fact, application of inapposite case law involving right-of-way franchise agreements to the Town's Wireless Law, as the Carriers propose, would directly and wrongly undermine the legality of <u>hundreds</u> or <u>thousands</u> of wireless siting laws throughout the country which, like the Town of Clarkstown's Wireless Law, attempt to balance the goals of <u>limited preemption</u> and <u>preservation</u> of local controls over zoning and land use matters involving

11

wireless siting matters.[5]

In <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630, 639 (2d Cir. 1999), and <u>Omnipoint Communications v. City of White Plains</u>, 430 F.3d 529 (2d Cir. 2005), the Second Circuit set forth the burden the <u>Carriers</u> bear before they can sustain a claim that a local zoning authority is violating the TCA. Specifically, the TCA, 47 U.S.C. <u>§ 332(c)(7)</u>, expressly <u>preserves</u> local zoning and land use regulations over the siting of cellular telephone towers/antennas, except it imposes two limitations on such local regulations: first, they may not "<u>unreasonably</u> discriminate among providers of functionally equivalent services" 47 U.S.C. § 332(c)(7), subsections (B)(i)(I). Second, they may not "prohibit or have the effect of prohibiting the provision of personal wireless services" <u>Id.</u> at subdivision (B)(i)(II).

It only constitutes such "prohibition" if: (1) there is a "<u>significant gap</u>" in cellular coverage in the area; and (2) the proposed antenna and/or tower is the "<u>least intrusive means</u>" of filling that gap. <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630, 639 (2d Cir. 1999). Under New York law the same standard applies, except that instead of a "least intrusive means" standard, the application must be shown to be "<u>more feasible than other options</u>" for filling the gap in coverage. <u>Omnipoint Communications v. City of White Plains</u>, 430 F.3d 529 (2d Cir. 2005).

To date, the seminal case in the Second Circuit concerning zoning and land use regulations of wireless siting continues to be the ruling in <u>Sprint Spectrum L.P. v. Willoth</u>. <u>See</u>

---

[5] As noted above, in a case involving the same lead plaintiff as herein, another Judge of this Court noted the carriers' similar failure to address the most controlling authority in this Circuit respecting wireless siting – the <u>Willoth</u> case. <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, 99 F.Supp.2d 381, 389 (S.D.N.Y. 2000) ("In its zeal to call my attention to dozens of cases inapposite to the instant facts, Plaintiffs have failed to cite the most recent Second Circuit opinion that is actually on point[,][] *Sprint Spectrum v. Willoth*, 176 F.3d 630 (2d Cir. 1999)").

Omnipoint Communications v. City of White Plains, supra.

Thus, because the TCA expressly preserves local authority over the siting of wireless antennas and facilities (47 U.S.C. § 332(c)(7)), this Court's review is limited to inquiring: (1) whether a Planning Board's decision to deny the application was in writing; and (2) whether a decision is supported by "substantial evidence," which merely means something more than a "scintilla" of evidence.  Omnipoint, 430 F.3d at 532.  Significantly, this deferential standard, applicable because the federal courts are otherwise intervening into local zoning and land use matters and local authority which is expressly preserved by the TCA, is not a "preponderance of the evidence" standard.  Thus, a Planning Board's decision is immune from attack so long as it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (further stating that "substantial evidence" "is a deferential standard, and courts 'may neither engage in [their] own fact-finding nor supplant the [] Board's reasonable determinations'").

The same foregoing rules are applicable to the Carriers' facial challenge – namely, that the Carriers must present clear and particularized evidence, and make a particularized showing, inasmuch as this Court's inquiry is limited to determining whether the requirements generally concern "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Nextel Partners of Upstate New York, Inc. v. Town of  Town of Canaan, 62 F.Supp.2d 691 (N.D.N.Y. 1999); see also APT Pittsburgh Ltd. Partnership v. Penn Tp. Butler County of Pennsylvania, 196 F.3d 469 (3d Cir. 1999).

Several additional important legal points and considerations apply to the preservation of local controls and decisions over wireless facilities siting issues:

13

1.      It is the Carriers' burden to establish that a significant "gap" in coverage exists. <u>Omnipoint</u>, 430 F.3d at 535 ("to establish necessity, <u>Omnipoint had to demonstrate</u> that there was a gap in cell service, and that building the proposed tower at the Fenway site was more feasible than other options") (emphasis supplied).  It is therefore lawful for a siting law to impose that burden on the Carriers.

2.      A minor or *de minimis* gap is not enough to constitute a "gap" in coverage.  <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630, 643-644 (2d Cir. 1999).

3.      A local board is fully authorized to deny a siting application, and avoid the zoning impacts inherent to it, when the applicant fails to prove that it has a non-*de minimis*  "gap" in coverage in the area..  <u>Id</u>.

3.      Even when the carriers establish the existence of a significant gap in coverage, the application can <u>still</u> be denied if the carriers fail to prove that the manner in which the carriers propose to fill that gap is "<u>more feasible than other options</u>" for filling the gap to the point where the gap is no longer significant.  <u>Omnipoint</u>, 430 F.3d at 535; <u>U.S. Cellular Telephone of Greater Tulsa v. City of Broken Arrow</u>, 340 F.3d 1122 (10th Cir. 2003) (application of wireless zoning regulation resulting in denial of application was lawful, even when the denial was not based upon a failure to show existence of "gap").

4.      The federal "preemption" regarding the siting of wireless telecommunications devices is expressly limited, and it is important to heed the words used by Congress in the statute itself (important terms are highlighted and addressed in the annotated footnotes):

47 U.S.C. § 332(c)

(7) <u>Preservation of local zoning authority</u>

14

(A) General authority

Except as provided in this paragraph,[6] nothing in this chapter[7] shall limit or affect the authority of a State or local government or instrumentality thereof over decisions[8] regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

    (I) shall not unreasonably discriminate among providers of functionally equivalent services; and

    (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.[9]

---

    [6] As discussed below, the Second Circuit has ruled that because of this explicit provision of "Except as provided in this paragraph", this paragraph is the sole source of federal preemption concerning wireless siting decisions in the TCA.  Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 420 (2d Cir. 2002).

    [7] As discussed below, §253, upon which the Carriers attempt to reply to the exclusion of the express preservation of local zoning and land use authority found in this §332, is in fact part of the same "chapter" as §332.  This clearly demonstrates the Carriers' misplaced and undue reliance on §253.

    [8] As discussed below, the Second Circuit has expressly ruled that the term "decisions" is broader than and includes "regulations" such as a wireless siting law; in fact, this is evidenced by the next subparagraph's use of the term "regulation."   Sprint Spectrum L.P. v. Mills, supra.  This further dispels any claim the Carriers may appear to make that §332 somehow does not govern siting "regulations."

    [9] As discussed in Point III below, the statute only requires a siting determination within a "reasonable" period of time, and this does not give "*preferential treatment to the personal wireless service industry in the processing of requests.*"   National Telecommunication Advisors, LLC v.  Board of Selectmen of Town of West Stockbridge, 27 F.Supp.2d 284 (D.Mass. 1998).

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by <u>substantial evidence contained in a written record</u>.[10]

(iv) No State or local government or instrumentality thereof may <u>regulate</u> the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions <u>to the extent that such facilities comply with the Commission's regulations concerning such emissions</u>.[11]

Yet, instead of applying these well-established and binding authorities and principles derived from the applicable statute – i.e., TCA §332(c)(7) – the Carriers purport to primarily rely on inapposite case law regarding <u>telecommunications franchise laws and franchise determinations</u> (47 U.S.C. § 253), which by their very nature raise inherent issues of excluding other common carriers.  Indeed, where a franchise is denied to operate in the entire municipality, it is easy to see how this could lead to "prohibiting" a common carrier's entry into the market. The distinction is not merely whether to apply §253 of the TCA (relating primarily to franchise agreements), as opposed to §332 (relating primarily to wireless networks), both of which specify that a municipality may not take action which "prohibit[s] or ha[s] the effect of prohibiting" the provision of telecommunications services.  47 U.S.C. §253; 47 U.S.C. § 332(c)(7)(B)(i)(II).  The distinction is more that a franchise law generally governs admission into the market as a whole, whereas a siting law such as the Wireless Law here governs individual antennas and structures

---

[10] As shown above, "substantial evidence" merely means something more than a mere "scintilla" of evidence, and is a highly deferential standard.  <u>Omnipoint</u>, <u>supra</u>.

[11] As shown in Point V below, the preemption against "regulat[ing]" based upon environmental effects of radio frequency (RF) emissions is expressly limited.  Notably, it only applies "<u>to the extent that</u>" the facility complies with federal standards.  Of equal importance, a local statute like the Wireless Law here, which merely requires the applicant to show it is in compliance with federal RF standards, is <u>not</u> a local "regulat[ion]" based on environmental effects of such emissions.  <u>See</u> Point V below.

16

under local zoning and land use authority, and whereas siting issues are expressly subject to the limited preemption and preservation language embodied in § 332(c)(7) and governing case law.

In a decision which is presently the subject of an *en banc* rehearing motion, the Ninth Circuit Court of Appeals recently embarked on a controversial, and defendants contend seriously erroneous, new means of analyzing wireless siting zoning regulations. In a case relied upon heavily by the Carriers here, the Ninth Circuit ruled in Sprint Telephony PCS v. County of San Diego, 490 F.3d 700 (9th Cir. 2007),[12] that 47 U.S.C. §253 (the franchise statute) and the case law developed respecting franchise laws, can be employed to analyze facial challenges to wireless siting zoning laws, even though 47 U.S.C. §332(c)(7) is where Congress expressly addressed and preserved (with enumerated limitations) local authority regarding wireless siting issues. Even the Ninth Circuit conceded that its reliance on such principles in analyzing a facial challenge of a wireless siting law was "[n]ovel," "new and different" from the existing case law in all the other circuits. 490 F.3d at 700. As shown below, the Ninth Circuit's ruling is wrong, and should not be followed. Specifically, more central than the question of whether §253 even applies to a siting law, the Ninth Circuit was wrong in allowing a facial challenge to a siting statute to result in an end-run around and negate what §332 expressly allows municipalities to do. That is, while the Ninth Circuit contended it was giving effect to both §253 and §332, it in fact

---

[12] We have contacted counsel for the municipality in County of San Diego and learned that the *en banc* application is still under review. The 9th Circuit's PACER docket on the County of San Diego case, Index No. 05-56435, reflects that the motion for *en banc* rehearing is being seriously considered. Even though Federal Rule of Appellate Procedure 35(e) provides that unless ordered otherwise such petitions are decided on the petition alone and without a response from the non-petitioner, on August 3, 2007 the 9th Circuit issued an order requiring the plaintiff-carrier to file a response to the petition (50 copies), and on September 11, 2007 the Court issued a further order allowing the petitioner County of San Diego to file 50 copies of a reply brief. Whatever the outcome of the petition for *en banc* rehearing, the ruling therein is plainly contrary to binding Second Circuit authority.

did not do so.  The controlling case law is and should be <u>Sprint Spectrum L.P. v. Willoth</u>, 176

F.3d 630, 639 (2d Cir. 1999) and <u>Omnipoint Communications v. City of White Plains</u>, 430 F.3d

529 (2d Cir. 2005), not cases analyzing franchise agreements.

A.    **Even If §253 Applies To A Facial Challenge To A Wireless Siting Law, The Specific Provisions Applicable To Wireless Siting Determinations Under §332(c)(7) Still Apply In Pari Materia.**

Under §332(c)(7), municipalities are expressly allowed to apply local zoning and land use

considerations to siting requests.  47 U.S.C. §332(c)(7).  As shown above, it is already

conclusively established under Second Circuit case law that such considerations lawfully and

legitimately include the impact on the neighborhood, the size, shape and configuration of the

wireless tower or facility, the applicant's actual need for the facility, and the available

alternatives, among other things.  <u>Willoth</u>, 176 F.3d at 639 (2d Cir. 1999); <u>Omnipoint</u>, 430 F.3d

529 (2d Cir. 2005).  Moreover, this same extensive case law has established that "prohibition" of

wireless services through zoning regulation <u>only</u> occurs if: (1) the applicant has a "<u>significant</u>

<u>gap</u>" in cellular coverage in the area; and (2) the proposed antenna and/or tower is the "<u>least</u>

<u>intrusive means</u>" of filling that gap.  <u>Willoth</u>, 176 F.3d at 639.  Yet, in response to the County of

San Diego's cogent observation that its wireless siting law there merely put into statutory form

the very same legitimate considerations courts have allowed, approved, and encouraged upon

consideration of siting applications, the Ninth Circuit merely stated that it found the claim

"unconvincing" (<u>County of San Diego</u>, 490 F.3d at 716).  The Court accordingly and summarily

ruled that a siting law which takes into consideration and specifies the very same considerations

which are allowed to be considered under §332(c)(7) and applicable case law thereunder, and

which requires the carriers to address those very same considerations in the same manner that

courts have approved, nevertheless somehow constitutes a "prohibition" or "barrier" to wireless telecommunications and is therefore unlawful.

The Ninth Circuit's ruling is erroneous and should not be followed.  The Second Circuit has applied the same analysis with regard to wireless siting determinations as it has to zoning laws applicable to wireless siting.  See Omnipoint, 430 F.3d 529 (2d Cir. 2005) (as reflected in the District Court's opinion therein, 175 F.Supp.2d 697, the application was made pursuant to a Zoning Ordinance requiring a special permit).  It simply cannot be that a municipality can base a denial of a siting application on a large number of acceptable grounds, including whether or not there is a genuine gap in coverage, or whether or not there are technologically available and less intrusive technological alternatives, all of which is subject to the carriers' burden of showing that those acceptable grounds do not exist (Omnipoint, 430 F.3d at 532), but it is somehow unlawful or burdensome on the carriers for the municipality to list those very same grounds in a statute so that all applicants are treated the same and the local board is provided with objective criteria and legislative guidance concerning the present state of the law respecting those very same lawful considerations.

Framed in terms of statutory interpretation, even if the Ninth Circuit was correct in ruling that §253 governs facial challenges to a siting statute, that does not mean that §332(c)(7) does not also apply to such challenges, or that §253 need not be interpreted in pari materia with the express grant of local authority and permissible considerations under §332(c)(7).  See generally Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 127, 116 S.Ct. 494 (1995) (discussing principles of statutory construction, including the need to reconcile statutory provisions in pari materia).

19

Stated otherwise, if it is lawful and proper to base siting determinations on factors regarding technological means and technological alternatives, and to place the burden of proof respecting those same factors and criteria on the carriers, and to affirm and defer to the municipality's decision on those factors whenever the municipality's decision is supported by something more than a mere "scintilla" of evidence (Omnipoint, 430 F.3d at 532), then it is simply unfathomable and incongruous for the Carriers to suggest that it is unlawful for a municipality to delineate those same factors and considerations in a local law which specifies that those very same factors must be considered as part of individual siting applications.

Moreover, both §253 and §332, again read properly in pari materia, contain similar restrictions that municipalities cannot engage in conduct which "prohibit[s]" or has the "effect" of prohibiting telecommunications services. See §253(a); §332(c)(7)(B)(i)(II) (the actual term "barriers" to telecommunications appears only in the caption of §253, not in its text, and it is undefined). However, the central reason why the Carriers so heavily rely on §253 in this case is not because the text of that statute provides them with broader rights or protection than the text of §332 (again, both texts similarly disallow "prohibit[ing]" or the "effect" of prohibiting telecommunications services). The real reason they rely so heavily on §253 is because the plethora of inapposite case law decided under that section, primarily in the inapposite area of franchise law and franchise decisions, has been more likely to find that a denial of a carrier's request amounts to a prohibition of telecommunications services than case law analyzing wireless siting applications. Compare TCG New York, Inc. v. City of White Plains, 305 F.3d 67 (2d Cir 2002) (franchise regulations of AT&T landline subsidiary's use of right-of-way unduly burdensome and unfair); with Willoth, 176 F.3d 630 and Omnipoint, 430 F.3d 529 ("reasonable"

20

discrimination among wireless providers allowed; carrier must prove its plan is "least restrictive

means" of filling "gap" in coverage).  In fact, the nature of a request for franchise rights is

significantly different than an application for approval under a wireless siting statute, and these

serious differences lead to differing analysis of whether or not a "prohibition" of service can be

found.  These important differences include:

| Laws concerning franchise agreements for use of public rights-of-way (§253) | Zoning laws respecting siting of individual wireless facilities/equipment (§332(c)(7)) |
|---|---|
| (1) Typically concern wired "common carrier" telephones companies requesting to erect telephone lines on telephone poles. Freeman v. Burlington Broadcasters, Inc., 204 F.3d 311, 324 (2d Cir. 2000); Vertical Broadcasting, Inc. v. Town of Southampton, 84 F.Supp.2d 379, 388-389 (E.D.N.Y. 2000) | (1) Exclusively relate to wireless telecommunications, concerning which Congress has "balanced" the interests of carriers to provide service, verses the interests of municipalities to maintain zoning control (Omnipoint, 430 F.3d  at 531) |
| (2) There are generally only one or two franchised providers in a given area – denial of use of a right-of-way cuts out of the market the sole or nearly sole competition for those services | (2) There are generally several wireless telecommunications providers; more to the point, denial of a single application for a single site does not even exclude the applicant from the market, only from that one site |
| (3) When a public right-of-way is needed, denial of a franchise to use it means the carrier cannot provide telephone service in the entire area, often the entire municipality | (3) Denial of a siting application means a single wireless antenna/facility will not be allowed at a single site; availability of alternative sites in the same area and the ability to fill a genuine "gap" is specifically accounted for |
| (4) The "application" process is more in the nature of an agreement with the municipality for the use of its public rights-of-way and therefore, when the municipality dictates the "application" criteria, including lease and franchise fees, it does so more in its self-interested proprietary capacity than its governmental capacity | (4) The application is to a zoning or planning board in the nature of a request for land use approval. The wireless siting laws are expressly made pursuant to local zoning and land use authority, concerning which federal courts must defer to the greatest extent, as that authority is expressly preserved by the TCA. Omnipoint, supra. |
| (5) The application's conditions and criteria are more likely to concern the municipality's | (5) Siting application requirements are specifically geared toward information |

21

self-interest of attracting the telecommunications provider willing to be the highest bidder for the use of the right-of-way. This leads to exclusion of other carriers, greater scrutiny by courts, and statutorily imposed requirements concerning "competitively neutral" fee structures (§253(c))

gathering, lessening of adverse land use impacts on the community, and to allow informed and consistent siting determinations; they are distinctly not money-making devices and do not result in agreements respecting franchise payments to the municipal coffers. Also, siting application criteria which encourage co-location in fact facilitate future wireless entrants. Moreover, unlike with respect to franchise agreements where the criteria must be equally applicable to all providers, it is settled that §332 actually <u>allows</u> zoning laws to "discriminate" among different wireless providers where the difference in treatment is based on legitimate zoning concerns. <u>Sprint Spectrum L.P. v. Willoth, supra</u>, 176 F.3d 630, 639 (2d Cir. 1999) (reasonable discrimination between differing cellular providers is allowed, given that only "unreasonable" discrimination is prohibited by §332(c)(7), subsections (B)(i)(I))

(6) The "public right of way" land (§253(c)) subject to the application is by definition publicly controlled land, and is typically used by and devoted to public utilities

(6) Unlike public rights-of-ways, the land subject to wireless siting applications is generally private property adjoining private property of others. This often leads to concerns of nearby property owners and residents and potential land use, aesthetic and property value-based objections to large metal towers, antennas, or facilities. This led Congress to "strike[] a balance between 'two competing aims--to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." <u>Omnipoint</u>, 430 F.3d at 531.

Thus, because a wireless siting application is distinctly different from a right-of-way franchise application, whether either of them constitutes a "prohibition" or "effective" prohibition of telecommunication services, requires a different analysis. As to wireless antenna/facility siting, the analysis developed under §332(c)(7) (<u>Willoth</u> and <u>Omnipoint</u>) is

22

obviously specifically geared toward those types of applications, and recognizes that an individual wireless service provider can hardly claim to be "prohibited" from the area market when, for instance, it does not have a genuine "gap" in service in the area, or when it has alternative, less intrusive technological means of filling that gap than erecting an immense tower which disturbs the landscape.  For example, in a 2000 lawsuit involving the same lead plaintiff in this lawsuit and the same Town of Clarkstown, <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, 99 F.Supp.2d 381, 389 (S.D.N.Y. 2000), the plaintiff-carrier's objection to a permit denial was rejected by this Court on the basis that the plaintiff-carrier failed to show a genuine "gap," the carrier had the ability to co-locate, and there was nothing inherent in the TCA which prohibited the Town's consideration of alternative proposals.

Indeed, <u>even as to determinations respecting public rights-of-way</u>, the FCC itself has interpreted the restriction against "prohibiting" or "effectively" prohibiting telecommunications services under §253, as <u>not</u> preempting valid zoning restrictions.  <u>Omnipoint Communications v. Port Authority of  N.Y. & N.J.</u>, 1999 WL 494120, *10-11 (S.D.N.Y. 1999) (citing FCC determination that the "safe harbor" provision in §253(c), allowing localities to "manage" their public rights-of-way, "include[s] the ability to ... 'enforce local zoning regulations'") (citing <u>Classic Tel., Inc.</u>, 11 F.C.C.R. 13082, at ¶ 39 (1996)).  Even more specifically, under §332(c)(7), municipalities have every right to impose zoning and land use restrictions and regulations respecting the siting of wireless facilities, and a claim that a zoning law goes too far must be analyzed subject to the express preservation of authority to impose local zoning and land use restrictions embodied in §332(c)(7).

Accordingly, even if §253 applies to facial challenges respecting wireless siting statutes,

the Ninth Circuit plainly erred in applying its right-of-way franchise jurisprudence in a vacuum

and with blinders to wireless siting laws, and by failing to apply the extensive jurisprudence

developed specifically for wireless siting zoning applications under §332(c)(7).  In fact, even the

Ninth Circuit admitted that "prohibition" under §253 generally means the same thing as

"prohibition" under §332.  490 F.3d at 715.  Yet, the Ninth Circuit failed to give full effect to its

superficial reference to §332 when it ruled that a local wireless law that requires a carrier to

demonstrate the unavailability of co-location, or unavailability of less intrusive towers or

antennas, or actual "gaps" in coverage, or similar typical and lawful zoning considerations,

amounts to a prohibition or effective prohibition of wireless service.  Compare Willoth, 176 F.3d

at 639 (2d Cir. 1999) (it only constitutes a "prohibition" or the "effect of prohibiting" if: (1) there

is a "significant gap" in cellular coverage in the area; and (2) the application of the cellular

service provider is the "least intrusive means" of filling that gap); Omnipoint Communications v.

City of White Plains, 430 F.3d 529 (2d Cir. 2005).

> **B.**      **§253 Cannot, And Should Not, Be Applied To The Exclusion Of §332(c)(7)**

Congress' express purpose and intent of §332, and the preservation of local zoning and

land use controls codified in §332(c)(7), was specifically directed to local wireless siting laws;

accordingly §332 in general, and §332(c)(7) specifically, should be applied to facial challenges to

local siting laws.  As a neighboring District Court stated in Vertical Broadcasting, Inc. v. Town

of Southampton, 84 F.Supp.2d 379, 388-389 (E.D.N.Y. 2000), where the court rejected the

carriers' claim that §253 (and its lack of a 30 day statute of limitations period) should apply to a

wireless siting determination:

Despite plaintiffs' attempts to state a claim under Section 253, the court holds that

the only TCA section applicable to the facts herein is Section 332.  Plaintiffs seek
to erect a communications tower in the Town. While the TCA has been described
as far from a "model of clarity," *see Sprint Spectrum, L.P. v. Willoth,* 176 F.3d
630, 641 (2d Cir.1999), quoting, *AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366,
119 S.Ct. 721, 738, 142 L.Ed.2d 835 (1999), one thing is clear. The type of
conduct of which plaintiffs complain falls squarely within the confines of Section
332.

Section 332 speaks specifically to local decisions regarding the siting of
communications towers and of the judicial recourse available to those who feel
that a local body has acted outside of the strictures of the TCA. The statute
provides a detailed roadmap of the judicial review applicable to siting decisions.
That section provides for a thirty day limitations period. To allow a plaintiff to
pursue untimely judicial review of a siting decision by relying on Section 253
would effectively nullify the limitations period of Section 332. To the extent that
plaintiffs have any claim at all, it is a claim under Section 332-not Section 253....

The court further notes that the more typical case brought under Section 253 is
one in which a provider complains that it is being assessed a license or franchise
fee that is neither competitively neutral nor nondiscriminatory. *E.g., GST Tucson
Lightwave, Inc.,* 950 F.Supp. at 969. Here, the issue is solely one of tower
location, not the assessment of any alleged discriminatory fee.

See also Freeman v. Burlington Broadcasters, Inc., 204 F.3d 311, 324  (2d Cir. 2000) (pointing

out that §253 "*is contained in the statutory subchapter entitled 'Common Carriers' and the part

entitled 'Development of Competitive Markets.' The section concerns the provision of local

telephone service and the impermissibility of state-created barriers to competitive markets*").

Similarly, as the Second Circuit held in Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 420

(2d Cir. 2002), the preservation of local authority to make wireless siting "decisions" contained

in §332(c)(7), includes the preservation of local authority to make "regulations" in that respect.

The Mills Court further ruled that §332(c)(7) is the sole allowable source for a claim of federal

preemption of local authority respecting siting of wireless facilities.  Id.[13]  Moreover, a facial

_____

[13] The Mills Court explained:

challenge to a wireless siting zoning statute <u>directly</u> challenges and implicates the municipality's "authority" to make determinations respecting local zoning and land use issues.  <u>See</u> §332(c)(7) ("Except as provided in this paragraph, nothing in this chapter[14] shall limit or affect <u>the authority</u> of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities").  As such, a facial challenge claiming that such local authority was abused in promulgating a wireless siting law is properly analyzed under §332 and §332(c)(7), not §253.  <u>See</u> <u>APT Pittsburgh Ltd. Partnership v. Penn Tp. Butler County of Pennsylvania</u>, 196 F.3d 469 (3d Cir. 1999) (challenge to wireless ordinance rejected; ordinance did not have the "effect of prohibiting" wireless service under §332).

### C.    The Wireless Law Does Not Violate §253 Or Cases Decided Under Inapposite Franchise Case Law

In any event, the Town of Clarkstown's Wireless Law does not amount to a "prohibition" or "effective" prohibition of wireless communication, or "unreasonable discrimination," whether viewed under the more specific case law developed under §332, or in the context of franchise agreements and §253.

In short, unlike in <u>TCG New York, Inc. v. City of White Plains</u>, 305 F.3d 67 (2d Cir 2002), a case involving a telecommunications franchise law and its application to landlines

---

the structure of § 332(c)'s paragraph (7) indicates that <u>Congress meant preemption to be narrow and preservation of local governmental rights to be broad,</u> for subparagraph (A) states that "<i>nothing</i> " in the TCA is to "limit or affect" local governmental decisions "<i>[e]xcept</i> as provided in this paragraph." 47 U.S.C. § 332(c)(7)(A) (emphases added).  Thus, unless a limitation is provided in § 332(c)(7), we must infer that Congress's intent to preempt did not extend so far. (emphasis added)

[14] Notably, §253 is part of the same chapter as §332.

proposed by an AT&T subsidiary, the discretion of the Clarkstown Planning Board is specifically

not open-ended.  Instead, it must be based on statutorily designated criteria related to legitimate

zoning and land use issues, the consideration of which has been expressly endorsed and approved

of by the Second Circuit (see Point V below).  The Town's Wireless Law does not allow for

lengthy delays in the application, and to the contrary, imposes strict and pre-defined time limits

for calendaring and deciding individual applications (see Point III below).  The fees imposed are

not discriminatory (unlike in TCG); they are limited and reasonable, and commensurate with

longstanding and well-established legal precedent (see Point IV).  Moreover, the application

process is not unduly burdensome, and for the most part merely requires certifications which the

Carriers routinely make (see Point V).  And, RF emissions and environmental effects are not

regulated; merely requiring the applicant to indicate and show that it meets federal RF emissions

standards is not regulation, and specifically is not preempted by the TCA (see Point V).

## POINT III

### THE WIRELESS LAW SETS STRICT AND SHORT TIME LIMITS
### FOR FINAL DETERMINATIONS, AND IS ENTIRELY LAWFUL AND PROPER

The Carriers' complaint that the application process is lengthy time-wise, rests on a

misreading or misstatement of the Wireless Law.  In fact, the Wireless Law specifies strict and

reasonable time limits and the Carriers' claims to the contrary are nothing more than a

smokescreen.  The Carriers are seriously wrong in claiming that first there is a 30 day period to

determine whether a pre-application is complete, and this 30 day period does not count toward

the strict 45 days to categorize the level of scrutiny warranted by the application, for a total of 75

27

days.[15]  In point of fact, there is only a 45 day period (not 75 days) to categorize the application

once a complete pre-application is submitted; i.e., if on day 30 the Planning Board has before it a

complete pre-application, it does not have an additional 45 days to set a category, it only has 15

days.  §251-15(B) ("The preliminary screening will be completed by the Planning Board within

45 days from the date the preapplication information is filed").[16]

Moreover, the statute prevents the Planning Board from waiting the full 45 days before

determining that the pre-application is incomplete.  It requires the Planning Board to promptly,

within 30 days of the date the pre-application is filed, to determine whether the submissions are

complete (§251-13(B)), and expressly sets forth that if the applicant believes it has submitted a

complete pre-application, immediate Article 78 review is authorized to challenge a determination

that the application is incomplete (§251-13(B)(2)).

Similarly, following a category designation, and the applicant's submission of the

materials requisite to that category, the Planning Board expressly has only 62 days to notice and

hold a public hearing on the application (§251-18(C)).

The Planning Board is then obligated to render a final ruling on the application within 62

---

[15] It is also important to note that the number of days discussed are those applicable to applications requiring a Special Permit, i.e. the most intrusive applications falling under Categories B, C, and D.  The pre-application-to-decision time span respecting the less intrusive Category A sites is by design significantly shorter – upon a determination that a pre-application fits within that category, the pre-application is "deemed" to be an application and is deemed exempted from the Special Permit requirement.  §251-16.  A hearing is held only concerning the appropriate conditions to be imposed regarding the building permit.  Moreover, the Planning Board must fix a date for the hearing within just 14 days and render a ruling concerning the conditions within just 14 days of the hearing.  Id.

[16] The pre-application materials are not complicated, and require nothing more than an identification of the name of the applicant, the address of the site, a description of the tower or antenna, an architect's letter certification respecting the tower or other structure, and a map showing area reception levels.  §251-13.

28

days of the public hearing (§251-18(D)).  And, like before, the option of waiting the full 62 days plus 62 days only to rule that additional application materials are incomplete, is <u>not</u> available to the Planning Board under the statute.  The statute expressly states that the Board must act quickly to determine whether these additional materials are complete and may not reject an application as incomplete after 30 days of its initial submission, <u>i.e.</u>, this time limit expires even before the 62 day deadline for holding a public hearing (§251-17(B)).

Further, a determination of "completeness" for purposes of these strict time limits and deadlines is "not ... a determination that the applicant has provided full and accurate information, and [does] not preclude the Planning Board from requiring the applicant to provide more detailed, corrected, or other information at later stages during the application <u>review process</u>" (§ 251-17(D)).  Thus, in contrast to the review process, which is guided by the normal give-and-take which occurs when issues arise during the review of an individual siting application, and which remains subject to the "reasonableness" standard embodied in the TCA, the process of examining and processing an application for a "complete" pre-application or application is more in the nature of a ministerial act and is, in fact, subject to strict deadlines.  And, again, <u>immediate</u> judicial review is expressly authorized in the event an applicant believes it did file a complete submission.  Thus, the Carriers' overblown and doomsday prediction that the application process is open-ended and inordinately lengthy is belied by the statute, which sets strict and reasonable time limits.

Moreover, in addition to misstating and misconstruing the statute, the Carriers' claim that the application process can be open-ended rests upon the entirely speculative and unsupported suggestion and assumption that a high level governmental body will subvert and ignore binding

29

law by falsely and repeatedly claiming that a completed pre-application is incomplete.  That

assumption, grounded not in fact but on baseless argumentation, is not a ground upon which this

Court can or should invalidate a statute.  In other words, and as shown in Point I, under well-

established principles governing facial challenges and ripeness, a claim that the Planning Board

is misconstruing its obligation to review an application or pre-application for completeness, and

is subverting the Wireless Law and its strict time limits, should at least await a time when the

Planning Board actually does misuse or abuse its authority and subverts the statute.[17]

Further still, the applicable case law confirms that the express time limitations provided

in the statute are entirely appropriate and lawful.  In this regard, the TCA itself does <u>not</u> contain a

specific time limit for determining applications.  It only requires that they be decided within a

"within a **reasonable period** of time after the request is made."  47 U.S.C. § 332(c)(7)(B)(ii).  A

strict time limit of 45 days to categorize an application, 62 days to set a public hearing, and 62

days to render a determination, is a "reasonable period of time."

"*Although the TCA requires local governments to act on applications for wireless service*

*facilities within a reasonable time, the statute was not intended 'to give preferential treatment to*

*the personal wireless service industry in the processing of requests, or to subject their requests*

*to any but the generally applicable time frames for zoning decision.*'"  <u>National</u>

<u>Telecommunication Advisors, LLC v.  Board of Selectmen of Town of West Stockbridge</u>, 27

---

[17] In support of their claim, the Carriers resort (at p. 15 of their brief) to relying only on a case involving an application for a franchise to install landline fiber optic cables, <u>Peco Energy Co. v. Township of Haverford</u>, 1999 WL 1240941 (E.D.Pa. 1999), where the local statute did not indicate how a franchise can be sought, what the application is required to show, by when the application must be decided, and included a provision that the franchise can be denied at the whim of the town manager.  It has no correlation whatsoever to the Wireless Law here.

F.Supp.2d 284 (D.Mass. 1998) (quoting Sprint Spectrum, L.P. v. City of Medina, 924 F.Supp. 1036, 1040 (W.D. Wash.1996)).

Indeed, the TCA expressly recognizes that those applications involving greater impacts and requiring greater scrutiny will simply require more time.  §332 (c)(7)(B)(ii) (applications must be decided within a "reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request").  See also Nextel Partners of Upstate New York, Inc. v. Town of Town of Canaan, 62 F.Supp.2d 691 (N.D.N.Y. 1999) (town's delay of application determination pending applicant's submission of additional requested information was lawful; relevant inquiry is whether the request for more information was supported by "substantial evidence" that the information was needed for informed decision).

In Masterpage Communications v. The Town of Olive, 418 F.Supp.2d 66 (N.D.N.Y. 2005), the district court found that a delay of two years, including a moratorium, was unreasonable.  The Court noted that the local law involved there did not – unlike the Wireless Law here -- contain time limits, and the local zoning officials seemed to be delaying the application.  That is not remotely what is involved here.  In fact, aside from the short 45 day period required to categorize the application (before which the application is not "duly filed" (§332 (c)(7)(B)(ii))), the amount of time involved is exactly the same as is applicable to traditional zoning applications, i.e., 62 days plus 62 days.  See N.Y. TOWN LAW §274-b(6).

## POINT IV

### THE FEES CHARGED ARE LIKEWISE REASONABLE, LIMITED AND LAWFUL

Most zoning and land use applications cost money.  The more complex the application

the more an applicant expects to pay.  Moreover, it is well settled under New York law that local

boards are entitled to impose reasonable application fees, to require an applicant to pay for a

board's technical expert consulting fees, and to require an applicant who requests permission to

construct a structure to post a bond in relation to that structure.  See Twin Lakes Development

Corp. v. Town of Monroe, 1 N.Y.3d 98, 769 N.Y.S.2d 445 (2003) (it is fully lawful for a town to

require a zoning applicant to pay its outside consultant's fees).

Under the Clarkstown Town Code, the total application fee for a wireless siting

application of the most intrusive proposed sites (Category D sites) is no greater than $1,500.

§251-40.[18]  Indeed, less intrusive proposed sites are charged an application fee of only $500 or

$1,000.  Id.  Aside from those modest fees, the Town Code lawfully and consistent with New

York law, passes on its outside technical expert consulting fee to the applicant.  §251-40(C).

Moreover, and notwithstanding the Carriers' bald and conclusory assertion that there is

purportedly "no" basis or means to challenge the reasonableness of fees, the fees are strictly and

reasonably tied to the actual costs posed by the application, and, as the New York Court of

Appeals specifically pointed out in Twin Lakes Development Corp., 1 N.Y.3d at 107-108, under

N.Y. TOWN LAW §§118 and 119, the fees charged are subject to audit prior to their payment.

Thus, in full accordance with New York law, the Town Code requires the posting of a

---

[18] There is also an "Antenna Advisory Board" whose comments are expressly "advisory [] only" and there is no hearing or other requirements respecting the Antenna Advisory Board (§251-12(B)).  If the applicant nevertheless wishes to appear before that board, a $500 fee applies.

32

relatively small maintenance/removal bond to ensure that the facility is properly removed when no longer in use or abandoned. §251-41 (the bonded principal is only $12,000 for specified antennas or $50,000 for large towers). See Town of Chester v. Republic Insurance Company, 89 A.D.2d 959, 454 N.Y.S.2d 107 (2d Dept. 1982) (maintenance bonds are authorized under N.Y. Town Law); Wright v. Town of LaGrange, 181 Misc.2d 625, 694 N.Y.S.2d 862 (Sup. Ct., Dutchess Co. 1999) (same). Under N.Y. TOWN LAW §277, the Planning Board's bonding requirement may be satisfied through certificates of deposit or other adequate security. In whatever manner the bonding requirement is satisfied, the relatively small bond is plainly not a burdensome or unlawful requirement.

The Carriers' citation to and reliance on this Court's So-Ordered Stipulation reached in Omnipoint Communications v. Village of Airmont, Case No. 07-Civ-0473 (S.D.N.Y. Apr. 18, 2007) (Brieant, J.), further demonstrates the foregoing points. In Village of Airmont, this Court so-ordered the parties' Stipulation of Settlement which provided that certain specific fees charged by specific private consultants for a specific wireless application were unreasonable and excessive. Accordingly, the Village agreed not to use those specific consultants in reviewing future wireless applications. However, this merely demonstrates that the issue of fees, as with the remainder of the Carriers' objections, is more properly reviewed and analyzed on an as applied basis. Moreover, and in any event, this Court did not invalidate the entire municipal scheme which imposed, and evidently continues to impose, even under the so-ordered Stipulation of Settlement in that case, the costs of the Village's outside consulting fees. Again, the case merely recognized and stands for the unremarkable proposition that specific consultants may charge unreasonable and excessive fees, and are to be avoided in the future.

33

Lastly, the modest and lawful fees and costs which are set forth in the Town's Wireless Law are by no means exorbitant or out of line with what is normally charged for other or similar applications of a complex nature. Indeed, they pale in comparison to fees which have been imposed by other municipalities. Compare Nextel Communications of Mid-Atlantic, Inc. v. Town of Randolph, 193 F.Supp.2d 311 (D. Mass. 2002) (application fee of $38,000, plus additional review fee of $38,000, for a total of $76,000 for wireless siting application did not comply with state zoning law and was therefore invalid).

## POINT V

### THE REMAINING APPLICATION REQUIREMENTS
### ARE SIMILARLY REASONABLE AND LAWFUL

The Carriers' complaint evidently objects to all of the pre-application and application requirements, even though they are all tied to the same permissible zoning and land use-related criteria that the Second Circuit has already ruled to be appropriate considerations for local municipalities to address in connection with wireless siting applications, and which the Second Circuit has already ruled to fall within the ambit of TCA-imposed burdens for which the Carriers themselves must demonstrate compliance. Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 639 (2d Cir. 1999); Omnipoint Communications v. City of White Plains, 430 F.3d 529 (2d Cir. 2005). The Carriers also object to any provision of the Wireless Law which even mentions dBM levels or radio frequencies ("RF") data, even though such data is the means by which coverage and reception is identified, even though the genuine existence of an actual "gap" in coverage is a central determining factor for local municipalities to consider under the TCA, and even though the Town's Wireless Law in no manner regulates the actual RF or radiation emissions levels. Id.

34

As extensively shown in Points I and II above, under §332 of the TCA, municipalities are expressly allowed to apply zoning and land use-related considerations to siting requests. 47 U.S.C. §332(c)(7). The Second Circuit in <u>Willoth</u> and <u>Omnipoint</u> explained that the TCA specifically preserves local zoning and land use regulations over cellular telephone towers/antennas, except it imposes two limitations on such local regulations: First, they may not "<u>unreasonably</u> discriminate among providers of functionally equivalent services" 47 U.S.C. § 332(c)(7), subsections (B)(i)(I). Second, they may not "prohibit or have the effect of prohibiting the provision of personal wireless services" <u>Id.</u> at subdivision (B)(i)(II). It only constitutes such "prohibition" if: (1) there is a "significant gap" in cellular coverage in the area; and (2) the proposed antenna and/or tower is the "least intrusive means" of filling that gap. <u>Willoth</u>, 176 F.3d 630, 639 (2d Cir. 1999). Under New York law the same standard applies, except that instead of a "least intrusive means" standard, the application must be shown to be "more feasible than other options" for filling the gap in coverage. <u>Omnipoint</u>, 430 F.3d at 535. The Wireless Law is directly targeted to those very same permissible and lawful considerations.

A.    **The Required Proof Of A Genuine "Gap," Including Relevant Criteria And Appropriate Details Regarding Coverage Maps, Is Entirely Proper and Lawful**

The Carriers apparently contend that the Wireless Law's requirement that they accompany their applications with an actual and meaningful map depicting where they and others in the area have wireless coverage, and where they expect to have coverage if the application is granted, is somehow improper.[19] <u>See</u>, <u>e.g.</u>, §251-13, pre-application Item (12); §251-19 Items (1)

---

[19] Indeed, the Carriers extensively complain about the pre-application requirements when, in fact, other than a coverage map, the items required in the pre-application are information typical to <u>any</u> zoning application, i.e. the name of the applicant, a description of the site, a description of the proposed facility,

(requiring identification of the location and type of existing wireless facilities in the area), (4) (requiring documentation that the applicant actually needs the structure and antenna); (27) (a signal strength study of the area (a/k/a "propagation" study, as used in <u>Willoth</u>) showing in-vehicle reception).

Yet, coverage maps are the most obvious and objective means of showing whether an actual "gap" in coverage exists, as shown by the multitudes of published cases relying upon actual coverage maps, or the deficiencies or absence thereof.  <u>See</u>, <u>e.g.</u>, <u>Willoth</u> (the applicant submitted limited "propagation" maps, and the Town obtain in-vehicle propagation maps); <u>Omnipoint</u> (as shown in the District Court's decision, 175 F.Supp.2d 697, coverage maps were presented to the zoning board to establish a "gap"); <u>U.S. Cellular Telephone of Greater Tulsa L.L.C. v. City of Broken Arrow, Oklahoma</u>, 340 F.3d 1122 (10th Cir. 2003) (pursuant to wireless siting law, coverage maps were used to show need and unavailability of co-location or alternative siting); <u>Metropcs Inc. v. City and County of San Francisco</u>, 2006 WL 1699580 (N.D.Cal. 2006) (whether actual gap existed at location was shown by "propagation maps, drive test data, switch data"); <u>Nextel Communications of Mid-Atlantic, Inc. v. Town of Hanson</u>, 311 F.Supp.2d 142 (D.Mass. 2004) (gap was shown through propagation maps and testimony from a radio frequency engineer); <u>Omnipoint Communications v. Village of Tarrytown</u>, 302 F.Supp.2d 205 (S.D.N.Y. 2004) (existence of gap was proved by propagation analysis, coverage maps, RF engineering reports, and testimony of RF expert).

The Carriers nevertheless purport to contend that the relevant provisions of the Wireless Law, requiring a map showing where existing antennas are located, and a model showing the

---

and an engineer's structural certification letter.  §251-13.

expected wireless reception in a vehicle at a specific level, could somehow be too difficult for them to put together.  Yet, as shown above, case law is firmly established that a wireless siting application can be denied where an applicant fails to demonstrate that it has an actual "gap" in the area and the denial is supported by substantial evidence.  Moreover, a "gap" does not exist where an applicant may effectively co-locate its antenna on existing towers, or where the proposed site is not shown by the applicant to be "more feasible than other options" for filling the gap in coverage.  Omnipoint, 430 F.3d at 535.  In fact, if the Carriers' claim of a "gap" and an inability to fill that gap through "less intrusive feasible" means is made "in conclusory fashion" and "without documentation" submitted by the Carriers, such deficiencies are, as a matter of law, lawful and legitimate ground to deny an application.  Id. at 536.  As such, and as noted above, it simply cannot be unlawful for a local wireless siting law to require that very same "documentation" and information as an express part of the application process itself.

The Carriers similarly object, albeit in unfounded and conclusory fashion, that the statute specifies the minimal level of reception which must be depicted on the submitted coverage maps, of -84 dBm or lower in a vehicle.  §251-13, Item (12).  However, aside from the fact that this objective mapping requirement merely establishes a baseline for review and comparison (i.e., an "apples to apples" comparison), it would have in fact been entirely lawful for the Town to have not just required the submission of a demonstrative coverage map at such levels, but instead to have done what other municipalities have done across the country – namely, to fix and regulate actuate dBm reception levels and to legislate that a reception level of -84 dBm (or even a weaker

-95 dBm level) is the point at which the municipality deems that no "gap" exists.[20]  See

Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board of Easttown Township,

331 F.3d 386 (3d Cir. 2003) (rejecting applicant's claim that it needed a signal above -85 dBm in

order to provide reliable service).

Instead, and directly contrary to the Carriers' false contentions and misleading quotations

from the statute,[21] Clarkstown does not set required or minimum/maximum dBm or RF levels.  It

merely imposes a baseline for the submission of consistent and objective "apples to apples"

mapping and submission criteria for all pre-applications in order to allow for meaningful

comparison and review of coverage issues at the early and short category-fixing stage, and to

prevent applicants from "fixing the numbers" either by submitting coverage maps which contend

(falsely) that no reception exists in the area but without showing the actual dBm criteria they

used for defining "acceptable" reception levels, or by using drastically stringent or divergent

---

[20] See, e.g. , Zoning Law of the Town of Denning, New York, § 10.2 ("Adequate Coverage" of
wireless transmissions is  -95 dBm); Code of Town of Stockbridge, Massachusetts, § 6.25.3 ("Adequate
Coverage" is  -95 dBm); Code of City of Riverside, California, § 16.36.040 ("Adequate Coverage" is  -95
dBm); Code of Town of Brandon, Vermont ("Adequate Coverage" is -90 dBm); Code of Concord,
Massachusetts, § 7.8.2.2 ("Adequate Coverage" is -95 dBm); Town of Westminster, VT, § 980
("Adequate Coverage" is -90 dBm).  These Town Codes, as to which this Court may take judicial notice,
are available and published online at:

> http://users.bestweb.net/~townhall/Law2001-2.pdf;
> http://www.townofstockbridge.com/Public_Documents/000103E9-80000001/S004250EE;
> http://www.riversideca.gov/municipal_code/Title_16/36/040.html.;
> http://www.town.brandon.vt.us/Ordinances/ord_cell_tower.htm; and
> http://www.emrnetwork.org/siting/states/concord_ma_bylaw.pdf
> (Town of Westminster, VT code not available online).

[21] The Carriers throughout their Brief repeatedly and selectively quote to language in the
Wireless Law regarding dBm and RF data levels, without further disclosing or mentioning that the
specific data fields and information, including, but not limited to, the numerous reference to specific
dBm levels, are for the submission of data and data-gathering purposes only, all of which has been
endorsed and approved of by the Second Circuit and sister circuits.

reception or RF levels and data.  That is, without a baseline submission requirement for the submitted coverage maps, the applicant could unilaterally define and purport to "map" reception levels so stringently that it hides the fact that reception in the area is more than adequate to place wireless calls and connect to the national network.  See Sprint Spectrum L.P. v. Willoth, 176 F.3d at 642-643.

Importantly, the concerns regarding incomplete, misleading and/or insufficient data are not hypothetical concerns.  They are derived from actual experience where siting applicants (often local real estate entities who make a living arranging siting for wireless carriers) do not submit maps or data showing the carriers' actual reception or RF levels in a given area.  Such mapping and data would by definition be "conclusory" (Omnipoint, supra) and insufficient.  See also Mele Decl., ¶18; ¶26; Simoes Decl., ¶¶6-16.

B.    The Requirements for Compliance with Federal Law Respecting
      RF Emissions And The Like Are Likewise Proper and Lawful

The Carriers complain at length – once again, with overblown rhetoric and inapposite case law – that applicants must identify the radio or transmitter they intend to erect, its radiation pattern and maximum power, must certify that these levels "will be within the threshold levels adopted by the FCC," provide the supporting data for the certification, and provide a copy of its FCC license to operate the facility.  See §251-19 Items (19) though (21), (23) through (25); supplemented with §251-21(A) (when a facility is proposed to be placed within 100 feet of another facility, the other facilities emissions should also be identified); §251-22(B) (the engineer preparing the report should be a radio frequency engineer or the like); §251-23 (providing that radiation levels cannot exceed federal and state standards, and describing the type of assessment

39

information to be provided); §251-24 (describing how radiation calculations are made in accordance with FCC and other federal and generally accepted manners).

Even a cursory look at the TCA and its <u>limited</u> federal preemption respecting wireless siting reveals that the Carriers are at best mistaken when they claim, as they repeatedly do throughout their papers, that requiring such information is somehow tantamount to regulating RF signals, or radiation and environmental effects of wireless transmission. The Wireless Law does nothing of the sort, and merely requires the applicant to show compliance with federal law. In fact, an engineer's report is all that is required.

The relevant and limited preemption provision of the TCA, contained in 47 U.S.C. §332(c)(7)(B)(iv), states:

> No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions <u>to the extent that such facilities comply with the Commission's regulations concerning such emissions</u>.

Thus, "the structure of § 332(c)'s paragraph (7) indicates that Congress meant preemption to be <u>narrow</u> and preservation of local governmental rights to be <u>broad</u>." <u>Sprint Spectrum L.P. v. Mills</u>, 283 F.3d 404, 420 (2d Cir. 2002) (emphasis added). As expressly stated in the statute itself, this limited preemption <u>only</u> applies "<u>to the extent that</u> such facilities comply with the Commission's regulations concerning such emissions." Stated otherwise, "[t]he <u>only</u> onus placed on state and local governments exercising their local power is that they may not regulate personal wireless service facilities <u>that conform to the FCC Guidelines</u> on the basis of environmental effects of RF radiation." <u>Cellular Phone Taskforce v. F.C.C.</u>, 205 F.3d 82, 96 (2d

Cir. 2000) (emphasis added).

To state the obvious, if federal preemption of environmental effects applies only "to the extent" the proposed facility complies with FCC regulations, it is entirely proper and lawful for a local municipality to simply require the applicant to show that the radiation emissions of its proposed facility are within the FCC regulatory limits. As one treatise put it:

> Local governments <u>can require facilities to comply with FCC emission standards</u>, but they cannot adopt different standards as the basis for their zoning decisions.... However, <u>raising concerns about or inquiring into the safety of RF emissions does not violate the TCA</u>. (emphasis added)

FEDERAL LAND USE LAW & LITIGATION § 10:10 (citing <u>Cellular Telephone Co. v. Town of Oyster Bay</u>, 166 F.3d 490[, 495] (2d Cir. 1999) and the Court's citation with approval[22] of <u>Smart SMR of New York, Inc. v. Zoning Com'n of Town of Stratford</u>, 995 F. Supp. 52 (D. Conn. 1998) and <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, 99 F. Supp. 2d 381 (S.D. N.Y. 2000)).[23]

---

[22] In contrast, the Second Circuit in <u>Oyster Bay</u> ruled that a local zoning board which failed to provide "substantial evidence" based upon zoning concerns left the impression that it was basing its denial of a wireless siting permit upon the fears of adverse health effects which predominated the public hearing. In so ruling, the Court stated:

> A review of the record before us of the two hearings reveals that the bulk of the testimony addressed citizens' fears of adverse health effects from the cell sites. <u>It is true that raising such concerns does not violate the TCA</u>, *see Smart SMR v. Zoning Comm'n*, 995 F.Supp. 52, 58 (D.Conn.1998) (<u>pointing out that locality does not violate the TCA by "merely inquiring into the safety of emissions from a wireless facility"</u>). But when the testimony is almost exclusively directed to health effects, there must be substantial evidence of some legitimate reason for rejecting the applications to avoid the conclusion that the denials were based on the impermissible health effects ground. (emphasis added)

[23] As the Second Circuit alternatively explained in <u>Mills</u>, "[n]ot all actions by state or local government entities, however, constitute regulation." <u>Mills</u>, 283 F.3d at 417, 420 (holding that municipal

The Carriers' nearly sole basis for contending that "[t]he Town's requirements thus go well beyond 'merely inquiring' about RF safety", is the fact that the FCC has distributed a suggestive "guide" to local municipalities with a checklist of items which they should address to ensure that FCC RF safety requirements are met.  Carriers' Brief at pp. 44-45 (aside from citing the FCC guide, citing cases holding that wireless siting applications cannot be <u>denied</u> on the basis of environmental concerns when the facility complies with FCC standards). But the subject FCC guide, published online at <u>http://wireless.fcc.gov/siting/</u> FCC_LSGAC_RF_Guide.pdf, states it is only a "voluntary" tool, as stated in its first page.  The guide is also "*not intended to replace OET Bulletin 65, which contains detailed technical information regarding RF issues*." <u>Id.</u>  And, not coincidentally, that very same FCC Bulletin 65 is what the Wireless Law <u>expressly</u> indicates governs applicable calculations.  § 251-24(G).   Moreover, the guide explains that its use of the term "categorically excluded" means only that the facility merely does not require a comprehensive Environmental Assessment report; it is not "excluded" from radiation level limits.  And even as to the checklist for "categorically excluded" facilities, localities are specifically not mandated to use it.  <u>Id.</u> at p. 8 ("*For your convenience, we have developed the checklist in Appendix A that may be used to streamline the process of determining whether a proposed facility is categorically excluded.  You are encouraged to adopt the use of this checklist in your jurisdiction, although <u>such use is not mandatory</u>*") (emphasis supplied).

---

enforcement of contractual rights respecting radiation emissions does not amount to "regulation").

**C.    The Requirement Of More Intensive Review Depending on the Site Category Is Likewise Proper and Lawful**

The Wireless Law utilizes a "Category" process of distinguishing between those applications which pose the greatest potential zoning and land use impacts, as distinguished from those which pose the least, and fashions the application requirements based upon such categorization.  The result of this categorization process means that less intrusive applications which do not seek to erect highly intrusive facilities or structures in sensitive areas such as near homes or parks, avoid the closer scrutiny warranted for the more intrusive ones in more sensitive areas.

Despite the Carriers' hysterical and overblown objections to this as discriminatory, the Second Circuit has specifically approved of this approach.  See Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 639 (2d Cir. 1999) ("local governments may reasonably take the location of the telecommunications tower into consideration when deciding whether [] to require a more probing inquiry")**.**

**D.    The Preference For Less Invasive And Less Intrusive Technologies, Including Alternate Technologies, Does Not Amount to "Prohibiting" Or "Effectively" Prohibiting Wireless Services**

The Willoth Court (176 F.3d at 640) ruled that even where a significant gap in coverage is shown, it is appropriate for a local municipality to prefer less invasive and less intrusive technologies under the "least intrusive means" and "more feasible than other options" analysis, discussed supra.  Thus, in rejecting the cellular provider's contentions under the TCA, the Willoth Court explained that the use of "new technology that will provide better transmission and reception with less intrusive towers" is in fact one of the goals of the TCA.  Id.

43

In fact, in delineating the authority of a local municipality to consider and determine

whether an application is the "least restrictive means" of filling an actual coverage gap, the

Willoth Court specifically held and clearly instructed:

> A local government may reject an application for construction of a
> wireless service facility in an under-served area without thereby
> prohibiting personal wireless services if the service gap can be
> closed by less intrusive means. *See Town of Amherst*, 173 F.3d at
> 14 ("[I]ndividual denial is not automatically a forbidden
> prohibition," but disallowing "the only feasible plan ⋯ might
> amount to prohibiting personal wireless service."). There are
> numerous ways to limit the aesthetic impact of a cell site. It may be
> possible to select a less sensitive site, *see Gearon & Co. v. Fulton
> County*, 5 F.Supp.2d 1351, 1355 (N.D.Ga.1998), to reduce the
> tower height, see Town of Amherst, 173 F.3d at 14-15, to use a
> preexisting structure or to camouflage the tower and/or antennae,
> *see, e.g., .....* A local government may also reject an application
> that seeks permission to construct more towers than the minimum
> required to provide wireless telephone services in a given area. A
> denial of such a request is not a prohibition of personal wireless
> services as long as fewer towers would provide users in the given
> area with some ability to reach a cell site. (emphasis supplied)

Similarly, in Pittsburgh LP v. Penn Township, Butler County, 196 F.3d 469, 480 (3d

Cir.1999), the Third Circuit explained that the "least intrusive means" standard requires:

> a showing that a good faith effort has been made to identify and
> evaluate less intrusive alternatives, *e.g.*, that the provider has
> considered less sensitive sites, alternative system designs,
> alternative tower designs, placement of antennae on existing
> structures, etc. (emphasis supplied)

Just like in response to the Carriers' other hysterical and overblown objections, if it is

entirely lawful and proper for a local municipality to make individual siting determinations based

on whether or not there are available alternatives to fill a purported coverage gap, including by

examination of less intrusive feasible means, and further including alternate technologies and

"alternate systems designs" (id.), it simply cannot be unlawful for that same municipality to codify those very same concerns and considerations in the local wireless law itself.

### E.    The Requirement Of A Willingness To Co-locate Is Likewise Proper and Lawful

Next, the Carriers complain that applicants are required to show they have endeavored to co-locate on existing towers or other facilities, and were unable to do so, and, if they are proposing to erect their own tower, a commitment to allow other carriers to co-locate in the future.  See, e.g., § 251-26 (if co-location is available, it must be used if the site is the most invasive Category C or D, and may be required for other applications); § 251-19 Items (2) (a statement of the carrier's plan for future wireless facilities in the area); (3) (a commitment to co-locate or allow co-location "wherever possible").

However, the law is abundantly well settled that it is proper for a local municipality to deny an application to erect a wireless facility, when existing facilities in the area are available to co-locate.  Omnipoint, 430 F.3d at 436[24]; New York SMSA Ltd. Partnership v. Town of Clarkstown, 99 F.Supp.2d 381, 389 (S.D.N.Y. 2000); Nextel Partners of Upstate New York, Inc. v. Town of Town of Canaan, 62 F.Supp.2d 691 (N.D.N.Y. 1999) (town's refusal to rule on application until carrier showed whether it could co-locate was lawful).  In fact, a municipality's

---

[24] The Second Circuit explained in Omnipoint:

> other cell companies serve the area in which Omnipoint has its gap. From this, the Board could infer that other towers erected by other companies are in the vicinity, and that Omnipoint had the burden of showing either that those towers lacked capacity for an Omnipoint facility or that (for some other reason) those towers were unavailable to bridge Omnipoint's coverage gap. This is not a theoretical consideration, because one finding in the damages opinion is that "the cheapest way for Omnipoint to close its coverage gap would be to co-locate on an existing tower in the Fenway area."

attempt to avoid or curtail the future proliferation of cell phone towers by requiring tower applicants to allow co-location is a fully legitimate and lawful requirement, particularly since the TCA expressly allows local zoning and land use controls over wireless siting because of these very same proliferation concerns (Omnipoint, 430 F.3d at 531), and the legislative intent of the Clarkstown Wireless Law reflects serious legislative concern over the "potential cumulative impact of these facilities on [the Town's] landscape and character" (§251-10(R)) (Legislative intent).

Indeed, a willingness to co-locate, and to allow co-location, is directly related to the permissible requirements and determination under Willoth and Omnipoint that a proposed tower, antenna or other facility be shown by the Carriers to be "more feasible than other options" for filling the gap in coverage while mitigating impacts.

### F.    The Requirements For General Information Regarding Aesthetic And Other Zoning and Land Use Impacts Is Proper and Lawful

The remaining requirements of the Wireless Law for new applications and existing wireless facilities are even more directly tied to quintessential zoning and land use-related criteria respecting aesthetic and other impacts which proposed cell phone towers or antennas or other facilities would have on the surrounding neighborhood.  See §251-19 Items (5) through (17) (requiring general information such as the name of the applicant and the person preparing the report, and a description of the site and proposed structure and antennas); (12) (the location of the nearest residence or places of public assembly); (14) (description of existing and proposed landscaping, whether any trees will be removed, drainage controls, and fencing); (18) (a plan for "effective[] screen[ing]" of the facility "so as to mitigate potential visual impacts"); (22) (a

46

statement of how the tower will be maintained and inspected); (26) (a certification as to structural integrity of the tower or other facility); and (28) (notice to New York State environmental, parks, and preservation agencies and their comments on the application); see also the remaining provision of the Wireless Law, regarding maintenance of existing facilities, recertification, prohibition of abandonment, and the like.

The Second Circuit's analysis and seminal opinion in Willoth is again directly controlling in this regard, and demonstrates both the legality and appropriateness of the application requirements, including the consideration of "cumulative impacts." As the Court of Appeals stated in Willoth, "[t]here are numerous ways to limit the aesthetic impact of a cell site," including to "select a less sensitive site," "reduce the tower height," or "use a preexisting structure or to camouflage the tower and/or antennae." 176 F.3d at 643. The Court similarly held that typical zoning and land use controls over wireless facilities are entirely proper and lawful, and are not subject to limited preemption, under the TCA. Id.

### G.    Preservation Of Property Values Is A Proper Siting Criteria

The negative impact a cell tower or other wireless telecommunication device or structure may have on the neighborhood and its property values is a legitimate zoning and land use-based concern. Willoth, 176 F.3d at 647; Omnipoint, 430 F.3d at 533-535.

### H.    The Planning Board's Determination Is Subject to Strict Statutory Controls And Is Neither "Open-ended" Nor Subject to "Unfettered Discretion"

The Wireless Law governs individual siting applications and siting decisions. As such, it is a far cry from a franchise law which allows an official to reject a franchise agreement for no apparent or bona fide reason. In addition, the Wireless Law extensively provides the Planning

Board with very specific and objective criteria upon which it must base its determination.

Further, it allows for court review at every stage, including even before a pre-application has

been accepted (§251-13(B)(2)); as soon as a site category has been assigned (§251-17); and after

a final determination is made (N.Y. CPLR, Article 78).

Furthermore, the Wireless Law requires a duly issued "decision" (§251-18(E) and (F)),

which mirrors the TCA's mandate that the determination be in writing and supported by

"substantial evidence" ( 47 U.S.C. §332(c)(7)).  New York law likewise mandates that a

determination be supported by sufficient evidence.  <u>Omnipoint</u>.  There is nothing in the Wireless

Law even to suggest that the Planning Board's siting determination can be based upon whim or

caprice, and the dictates of federal law and state law are expressly recognized and incorporated

throughout the Wireless Law itself.

In sum, the Planning Board does not possess "unfettered" or "open-ended" discretion, as

the Carriers contend.  In this regard, the Ninth Circuit's ruling in the <u>County of San Diego</u> case

discussed in Point II above, that the municipality there had "open-ended" discretion (the district

court had similarly ruled the discretion was "unfettered"), is again seriously mistaken.  490 F.3d

at 715-716.  In so ruling, the Ninth Circuit negated the express preservation of land use discretion

and authority provided in §332 when it ruled that the existence of a zoning board's "discretion"

amounts to an unlawful "prohibition" or "effective" prohibition to telecommunications.

In fact, the rule is the precise opposite.  Namely, under §332(c)(7)(B)(iii), federal courts

are obligated to defer to the discretion of the local board, so long as it is supported by

"substantial evidence," which is less than the preponderance of evidence standard and which

merely requires something more than a "scintilla" of evidence.  <u>Omnipoint</u>, 430 F.3d at 532 (a

federal courts is obliged to apply this "deferential standard" and is also prohibited from engaging in its own fact-finding; that is the local board's sole province).  Like the Carriers' brief here, the Ninth Circuit derived its rule prohibiting "open-ended discretion" not from zoning law, where by definition all discretion is subject to the "substantial evidence" requirement and judicial review and is not "unfettered," but from the inapposite franchise area and inapposite franchise law, where courts have held that a municipality which leaves itself the option of refusing a franchise for any reason, has unfettered discretion resulting in a prohibition of telecommunications services.

The Carriers' here similarly argue at great length that if the Planning Board has any discretion respecting how to apply siting criteria, that constitutes "unfettered discretion".  Thus, for example, they argue that the screening matrix includes "unfettered discretion" because (just like the Second Circuit approved) it considers whether the Carrier proposed to use antenna "stealthing" technology, such as a camouflaged antenna tower.  The Carriers complain that what exact stealthing suffices for assignment of points is not "defined" enough to their liking and the Planning Board therefore has some measure of discretion in relation thereto.  The assertion subverts the express zoning and land use discretion preserved by the TCA.

Moreover, the provision added at the carriers' request (see Mele Decl.) allowing the Planning Board to waive any requirement "in the event that the requirements and conditions for which a waiver or relaxation is made are found not to be requisite in the interest of public health, safety or general welfare, and may only be exercised in the event that the Planning Board, in issuing a waiver or relaxation, makes specific findings that the interests of this chapter would otherwise be satisfied, the waiver or relaxation is reasonably necessary for the provision of

49

wireless communications services consistent with the interests of both this chapter and the TCA, and the applicant has taken all <u>reasonably available mitigation measures</u>" (§ 251-18), specifically tracks and complies with New York Town Law respecting special permits (as well as the TCA). <u>See</u> N.Y. TOWN LAW §274-b(5) (if allowed to do so by local law, the local body charged with issuing special permits may "waive" requirements "in the event any such requirements are found not to be requisite in the interest of the <u>public health, safety or general welfare or inappropriate to a particular special use permit</u>").  The parameters of such waiver authority are specifically defined, the Planning Board must be able to make the required specific findings, the findings are subject to immediate Article 78 judicial review, and by no means is the authority open-ended or unfettered.  Equally significant, the authority to <u>grant</u> a "waive[r]" and to "relax[]" the effects of the Wireless Law cannot by any stretch of the imagination amount to unfettered discretion to <u>deny</u> a siting application or a "prohibition" of wireless services.

In sum, the Carriers' challenge to the Wireless Law on the grounds of undue or unfettered discretion is utterly devoid of merit.

**I.    The Carriers' Suggestion That A Zoning Law May Not Provide That A Wireless Facility Must Be "Inaccessible To Children" And Not In Areas Where Children Will Have Access To Them (i.e., in or adjacent to child day <u>care centers, schools, camps, public parks or playgrounds), Is Specious</u>**

In a final effort to manufacture a claim of "prohibition" of wireless services, the Carriers resort to an entirely strained and specious argument to the effect that a municipality supposedly has no authority to require that large electrical and transmission devices be segregated from schools and other sensitive areas where there are serious and heightened safety risks of electrocution and bodily injury.  <u>See</u> §251-29 ("Security; "*All antenna towers, monopoles and*

50

*other supporting structures shall be made inaccessible to children and constructed or shielded in such a manner that they cannot be accessed*"; <u>only</u> those with new <u>poles or towers structures</u> must not be located within 350 feet of a "*child day-care center, school, camp, public park or playground*").

In so arguing, at page 29 of the Carriers' brief, the Carriers cite to a telephone landline case, an FCC ruling regarding telephone franchise agreements,[25] and 47 U.S.C. §253, whereupon the Carriers contend that a municipality has no authority to require that large electrical devices be kept away from children.

The claim is utterly specious, and ignores that protection of the public from electrical wires and structures (not from RF emissions, but from the live wires and the structures themselves) is distinctly the province of local building, zoning, and land use controls, as distinctly preserved by §332(c)(7). <u>See</u> <u>also</u> <u>American Tower LP v. City of Huntsville</u>, 295 F.3d 1203, 1208-1209 (11th Cir. 2002) (a *"tower's unusual proximity to two schools and several soccer fields used by children"*, along with other evidence, itself constituted "*substantial evidence*" pursuant to §332(c)(7) to support zoning board's denial of application to erect a wireless tower).

Moreover, the Carriers do not even purport to claim or suggest that the areas near where

---

[25] The case cited by the Carriers, <u>New Jersey Payphone Ass'n v. Town of West New York</u>, 299 F.3d 235 (3d Cir. 2002), involved a law that granted only one provider the right to use the public right-of-way for landline pay telephones, and prohibited all other providers from doing so. Similarly, the name itself of the FCC ruling upon which the Carriers rely, demonstrates how it too has nothing to do with a zoning and land use provision addressed to safeguarding children from electrocution and bodily injury. <u>See</u> <u>In re Petition of State of Minnesota for Declaratory Ruling Regarding Effect of Section 253 on Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way</u>, 14 F.C.C.R. 21697 (1999).

children congregate are so pervasive that they have no other suitable sites or available alternatives to locate their towers in order to fill any actual "gaps" in coverage.  Willoth, supra.  And, further still, if it ever happens to occur that a carrier somehow has no alternative but to place a cell phone tower in the middle of a school playground, notwithstanding the serious safety concerns that children may be enticed to climb the tower, such an unlikely occurrence could still potentially invoke the specific provisions of the Wireless Law which nevertheless allow for relaxation of any particular requirements in a particular case where it is deemed necessary to avoid an actual "prohibition" or "effective prohibition" of wireless services under the TCA.  See Point I above, at 7-11.

## POINT VI

### ALTERNATIVELY, IF ANY PORTION OF THE WIRELESS LAW IS FOUND UNLAWFUL, THEN THIS COURT SHOULD ENFORCE THE SAVINGS CLAUSE

Lastly, §251-43 of the Wireless Law contains the following savings clause: "Should any section, paragraph, sentence, clause, word or provision of this chapter be declared void, invalid or unenforceable, for any reason, such decision shall not affect the remaining provisions of this chapter."  Thus, if any portion of the law is found unlawful, but see Points I-V above – the proper remedy would be to only sever and strike that portion and otherwise affirm and adhere to enforcement of the remainder of the Wireless Law.  See Cox Communications PCS, L.P. v. City of San Marcos, 204 F.Supp.2d 1260 (S.D. Cal. 2002) (involving franchise law; proper remedy when individual portions are found invalid is to sever and invalidate only those portions).

Indeed, the propriety of severance as the remedy in the event that any provision were deemed unlawful is particularly warranted where, as here, in promulgating its Wireless Law, the

52

Town specifically acknowledged the TCA, and went to great lengths in an attempt to strike the proper "balance" which the TCA authorizes it to strike. <u>Omnipoint</u>, 430 F.3d at 531; §251-10. The Wireless Law in fact contains additional express provisions mandating the issuance of a special permit, and waiving or deeming satisfied any requirements, if the TCA would otherwise be violated. §251-32(B); §251-18.

The Carriers' rote objection and position that the <u>entire</u> Wireless Law is laden with illegality, and that severance would therefore be improper, is unavailing and unfounded at best. <u>See</u> <u>also</u> Points I-V above.

<u>CONCLUSION</u>

For these reasons, it is respectfully submitted that the Court should deny the Carriers'

motion for summary judgment, and should grant the Town's cross-motion for summary

judgment.

Dated: Garden City, New York
      March 14, 2008

                                 Respectfully Submitted,

                                 ROSENBERG CALICA & BIRNEY LLP

                                 By: _____/s/_____
                                       Edward M. Ross (EMR-1700)
                                       Judah Serfaty (JS-1833)
                                 *Attorneys for Defendants*
                                 100 Garden City Plaza - Suite 408
                                 Garden City, New York 11530
                                 (516) 747-7400