**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

**NEW YORK SMSA LIMITED PARTNERSHIP d/b/a VERIZON WIRELESS,  NEW CINGULAR WIRELESS PCS, LLC, SPRINT SPECTRUM L.P., and OMNIPOINT COMMUNICATIONS, INC. a wholly owned subsidiary of T-MOBILE USA, INC.,**

**Plaintiffs,**

v.

**TOWN OF CLARKSTOWN, and THE TOWN BOARD OF THE TOWN OF CLARKSTOWN,**

**Defendants.**

**Case No. 07-cv-7637 (CLB) (GAY)**

<u>**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**</u>

Michael A. Rowe, Esq. (MR 8643)
Karl J. Nelson, Esq. (Pro Hac Vice)
SAUL EWING, LLP
750 College Road East, Suite 100
Princeton, New Jersey 08540-6617
Tel.: 609.452.3123
Fax: 609.452.3125

***Attorneys for Plaintiff
Omnipoint Communications, Inc.***

Andrew G. McBride, Esq. (AM1966)
John E. Barry, Esq. (JB 1776)
Joshua S. Turner, Esq. (Pro Hac Vice)
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Tel.: 202.719.7000
Fax: 202.719.7049

***Attorneys for Plaintiff
New York SMSA L. P. d/b/a Verizon
Wireless***

Gregory D. Meese, Esq. (GDM 8738)
PRICE, MEESE, SHULMAN &
D'ARMINIO, P.C.
50 Tice Boulevard
Woodcliff Lake, NJ 07677
Tel: 201.391.3737

***Attorney for Plaintiff
Sprint Spectrum L.P.***

Christopher B. Fisher, Esq. (CF 9494)
CUDDY & FEDER LLP
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel.: 914.761.1300
Fax: 914.761.5372

***Attorney for Plaintiff
New Cingular Wireless PCS, LLC***

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 5

I.  CHAPTER 251's ATTEMPT TO REGULATE THE TECHNICAL ASPECTS
     OF WIRELESS FACILITIES IS PREEMPTED ................................................. 5

   A.  The Town's Attempt to Impose Technical and Operational Standards Treads on a
        Field Completely Occupied by Federal Law ....................................... 5

   B.  The Town's Attempt to Impose Technical and Operational Standards on Wireless
        Carriers Is Preempted Because it Conflicts with Federal Law ........................ 10

   C.  Chapter 251's Consideration of the Environmental Effects of RF Emissions
        Violates Section 332(c)(7)(B)(iv) of the Communications Act....................... 16

   D.  Section 332's Preservation of Traditional Zoning Authority Does Not Authorize
        the Town to Regulate the Technical Aspects of Wireless Service .................. 21

II.  CHAPTER 251 VIOLATES SECTION 253 AND IS PREEMPTED ................ 24

   A.  Chapter 251 Violates Section 253 on its Face ..................................... 25

   B.  The Town's "Waiver Clauses" Cannot Save Chapter 251 from Preemption Under
        Section 253 ................................................................................. 28

III.  THERE IS NO DOUBT SECTION 253 APPLIES TO CHAPTER 251 .......... 30

   A.  Section 253(a) Preempts Any Local Legal Requirement That Has the Effect of
        Prohibiting Any Telecommunications Service ................................... 30

      1.  Section 253(a) Applies to Any State or Local Regulation of
           Telecommunications Service ................................................... 31

      2.  Application of Section 253 Is in No Way Limited to Franchise Regulations .. 32

      3.  The Town's Position Is Based Upon a Misreading of Second Circuit Precedent
           ................................................................................................. 34

   B.  Characterizing an Ordinance as Zoning-Related Does Not Shield It From Section
        253 ............................................................................................ 35

   C.  Section 332's Independent Restrictions on Wireless Siting Decisions Do Not
        Affect the Preemptive Scope of Section 253 ................................... 37

      1.  Precedent in This Circuit Shows That the Scope of Section 332(c)(7)(A) Is
           Limited to Traditional Zoning "Decisions." ............................. 38

2.  The Federal Courts Have Confirmed That the Scope of Section 332(c)(7)(A) is Limited to "Decisions." ................................................................ 40

3. Chapter 251 Is Not a "Zoning" Ordinance ........................................ 42

4. The Town's Other Arguments That the Scope of Section 253 Does Not Encompass Chapter 251 Fail ................................................ 43

**IV.  THE UNLAWFUL PROVISIONS OF CHAPTER 251 ARE NOT SEVERABLE** ................................................................ **45**

**V.   THE WIRELESS CARRIERS' FACIAL CHALLENGE IS RIPE** .................. **46**

**CONCLUSION** ................................................................ **50**

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

*AT&T Corp. v. Iowa Utilities Board*,
   525 U.S. 366 (1999).....................................................................................44

*Adams Express Co. v. Croninger*,
   226 U.S. 491 (1913).....................................................................................44

*Adamson Cos. v. City of Malibu*,
   854 F. Supp. 1476 (C.D. Cal. 1994) ...........................................................29

*Aeron Marine Shipping Co. v. United States*,
   695 F.2d 567 (D.C. Cir. 1982) ....................................................................43

*Air Transport Ass'n of America, Inc. v. Cuomo*,
   No. 07-5771, 2008 WL 763163 (2d Cir. Mar. 25, 2008)...........6, 40, 48, 49

*Babbitt v. United Farm Workers National Union*,
   442 U.S. 289 (1979), *vacated by*, 442 U.S. 936 (1979).............................50

*Bastien v. AT&T Wireless Services, Inc.*,
   205 F.3d 983 (7th Cir. 2000) ....................................................................7, 9

*In re Bellamy*, 962 F.2d 176 (2d Cir. 1992),
   *overruled sub nom. on other grounds by*
   *Nobelman v. American Savings Bank*, 508 U.S. 324 (1993) .......................43

*Broyde v. Gotham Tower, Inc.*,
   13 F.3d 994 (6th Cir. 1994) ..........................................................................8

*CISPES v. FBI*,
   770 F.2d 468 (5th Cir. 1985) ......................................................................29

*California Coastal Commission v. Granite Rock Co.*,
   480 U.S. 572 (1987).....................................................................................47

*Capital Cities Cable, Inc. v. Crisp*,
   467 U.S. 691 (1984)..................................................................................6, 10

*Cellular Phone Taskforce v. FCC*,
   205 F.3d 82 (2d Cir. 2000)..........................................................................17

*Cellular Telephone Co. v. Town of Oyster Bay,*
    166 F.3d 490 (2d Cir. 1999)................................................................18, 19

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984).............................................................................17

*City of Auburn v. Qwest Corp.,*
    260 F.3d 1160 (9th Cir. 2001) ............................................3, 25, 42, 48, 49

*City of Rancho Palos Verdes, California v. Abrams,*
    544 U.S. 113 (2005)............................................................................16

*Cleveland v. Beltman North American Co.,*
    30 F.3d 373 (2d Cir. 1994)....................................................................44

*Cox Communications  v. City of San Marcos,*
    204 F. Supp. 2d 1272 (S.D. Cal. 2002).....................................................40

*Downey v. Allstate Insurance Co.,*
    638 F. Supp. 322 (S.D.N.Y. 1986)...........................................................18

*Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co.,*
    289 U.S. 266 (1933)............................................................................9

*Freeman v. Burlington Broadcasters, Inc.,*
    204 F.3d 311 (2d Cir. 2000)................................................................8, 22

*GTE Mobilnet of California Ltd. Partnership v. City and County of San*
    *Francisco,* No. C 05-04056 SI, 2007 WL 420089 (N.D. Cal. Feb. 6, 2007)..............36

*Geier v. American Honda Motor Co.,*
    529 U.S. 861 (2000).......................................................................2, 7, 13, 45

*Green Mountain Railroad Corp. v. Vermont,*
    404 F.3d 638 (2d Cir. 2005)...............................................................47, 48

*Head v. New Mexico Board of Examiners in Optometry,*
    374 U.S. 424 (1963)............................................................................7

*Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,*
    471 U.S. 707 (1985)............................................................................7

*Illinois Bell Telephone Co. v. Village of Itasca, Illinois,*
    503 F. Supp. 2d 928 (N.D. Ill. 2007).......................................................35

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)..................................................................................................7

*MetroPCS, Inc. v. City and County of San Francisco*,
  400 F.3d 715 (9th Cir. 2005) ..........................................................................40, 41

*National Advertising Co. v. Town of Niagara*,
  942 F.2d 145 (2d Cir. 1991)............................................................................45, 46

*National People's Action v. City of Blue Island, Illinois*,
  594 F. Supp. 72 (N.D. Ill. 1984) ..........................................................................29

*Newpath Networks LLC v. City of Irvine*,
  SACV 06-550-JVS (C.D. Cal. March 10, 2008) ...................................................25

*New Jersey Payphone Ass'n v. Town of West New York*,
  299 F.3d 235 (3d Cir. 2002)...........................................................................27, 48

*New York SMSA Ltd. Partnership v. Town of Clarkstown*,
  99 F. Supp. 2d 381 (S.D.N.Y. 2000)......................................................................39

*NextG Networks of California, Inc. v. County of Los Angeles, California*,
  522 F. Supp. 2d 1240 (C.D. Cal. 2007) .................................................................36

*NextG Networks of California, Inc. v. City of San Francisco*,
  No. C 05-00658, 2006 WL 1529990 (N.D. Cal. June 2, 2006) ..............................36

*NextG Networks of New York, Inc. v. City of New York*,
  513 F.3d 49 (2d Cir. 2008)..................................................................31, 34, 35

*Nobelman v. American Savings Bank*,
  508 U.S. 324 (1993)...............................................................................................43

*Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board of
  Easttown Township*, 331 F.3d 386 (3d Cir. 2003) ...........................................14, 15

*Omnipoint Communications, Inc. v. City of White Plains*,
  430 F.3d 529 (2d Cir. 2005)..................................................................................40

*PECO Energy Co. v. Township of Haverford*,
  No. 99-4766, 1999 WL 1240941 (E.D. Pa. Dec. 20, 1999)......................................30

*Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Ass'n*,
  491 U.S. 490 (1989)...............................................................................................44

*Qwest Communications Corp. v. City of New York,*
    387 F. Supp. 2d 191 (E.D.N.Y. 2005) .......................................................47

*Qwest Communications Inc. v. City of Berkeley,*
    433 F.3d 1253 (9th Cir. 2006) ............................................................25, 37

*Qwest Corp. v. City of Santa Fe, New Mexico,*
    380 F.3d 1258 (10th Cir. 2004) .........................................................25, 34

*RT Communications, Inc. v. FCC,*
    201 F.3d 1264 (10th Cir. 2000) ...............................................................32

*Reno v. Catholic Social Services, Inc.,*
    509 U.S. 43 (1993)....................................................................................49

*Riegel v. Medtronic, Inc.,*
    128 S. Ct. 999 (2008).................................................................................7

*Smart SMR of New York, Inc.  v. Zoning Commission of the Town of Stratford,*
    995 F. Supp. 52 (D. Conn. 1998)..............................................................19

*Southwestern Bell Wireless, Inc. v. Johnson County*
    *Board of County Commissioners,*
    199 F.3d 1185 (10th Cir. 1999) .................................................................8

*Sprint Spectrum L.P. v. Mills,*
    283 F.3d 404 (2d Cir. 2002).............................................................23, 39

*Sprint Spectrum L.P. v. Willoth,*
    176 F.3d 630 (2d Cir. 1999)...........................................11, 16, 32, 34, 39

*Sprint Telephony PCS, L.P. v. County of San Diego,*
    490 F.3d 700 (9th Cir. 2007) ......................................................... *passim*

*TC Systems, Inc. v. Town of Colonie, New York,*
    263 F. Supp. 2d 471 (N.D.N.Y. 2003).....................................................49

*TCG New York, Inc. v. City of White Plains,*
    305 F.3d 67 (2d Cir. 2002)..........................................2, 25, 32, 33, 47

*T-Mobile Central, LLC v. City of Grand Rapids,*
    No. 1:06-CV-747, 2007 WL 1287739 (W.D. Mich. May 2, 2007)............20

*T-Mobile Central, LLC v. Unified Government of Wyandotte County/Kansas City,*
    528 F. Supp. 2d 1128 (D. Kan. 2007)......................................................20

*Twin Lakes Development Corp. v. Town of Monroe*, 1 N.Y. 3d 98 (2003) ....................... 27

*Verizon Wireless (VAW) LLC v. City of Rio Rancho, New Mexico*,
    476 F. Supp. 2d 1325 (D.N.M. 2007) ............................................................ 35, 40, 43

*Vertical Broadcasting, Inc. v. Town of Southampton*,
    84 F. Supp. 2d 379 (E.D.N.Y. 2000) ....................................................................... 38

## STATE CASES

*People ex rel. Alpha Portland Cement Co. v. Knapp*,
    230 N.Y. 48, 129 N.E. 202 (N.Y. 1920) ..................................................................... 45

*Westinghouse Electric Corp. v. Tully*,
    63 N.Y.2d 191, 470 N.E.2d 853 (N.Y. 1984) ............................................................. 45

## STATUTES

47 U.S.C. § 253 .......................................................................................... *passim*

47 U.S.C. § 253(a) ...................................................................................... *passim*

47 U.S.C. § 301 ................................................................................................... 6

47 U.S.C. § 303 .............................................................................................. 7, 45

47 U.S.C. § 332(c)(3) ....................................................................................... 37

47 U.S.C. § 332(c)(3)(A) .............................................................................. 23, 37

47 U.S.C. § 332(c)(7) .................................................................................... *passim*

47 U.S.C. § 332(c)(7)(A) ............................................................... 3, 21, 37, 38, 40

47 U.S.C. § 332(c)(7)(B)(i)(I) ......................................................................... 15

47 U.S.C. § 332(c)(7)(B)(iv) ........................................................................ *passim*

Telecommunications Act of 1996, 47 U.S.C. §§ 151 *et seq* ............................... 35

## ORDINANCES

Code of Town of Clarkstown, N.Y. Chapter 251 ...................................... *passim*

Code of Town of Clarkstown, N.Y. Chapter 290 .............................................................43

## LEGISLATIVE MATERIALS

H.R. Rep. No. 104-458 (1996) *reprinted in,*
    1996 U.S.C.C.A.N. 138 ...............................................................................21, 37, 45

S. Rep. No. 104-230 (1996) ......................................................................................16, 22

## ADMINISTRATION MATERIALS

*Amendment of the Commission's Rules to*
    *Establish New Personal Communications Services,*
    8 F.C.C.R. 7700 (1993)...........................................................................................12

*Amendment of the Commission's Rules to Preempt State and Local Regulation of*
    *Tower Siting for Commercial Mobile Services Providers,* Petition for
    Rulemaking, RM 8577, WT Docket No. 97-192 (Dec. 22, 1994).............................21

*Federal-State Joint Board on Universal Service,*
    12 F.C.C.R. 8776 (1997)..........................................................................................31

*Future Use of Frequency Band 806-960 MHZ,*
    46 F.C.C.2d 752 (1974), *aff'd,* 525 F.2d 630 (D.C. Cir. 1976)....................................6

*Implementation of Section 703(E) of the Communications Act,*
    13 F.C.C.R. 6777 (1998)..........................................................................................31

*Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of*
    *1993,* Twelfth Report, WT Docket No. 07-71 (Feb. 4, 2008) ....................................12

*Implementation of the Local Competition Provisions of the Communications Act*
    *of 1996, Interconnection between Local Exchange Carriers and Commercial*
    *Mobile Radio Service Providers,*
    11 F.C.C.R. 15499 (1996).........................................................................................31

*Petition of Cingular Wireless LLC for a Declaratory Ruling that Provisions of the*
    *Anne Arundel County Zoning Ordinance are Preempted,*
    18 F.C.C.R. 13126 (2003)..............................................................................8, 22, 42

*Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect*
    *of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport*
    *capacity in State Freeway Rights-of-Way,*

14 F.C.C.R. 21697 (1999)...........................................................................28, 32, 36

*Requests for Relief from State & Local Regulations Pursuant to Section*
    *332(c)(7)(B)(v) of the Communications Act of 1934,*
    15 F.C.C.R. 22821 (2000)..................................................................16, 17

*Use of the Bands 825-845 MHz and 870-890 MHz,*
    89 F.C.C.2d 58 (1982) .............................................................................6

*Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications*
    *Systems,* 86 F.C.C.2d 469 (1981)...................................................6, 7, 8, 12

## MISCELLANEOUS

Brief of the United States and the Federal Communications Commission as
    Amicus Curiae in Support of Appellees, Murray v. Motorola, Inc.,
    No. 07-cv-1074 (D.C. Ct. App. Mar. 31, 2008)................................................1, 2, 6, 7

FCC, *A Local Government Official's Guide to Transmitting Antenna RF Emission*
    *Safety,* (June 2, 2000), *available at*
    http://wireless.fcc.gov/siting/FCC_LSGAC_RF_Guide.pdf. ...............................19, 20

## **INTRODUCTION**

There are over 40,000 political subdivisions in this country.  If even a fraction of them attempted to do what Clarkstown has done—dictate wireless equipment specifications, impose a cumbersome application system for the construction of wireless facilities, and claim unfettered discretion to block further network development—the interstate mobile communications system we now enjoy would quickly unravel.  Chapter 251 of the Clarkstown Town Code purports to regulate antenna technology, radio frequency interference ("RFI"), potential health and safety effects of radio frequency ('RF') emissions, wireless power levels and adequacy of service. Such regulation is well outside the traditional purview of local zoning, and runs afoul of: (1) the federal government's occupation of the field of wireless communications; (2) federal statutory law concerning wireless communications; and (3) the body of law developed by the federal courts interpreting the sources and scope of federal preemption.

Wireless communication is an area that Congress has assigned to the exclusive jurisdiction of the Federal Communications Commission ("FCC").   In a brief recently filed in the District of Columbia Court of Appeals, the FCC noted that the area of technical standards for wireless communications has been completely occupied by the federal government for decades. Brief of the United States and the Federal Communications Commission as Amicus Curiae in Support of Appellees at 12, Murray v. Motorola, Inc., No. 07-cv-1074 *et. seq*. (D.C. Ct. App. Mar. 31, 2008) ("FCC App. Br."). Surveying the Communications Act and its own wireless regulations, the FCC asserted "exclusive authority to set technical standards for RF communications and regulate RF transmissions used to provide cell phone service." *Id.* 14.  That exclusivity was necessary, stated the agency, in order to ensure uniform equipment standards and interoperability of wireless technology across the country.  *Id.* at 13.  Chapter 251 steps directly in the path of this carefully calibrated federal regulatory plan.

While the the Town of Clarkstown, New York ("Clarkstown" or "Town") inaccurately accuses Plaintiffs of ignoring relevant arguments and case law, in its own Memorandum of Law in Support of Cross-Motion for Summary Judgment (filed Mar. 14, 2008) ("Town Mem."), it completely ignores the FCC's position on field and conflict preemption in the area of wireless regulation. This omission is particularly telling in light of the Supreme Court's admonition that an agency's views about the preemptive force of its own regulatory program are entitled to weight in the preemption analysis. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000). When the preempted portions of Chapter 251 are eliminated, such as the technology preferences at the heart of the "scoring" of applications, the ordinance cannot operate as a coherent whole. Thus, the FCC's position on preemption, as supported by the statutory and regulatory scheme, resolves this case in Plaintiffs' favor. This Court should declare the entire ordinance invalid on that basis and require the Town to enact an ordinance that confines itself to the traditional land use regulations preserved for local governments under the Communications Act.

Furthermore, the Town all but concedes that, if Section 253 of the Communications Act applies to Chapter 251 of the Clarkstown Town Code, numerous provisions of Chapter 251 must be struck down as preempted by federal law. *See, e.g.*, Town Mem. 49 (acknowledging that courts applying Section 253 have struck down local regulations for providing local regulatory boards with the same unfettered discretion exemplified in Chapter 251). This concession is well-taken in light of binding Second Circuit precedent. *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 81 (2d Cir. 2002) ("[T]he Ordinance's provision allowing the White Plains Common Council to consider any factor deemed to be in the public interest provides precisely

the sort of discretion to prohibit telecommunications services that § 253 preempts." (citing *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1179 (9th Cir. 2001)).

Having conceded Chapter 251's vulnerability under Section 253, however, the Town attempts to sidestep the Second Circuit's interpretation of Section 253 by claiming that this federal statute does not apply to zoning ordinances aimed at wireless carriers, and that Section 332's limited zoning preservation carve-out is the exclusive vehicle for challenging such ordinances.  This argument cannot be squared with the plain language of Section 253(a). Entitled "Removal of Barriers to Entry," Section 253(a) provides that:  "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability *of any entity* to provide *any* interstate or intrastate telecommunications service."  47 U.S.C. § 253(a) (emphases added).  Chapter 251 is a "local legal requirement" and Plaintiffs are providers of "interstate telecommunications services."  The inquiry can and should end there.  Nothing in the statute or legislative history suggests that Congress wished to exclude wireless carriers from protection against barriers to market entry or remove wireless carriers from Section 253 in favor of some other statutory scheme.  Both the FCC and the courts have recognized the broad sweep of Section 253 and numerous courts have rejected attempts to blue pencil wireless carriers out of the plain language of the statute.

The Town's argument also requires an incorrect interpretation of Section 332.  Section 332(c)(7)(A)'s preservation of local zoning authority deals with individual zoning decisions.  All the case law relied upon by the Town involves challenges to individualized zoning decisions based on specific facts.  Such cases say nothing about a facial challenge to a set of entry rules like those contained in Chapter 251.  It is, then, not surprising that every federal court that has considered this issue has rejected the Town's argument, and found that Section 332 and Section

253 both apply to wireless carriers and serve different functions in the federal regulatory regime. This includes the Ninth Circuit, whose case law on Section 253 has been repeatedly cited with approval in the Second Circuit, and whose case law on Section 332 mirrors the Section 332 case law in the Second Circuit. The Town simply has no support for its argument that wireless carriers should not be covered by Section 253.

Finally, Chapter 251 goes so far beyond the traditional regulation of land use that it is not a "zoning" ordinance at all. Chapter 251 is categorically different, both substantively and procedurally, from a traditional zoning ordinance. It purports to directly regulate wireless technical infrastructure and wireless service in a manner that cannot be characterized as "zoning." The fact the Town itself enacted Chapter 251 as a free-standing chapter of the Clarkstown Town Code, separate and apart from the zoning code provisions. Thus, even if zoning ordinances were excepted from facial challenges under Section 253 (and the every federal court to consider the matter has held they are not), Chapter 251 would lie well outside that exception as it is anything but a traditional land use measure.

The Wireless Carriers comply with standard zoning requirements across the country, and work with local zoning authorities every day to resolve antenna placement issues. Chapter 251 stands apart as one of the most burdensome, open-ended, costly, and intrusive wireless ordinances in the United States. It represents a highly unusual municipal attempt to dictate the architecture of the wireless network and directly regulate wireless service. And that is why, for the first time, all of the major carriers have joined in a facial challenge to a wireless ordinance. For this reason, and for all the reasons set out in Plaintiffs Motion for Summary Judgment, this Court should enter a declaratory judgment that Chapter 251 is preempted by the Supremacy Clause of the U.S. Constitution, and further order that the Town of Clarkstown, New York,

Town Board of the Town of Clarkstown, and any town official are forbidden from taking any

action to enforce or implement Chapter 251.[1]

## ARGUMENT

### I.    CHAPTER 251'S ATTEMPT TO REGULATE THE TECHNICAL ASPECTS OF WIRELESS FACILITIES IS PREEMPTED.

In its Cross-Motion for Summary Judgment the Town directs most of its fire to an

attempt to convince the Court that Section 253 does not apply to wireless carriers.  As discussed

in Section II below, the Town is wrong on this score—Section 253 renders Chapter 251 invalid.

However, the Town ignores the fact that field and conflict preemption are equally fatal to

Chapter 251.  Indeed, in light of the FCC's recent filing in the D.C. Court of Appeals (attached

as Exhibit A to this reply), field preemption and preemption by conflict with FCC regulation

provide the clearest and most compelling path to resolution of this case.  By failing to offer any

response to these arguments, the Town has effectively conceded that it has no satisfactory

response on the merits to Plaintiffs' field and conflict preemption arguments.

#### A.    The Town's Attempt to Impose Technical and Operational Standards Treads on a Field Completely Occupied by Federal Law.

Where federal regulation is so comprehensive that it effectively "occup[ies] an entire

field of regulation," and thus leaves no room for state or local participation, state or local

---

[1]    Both parties agree that "this case is clearly amenable to summary judgment as a purported facial challenge to the statute." Town Mem. 5 n.4.  At the same time, Defendants have submitted several declarations, *see* Declarations of Amy Mele, Town Attorney, Jose C. Simoes, Town Planner, and Michael P. Musso, P.E., Senior Project Engineer of HDR, Inc. (together, the "Declarations"), and purport to incorporate the facts contained in those Declarations into the section of their memorandum of law entitled "Statement of Facts." *See id.*  With only two limited exceptions, however, *see* Town Mem. 39, 49, Defendants do not cite to, or rely on, the information contained in the Declarations in support of any of their arguments.  Therefore, except where the Declarations are expressly cited and relied upon by Defendants, Plaintiffs have ignored the Declarations and respectfully submit that the Court should do so as well.  Plaintiffs have raised only issues of law in their motion, and Defendants apparently agree that the Court can resolve those issues without any discovery or other factual development.  Thus, Plaintiffs' decision not to submit rebuttal declarations to the Court should not be interpreted as agreement with the many extraneous facts alleged in the declarations submitted by Defendants.

regulation of any kind is preempted. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984). Like the regulation of navigable waterways or aviation, the regulation of interstate communications by radio fairly announces itself as amenable to only one form of central regulation. The Communications Act expressly provides that the federal government, rather than state or local governments, shall "maintain . . . control . . . over all the channels of radio transmission," 47 U.S.C. § 301, of which the provision of wireless service is an integral part. The FCC has repeatedly stated its exclusive control over technical and operational issues in a range of contexts pertaining to wireless services. *See, e.g.*, *Future Use of Frequency Band 806-960 MHZ*, 46 F.C.C.2d 752, 766-67 (¶ 43) (1974) (the FCC's "technical standards and . . . operational rules are to apply nation-wide . . . without regard to state boundaries or varying local jurisdictions"); *Use of the Bands 825-845 MHz and 870-890 MHz*, 86 F.C.C.2d 469, 503-05 (¶¶ 79, 82) (1981); *Use of the Bands 825-845 MHz and 870-890 MHz*, 89 F.C.C.2d 58, 95 (¶ 81) (1982). There are few areas where field preemption is as clear as it is with respect to the technical and operational aspects of wireless networks.[2]

In a brief filed in the District of Columbia Court of Appeals this March, the FCC reaffirmed the federal government's occupation of the entire field of wireless technology. *See* FCC App. Br.[3] Of particular relevance to this case are (1) the FCC's reiteration that "[t]he

---

[2]    The Second Circuit recently discussed the doctrine of field preemption in a case involving the Federal Aviation Act ("FAA"). *See Air Transport Ass'n of Am., Inc. v. Cuomo*, No. 07-5771, 2008 WL 763163 (2d Cir. Mar. 25, 2008) The parallels between the Communications Act and the FAA are striking. In discussing the application of field preemption, the Second Circuit noted that the FAA "was enacted to create a 'uniform and exclusive system of federal regulation' in the field of air safety," "the FAA 'was passed by Congress for the purpose of centralizing in a single authority . . . the power to frame rules for the safe and efficient use the nation's airspace.'" *Id.* at *5. As discussed below, the same is true in the realm of wireless communication, where Congress established the FCC to provide national, uniform rules for the efficient use of available spectrum for interstate communications.

[3]    The Town objects to Plaintiffs' citation of "a 69-page decision from the Superior Court of the District of Columbia, Civil Division [*Murray v. Motorola*] and an FCC amicus brief in the same case involving federal preemption of state tort claims" and argues that these sources do not "bear on the issues presented." Town Mem. 1, n.2. The Town's objection is misplaced. Preemption of a state or local regulation cannot be distinguished from

federal government, through the FCC, has long exercised *sole responsibility for regulating technical standards* with respect to RF emissions generally and wireless telephone service in particular," *id*. at 2 (emphasis added), and (2) the FCC's statement that "[t]he regulatory powers of the FCC reach their zenith with respect to the technical standards for RF communications," *id*. at 5 (citing *Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 430 n.6 (1963)). Because "the FCC has specifically 'assert[ed] federal primacy over the areas of technical standards . . . for cellular service,'" (quoting *Use of the Bands 825-845 MHz and 870-890 MHz*, 86 FCC 2d at 505 (P. 82)), regulations such as those in Chapter 251 that trespass on this exclusive federal authority are categorically preempted.

As Plaintiffs explained in their opening brief, the Commission's position is supported by the text of the Communications Act (which grants the FCC broad power over all technical aspects of radio communications, including spectrum licensing, frequency assignment, signal strength, resolution of interference issues, and the "kind of apparatus to be used" for all forms of wireless communication), 47 U.S.C. § 303, and by 80 years of precedent. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment at 30-35 (filed Jan. 11, 2008) ("Pls.' Mem."); *see also Head*, 374 U.S. at 430 (regulation of technical matters concerning frequency allocation is "clearly exclusive" of state and local regulation); *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000) (holding that the Communications Act makes "the FCC responsible for determining the number, placement and operation of the cellular towers and other infrastructure"); Memorandum Opinion and Ordering Granting Motion to

---

preemption of a lawsuit applying state law, *see Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1007-08 (2008) (holding that federally preempted state law "requirements" include those imposed by common law causes of action), and the FCC's views regarding the preemptive force of its regulations are entitled to "substantial weight," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996), and can be "dispositive." *Id*. (quoting *Hillsborough County. v. Automated Med. Labs.*, Inc., 471 U.S. 707, 714 (1985)); *see also Geier v Am. Honda Motor Co.*, 529 U.S. 861, 883 (2000) ("the agency's own views [on preemption] should make a difference").

Dismiss at 49, Murray v. Motorola, Inc., 2001 CA 008479B (D.C. Super. Ct. Aug. 24, 2007) ("If ever there were a field in which Congress had mandated the 'primacy' of federal regulation, it is surely the control of radio frequencies. There is no room for argument on this point. Both the defendants and the FCC, in their briefing, have cited countless authorities to support this conclusion."); *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 320 (2d Cir. 2000) (finding that the FCC's broad mandate "make[s] it clear that Congress intended the FCC to possess exclusive authority over technical matters related to radio broadcasting" and explaining that "[t]his authority is embedded in the FCC's broad authority to develop a comprehensive national regulatory system governing telecommunications"); *Use of the Bands 825-845 MHz and 870-890 MHz*, 86 F.C.C.2d at 503 (¶ 80) ("Federal courts even before passage of the Communications Act in 1934 had held that the Federal government already fully and exclusively occupied the field of radio licensing and regulation."). The field of radio frequency interference ("RFI") in particular has long been recognized as a field in which the federal government has exclusive and pervasive regulatory authority. *See* Pls.' Mem. 33-35; *see also Petition of Cingular Wireless LLC for a Declaratory Ruling that Provisions of the Anne Arundel County Zoning Ordinance are Preempted*, 18 F.C.C.R. 13126, 13132 (¶ 13) (2003) ("*Anne Arundel*") ("The Commission and federal courts have consistently found that the Commission's authority in the area of RFI is exclusive and any attempt by State or local governments to regulate in the area of RFI is preempted."); *Freeman*, 204 F.3d at 320 (2d. Cir. 2000) (concluding that "federal law has preempted the field of RF interference regulation"); *Sw. Bell Wireless, Inc. v. Johnson County Bd. of County Comm'rs*, 199 F.3d 1185, 1193 (10th Cir. 1999), *cert. denied*, 530 U.S. 1204 (2000) ("Congress intended federal regulation of RFI issues to be so pervasive as to occupy the field."); *Broyde v. Gotham Tower, Inc.*, 13 F.3d 994, 997 (6th Cir. 1994) (noting the

"irreconcilable conflict between the FCC's exercise of exclusive jurisdiction over the regulation of radio frequency interference and the imposition of common law standards in a damages action"). Thus, a local government that regulates the technical aspects of wireless in its regulation of a wireless carrier in any way, including by embedding that regulation in an antenna siting ordinance, is "tread[ing] directly on the very areas reserved to the FCC." *Bastien*, 205 F.3d at 989.

This exclusivity of federal regulation is made essential by the very nature of wireless communication. As the Supreme Court recognized 75 years ago: "No state lines divide the radio waves, and national regulation is not only appropriate but essential to the efficient use of radio facilities." *Fed. Radio Comm'n v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 279 (1933). By their nature, wireless devices are mobile and can move freely from state to state. Without the national uniformity provided by an exclusive federal regulator, a uniform nationwide network would not be possible. Clarkstown's attempted regulation of the network illustrates this problem. Its preference for certain technologies will likely create coverage gaps or require that wireless devices used in Clarkstown be reconfigured or transmit at different power levels. Its assertion of jurisdiction over RFI could mean that wireless carriers must reduce their power levels to accommodate other services to which the FCC would assign a lower priority. Given the extensive use of wireless devices for public safety and first responder functions, regulation like that adopted by the Town can be dangerous. Low signal strength or other technical variations in the network can adversely affect network functions such as locational tools for wireless 911 calls. Chapter 251 introduces exactly such technical variance on the local level.

Chapter 251 is riddled with impermissible regulations of the technical standards of wireless service. Indeed, the purpose of Chapter 251 appears to be to give the Town control over the ways wireless networks located within the Town are designed, engineered, constructed, and operated. Specifically, the Town attempts to:

- control the network technologies that the Wireless Carriers employ by establishing a preference for certain wireless technologies that is so substantial that it amounts to a *de facto* requirement that the Wireless Carriers use such technologies, *see* Clarkstown Town Code, § 251-10(E), -15(A), -19(G)(9);

- dictate what qualitative level of service constitutes "adequate service," *see id.* § 251-13(A)(12), -19(F)(27);

- regulate radio frequency interference ("RFI"), *see id.* § 251-10(T), -11(E), -19(F)(24), -22(A)(3); and

- regulate the level of radio frequency emissions**,** *see id.* § 251-19(F)(23), -21(A), -22, -23, -37, Table 1.

Because Chapter 251 intrudes upon the federal government's occupation of the entire field of wireless technical standards and RFI, Chapter 251 is preempted in its entirety.

**B.**     **The Town's Attempt to Impose Technical and Operational Standards on Wireless Carriers Is Preempted Because it Conflicts with Federal Law.**

Chapter 251 is also preempted because it conflicts with and frustrates valid policy decisions made by the FCC pursuant to its exclusive regulatory authority. *See Capital Cities Cable, Inc.*, 467 U.S. at 699 (holding that when a state law "stands as an obstacle to the accomplishment and execution" of a valid federal policy, federal law must prevail).

Even if Clarkstown had the authority to address the technical aspects of wireless communications, it could not do so in a manner that conflicted with or contradicted FCC

regulation.  Because Chapter 251 imposes technical requirements which are at odds with the

FCC's requirements, they are preempted.  For example, Chapter 251 creates a preference for

certain wireless technologies in Clarkstown that is so weighted in favor of distributed antenna

systems ("DAS") and similar "alternate technologies," that it amounts to a *de facto* requirement

that the Wireless Carriers use such technologies.  *See, e.g.*, Clarkstown Town Code, § 251-10(E)

(expressly stating that the use of "alternate technology, including but not limited to, distributed

antenna systems (DAS) and microcells, is declared to be preferred over conventional tower

sites"); *id.* § 251-15(A)(1)(A) (establishing a streamlined category for those applications that,

among other things, use "preferred alternate technology (DAS, microcells)"); *id.* § 251-19(G)(9)

(for Category C and D sites, requiring submission of a report demonstrating the applicant's

review of alternate technologies such as microcells or DAS, "demonstrating in detail the

technological reason to justify why alternate technologies cannot be utilized"); *see generally*

Pls.' Mem. 36-38.  The Town's brief highlights that the overarching purpose of Chapter 251 is to

ensure wireless carriers use "alternate technologies" by explaining that the time span for

Category A sites—which all but require the use of DAS, *see id.* 36-38—"is *by design*

significantly shorter," Town's Mem. 28 n.15 (emphasis added).  It is difficult to imagine a more

direct attempt by a local government to dictate the technology used in wireless network

deployment.[4]

The Town's requirement that Wireless Carriers utilize its "preferred technology"

conflicts directly with a variety of FCC orders.  *First*, the FCC has expressly prohibited state and

local governments from imposing technical regulations of precisely this type. *Use of the Bands*

---

[4]       Though the Town attempts to defend these preferences on the basis that it may prefer "less intrusive towers," Town Mem. 43 (citing *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 640 (2d Cir. 1999)) (quotation marks omitted), Chapter 251 always imposes this preference or *de facto* technology requirement regardless of whether the preferred technologies actually constitute the least intrusive means in particular circumstances.

*825-845 MHz and 870-890 MHz*, 86 F.C.C.2d at 503-05 (¶¶ 79, 82) ("In accordance with our authority discussed above, we are asserting federal primacy over the areas of technical standards and competitive market structure for cellular service," because any additional or conflicting requirements would frustrate the goals of the Commission in ensuring that wireless spectrum is used "effectively and efficiently").

*Second*, the FCC has explained that its regulatory scheme aims to provide carriers maximum flexibility in designing and building their networks:

> The Commission has adopted flexible licensing policies instead of mandating any particular technology or network standard. Mobile telephone service providers have the flexibility to deploy the network technologies and services they choose as long as they abide by certain technical parameters designed to avoid radiofrequency interference with adjacent licensees. . . . As a result of the flexibility afforded by the Commission's market-based approach, different U.S. providers have chosen to deploy a variety of different technologies with divergent technology migration paths, and competition among multiple incompatible standards has emerged as an important dimension of non-price rivalry in the U.S. mobile telecommunications market and a distinctive feature of the U.S. mobile industry model.

*Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Twelfth Report*, WT Docket No. 07-71, at 61 (¶ 125) (Feb. 4, 2008).  The FCC pointed out that creating and sustaining a competitive marketplace in wireless telecommunications services has important benefits for consumers including "lower prices, higher quality, and greater choices of services." *Id*. at 87 (¶ 194); *see also Amendment of the Commission's Rules to Establish New Personal Commc'ns Servs.*, 8 F.C.C.R. 7700, 7755 (¶¶ 135-36) (1993) ("*PCS Service Rule Order*") (explaining that in adopting a "flexible approach" to technical standards for personal communications services and devices "we have tried to provide the maximum flexibility in technical standards so as to allow the new service to develop in the most rapid, economically feasible, diverse manner").

Nothing could be more antithetical to the FCC's policy of granting wireless carriers maximum flexibility in technical designs than the Town's attempt, through Chapter 251, to impose a specific, "one-size-fits-all" technical preference for DAS and similar "alternate technologies." This is exactly the kind of conflict the Supreme Court recognized and rejected in *Geier*. In *Geier*, federal policy favored the promotion of a mix of technologies to create incentives for innovation in auto safety, while plaintiffs in a state tort suit sought to impose a universal air bag requirement as part of the general standard of care. The Supreme Court held that the conflicting state suit was preempted. *Geier*, 529 U.S at 881. The Town thus cannot claim the ability to mandate the adoption of specific wireless technology in the face of a federal determination that carriers should be given the flexibility to design and deploy their own networks.

Just as the Town cannot dictate the use of a single technical approach by the Wireless Carriers, it also may not dictate what constitutes adequate radio signal strength (equal to or below "-84 dBm") in the functioning of the Wireless Carriers' networks. *See* Clarkstown Town Code, § 251-13(A)(12), -19(F)(27). For the same reasons set forth above, the Town's attempt to set by regulatory fiat the level of "adequate service" for wireless telecommunications conflicts directly with the federal government's regulatory scheme and is, therefore, preempted. See Geier, 529 U.S. at 881.

In an attempt to justify the "adequate service level" provisions of Chapter 251, the Town first claims that these provisions do not, in fact, "set required or minimum/maximum dBm or RF levels." Town Mem. 38 (though in the paragraph immediately preceding this assertion the Town claims that it has the authority to set such levels in any event). Instead, the Town argues that it is merely "impos[ing] a baseline" that will help it sort applications for Category A, B, C or D

treatment.  *Id.*  This is a distinction without a difference.  If the Town intends to use the signal mapping data to determine where there is and where there is not adequate service, and if the Town demands to see signal maps showing a -84 dBm contour, it is self-evident that the Town will make "adequate service level" determinations based on whether carriers do or do not meet this signal level.

The Town then cites a number of cases to try and support its claim that it can unilaterally determine a signal level that constitutes "adequate service." Town Mem. 37-38 (citing in particular *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386 (3d Cir. 2003)).  However, each of these cases involves a challenge to the denial of a specific wireless antenna siting application and must be read in that limited context.  Moreover, these cases actually establish that there is no "one size fits all" approach for determining adequate coverage.[5]

For example, in *Easttown Township*, upon which the Town relies heavily, the Court *affirmed* the determination that no correlation had been established between a particular signal strength level and "the actual ability of users to access the national telephone network."  331 F.3d at 398.  As the Third Circuit's decision suggests, a particular signal level may be adequate for providing service in one setting, but may be completely insufficient in another.  The sufficiency of a particular strength of a wireless signal is influenced by a number of factors, including the frequency band that is used, the terrain of the surrounding area, the location of the customers (*e.g.*, out of doors, in a vehicle, or in a building) to whom service is being provided, the type of wireless technology that the carrier uses to provide service, and the type of service

---

[5]     It goes without saying that none of the cases cited by the Town involving individual consideration of service levels in the context of specific wireless siting decisions can stand for the proposition that a municipality can prefer a particular technology *ex ante* in all circumstances.

used by the customer (*e.g.*, voice, data, SMS, video, or music).  Because there is no correlation between specific signal strength levels and wireless telecommunications service levels, *see id.* at 398, the Town cannot justify its *de facto* minimum threshold as "merely impos[ing] a baseline for the submission of consistent and objective 'apples to apples' mapping and submission criteria . . . to allow for meaningful comparison and review of coverage issues."  Town Mem. 38.

The Town's attempt to establish a uniform signal strength baseline is not only irrelevant to the issue of service provision, it runs afoul of Section 332's requirement that functionally equivalent services be treated in a non-discriminatory fashion.  Because functionally equivalent services that use different technologies require different RF signal strength levels to provide reliable telecommunications services, a regulation requiring all applicants to meet the same rigid RF signal strength reception level requirement amounts to an unlawful discriminatory mandate of the type specifically barred by Section 332. *See* 47 U.S.C. § 332(c)(7)(B)(i)(I).  The federal statutory command that functionally equivalent services using different technologies not be treated in a discriminatory manner requires regulatory flexibility, because Chapter 251's one-size-fits-all requirements regarding decibel-level maps would disproportionately impact those functionally equivalent telecommunications services that require a higher signal level to provide service.  The Town cannot short circuit the inquiry under Section 332, which is inherently fact-specific and must be determined on a case-by-case basis, by imposing such a blanket and ultimately discriminatory requirement on all applicants.

Moreover, by establishing a uniform "adequate" level of wireless service throughout Clarkstown, Chapter 251 prohibits wireless carriers from competing to provide the highest level of service possible.  The regulation of signal strength also impacts the type of services that can be offered now and particularly in the future as more advanced services, such as data or video

services, may require higher signal strength.  This restriction of competition and innovation strikes at the heart of the 1996 Act, which was expressly "pro-competitive," S. Rep. No. 104–230, at 1 (1996).

Thus, Chapter 251 is preempted both because it conflicts with federal law and policy and because the federal government has occupied the area of technical regulation of signal strength. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (noting that in passing the Telecommunications Act of 1996, Congress sought to "encourage the rapid deployment of new telecommunications technologies"); *cf. Willoth*, 176 F.3d at 640 (disapproving regulatory regimes that "would act as a disincentive for wireless service providers to develop and deploy new technology that will provide better transmission and reception with less intrusive towers" as contrary to "the TCA's goal of increased innovation").

**C.     Chapter 251's Consideration of the Environmental Effects of RF Emissions Violates Section 332(c)(7)(B)(iv) of the Communications Act.**

In addition to trespassing into a federally occupied field and conflicting with a comprehensive set of federal regulations, Chapter 251's requirements related to the environmental effects of RF energy directly violate Section 332(c)(7)(B)(iv) of the Communications Act and are thus expressly preempted.  Section 332(c)(7)(B)(iv) provides an explicit, textual admonition that "[n]o state or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."  47 U.S.C. § 332(c)(7)(B)(iv).  The FCC has construed this provision broadly to grant the Commission "plenary authority in this area," *Requests for Relief from State & Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934*, 15 F.C.C.R. 22821, 22828 (¶ 17)

(2000) ("*Requests for Relief*"), and the Second Circuit has upheld this construction as a reasonable interpretation entitled to *Chevron* deference, *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 96 (2d Cir. 2000) ("The FCC's interpretation [of Section 332(c)(7)(B)(iv)] is therefore entitled to deference [under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984),] and, because the FCC's interpretation is reasonable, we are bound to accept it."). As the FCC has explained, "[p]ursuant to Section 332(c)(7), and consistent with the Commission's general authority to regulate the operation of radio facilities, State and local governments *are broadly preempted from regulating the operation of personal wireless service facilities based on RF emission considerations*." *Requests for Relief*, 15 F.C.C.R. at 22828 (¶ 17) (emphasis added). Section 332(c)(7)(B)(iv) thus confirms that local governments have no authority to regulate the placement or operation of wireless facilities on the basis of the health or other effects of RF emissions as long as the facilities in question meet FCC guidelines.[6]

The Town's RF disclosure obligations violate Section 332 of the Communications Act in at least two ways. *First*, the requirement to provide detailed information about RF emissions is itself an impermissible "regulation" in violation of Section 332(c)(7)(B)(iv). Section 332(c)(7)(B)(iv) states that a local government may not "*regulate . . .* on the basis of the environmental effects of radio frequency emissions." 47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added). As Plaintiffs established in their Motion for Summary Judgment, the detailed information-gathering tasks prescribed by Chapter 251 are themselves a "regulation" of the operation of wireless service facilities "on the basis of the environmental effects of radio

---

[6]    In addition to expressly preempting Clarkstown's attempts to regulate based on the health effects of RF, Section 332(c)(7)(B)(iv) serves as a further indication of the pervasiveness of federal regulation when it comes to the technical aspects of wireless telecommunications. When Congress enacted Section 332(c)(7)'s limited preservation of local zoning authority, it included Section 332(c)(7)(B)(iv) to ensure that municipalities were not able to do what Clarkstown attempts here—use their limited and traditional zoning authority to interfere with technical regulations that have been exclusively federal for nearly a century.

frequency emissions." *See* Pls.' Mem. 46-47 (citing *Downey v. Allstate Ins. Co.*, 638 F. Supp. 322, 325 (S.D.N.Y. 1986) ("The New York Court of Appeals has construed the term 'rule or regulation' to embrace '*any kind of* legislative or quasilegislative [*sic*] norm or *prescription* which establishes a pattern or course of conduct for the future.'" (citation omitted))).   For this reason, requiring a wireless carrier to produce *any* RF data rather than only stating compliance with FCC RF emission standards, even if the data is not used in evaluating a tower siting application, would be preempted under Section 332(c)(7)(B)(iv).

*Second*, Chapter 251 clearly contemplates that the Town *will* use this data in evaluating applications.   In enacting Chapter 251, the Town has imposed an affirmative burden on the Wireless Carriers to conduct technical studies that—because they go beyond stating FCC compliance—have no relevance unless the Town intends to use the resulting data to regulate the placement of RF emitting facilities.  *See, e.g.*, Clarkstown Town Code, § 251 at Table 1; *id.* § 251-29.   The list of criteria for evaluating wireless facility applications under Chapter 251 includes a category entitled "Potential aesthetic and safety impacts on public assembly," which awards more points to an application for increasing "distance from schools, day-care facilities[,] etc." *Id.* § 251, Table 1.  An application receives maximum points for being more than 1000 feet away, half for being between 500 and 1000 feet away, none for being within 500 feet, *id.*, and there is an absolute prohibition on facilities within 350 feet, *id.* § 251-29(B).   It is obvious from the distances involved that the "safety impacts" contemplated are related to RF emissions rather than potential damage from a tower's collapse, *see, e.g.*, *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 491 (2d Cir. 1999) ("Height requirements vary due to local topography, but usually fall in the range of 80'-150' above ground level.").

The Town proffers a number of defenses of its RF regulations, none of which is persuasive. While the Town claims that the Second Circuit has authorized localities to inquire into RF compliance, the requirements of Chapter 251 go well beyond "merely inquiring" about compliance with FCC rules. Chapter 251 requires wireless providers to submit extensive technical data and certifications related to RF emissions that are unrelated to stating that a proposed antenna satisfies the FCC's requirements and that are vastly more intrusive than anything the FCC requires for licensing radio transmitters. *See, e.g.*, Clarkstown Town Code, § 251-19(F)(23), -21(A), -22, -23, -37.[7]

As Plaintiffs explained in their Motion for Summary Judgment, actually determining compliance with the FCC's rules requires nothing more than a two page checklist, *see* Pls.' Mem. 44-45, that the FCC has already designed for use by local officials in determining whether proposed wireless facilities present a compliance concern, *see A Local Government Official's Guide to Transmitting Antenna RF Emission Safety: Rules, Procedures, and Practical Guidance*, FCC, at Appendix A (June 2, 2000), *available at* http://wireless.fcc.gov/siting/ FCC_LSGAC_RF_Guide.pdf ("Local Government Guide"). The Town's only response in defense of Chapter 251's additional requirements is that the FCC's checklist is merely "voluntary," and not mandatory. *See* Town Mem. 42. This is true in the limited sense that the FCC does not *require* a local government to use the particular form provided on its website. However, the fact that the Local Government Guide is not mandatory does not alter the fact that

---

[7]     *Town of Oyster Bay* does not authorize a local municipality to require a wireless carrier to provide technical data with respect to RF emissions. *Town of Oyster Bay* and the case on which that court relied, *Smart SMR of New York, Inc. v. Zoning Comm'n*, 995 F. Supp. 52 (D. Conn. 1998), did not even involve local regulation. In both cases the question before the court was whether oral inquiries about the potential health affects of proposed wireless installations *by individual citizens at a public hearing* were enough to taint the zoning decision under federal law. *See Town of Oyster Bay*, 166 F.3d at 492, 495; *Smart SMR*, 995 F.Supp. at 58. By contrast, the formal regulations set out in Chapter 251 are orders of magnitude more intrusive, more burdensome, and more detailed than the "mere inquiries" the court let pass in *Town of Oyster Bay*.

it covers all of the information necessary to ascertain FCC compliance.  For a local government to go *beyond* the checklist and compel an applicant to provide additional information about RF is thus not necessary for obtaining a statement of compliance with FCC standards.  Indeed, the FCC believes that using the checklist to determine "that a facility is categorically excluded should generally suffice to end the inquiry."  *Id.* at 11.

In defense of its requirement that "new poles or tower[] structures must not be located within 350 feet of a 'child day-care center, school, camp, public park or playground,'" Town Mem. 51 (quoting Clarkstown Town Code, § 251-29) (emphasis omitted), the Town asserts that such limitations are grounded in the legitimate goal of requiring "that large electrical devices be kept away from children."  *Id*.  This justification cannot pass logical scrutiny.  If the Town were worried only about the attractive nuisance posed by "large electrical devices," then wireless facilities would be subject only to the same general regulations as other electrical facilities, including power lines and circuit breakers, and there would be no need to enact a wireless-specific restriction.

The Town's related claim that antennas cannot be safely installed on school property is absurd.  Other jurisdictions routinely authorize the use of public buildings, including schools, as locations for antennas. *See, e.g.*, *T-Mobile Cent., LLC v. City of Grand Rapids*, No. 1:06-CV-747, 2007 WL 1287739, at *8 (W.D. Mich. May 2, 2007) (directing the City to grant a petition to construct a telecommunications tower at an elementary school); *T-Mobile Cent., LLC v. Unified Gov't*, 528 F. Supp. 2d 1128, 1135 (D. Kan. 2007) (noting an alternative wireless antenna location on a stadium light monopole at a high school, on which an antenna from another carrier was already located).  Moreover, schools have many types of equipment that are off limits to students; there is nothing about the equipment associated with an RF antenna that is inherently

more dangerous than, for example, a steam boiler, the step-down transformers that provide electricity to the classrooms, or the lawn mowers that are used for maintaining athletic fields. Thus, the only reason for enacting special restrictions applicable solely to wireless facilities is a misplaced concern about the environmental effects of RF emissions, which is a clear violation of 47 U.S.C. § 332(c)(7)(B)(iv).

**D.    Section 332's Preservation of Traditional Zoning Authority Does Not Authorize the Town to Regulate the Technical Aspects of Wireless Service.**

Congress made clear when it enacted Section 332(c)(7)(A) that this provision was intended only to preserve traditional local zoning authority.  It was not intended to give local governments any new authority over wireless equipment or operations.  While the FCC was considering a proposal to preempt *all* state and local tower siting regulations and replace them with a wholly federal regime, *see Amendment of the Commission's Rules to Preempt State and Local Regulation of Tower Siting for Commercial Mobile Services Providers*, Petition for Rulemaking, RM 8577, WT Docket No. 97-192 (Dec. 22, 1994), Congress stepped in and took an intermediate course.  It preserved traditional land use authority for local governments, but superimposed a set of federal requirements and restrictions on the exercise of that authority.  The "Preservation of Local Zoning Authority" in Section 332(c)(7)(A) was limited to traditional zoning criteria and was "not intended to limit or affect the Commission's general authority over radio telecommunications, *including the authority to regulate the construction, modification and operation of radio facilities*."   H.R. Rep. No. 104-458, at 209 (1996), *reprinted in* 1996 U.S.C.C.A.N. 138.

Clearly, the "preservation" concept was intended only to allow local governments to regulate traditional zoning issues such as height, setback requirements, and similar matters.  As Congress explained, local governments retain "the flexibility to treat [wireless] facilities that

create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements." Sen. Rep. No. 140-230 at 208. "Traditional zoning authority" has been narrowly construed literally since the enactment of Section 332(c)(7)(A)'s carve out. *See, e.g.*, *Freeman*, 204 F.3d at 325 (mentioning that the carve out includes "preserving the character of the [area] and avoiding aesthetic blight").

Ordinances that stray into technical wireless issues go beyond traditional zoning and are preempted. As the FCC explained in rejecting a local government's claim that Section 332(c)(7) gave it the authority to regulate certain technical aspects of wireless telecommunications,

> The County argues in effect that the provisions in the Telecommunications Act of 1996 expanded local authority at the expense of the Commission by overruling preexisting decisions that local regulation of RFI was preempted. However, section 332(c)(7), which is entitled "Preservation of local zoning authority," only *preserves* local "decisions regarding the placement, construction, and modification of personal wireless service facilities." . . . [T]he 1996 provisions did not alter the Commission's general authority over radio transmissions granted by earlier communications legislation and affirmed by existing precedent.

*Anne Arundel*, 18 F.C.C.R. at 13137-38 (¶ 21) (citations omitted).

The Town's argument that Section 332(c)(7) constitutes the only source of preemption in this area, and that Section 332(c)(7) therefore represents a repeal by implication of all prior preemptive statutes, is thus belied by the background and history of Section 332 itself, the decisions of other courts (including the Second Circuit) on this subject, and the FCC's position on the relationship of Section 332(c)(7) to other sources of preemption. Indeed, the Town's brief concisely demonstrates the perils of adopting its reading of the statute. The Town's claim that "it would have in fact been entirely lawful for the Town to . . . fix and regulate actuate [sic] dBm reception levels and to legislate . . . a reception level of -84 dBm (or even a weaker -95 dBm level) is [sic] the point at which the muncipality deems that no 'gap' exists," Town Mem. 37-38,

upends the history of federal regulation of wireless communications and would grant authority to the Town that Congress and the FCC have both explicitly withheld.

There is nothing in the "preservation of local zoning authority" that would justify this dramatic reversal of nearly a century of plenary federal authority over all forms of communication by radio waves. The Town's only argument to the contrary stems from a single line in *Sprint Spectrum v. Mills*, 283 F.3d 404 (2d Cir. 2002). *See* Town Mem. 25 (claiming that Mills stands for the proposition that Section 332(c)(7) is the "sole allowable source for a claim of federal preemption of local authority respecting siting of wireless facilities."). But the Town misconstrues the court's statement in *Mills*, which goes only to the limited nature of preemption in Section 332 *itself*, and is clearly not intended to mean that no other provisions of the Communications Act can have preemptive effect in this context.

The Town's wooden reading of Section 332(c)(7) would mean that even provisions *in other parts of Section 332* that unequivocally preempt local ordinances and regulations would be rendered inoperable. *See, e.g.*, 47 U.S.C. § 332(c)(3)(A) (providing that "no *State or local government* shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a *State* from regulating the other terms and conditions of commercial mobile service.") (emphasis added). Under the Town's reasoning, Section 332(c)(7) would allow it to use its zoning authority to "regulate the entry of" and the "rates charged by" commercial mobile wireless providers, despite the express language to the contrary in Section 332(c)(3)(A). This interpretation is untenable.

Section 332(c)(7)'s savings clause for local zoning is thus irrelevant to the preemption at issue here—preemption that flows from decades of recognition that only the federal government can properly regulate interstate communication by radio waves.

## II.     CHAPTER 251 VIOLATES SECTION 253 AND IS PREEMPTED.

Section 253 provides an independent basis for finding that Chapter 251 is preempted by federal law. The Town essentially concedes that, if Section 253 applies, Chapter 251 violates it. *See* Town Mem. 49 (courts applying Section 253 "have held that a municipality which leaves itself the option of refusing a franchise for any reason[] has unfettered discretion resulting in a prohibition of telecommunications services"). The Town cannot refute Plaintiffs' demonstration that Chapter 251 prohibits the ability of wireless carriers to provide telecommunications services by, among other things: (1) imposing burdensome application and approval requirements; (2) authorizing unlimited delays and excessive private consultant fees; (3) conferring unfettered discretion to deny an application; and (4) instituting a number of absolute "no tower zones" throughout Clarkstown. Pls.' Mem. 12-30. Despite its concession on the issue of impermissible discretion, the Town attempts to salvage Chapter 251 by pointing to the putative "waiver clauses" written into the ordinance. In effect, the Town claims that any illegal provisions in Chapter 251 should be disregarded by this Court because Chapter 251 accords the Town discretion to waive any requirement that violates federal law. *See, e.g.*, Town Mem. 7-11. A waiver cannot save an unlawful provision—if it could, state and local governments would be free to enact any federally preempted scheme, so long as it contained waiver language. In fact, in the context of Section 253, waiver provisions make matters worse, by increasing municipal discretion and creating an additional opportunity for discriminatory treatment of functionally equivalent competing carriers.

A.     **Chapter 251 Violates Section 253 on its Face.**

The Town fails to rebut Plaintiffs' demonstration that numerous aspects of Chapter 251, alone and in combination, have the effect of prohibiting "the ability of [Plaintiffs] to provide [] interstate or intrastate telecommunications service[s]." 47 U.S.C. § 253(a).  The federal courts, including the Second Circuit, clearly agree that local telecommunications ordinances that create burdensome processes, vest unbridled discretion in local governmental decision-makers, or that impose "substantial costs" or "extensive delays" on telecommunications providers are preempted by § 253(a).  *See TGC New York*, 305 F.3d at 76 (holding that grant of broad discretion of town council, and process allowing for extensive delays in the handling of applications, ran afoul of § 253); s*ee also Sprint Telephony PCS v. County of San Diego*,  490 F.3d 700, 711-18 (9th Cir. 2007);  *Qwest Commc'ns v. City of Berkeley*, 433 F.3d 1253, 1256-58 (9th Cir. 2006); *Qwest Corp. v. City of Santa Fe*, 380 F.3d 158, 1270-71 (10th Cir. 2004); *City of Auburn, et al. v. Qwest Corp.*, 260 F.3d at 1175-76.  Just last month, the United States District Court for the Central District of California considered whether a municipal zoning ordinance regulating wireless communications facilities was preempted by Section 253(a).  *Newpath Networks LLC v. City of Irvine*, SACV 06-550-JVS (C.D. Cal. March 10, 2008). The court held that when considered in combination, the regulations were "burdensome and prohibitive."   In support of this conclusion, the court noted that the ordinance established application requirements that were "lengthy, time consuming and certainly expensive," and allowed for a "patently discretionary" decision process. *Id.*

As set forth in the Complaint, Chapter 251 contains these offensive features.  *First*, Chapter 251 violates Section 253(a) by imposing overly-burdensome application requirements, which among other things allow the Town to request *any* additional information in connection with the application, and authorizing limitless delays.  *See* Pls.' Mem. 25-26.

*Second*, Chapter 251 confers broad, standardless discretion on the Town to deny telecommunications service, including virtually absolute discretion to "approve, approve with conditions or disapprove the application," Clarkstown Town Code, § 251-18(D), which is impermissible under Section 253, *see* Pls.' Mem. 22-29.

Chapter 251 provides the Town unfettered substantive discretion over ultimate decisions to deny or approve wireless applications, and the Town may require *any* conditions for approval of an application.  Chapter 251's grant of impermissible substantive discretion is illustrated by the Town's ability: (a) to determine that some applications will receive much stricter scrutiny based on completely subjective factors, *see id.* at 26 (citing Clarkstown Town Code, § 251 at Table 1); (b) to outright deny applications that do not fall under Category A based on those subjective factors, *id.* at 27 (citing Clarkstown Town Code, § 251-18(D)); and (c) to impose unlimited "aesthetic conditions" on *any* permits granted, *id.* at 27 (internal quotations omitted) (citing Clarkstown Town Code § 251-16(A), -18(D)).

Chapter 251 also provides the Town absolute *procedural* discretion by allowing it to demand *any* additional information as part of an application, delay the application process indefinitely, and charge any amount in fees for private consultants that the Town in its sole discretion deems necessary.  *See id.* at 13-29. Although the Town asserts that Chapter 251 "imposes strict and pre-defined time limits for calendaring and deciding individual applications," Town Mem. 27, and "very specific and objective criteria upon which it must base its determination," *id.* at 48, the Town does not deny that it may request any additional information it chooses, as many times as it chooses, *see* Clarkstown Town Code, §§ 251-13, -17(B), -17(D), -19 to -27.  The Town may then deem an application incomplete until an applicant responds to such requests.  *See* Pls.' Mem. 25-26.  Because there is no limit to the amount or type of

information the Town may request or the number of information demands it can make, this loophole effectively allows the Town to deny an application for any reason it chooses and for as long as it chooses.  Nor can the Town deny the subjectivity inherent in its "scoring" system. Moreover, Chapter 251 explicitly affords this discretion to act which may delay or frustrate an application and the very nature of discretion is that it is subject to deferential review by a court.

The Town cannot dispute that Chapter 251 authorizes the Town to require Plaintiffs to pay for *any* professional services that the Town deems necessary in reviewing an application. *See id.* at 27 (citing Clarkstown Town Code, § 251-40(C)).  The Town's citation to *Twin Lakes Development Corp. v. Town of Monroe*, 1 N.Y. 3d 98 (2003), Town Mem. 32, in an attempt to justify these fees is unavailing.  *Twin Lakes* deals solely with due process objections to specific consultant fees, and says nothing whatsoever about whether federal law permits municipalities to impose open-ended fee requirements that could prohibit or have the effect of prohibiting telecommunications services.  The federal government's preemption of the field of the technical standards related to wireless telecommunications should render unnecessary the Town's hiring of "technical experts involving radio frequency."  Clarkstown Town Code, § 251-40(C).  The Town cannot make Plaintiffs' pay for studies that are themselves outside of the Town's authority to require or consider.  The Town's failure to address any of these specific instances of improper discretion, fully aired by Plaintiffs in their opening brief, undermines the Town's self-serving assertion that Chapter 251 "does not allow for lengthy delays in the application [process]." Town Mem. 27.

*Third*, Chapter 251 violates Section 253(a) by erecting absolute prohibitions to wireless telecommunications facilities in certain locations throughout the Town, including any location within 350 feet from a "child day care center[], school[], camp[], public park[] or playground[]."

*See* Pls.' Mem. 29-30 (quoting Clarkstown Town Code, § 251-29(B)).  By providing that such a large portion of the Town is completely unavailable for the construction of wireless telecommunications facilities, Chapter 251 directly prohibits telecommunications service.  *Id.* (citing *New Jersey Payphone Ass'n v. Town of W. New York*, 299 F.3d 235, 242 (3d Cir. 2002) and *Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, 14 F.C.C.R. 21697 (1999) ("*Minnesota Preemption Order*").   The Town's claim that may ban the construction of new telecommunications facilities in large sections of the town so long as it deigns to consider waiver requests, Town Mem. 52, proves far too much.  Under this logic, the Town would be free to bar the construction of all wireless telecommunications facilities throughout the town, so long as it established a discretionary waiver procedure.  If the broad federal preemption of local legal requirements that prohibit or have the effect of prohibiting the ability of carriers to provide telecommunications service means anything, it must mean that an outright ban on the construction of facilities in specific geographic areas is not permissible.

   **B.    The Town's "Waiver Clauses" Cannot Save Chapter 251 from Preemption Under Section 253.**

   The Town contends that Chapter 251 cannot violate federal law because it "contains an express provision which allows the Planning Board to grant individual applicants a 'waiver' or 'exception' respecting any specific provision or condition when an applicant demonstrates persuasive grounds therefor, including for the purpose of complying with the Communications Act" and "if denying a siting application would constitute an unlawful prohibition of telecommunications services under the Communications Act, the Planning Board must grant the application."  Town Mem. 10-11.

But it is well settled that otherwise impermissible legislation cannot be saved simply by incorporating a generic waiver clause stating that the legislation is to be interpreted consistent with federal law. *See, e.g.*, *CISPES v. FBI*, 770 F.2d 468, 474 (5th Cir.1985) (holding that a subsection providing that statute should not be "construed or applied so as to abridge the exercise of [First Amendment rights] . . . cannot substantively operate to save an otherwise invalid statute"); *Adamson Cos. v. City of Malibu*, 854 F. Supp. 1476, 1493 n.13 (C.D. Cal. 1994) (explaining that a "City cannot enact a statute with very narrow requirements and then, by means of a boilerplate clause, assure the constitutionality of all its procedures" in a rent control ordinance); *Nat'l People's Action v. City of Blue Island*, 594 F.Supp. 72, 77, 80 (N.D. Ill. 1984) (rejecting the relevance of a clause which "attempt[ed] to 'save' a statute that might otherwise be unconstitutional solely by claiming that the statute should not be construed in such a way as to render it unconstitutional"). If this approach were permissible, adding a waiver clause would effectively insulate even the most obviously unlawful local enactments from judicial scrutiny.

Moreover, because one of Chapter 251's most serious violations of federal law is the excessive discretion that it confers on the Town, adding an *additional* layer of discretion to selectively waive provisions that the Town deems preempted only compounds the problem. Further, the Town asks this Court simply to ignore the actual text of Chapter 251 and assume that it will act in a way that does not violate federal law. For example, the Town argues that "the Carriers' claim that the application process can be open-ended rests upon the entirely speculative and unsupported suggestion and assumption that a high level governmental body will subvert and ignore binding law by falsely and repeatedly claiming that a completed pre-application is incomplete." Town Mem. 29-30.

In *PECO Energy Co. v. Township of Haverford*, No. 99-V766, 1999 WL 1240941 (E.D. Pa. Dec. 20, 1999) (not reported), the court considered the same arguments advanced by the Town in this case, namely that a local government should be trusted to refrain from implementing provisions of a statute in a way that would violate federal law. Just like the Township of Haverford in *PECO*, the Town asks this Court to accept on faith that "local officials charged with implementing [Chapter 251] will do so in a manner consistent with the [1996 Act]." *Id.* at *8. This Court cannot "just assume, based on nothing more than faith in the goodwill" of the Town that it "has not overstepped that authority." *Id*. As in *PECO*, "[r]ather than trusting [the Town] lawfully to implement [Chapter 251]," "the better course is to send the [Town] back to the drafting table." *Id.*

## III.    THERE IS NO DOUBT SECTION 253 APPLIES TO CHAPTER 251.

The Town suggests that the Wireless Carriers "refus[e] to meaningfully confront or address the controlling federal statute or the controlling federal case law on wireless siting facilities" and instead "resort to a barrage of inapposite and non-binding cases having little or nothing to do with wireless siting laws." Town Mem. 1-2. However, as shown below, the plain language of Section 253 clearly applies and preempts regulatory regimes such as that established in Chapter 251. To avoid the Second Circuit's application of Section 253, the Town cites to irrelevant cases involving specific zoning applications and siting decisions, refusing to confront the facial challenge to a legislative rule which is before the Court.

### A.    Section 253(a) Preempts Any Local Legal Requirement That Has the Effect of Prohibiting Any Telecommunications Service.

The Town's claim that Section 253 does not apply in this case is based on three fundamental misunderstandings of relevant law. *First*, the Town attempts to narrow dramatically the application of Section 253 by ignoring the plain language of the statute, agency

interpretations, and federal case law, all of which support expansive application.  *Second*, the Town argues, implausibly, that Section 253 is limited to "franchise" agreements or similar requirements.  *See id.* 16-17. ("[T]he Carriers purport to primarily rely on inapposite case law regarding telecommunications franchise laws and franchise determinations (47 U.S.C. § 253).").

*Finally*, the Town argues that the rubric set forth in the *Willoth* case, involving only site-specific issues, rather than Section 253, is the appropriate measure of the facial validity of ordinances concerning wireless telecommunications infrastructure.    *See* Town Mem. 12-14.  In fact, as recent Second Circuit case law suggests, Section 253 may be applied to any "State or local statute or regulation, or other State or local legal requirement" that prohibits or has the effect of prohibiting the provision of telecommunications service, 47 U.S.C. § 253(a), including Chapter 251.  *NextG Networks of New York. v. City of New York*, 513 F.3d 49 (2d Cir. 2008).

  1.  Section 253(a) Applies to Any State or Local Regulation of Telecommunications Service.

As a threshold matter, Section 253(a) applies generally to all "telecommunications service[s]."    47 U.S.C. § 253(a).    There is no question that wireless service is a "telecommunications service," *see Implementation of Section 703(E) of the Communications Act, Report and Order*, 13 F.C.C.R. 6777, 13 F.C.C.R. 6777, 6795 (¶ 40) (1998) ("In fact, the Commission has already recognized that cellular telephone, mobile radio, and PCS are telecommunications services."); *Federal-State Joint Board on Universal Service*, 12 F.C.C.R. 8776, 9175 (¶ 780) (1997) (holding that "cellular telephone and paging services; mobile radio services" are "telecommunications"); *Implementation of the Local Competition Provisions of the Communications Act of 1996, Interconnection between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, 11 F.C.C.R. 15499, 15997 (¶ 1008) (1996) ("*Local*

*Competition Order*") ("All CMRS providers offer telecommunications."), and that Plaintiffs provide "telecommunications service" in Clarkstown.

The FCC has noted the broad sweep of the language chosen by Congress in Section 253(a). The FCC has stated that the inclusion of the terms "statute," "regulation," and the broad catch-all phrase "other State or local legal requirement" reflects Congress's intent that Section 253 be applied to all manner of legal requirements, regardless of nomenclature. "The use of this language also indicates that section 253(a) was meant to capture a broad range of state and local actions that prohibit or have the effect of prohibiting entities from providing telecommunications services. We believe that interpreting the term 'legal requirement' broadly, best fulfills Congress' desire to ensure that states and localities do not thwart the development of competition." *Minnesota Preemption Order*, 14 F.C.C.R. at 21707 (¶¶ 17-18) (concluding that development agreement entered into pursuant to a local government's procurement authority "does rise to the level of a 'statute, regulation, or legal requirement,'").

        2.     Application of Section 253 Is in No Way Limited to Franchise Regulations.

The Town notes that denial of a franchise would prohibit a common carrier's entry into a market, and suggests that only a franchise regulation could run afoul of Section 253. Town Mem. 16. While it may be true that denial of a franchise would have such an effect, this fact in no way limits the reach of the broad, plain language of § 253(a) (described in detail above) to franchising scenarios. Clearly, "a prohibition does not need to be complete or 'insurmountable' to run afoul of § 253(a)." *TCG New York*, 305 F.3d at 76 (quoting *RT Commc'ns, Inc. v. FCC*, 201 F.3d 1264, 1268 (10th Cir. 2000)); *see also Willoth*, 176 F.3d at 640-41 ("Construing subsection B(i)(II) to apply only to general bans would lead to the conclusion that, in the absence of an explicit[ly] anti-tower policy, a court would have to wait for a series of denied applications

before it could step in and force a local government to end its illegal boycott of personal wireless devices.")  As discussed in the brief accompanying the Carriers' Motion for Summary Judgment, a zoning regulation imposing burdensome and onerous reporting and fees, and providing unfettered discretion to the decisionmakers, may have the effect of prohibiting provision of telecommunications services, by creating a profoundly hostile regulatory environment.  Pls.' Mem. 13-40.

Arguments seeking to limit the preemptive effect of Section 253(a) to "franchise" ordinances have been presented to other federal courts, but have been soundly rejected.  The government in *County of San Diego*, like Clarkstown, argued that the challenged ordinance was not subject to Section 253(a) because its voluminous and burdensome requirements were in the nature of zoning regulations, rather than a franchise ordinance.  *County of San Diego,* 490 F.3d at 716.  The court rejected this argument, noting that the determinative issue with regard to a siting ordinance was "largely the same" as with regard to a franchise ordinance: whether the regulation "presents barriers to wireless telecommunications within the County."  *Id.*

Other federal courts analyzing telecommunications statutes and ordinances under Section 253 also have described the breadth of the preemption without any restriction of the preemption to franchise regulations.  The Second Circuit has noted that

> in determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, [one must consider] whether the ordinance materially inhibits or limits the ability of *any competitor or potential competitor* to compete in a fair and balanced legal and regulatory environment.

*City of White Plains*, 305 F.3d at 76 (emphasis added).  The analysis mandated by the Second Circuit clearly applies to scenarios other than franchise agreements.  Rather, the analysis is plainly applicable to any ordinance, of any kind, that inhibits the provision of telecommunications services.

Likewise, the Tenth Circuit has observed that Section 253 "contains a clear expression by Congress of an intent to preempt local ordinances which prohibit the provision of telecommunications services." *City of Santa Fe*, 380 F.3d at 1269.    No federal court has described Section 253 as uniquely applicable to laws concerning franchise agreements, and their descriptions of the purpose, meaning, and application of Section 253 is in no way limited by the section's frequent use in telecommunications franchising cases.

 3. The Town's Position Is Based Upon a Misreading of Second Circuit Precedent.

At its core, the Town's argument relies on a flawed reading of Second Circuit caselaw. Relying primarily on *Willoth,* 176 F.3d 630, the Town argues that the Second Circuit has declared de facto legitimate any municipal regulation that may result in decisions that could be analyzed under the rubric set out for siting *decisions* in *Willoth*.    *See* Town Mem. 12-14, 18.

In fact, the Second Circuit has not authorized this type of interference with wireless commerce, and the *Willoth* case is irrelevant to the issues presented here.    Less than six months ago, the Second Circuit issued a decision affirming that Section 253 provides an appropriate means to challenge a local regulatory scheme affecting wireless deployment, and recognizing the broad scope of federal power in terms of telecommunications deployment.    *NextG Networks of New York*, 513 F.3d 49.    *NextG Networks of New York* involved the City of New York's comprehensive efforts to control wireless deployment on existing utility poles through a complex franchising scheme.    As the Court summarized the issue:    "Broadly speaking, this case concerns whether the City has impeded NextG's access to the New York City telecommunications market by unlawfully denying NextG the use of City-owned poles."    *Id.* at 50.    Aggrieved by the City's scheme, the appellant sought a declaration that the scheme violated § 253.    As in this case, the appellant argued that "the City's regulatory scheme as a whole violated Section 253 … because

'the City assumes it has the unfettered discretion and power to determine who may or may not provide telecommunications services.'" *Id.* at 54.

The trial court dismissed the appellant's Section 253 claim as moot after certain of the offending regulations expired. On appeal, the Second Circuit considered the scope of Section 253 claims when evaluating the mootness argument. Specifically referencing the appellant's "unfettered discretion" assertion, the Court noted that such a claim was not mooted by changes in the regulatory scheme and reversed the trial court's dismissal. Recognizing the broad availability of Section 253 claims, the Court remanded the case "to the District Court for consideration, *inter alia*, of [the appellant's] claims that the City's regulatory scheme is in material respects preempted by the Telecommunications Act of 1996." *Id.* at 54. *NextG Networks of New York* thus affirms the broad reach of the protections afforded by Section 253 and its application to providers of federally licensed telecommunications services such as wireless telecommunications.

**B.    Characterizing an Ordinance as Zoning-Related Does Not Shield It From Section 253.**

Well settled law establishes that Section 253(a) applies to zoning ordinances that are aimed at wireless providers. Indeed, every single court that has considered the matter has concluded that it does. *See, e.g.*, *County of San Diego*, 490 F.3d at 714 ("[T]he plain language of [Section 253(a)] (removing barriers) permits facial challenges to zoning ordinances" by wireless carriers, as in this case.); *see also Illinois Bell Tel. Co. v. Vill. of Itasca*, 503 F. Supp. 2d 928, 940 (N.D. Ill. 2007) (finding plaintiff had successfully pled a violation of Section 253(a) in bringing facial challenge to municipal zoning ordinance); *Verizon Wireless (VAW) LLC v. City of Rio Rancho*, 476 F. Supp. 2d 1325, 1332 (D.N.M. 2007) (concluding facial challenge to zoning ordinance regulating wireless telecommunications facilities under Sections 253 and 332 was ripe

where the plaintiffs "challenge[d] the permit requirements themselves, not the application of the requirements"); *NextG Networks of Cal., Inc. v. County of Los Angeles*, 522 F. Supp. 2d 1240, 149-53 (C.D. Cal. 2007) (holding that a zoning ordinance regulating wireless telecommunications facilities was preempted on its face by Section 253(a)).

The Town's decision in its memorandum (but not in its enactment) to style Chapter 251 a "zoning ordinance" is irrelevant, and if accepted, the Town's proffered distinction would allow municipalities to circumvent preemption of even the most obvious barriers to entry simply by appending the label "zoning" to them. Courts have routinely rejected artifice of this type. *See e.g.*, *GTE Mobilnet of California Ltd. P'ship v. City and County of San Francisco*, No. C 05-04056 SI, 2007 WL 420089, at *7 (N.D.Cal. 2007) ("[T]he distinction between a franchise permit and an encroachment permit is irrelevant because denial of either permit may prohibit the provision of service under § 253(a)."); *NextG Networks of Cal., Inc. v. City of San Francisco*, No. 05-00658, 2006 WL 1529990, at *6 (N.D. Cal. June 1, 2006) ("If a city could circumvent the requirements of section 253(a) simply by enacting regulations that apply to all utilities, then federal law would fail to provide any meaningful special protection to telecommunications providers."). The concern expressed in these cases is consistent with the FCC's warning in the *Minnesota Preemption Order* decision that a "more restrictive interpretation [of Section 253] . . . easily could permit state and local restrictions on competition to escape preemption based solely on the way in which action was structured." 14 F.C.C.R. at 21707 (¶ 18).

Thus, judicial review under Section 253 must address the substantive provisions of Chapter 251 and consider their practical effects, regardless of the title or purpose of the local law. *See County of San Diego*, and *Rio Rancho*, *supra*. The Town's contrary position would elevate form over substance. Where a purported "zoning ordinance" in fact permits a

municipality to engage in pervasive and intrusive regulation of virtually all aspects of a wireless carrier's deployment and operation of its network, it falls squarely within the plain language of, and Congress's intent with respect to, Section 253.  *See* H.R. Conf. Rep. No. 104-458, at 126 (1996), reprinted in 1996 U.S.C.C.A.N. 138 (Section 253 was "intended to remove all barriers to entry in the provision of telecommunication services. [This new section] preempts any State and local statutes and regulations, or other State and local legal requirements, that may prohibit or have the effect of prohibiting any entity from providing interstate or intrastate telecommunications services."); *see also Qwest Communications Inc. v. Berkeley,* 433 F.3d 1253,1256 (9th Cir. 2006) (citation omitted) (finding the "preemptive language [of § 253(a)] to be clear and 'virtually absolute' in restricting municipalities to a 'very limited and proscribed role in the regulation of telecommunications.'").  Accordingly, regardless of what the Town calls Chapter 251, it must be analyzed under Section 253.

> C.     **Section 332's Independent Restrictions on Wireless Siting Decisions Do Not Affect the Preemptive Scope of Section 253.**

Nothing in Section 332(c)(7)(A) undermines the broader protection for all telecommunications carriers contained in Sections 253 and 332(c)(3).[8]  Section 332(c)(7)(A) expressly limits the scope of the local wireless authority it preserves to individual siting "decisions."  *See* 47 U.S.C. § 332(c)(7)(A) ("[N]othing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over *decisions* regarding the placement, construction, and modification of personal wireless service facilities.") (emphasis added).  By its own terms, therefore, Section 332(c)(7)(A) *does not extend* to regulatory regimes like Chapter 251, which establish prospective rules, in essence legislative conditions for market

---

[8]     This is especially so given the existence of Section 332(c)(3)(A), which specifically applies the broad Section 253(a) preemption to the wireless context.  "[N]o state or local government shall have any authority to regulate the entry of or the notes charged by any commercial mobile service. . . ." 47 U.S.C. §332(c)(3)(A).

entry.  The plain language of Section 253(a) permits a facial challenge to any legal restriction that "prohibit[s] or ha[s] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," 47 U.S.C. § 253(a), including wireless service.  Nothing in the text of Section 253 exempts zoning laws, and nothing in the text of Section 332(c)(7)(A) would restrict a facial challenge to such laws.  There is thus no conflict between the two sections that would preclude the Wireless Carriers' challenge.

       1.      **Precedent in This Circuit Shows That the Scope of Section 332(c)(7)(A) Is Limited to Traditional Zoning "Decisions."**

While the Town avoids Section 332(c)(7)(A)'s explicit textual confinement to "decisions," courts in the Second Circuit have recognized its legal significance.  The District Court's opinion in *Vertical Broadcasting, Inc. v. Town of Southhampton*, from which the Town quotes at length, reveals in particular that Section 332 is the exclusive remedy only in disputes over specific zoning decisions where there is no allegation of a general "prohibition" of service.  In *Vertical Broadcasting*, the court rejected the plaintiffs' attempt to avoid the statutory 30-day time limitation for bringing a suit under Section 332 by challenging the town's denial of its zoning application under Section 253.  84 F. Supp. 2d 379, 388-89 (E.D.N.Y. 2000).  The court based its conclusion that Section 253 did not apply to the plaintiff's suit on the fact that "[n]o allegation regarding a prohibition on providing service is made here.  Instead, there is *only* the allegation that plaintiffs are being deprived of the right to provide service from a *particular location*—a complaint that is clearly subject to redress only under Section 332," which "speaks specifically to local *decisions*."  *Id.* at 388 (emphases added).

Every one of the cases cited by the Town involves the scrutiny of a specific siting decision, not a facial challenge to an ordinance.[9]  A review of these cases shows that the analysis used in challenges to specific zoning decisions does not, and indeed cannot, apply to a facial challenge of an ordinance such as in this case.  For example, the Town relies on *Willoth* to argue that a "prohibition" occurs only if there is a "significant gap" in coverage and the proposed facility is the "least intrusive means" of filling that gap.  *See* Town Mem. 12 (citing *Willoth*, 176 F.3d at 639).  But *Willoth* makes clear that this test applies only in the context in which it was decided, *i.e.* a specific local zoning decision.  In *Willoth*, the court analyzed whether a local planning board's decision to deny a wireless tower application constituted a "prohibition" under Section 332 of the TCA and constructed this two-part test to answer that question for "a given remote location."  *Willoth* 176 F.3d at 643.  The same is true of *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 99 F. Supp. 2d 381 (S.D.N.Y. 2000), which involved a challenge to a specific permit decision by the Town.  The test becomes nonsensical, however, in the context of a facial challenge because without a specific location at which to determine whether a gap exists, and without a specific proposal to determine whether there is a less intrusive means, a court is left with nothing to evaluate.

In a related argument, the Town asserts that, because Chapter 251 is a "zoning" regulation, it can only be challenged under a "substantial evidence" standard after a "duly issued

---

[9]    The Town cites *Sprint Spectrum v. Mills*, 283 F.3d 404 (2d Cir. 2002) for the proposition that "the preservation of local authority to make wireless siting 'decisions' . . . includes the preservation of local authority to make 'regulations' in that respect."  Town Mem. 25.  But this assertion, which is not supported by a citation, reads far too much into the *Mills* decision, which turned on whether a lease contract that specified certain RF limits amounted to prohibited "regulation" of wireless siting as barred by Section 332(c)(7)(B)(iv), or whether it was a permissible proprietary action that was not reached by that subsection of the Act.  *Mills*, 283 F.3d at 417, 420.  In fact, the court's conclusion was, in essence, that the proprietary action taken by the government in the site lease was neither a "decision" nor "regulation" under the language of Section 332, and thus stood entirely outside the reach of the Act.

'decision.'" Town Mem. 48; *see also id.* at 13. However, because courts base their "substantial evidence" determinations on the standards set out in local zoning ordinances, *see, e.g.*, *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005) (conducting a "substantial evidence" analysis based on New York standards of what constitutes valid grounds for local zoning decisions), the Town's approach could arguably immunize the substantive elements of a zoning ordinance from any direct challenge on federal preemption grounds. Moreover, because the evaluation of a decision under a "substantial evidence" standard requires an actual final decision to evaluate, this approach would foreclose all pre-enforcement challenges to local regulations, contrary to recent Second Circuit precedent. *See Air Transport Ass'n of Am., Inc. v. Cuomo*, No. 07-5771, 2008 WL 763163, at *2 (2d Cir. Mar. 25, 2008).

> 2.     The Federal Courts Have Confirmed That the Scope of Section 332(c)(7)(A) is Limited to "Decisions."

The courts that have addressed whether Section 253 permits a wireless carrier to bring a facial challenge to a prohibition on the provision of wireless services that is unrelated to a particular zoning decision have consistently rejected the argument made by the Town in this case. *See, e.g.*, *County of San Diego*, 490 F.3d at 713 (holding that a facial challenge to an entire wireless zoning ordinance is properly brought under Section 253); *City of Rio Rancho*, 476 F. Supp. 2d at 1336, 1339 (holding that "decisions" within the meaning of § 332(c)(7) do not include ordinances and that "a decision is case-specific; it is the result of an adjudicative process, not a legislative process," thus allowing "a facial challenge to the Ordinance under § 253"); *Cox Commc'ns v. City of San Marcos*, 204 F. Supp. 2d 1272, 1276-77 (S.D. Cal. 2002) (dismissing carrier's claims under Section 332(c)(7) because that provision "only allow[s] for a cause of action if the local authority has made a *decision*" and "any interpretation of [Section 332(c)(7)] that allows applicants to challenge the laws, rather than decision, would be superfluous because

47 U.S.C. § 253 already gives applicants this option.  Where 47 U.S.C. § 253 provides a cause of action against *local regulations*, section 332 gives a cause of action against *local decisions*.").

The Ninth Circuit's decision in *County of San Diego* is especially instructive and should be given particular weight because it reconciles the application of Section 253 with precedents that are directly comparable to the Second Circuit's own wireless jurisprudence.  Prior to *County of San Diego*, in *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715 (9th Cir. 2005), the Ninth Circuit articulated a position analogous to the Second Circuit's decisions in *Willoth* and *Omnipoint*, which applied Section 332 to a wireless carrier's challenge to the denial of a specific application to build a wireless facility.  Just as in *Willoth* and *Omnipoint*, the *MetroPCS* court was confronted with a denial of an individual siting application and the court used Section 332 to analyze whether a "significant gap" in coverage existed and whether the proposed facility was the "least intrusive means" of filling that gap.  400 F.3d at 731-34. Notably, the Town in this case places great weight on the *Omnipoint* and *Willoth* decisions and relies almost exclusively on them for its claim that Section 332 is the sole vehicle for challenging a local wireless regulation in the Second Circuit.  However, contrary to the Town's argument, in *County of San Diego* the Ninth Circuit found that the analogous Ninth Circuit precedent of *MetroPCS* presented no barrier to a facial challenge to a wireless zoning statute under Section 253.  490 F.3d at 713-14.

In *County of San Diego*, the Ninth Circuit addressed *MetroPCS* and refuted the argument, raised by the Town here, that allowing a facial challenge to an ordinance under Section 253 would create a "giant loophole" in Section 332(c)(7).  The court pointed out that "wireless providers could not simply avoid § 332(c)(7) . . . by styling their challenges to *individual zoning decisions* as facial challenges under § 253(a).  Rather, § 332(c)(7) would continue to offer a more

expedient, and extensive, basis for review" in such cases, in no small part because Section 332(c)(7) contains additional procedural requirements that localities must comply with when making individual zoning decisions. 490 F.3d at 713-14 (emphasis added). *County of San Diego* is compelling evidence that neither *Willoth* nor *Omnipoint* mean that the Second Circuit would agree with the Town's creative interpretation of those cases. In fact, to date the Second Circuit has followed the lead of the Ninth Circuit in developing its preemption jurisprudence under Section 253, *see, e.g.*, *TCG New York, Inc.*, 305 F.3d at 81-82 (relying extensively on *City of Auburn*, 260 F.3d 1160, in analysis of regulations under Section 253), and there is no reason to believe that the Second Circuit would not continue to do so by adopting the reasoning articulated by the Ninth Circuit in *County of San Diego*.

### 3.    Chapter 251 Is Not a "Zoning" Ordinance

Even if there were any doubt as to Section 253's applicability to zoning ordinances, which there is not, Chapter 251 does not constitute an ordinance enacted pursuant to traditional zoning authority. The Chapter, on its face, is not a generally applicable zoning ordinance but rather singles out wireless telecommunications facilities for a disparate regulatory scheme. Chapter 251 cannot be saved by the limited carve-out provided in Section 332(c)(7)(A) because it clearly goes far beyond "traditional zoning regulation of the physical facility such as height limitations, setback requirements, screening or painting guidelines, structural safety standards and the like." *Anne Arundel*, 18 F.C.C.R. at 13137 (¶ 19).

The Town did not adopt Chapter 251 as an amendment to its zoning code in furtherance of State zoning enabling legislation. Rather, the Town enacted Chapter 251 as unique regulation pursuant to New York municipal home rule legislation, *see* § 251-11(A) ("This chapter is hereby enacted pursuant to the provisions of § 10 of the Municipal Home Rule Law."), on the basis that it has inherent authority to regulate in the area of wireless services. Indeed, in enacting Chapter

251 the Town devoted an entire chapter of its Town Code to the specific subject of wireless regulation wholly separate and apart from the chapter of the Town Code devoted to zoning. *Compare* Clarkstown Town Code Chapter 251 ("WIRELESS TELECOMMUNICATIONS FACILITIES") *with* Clarkstown Town Code Chapter 290 ("ZONING").

        4.       The Town's Other Arguments That the Scope of Section 253 Does Not Encompass Chapter 251 Fail.

The Town's claim that Section 332 should constrain Section 253's preemptive effect is flawed in two additional ways. *First*, the Town presumes that, because Section 332(c)(7) refers specifically to "wireless service facilities" while Section 253 more broadly encompasses "telecommunications service," the more specific provision in the former forecloses application of the more general provision in the latter. However, this canon of statutory construction applies only where two provisions "inescapably conflict" with one another. *See Aeron Marine Shipping Co. v. United States*, 695 F.2d 567, 576 (D.C. Cir. 1982) (holding that specific terms prevail over general terms "only when there is an 'inescapable conflict' between the specific provision and the general provision"). The Second Circuit has held that when, as here, there is no such "inescapable conflict," the more general provision limits how broadly the more specific provisions can be read *See In re Bellamy*, 962 F.2d 176, 180-81 (2d Cir. 1992) (holding that the scope of a more specific provision must be limited by a more general provision and stating that "[s]uch a harmonious reading . . . accommodates the principle that whenever possible statutory provisions should be construed so as to avoid conflict"), *overruled sub nom. on other grounds by Nobelman v. Am. Savs. Bank*, 508 U.S. 324 (1993). The construction adopted by the other federal courts that have addressed this issue shows that there is no "inescapable conflict." *See County of San Diego*, 490 F.3d at 713; *City of Rio Rancho*, 476 F. Supp. 2d at 1339. Because courts have an affirmative duty to harmonize statutes to avoid any potential conflicts, *see*

*Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 510 (1989), Section 332 cannot be read so broadly as to trump the plain text of Section 253, and Section 253's broad language must read as consistent with the limited preservation of traditional zoning authority in Section 332.  This point is emphasized by Section 332(c)(3)'s strict limits on local regulatory authority, which incorporate the same protections as in Section 253.

*Second*, the Town's attempt to characterize Section 332's preservation of local authority as a savings clause that blocks application of Section 253 is foreclosed by Supreme Court precedent.  The Court has made clear that such clauses cannot trump express statutory directives, such as that found in Section 253.  *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378-80 (1999).  That Section 332(c)(7) preserves local zoning authority over individual wireless siting decisions does not mean that Section 253 does not preempt a zoning ordinance that stands as an impermissible barrier to entry.  *See Cleveland v. Beltman N. Am. Co.*, 30 F.3d 373, 379 (2d Cir. 1994) (noting that a savings clause "saves only those rights and remedies that are 'not inconsistent with the rules and regulations prescribed by the provisions of [the] act. . . . [T]he act cannot be said to destroy itself.'" (quoting *Adams Express Co. v. Croninger*, 226 U.S. 491, 507 (1913))).  Section 332(c)(7) was meant to give wireless carriers additional protections in individual tower siting cases based on specific concerns with abuse of state and local zoning authority to block network development.  It makes no sense to use Section 332(c)(7) to remove wireless carriers from the protection of another, more sweeping federal statute designed to open local markets.

*Finally*, the Town's expansive interpretation of Section 332(c)(7) would, as the Second Circuit warned, cause the Communications Act to "destroy itself" by allowing the Town to avoid preemption simply by characterizing otherwise impermissible regulation as enacted pursuant to

the Town's reserved zoning authority.  Indeed, under the Town's aggressive reading of Section 332(c)(7), the Town could amend Chapter 251 to include a radio licensing scheme in defiance of 47 U.S.C. § 303, which unequivocally gives the FCC exclusive control over radio licensing, thus defeating numerous explicit provisions.  This is not only incorrect as a matter of law, *see Geier*, 529 U.S. at 870, it flies in the face of Congress's intent with respect to Section 332(c)(7), which was to carve out a narrow reservation of traditional local zoning authority that would not interfere with other provisions of the Communications Act.  *See* H.R. Rep. No. 104-458, at 209.

## IV.    THE UNLAWFUL PROVISIONS OF CHAPTER 251 ARE NOT SEVERABLE.

The Town argues that Chapter 251 should not be struck down in its entirety and that only offensive provisions should be severed because: (1) Chapter 251 contains a severability clause; (2) the Town "went to great lengths in an attempt to strike the proper 'balance' which the TCA authorizes it to strike;" and (3) Chapter 251 "contains additional express provisions mandating the issuance of a special permit, and waiving or deeming satisfied any requirements, if the TCA would otherwise be violated."  Town Mem. 52-53.

*First*, the Town entirely ignores controlling state law which requires both an examination of legislative intent regarding severability and whether the remaining provisions can function as a coherent whole.  *See* Pls.' Mem. 47-49 (*citing People ex rel. Alpha Portland Cement Co. v. Knapp*, 129 N.E. 202 (N.Y. 1920) and *Westinghouse Elec. Corp. v. Tully*, 470 N.E.2d 853 (N.Y. 1984)).  Despite the existence of a severability clause, Chapter 251 must be struck down in its entirety because "the balance of the legislation is incapable of functioning independently [because] the valid and invalid provisions are so intertwined."  *Nat'l Adver. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991).  For example, without the heavy preferences for DAS and alternate technologies that are the purpose of Chapter 251, the entire scheme by which pre-applications and applications are sorted would be nonsensical and could not survive.

Further, the provisions identified in Chapter 251 that provide the Town with unlawful discretion over procedures are so central to the ordinance that they could not be severed in a way that would leave Chapter 251 capable of meaningful application. *Id.*

*Second*, the Town's statement that it has attempted to comply with federal law in no way impacts whether unlawful provisions can be severed from Chapter 251. It is self-evident that the Town's efforts to comply with federal law, even if genuine, cannot save a regulatory scheme that runs afoul of federal statutes, regulations and established case law, and vastly overreaches the traditional zoning authority that is preserved to the Town.

*Third*, just as the Town cannot use a waiver provision to save an otherwise unlawful ordinance, see supra Section II.B, neither can the Town use such a waiver provision to save Chapter 251 from being struck down in its entirety. Thus, as already explained, *see* Pls.' Mem. 47-49, any remaining valid provisions, standing alone, are incapable of meaningful application and do not accomplish the Town's legislative purpose. *Nat'l Adver. Co.*, 942 F.2d at 148.

## V.    THE WIRELESS CARRIERS' FACIAL CHALLENGE IS RIPE.

The Town argues that Plaintiffs' claims are nonjusticiable for two reasons. *First*, the Town contends that "virtually the entirety of plaintiffs' complaint" is not ripe for a facial challenge because it is based on "untested and doomsday assertion[s]," "overblown worst-case scenarios," and "sheer speculation" about abusive applications of Chapter 251 that "could" happen. Town Mem. 7. The Town claims that, because Chapter 251 "might operate [lawfully] under some conceivable set of circumstances," *id.* at 8 (internal quotations and citation omitted), Plaintiffs can challenge Chapter 251 only in "particular cases," *id.* at 9 (internal quotations and citation omitted). *Second*, the Town suggests Plaintiffs cannot challenge Chapter 251 "before they have filed a single siting application, much less been denied one." *Id.* at 7 (emphasis omitted). Both arguments are without merit.

*First*, although the Town correctly identifies several cases discussing the standards for facial challenges, the Town fails to appreciate, much less address, the substance of Plaintiffs' objections to Chapter 251.  Plaintiffs do not challenge Chapter 251 based on "doomsday" hypotheticals about unlawful ways the Town *might* enforce Chapter 251 against Plaintiffs, but rather on the ground that numerous provisions of Chapter 251 are, for various reasons, preempted on their face, no matter how they are applied.  As Plaintiffs have explained in detail, *see* Pls.' Mem. 22-29, Chapter 251 confers broad, unfettered discretion on the Town, which is itself a sufficient violation of Section 253 of the Telecommunications Act of 1996 to invalidate the statute.  *See TCG New York*, 305 F.3d at 81 (holding that discretion to reject application based on any public interest factors "deemed pertinent by the City" is inconsistent with Section 253); *see also Qwest Commc'ns Corp. v. City of New York*, 387 F. Supp. 2d 191, 193 (E.D.N.Y. 2005) (disapproving of "unfettered discretion to grant or deny an application").  The Town's absolute bar on the construction of new facilities in large areas of the town also constitutes a prohibition of the type barred by Section 253.

Moreover, in one of the principal cases relied upon by the Town for its assertions regarding the standard by which this facial challenge under Section 253 should be judged, the Second Circuit explicitly stated that when the preempted regulation is the "permitting process itself, not the length or outcome of that process in particular cases" a complaining party need not show there is "'no possible set of conditions that [the permitting authority] could place on its permit that would not conflict with federal law.'"  *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (quoting and rejecting state's argument regarding the standard to be applied in assessing facial preemption challenge to permitting statute and distinguishing standard set out in *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987)).  Thus,

Chapter 251 is precisely the type of "regulation" that the Town concedes is a proper subject of a facial challenge.  Town Mem. 9 (admitting that, while regulatory outcomes in particular cases are not subject to facial challenge, "the act of regulation itself" may be challenged (internal quotations and emphasis omitted)).  "'The facial/as-applied distinction would be relevant only if [the Court] might find some applications of [Chapter 251] preempted and others not.'"  *Green Mountain*, 404 F.3d at 644 (citation omitted).  Because Chapter 251 "'is in direct conflict' with a federal statute . . . the 'focus is the *act of regulation itself*, not the effect of the [] regulation in a specific factual situation.'"  *Id.* (emphasis added).

For the same reasons, Plaintiffs' facial challenges to Chapter 251's absolute prohibitions and overly-burdensome application requirements are also justiciable.  Plaintiffs have explained how Chapter 251 prohibits their ability to provide telecommunications services "by imposing excessive burdens and delays on permit applications," Pls.' Mem. 21, and "flatly prohibit[ing] the construction of wireless facilities with new structures, such as poles or towers, in large areas of the Town," *id.* at 29.  Because Chapter 251 effects these unlawful prohibitions on its face, it is subject to a facial challenge under Section 253.  *See, e.g.*, *City of Auburn*, 260 F.3d at 1175 ("onerous application process" can in itself be prohibitive); *New Jersey Payphone Ass'n*, 299 F.3d at 242 (absolute siting prohibition violates Section 253 even when alternative siting is available nearby).  The Town's attempt to save the offending provisions of Chapter 251 by repeatedly citing its authority to issue a "waiver" or "exception," *see* Town Mem. 10 (internal quotations omitted), simply reaffirms that Chapter 251 grants the Town the broad and unfettered discretion prohibited by the Communications Act.

*Second*, Plaintiffs' facial challenge in no way requires that an application be made and denied under Chapter 251 to be ripe.  This is clear from the recent decision in *Air Transport*

*Ass'n of America, Inc.*, No. 07-5771, 2008 WL 763163, in which the Second Circuit held that New York State's Passengers Bill of Rights ("PBR") was preempted by federal law. In considering the plaintiff's facial challenge to the law on preemption grounds before any of the provisions of the PBR had been enforced against the plaintiff, the court explained that the plaintiffs' "preenforcement challenge presents no problem of unripeness or other barriers to justiciability." *Id.* at *2. Here too, where Plaintiffs challenge not particular applications of Chapter 251 but the law itself as preempted, there is no ripeness barrier to a facial challenge.

Furthermore, the Town does not dispute that Plaintiffs currently operate facilities in the Town and cannot deny that, through its retroactivity provisions, Chapter 251 has an immediate and unavoidable impact on Plaintiffs' business because even existing wireless infrastructure is subject to Chapter 251. *See* Complaint for Declaratory and Injunctive Relief ¶ 3 (filed Aug. 27, 2007) (citing Clarkstown Town Code, § 251.37(c),(d)). Indeed, for this reason alone, the threat posed by Chapter 251 to Plaintiffs' operations is in no way speculative. Because Chapter 251 applies to all existing wireless infrastructure upon the renewal of existing permits or, in the case of an existing permit without an expiration date, within five years, even if Plaintiffs never submit a zoning application under Chapter 251, there is nothing they can do—short of ceasing to do business in Clarkstown—to avoid the requirements of Chapter 251. Where the mere presence of the regulation "'presents plaintiffs with [an] immediate dilemma [of choosing] between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation,' the constitutional component of ripeness is satisfied." *TC Systems, Inc. v. Town of Colonie*, 263 F. Supp 2d 471, 479-80 (N.D.N.Y. 2003) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 (1993)); s*ee also City of Auburn*, 260 F.3d at 1171-72 (facial challenge to ordinance was ripe for summary judgment where plaintiff faced "a realistic danger of sustaining

a direct injury as a result of the statute's operation or enforcement" and plaintiff's threat of injury was not "speculative or conjectural") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).   There is thus no question that Plaintiffs' facial challenge to Chapter 251 is ripe for adjudication.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court should grant Plaintiffs' Motion for Summary Judgment and deny the Town of Clarkstown's Cross-Motion for Summary Judgment.

Respectfully submitted,

By:    /s/ Andrew G. McBride
Andrew G. McBride, Esq. (AM1966)
John E. Barry, Esq. (JB 1776)
Joshua S. Turner, Esq. (Pro Hac Vice)
**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
Tel.: 202.719.7000
Fax: 202.719.7049
**Attorneys for Plaintiff**
**New York SMSA Limited Partnership d/b/a**
**Verizon Wireless**

Christopher B. Fisher, Esq. (CF 9494)
**CUDDY & FEDER LLP**
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel.: 914.761.1300
Fax: 914.761.5372
**Attorney for Plaintiff**
**New Cingular Wireless PCS, LLC**

Gregory D. Meese, Esq. (GDM 8738)
**PRICE, MEESE, SHULMAN &**
**D'ARMINIO, P.C.**
50 Tice Boulevard
Woodcliff Lake, NJ 07677
Tel: 201.391.3737
**Attorney for Plaintiff**
**Sprint Spectrum L.P.**

Michael A. Rowe, Esq. (MR 8643)
Karl J. Nelson, Esq. (Pro Hac Vice)
**SAUL EWING, LLP**
750 College Road East
Suite 100
Princeton, New Jersey 08540-6617
Tel.: 609.452.3123
Fax: 609.452.3125
**Attorneys for Plaintiff**
**Omnipoint Communications, Inc.**

Dated: This 18th day of April, 2008.