UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NEW YORK SMSA LIMITED PARTNERSHIP d/b/a
VERIZON WIRELESS, NEW CINGULAR WIRELESS          Case No. 07 CV 7637
PCS, LLC, SPRINT SPECTRUM L.P., and OMNIPOINT    (Brieant, J.)
COMMUNICATIONS, INC., a wholly owned subsidiary  (Yanthis, M.J.)
of T-MOBILE USA, INC.,

                            Plaintiffs,

          -against-


THE TOWN OF CLARKSTOWN and THE TOWN
BOARD OF THE TOWN OF CLARKSTOWN,

                            Defendants.

------------------------------------------------------------------------X


## DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT
## OF CROSS-MOTION FOR SUMMARY JUDGMENT


                         ROSENBERG CALICA & BIRNEY LLP
                         Attorneys for Defendants
                         100 Garden City Plaza, Suite 408
                         Garden City, New York 11530
                         516-747-7400



May 9, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RELEVANT BACKGROUND AND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT I

       THE CARRIERS IGNORE THE RIPENESS DEFECTS . . . . . . . . . . . . . . . . . . . . . . . . 6

POINT II

       THE REQUIREMENTS FOR PROOF OF ACTUAL COMPLIANCE
       WITH FEDERAL RF REGULATIONS DO NOT AMOUNT TO
       IMPERMISSIBLE "REGULATION" OF RF STANDARDS . . . . . . . . . . . . . . . . . . . . . 9

POINT III

       THE CARRIERS MISSTATE AND MISAPPLY THE LAW . . . . . . . . . . . . . . . . . . . . 13

       A.    The Carriers Directly Misstate The Law By Contending That The
             Preservation Of Local Authority Under §332(c)(7) Is "Narrow." . . . . . . . . . . . 13

       B.    The Carriers Erroneously Contend That A Municipality May Not
             Prefer Less Intrusive Applications Or Alternative Technologies. . . . . . . . . . . . 16

       C.    The Carriers Erroneously Contend The Town Cannot Regulate
             The Placement Of Towers Near A Playground Or School. . . . . . . . . . . . . . . . . 17

       D.    The Carriers Speciously Contend That A Local Wireless Ordinance
             Cannot Inquire Into Whether A Legitimate "Gap" In Coverage Exists
             By Requiring The Submission Of Actual Coverage Data And Maps. . . . . . . . 18

       E.    The Carriers' Contention That The Wireless Law Contains Unfettered
             "Procedural Discretion" Is Both Legally and Factually Unavailing. . . . . . . . . 21

       F.    The Carriers' Claim That The Wireless Law Is Not
             A "Zoning" Law Is Perplexing And Unavailing. . . . . . . . . . . . . . . . . . . . . . . . 24

POINT IV

    THIS COURT SHOULD NOT BE MISLED BY THE CARRIERS' FALSE
    AND SPURIOUS CONTENTION THAT "THE TOWN ALL BUT CONCEDES
    THAT, IF SECTION 253 OF THE COMMUNICATIONS ACT APPLIES TO
    CHAPTER 251 OF THE CLARKSTOWN TOWN CODE, NUMEROUS
    PROVISIONS OF CHAPTER 251 MUST BE STRUCK DOWN AS
    PREEMPTED BY FEDERAL LAW" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

POINT V

    THE ARTIFICIAL DISTINCTION BETWEEN "DECISIONS" AND
    "REGULATIONS" ESPOUSED BY THE CARRIERS IS UNTENABLE . . . . . . . . . . 27

POINT VI

    THE NINTH CIRCUIT'S RULING IN SPRINT TELEPHONY PCS V. CO.
    OF SAN DIEGO, 490 F.3d 700 (9th Cir. 2007), *EN BANC* REHEARING
    APPLICATION PENDING, IS NOT BINDING ON THIS COURT AND
    SHOULD BE REJECTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT VII

    THE CARRIERS' COMPARISON OF THE TOWN'S WIRELESS LAW TO
    OTHER WIRELESS SITING LAWS IS PERPLEXING AND UNAVAILING . . . . . . 34

POINT VIII

    ALTERNATIVELY, IF ANY PORTION OF THE WIRELESS LAW IS
    FOUND UNLAWFUL, THEN THIS COURT SHOULD ENFORCE THE
    SAVINGS CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## <u>TABLE OF AUTHORITIES</u>

**<u>Federal Cases</u>**

American Tower LP v. City of Huntsville
     295 F.3d 1203 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Cal. Coastal Comm'n v. Granite Rock Co.
     480 U.S. 572 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cox Communications PCS, L.P. v. City of San Marcos
     204 F.Supp.2d 1260 (S.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Freeman v. Burlington Broadcasters, Inc.
     204 F.3d 311 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Green Mountain R.R. Corp. v. Vermont
     404 F.3d 638 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Metropcs Inc. v. City and County of San Francisco
     2006 WL 1699580 (N.D.Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

New York SMSA Ltd. Partnership v. Town of Clarkstown
     99 F. Supp. 2d 381 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 17

Nextel Communications of Mid-Atlantic, Inc. v. Town of Hanson
     311 F.Supp.2d 142 (D.Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Nextel Partners of Upstate New York, Inc. v. Town of Canaan
     62 F.Supp.2d 691 (N.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31, 33

NextG Networks of NY, Inc. v. City of New York
     513 F.3d 49 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Omnipoint Communications v. City of White Plains
     430 F.3d 529 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Omnipoint Communications v. Village of Airmont
     Case No. 07-Civ-0473 (S.D.N.Y. Apr. 18, 2007) (Brieant, J.) . . . . . . . . . . . . . . . . . . . . 7

Omnipoint Communications v. Village of Tarrytown
     302 F.Supp.2d 205 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PECO Energy Co. v. Township of Haverford
    No. 99-V766, 1999 WL 1240941 (E.D. Pa. Dec. 20, 1999) . . . . . . . . . . . . . . . . . . . . . . 26

Qwest Corp. v. City of Sante Fe
    380 F.3d 1258 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Schleifer v. City of Charlottesville
    159 F.3d 843 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Smart SMR of New York, Inc. v. Zoning Com'n of Town of Stratford
    995 F. Supp. 52 (D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sprint Spectrum L.P. v. Mills
    283 F.3d 404 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-16, 29, 30

Sprint Spectrum L.P. v. Willoth
    176 F.3d 630 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Sprint Telephony PCS V. Co. of San Diego
    490 F.3d 700 (9th Cir. 2007), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

TCG New York, Inc. v. City of White Plains
    305 F.3d 67 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. Cellular Telephone of Greater Tulsa L.L.C. v. City of Broken Arrow, Oklahoma
    340 F.3d 1122 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Salerno
    481 U.S. 739, 107 S.Ct. 2095 (1987); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

Vertical Broadcasting, Inc. v. Town of Southampton
    84 F.Supp.2d 379 (E.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


**State Cases**

Committee to Preserve Brighton Beach v. Council of City of New York
    214 A.D.2d 335, 625 N.Y.S.2d 134 (1st Dept. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 23

Twin Lakes Development Corp. v. Town of Monroe
    1 N.Y.3d 98, 769 N.Y.S.2d 445 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Federal Statutes

47 U.S.C. §253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

47 U.S.C. §332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Federal Communications Act of 1934 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## State and Local Statutes

N.Y. CPLR, Article 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

N.Y. Town Law §274-b(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 24

N.Y. Town Law §118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.Y. Town Law §119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Town of Clarkstown Town Code: Chapter 251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## Other Authorities

FCC Guide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

West - Federal Land Use Law & Litigation § 10:10 (2008 Ed.) . . . . . . . . . . . . . . . . . . . . . 10, 13

## PRELIMINARY STATEMENT

This reply memorandum of law is respectfully submitted in further support of the Town's[1] cross-motion for summary judgment dismissing the Carriers' facial challenge to the Town's recently amended Wireless Law.  As detailed at length in the Town's prior opposing and cross-moving papers, the Carriers' blunderbuss attack on the Town's entire Wireless Law is devoid of merit, and should be rejected by this Court.  In opposition to the Town's cross-motion, the Carriers have again resorted to mischaracterizations and distortions of the Town's position on federal preemption – and of the Wireless Law itself.  We address and dispel these utter distortions below.

The opening salvo of the Carriers' latest brief employs the following scare tactic and makes the majestic claim that "[i]f even a fraction of [the over 40,000 political subdivisions in this country] attempted to do what Clarkstown has done – dictate wireless equipment specifications, impose a cumbersome application system for the construction of wireless facilities, and claim unfettered discretion to block further network development – the interstate mobile communications system we now enjoy would quickly unravel" (Pls. Mem. of L. in Opp. to Cross-Mot. at 1).  The problem with the Carriers' grandiose claim, however, is that the Town's actual Wireless Law at issue: (1) does <u>not</u> dictate wireless equipment specifications – the Wireless Law merely requests data and information to enable the Planning Board to conduct a meaningful review of future applications and to consider any available less intrusive means of filling any genuine "gaps" in coverage, in full accordance with applicable FCC regulations, the FCC's Guide (discussed <u>infra</u>), and relevant case law; (2) does <u>not</u> impose a cumbersome

---

[1] Unless indicated otherwise, capitalized terms used herein are given the same meaning as defined in defendants' cross-moving papers.

application system – indeed, the Carriers have failed to submit even a single affidavit let alone any actual evidence to demonstrate that it would be unduly burdensome or cumbersome to comply with the new law, in contrast to the sworn declarations of the Town's Planner and the Town's outside wireless consultant and expert; and (3) does not claim unfettered discretion to block further network development – rather, the Wireless Law contains detailed and specific criteria to be considered and applied by the Planning Board in non-discriminatory fashion to all applications, coupled with a potential waiver for any exceptional circumstances or undue hardship (which waiver provisions were added at the behest of the Carriers themselves, and contain the very same discretionary factors and provisions inherent to New York zoning law respecting all special permits (N.Y. TOWN LAW §274-b(5)). Accordingly, the interstate mobile communications system we now enjoy will not quickly unravel due to the Town of Clarkstown's Wireless Law, which provides the same review of applications as the Second Circuit endorsed.

In a similar vain, the Carriers' latest brief continues to read like a wireless industry manifesto – i.e., advocating the abolishment of virtually any local controls over wireless facilities – as if the TCA did not expressly preserve local zoning and land use controls over the siting of wireless facilities. See 47 U.S.C. §332(c)(7) (entitled "***Preservation of local zoning authority***"). In their initial brief, the Carriers boldly contended that "*Any* state or local intrusion into the equipment used, power levels employed, or quality of service provided in radio communication is prohibited" (Pls.' Mem. of L. in Sup. of Mot. for Summ. Judg. at 2) (emphasis in original). The Carriers continue their drumbeat in their opposing/reply papers by contending that "requiring a wireless carrier to produce *any* RF data rather than only stating compliance with FCC RF emission standards, even if the data is not used in evaluating a tower siting application,

2

would be preempted under Section 332(c)(7)(b)(iv)" (Pls.' Reply Mem. of L. at 18) (emphasis in original).

Again, the problem with the Carriers' emboldened and sweeping proclamations about the extent of the <u>limited</u> federal preemption in this area is that the Carriers are simply dead wrong. Worse still, the Carriers talk out of both sides of their mouth. Out of one side of their mouth the Carriers claim the Town cannot seek "*any*" RF data. Then, out of the other side of their mouth, the Carriers continue to rely upon the FCC's permissive and non-binding "Guide" (discussed <u>infra</u>), even though the Guide itself expressly <u>permits</u> and <u>authorizes</u> towns and other state and local municipalities to engage in their own RF data gathering and analyses to confirm compliance with FCC standards, and even though the Carriers have utterly failed to demonstrate how <u>any</u> of the specific RF data submission requirements embodied in the Town's Wireless Law are in <u>any</u> manner inconsistent with the FCC's Guide. Thus, the Carriers' blunderbuss assault on the RF data gathering and submission requirements embodied in the Town's newly amended Wireless Law is completely devoid of merit.

Another salient tactic the Carriers employ is to blatantly mischaracterize the Town's position, and the Wireless Law itself, in an effort to create a "straw man" argument. Thus, for example, the Carriers contend the Town has all but "conceded" that if Section 253 of the TCA applies, then the Wireless Law is preempted. However, this gross distortion ignores the Town's <u>actual</u> position – namely, that Section 253 of the TCA (governing telecommunications generally) and Section 332 (more specifically governing wireless telecommunications facilities) should be read *in para materia*. That Section 332 should be read *in para materia* with Section 253 cannot seriously be questioned. Nor can it seriously be disputed that Section 332(c)(7) and its <u>express</u>

preservation of local zoning authority, and which underlined expressly refers to and uses the terms "authority" and "*regulation,*" is not strictly limited to individual siting decisions, and applies to wireless siting laws as well.

Another "straw man" erected by the Carriers is that the Wireless Law somehow tramples upon federal preemption of wireless infrastructure by defining "adequate coverage." However, far from doing so, and in notable contrast to other municipalities which actually underlined do attempt to legislate what "adequate coverage" entails,[2] the Town's Wireless Law merely requires an applicant to submit meaningful coverage data and coverage maps so that the Planning Board can address coverage issues in a meaningful and objective fashion. Again, given the underlined express language of Section 332, and given the underlined plethora of case law holding that an applicant must establish a genuine gap in coverage, the Carriers cannot seriously contend that the submission of coverage data and coverage maps is preempted.

Moreover, the Carriers are again just plain wrong when they argue that a local wireless ordinance cannot embody a preference for co-location or other less intrusive technologies. For one, it is nonsensical to suggest that a local ordinance preference for co-location or other less intrusive technologies is impermissible, while the very same preference is lawful and permissible as applied to individual siting applications. Further, it is instructive to note that prior to the

---

[2] As previously noted, in contrast to the Town of Clarkstown's wireless ordinance at issue (which merely requests coverage data), several municipalities have gone one step further and have legislatively imposed actual reception levels at which coverage is deemed "adequate." See Town's Mem. of L. in Supp. of Cross-Mot., at n. 20 (citing to the local wireless ordinances of the Town Code of Denning, New York ("Adequate Coverage" of wireless transmissions is -95 dBm); Town Code of Stockbridge, Massachusetts ("Adequate Coverage" is -95 dBm); City Code of Riverside, California ("Adequate Coverage" is -95 dBm); Town Code of Brandon, Vermont ("Adequate Coverage" is -90 dBm); Town Code of Concord, Massachusetts ("Adequate Coverage" is -95 dBm); and Town Code of Westminster, VT ("Adequate Coverage" is -90 dBm).

4

recent amendments, the Town's Wireless Law included a local ordinance preference for co-location (as do numerous other local ordinances across the country), and there was never any hint or suggestion, let alone claim, by the Carriers that such preference was somehow preempted by Sections 253 or 332 of the TCA.  In fact, this Court, in New York SMSA Ltd. Partnership v. Town of Clarkstown, 99 F. Supp. 2d 381 (S.D.N.Y. 2000), expressly held that it was permissible for the Town, even under the prior version of this Wireless Law, to prefer co-location without running afoul of the anti-discrimination or limited preemption sections of the TCA.

<h3 align="center">RELEVANT BACKGROUND AND FACTS</h3>

The Court is again respectfully referred to the cross-moving declarations of Amy Mele, Town Attorney, Jose C. Simoes, Town Planner, Michael P. Musso, P.E., Senior Project Engineer of HDR, Inc. (the Town's outside wireless consultant), and the Town's Local Civ. R. 56.1 Statement and accompanying citations to the summary judgment record.

The Carriers have chosen to simply ignore the Town's evidentiary submissions. However, the Carriers are constrained to acknowledge that the recent amendments to the Town's Wireless Law are the product of lengthy and exhaustive review, studies and analyses of the issues, both internally and with the aid of outside input from experts and consultants, including ad-hoc inter-municipality meetings, extensive work sessions with and input by the Carriers themselves, and including several revisions made at the Carriers' behest (more on this below). The Carriers are also constrained to acknowledge they have no genuine evidence – either in the way of any affidavits, declarations, or documents – to support their self-serving and erroneous contention that the amendments were designed or aimed to circumvent the limited federal preemption of wireless communications facilities under the TCA.  See Musso Reply Decl.

In contrast to the Town's submission of actual evidence and sworn declarations from the Town Attorney, the Town Planner, and the Town's outside wireless consultant, the Carriers do not submit even a <u>single</u> affidavit – expert or otherwise – to demonstrate that it would be unduly burdensome or costly to comply with the recent amendments to the Town Wireless Law. Accordingly, this Court is left to conclude that the Carriers can <u>readily</u> and <u>easily</u> comply – e.g., they can push a button and submit data they <u>already</u> have or which is readily accessible. They simply do not <u>want</u> to comply – no doubt because they would prefer to simply keep the Town and other state and local municipalities in the dark about their <u>actual</u> data. In fact, the Carriers' only response to the Town's evidence regarding the streamlining and reasonableness of the application process and the specific data submission requirements is that they should be "disregarded" as "irrelevant." Not so.

## POINT I

## THE CARRIERS IGNORE THE RIPENESS DEFECTS

As demonstrated in Point I of the Town's prior brief, the Carriers' facial challenge is unripe as to the majority of the Carriers' claims and contentions in this lawsuit. No case has ever held that a municipality is without the authority to enact a local law regarding how wireless siting applications are to be processed and determined, and in fact Section 332(c)(7) of the TCA <u>expressly</u> preserves and confers that zoning authority. The Carriers' facial challenge herein is therefore addressed not to whether the Town had authority to enact the recent amendments to the Wireless Law, but to whether the Wireless Law goes too far. Accordingly, this is <u>precisely</u> when the "most difficult" burden of establishing that "<u>no set of circumstances exists</u>" under which application of the Wireless Law would be valid. <u>See</u> extensive discussion in Point I of the

6

Town's initial brief herein of <u>United States v. Salerno</u>, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100

(1987); <u>Cal. Coastal Comm'n v. Granite Rock Co.</u>, 480 U.S. 572, 580 (1987); <u>Green Mountain</u>

<u>R.R. Corp. v. Vermont</u>, 404 F.3d 638, 643-644 (2d Cir. 2005).  The Carriers admit these

authorities apply (<u>see</u> Carriers' Mem. of L. in Opp. to Cross-Mot., at 47).

      A significant portion of the Carriers' initial moving papers was devoted to the Carriers'

argument – made without any <u>factual</u> support or data – that it would be unduly burdensome and

costly for the Carriers to comply with the new law.  The Carriers thus argued, albeit without

support in the Wireless Law or evidentiary support, that the application fees and anticipated

costs of compliance, coupled with the potential for outside consultant fees, would invariably lead

to undue delays, increased compliance costs, consulting fees, and the like.  In response, the

Town and its outside wireless consultant, Michael Musso, P.E., demonstrated how the actual and

specific provisions of the recent amendments contain explicit provisions <u>limiting</u> the applicable

time limits, costs, and burdens, and are <u>not</u> intended and should <u>not</u> lead to any undue delays or

increased compliance costs.  <u>See</u> <u>also</u> Simoes Decl., ¶¶ 6-18.  In fact, the Town pointed out that

its outside consultant, Michael Musso, P.E., is the very <u>same</u> outside consultant whom the

Village and the Carriers approved as the Village's "replacement" outside consultant in the matter

of <u>Omnipoint Communications v. Village of Airmont</u>, Case No. 07-Civ-0473 (S.D.N.Y. Apr. 18,

2007) (Brieant, J.), a case upon which the Carriers themselves relied.  <u>See</u> Musso Decl., ¶17.

      The Town also conclusively demonstrated that under controlling New York law, local

boards are fully empowered and entitled to impose reasonable application fees, to require an

applicant to pay for a board's technical expert consulting fees, and to require an applicant who

requests permission to construct a structure to post a bond, and that there is indeed a specific

basis and means to challenge the reasonableness of any fees, which remain subject to audit prior to their payment.  See Town Mem. in Opp. and Supp. of Cross-Mot., Point IV (discussing Twin Lakes Development Corp. v. Town of Monroe, 1 N.Y.3d 98, 769 N.Y.S.2d 445 (2003); N.Y. TOWN LAW §§118 and 119).

The Carriers' response is to simply ignore the foregoing.  In fact, in addition to giving short shrift to the actual Wireless Law provisions regarding strict time limits, extremely limited fees, and limited application requirements, the Carriers completely ignore the sworn declaration of Michael Musso, P.E., who attests that based upon his extensive experience as a wireless siting technical consultant, the requirements are not in any way burdensome or extraordinary, and for the most part concern information which the Carriers already have in their possession, and which is otherwise routinely provided in connection with wireless siting applications.  See, e.g., Musso Decl., ¶¶ 10 & 18.  Upon this summary judgment record, the Carriers do not supply even a single declaration or a shred of evidence to refute Mr. Musso's assertions, let alone to refute the sworn contentions and attestations by the Town Attorney and the Town Planner in this regard.  See id.; see also Mele Decl., ¶¶9-11, ¶36; Simoes Decl., ¶¶ 6-18.

The same goes for the very short time limits for the application process, and the limited fees imposed in connection therewith – namely, the Carriers simply ignore the strict Wireless Law provisions and the sworn declarations which demonstrate that particularly in view of the very short and strict time limits which apply, wireless siting applications should be processed even more quickly under the recent amendments, and that the fees imposed are reasonable and by no means excessive.  See Musso Decl., ¶10; ¶18; Mele Decl., ¶¶9-11, ¶36; Simoes Decl., ¶¶6-18.  Once again, the Carriers do not even purport to refute these sworn declarations through any

8

evidence or declarations of their own.

Accordingly, and at a minimum, the following claims and objections levied by the Carriers are unripe: (1) the Carriers' objections concerning potential undue delays; (2) the Carriers' objections concerning the costs of an application and their potentially having to pay for the Planning Board's outside technical consultants; (3) the Carriers' objections concerning the items required to be included in the pre-application or application process as allegedly being too burdensome, especially given that the Planning Board can waive any specific requirements if compliance with any required item of compliance would be unduly burdensome in a particular case; (4) the Carriers' objections concerning wireless siting requirements and criteria as allegedly being too burdensome or prohibitory, especially since the law itself allows for a request for a waiver of any unduly burdensome or prohibitory requirements or criteria in a particular case; and (5) the Carriers' misplaced objections that the law prohibits or tends to prohibit the provision of wireless services, especially since the law itself specifically requires the issuance of a special permit if any specific denial would amount to unlawful prohibition.

## POINT II

## THE REQUIREMENTS FOR PROOF OF ACTUAL COMPLIANCE WITH FEDERAL RF REGULATIONS DO NOT AMOUNT TO IMPERMISSIBLE "REGULATION" OF RF STANDARDS

The Carriers attach and rely upon an amicus brief filed on behalf of the FCC in a state court tort case premised on the environmental effects of cell phones, wherein the FCC predictably urged that the FCC regulates the "technical standards" for RF emissions from cell phones, and that as a result, compliance with federal RF regulations preempts a state court tort claim for personal injuries allegedly resulting from RF exposure. That is distinctly not the issue

9

here.  As shown at length in the Town's initial brief herein, data submission requirements to determine whether an applicant is in <u>compliance</u> with federal law is specifically (indeed inherently) not local "regulation" of what those standards should be.  <u>See</u> Town Mem. of L. in Supp. of Cross-Mot. at 39-42.

Instead of looking to an FCC amicus brief on tort preemption (or FCC rulings concerning locally promulgated RF standards <u>inconsistent</u> with FCC standards[3]) which does not even purport to address at all whether a local government may require a wireless siting applicant to show compliance <u>with FCC standards</u>, the relevant inquiry in the case at bar is based upon: (1) TCA Section 332, which expressly limits preemption <u>only</u> "to the extent that such facilities comply with the Commission's regulations concerning such emissions" (TCA, §332(c)(7)(B)(iv)); (2) Second Circuit case law recognizing that mere inquiries concerning RF in general or RF compliance with federal standards in particular, does <u>not</u> amount to impermissible "regulation" (West-FEDERAL LAND USE LAW & LITIGATION § 10:10 [2008 Ed] (citing <u>Cellular Telephone Co. v. Town of Oyster Bay</u>, 166 F.3d 490[, 495] (2d Cir. 1999) and the Court's citation with approval of <u>Smart SMR of New York, Inc. v. Zoning Com'n of Town of Stratford</u>, 995 F. Supp. 52 (D. Conn. 1998) and <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, 99 F. Supp. 2d 381 (S.D. N.Y. 2000)); and (3) the FCC's own published Guide to local governments, which <u>expressly</u> contemplates and recognizes the right of local governments to make inquiries into and assess whether an applicant-carrier is indeed complying and/or intends to comply with FCC standards (http://wireless.fcc.gov/siting/FCC_LSGAC_RF_Guide.pdf ).

---

[3] <u>See</u> <u>e.g.</u> the Carriers' citation to <u>Anne Arundel</u>, 18 F.C.C.R. at 13137-38, where the FCC again predictably objected to locally promulgated RF standards prohibiting interference with emergency systems, <u>beyond</u> the RF regulations of the FCC.  Again, <u>not</u> the situation here.

10

See Town Mem. of L. in Supp. of Cross-Mot., at 39-42.

Indeed, the FCC's Guide (annexed for the Court's convenience as exhibit A to the Musso Reply Declaration) completely dispels the Carriers' position.  The Guide in fact <u>encourages</u> local municipalities to inquire into very <u>detailed</u> data and analyses to determine whether a proposed wireless facility complies with FCC regulations.  The Guide further states that even those sites which the Guide indicates are "categorically excluded" are in fact not exempt from inquiry and analysis, and localities can still assess whether their RF levels comply with federal standards.  In fact, the Guide <u>expressly</u> encourages and allows municipalities to perform the following detailed analysis of radio frequency (RF) data:

> 17. Enter the power threshold for categorical exclusion for this service from the attached Table 1 in watts ERP or EIRP*. (note: EIRP = (1.64) X ERP):
>
> 18. Enter the total number of channels if this will be an omnidirectional antenna, or the maximum number of channels in any sector if this will be a sectored antenna:
>
> 19. <u>Enter the ERP or EIRP per channel</u> (using the same units as in question 17):
>
> 20. Multiply answer 18 by answer 19:
>
> 21. Is the answer to question 20 less than or equal to the value from question 17 (yes or no)?
>
> If the answer to question 21 is YES, this facility is categorically excluded. It is unlikely to cause exposure in excess of the FCC's guidelines.
>
> <u>If the answer to question 21 is NO, this facility is not categorically excluded. Further investigation may be appropriate to verify whether the facility may cause exposure in excess of the FCC's guidelines.</u>
>
> *<u>"ERP" means "effective radiated power" and "EIRP" means "effective isotropic radiated power</u> (emphasis supplied).

Further, the mere fact that the "Optional Checklist" is only 2 pages long is misleading

and a red-herring.  The Guide itself is much longer, and contains detailed and complex

illustrations, tables, graphs, and charts.  The actual data review and analysis to be performed by

local municipalities or their consultants which are expressly contemplated and authorized by the

Guide, including in situations where the answer to question 21 to the "Optional Checklist" is

"NO," entail sophisticated RF and engineering data and analysis, some of which is detailed in

the accompanying tables, graphs and charts.  See also Musso Reply Decl., ¶¶2-7 & Ex. A

thereto.

       In addition, the Guide is intended to be just that – a Guide – not a step-by-step standard

or regulation that local municipalities must follow in order to avoid preemption.  Moreover, the

Guide specifically acknowledges the complexity of RF issues, and alludes to municipalities

retaining their own RF experts.  Indeed, one of the "twin goals" of the Guide is "to define and

promote locally-adaptable procedures that will provide you, as a local official concerned about

transmitting antenna emissions, with adequate assurance of compliance" (Guide at p. 2)

(emphasis added).

       The Guide is also "*not intended to replace OET Bulletin 65, which contains detailed*

*technical information regarding RF issues*" (Joint Intr. Ltr. to Guide by W. Kennard, Chairman,

FCC, and K. Fellman, Chair, Local and State Government Advisory Committee) (emphasis

added).  Not coincidentally, that very same FCC Bulletin 65 is what the Town's Wireless Law

expressly indicates governs applicable calculations.  § 251-24(G).  See generally Musso Reply

Decl., ¶¶ 2-7 & Ex. A thereto.

       Lastly, as one commentator has aptly noted:

> Local governments can require facilities to comply with FCC
> emission standards, but they cannot adopt different standards as

the basis for their zoning decisions....  However, <u>raising concerns about or inquiring into the safety of RF emissions does not violate the TCA.</u> (emphasis added)

West-FEDERAL LAND USE LAW & LITIGATION § 10:10 [2008 Ed].

The Carriers' claim that RF data is sacrosanct, and that "any" locally-adapted procedures which requires the submission and review of RF data or emissions – even to determine compliance with FCC standards – is somehow illegal and preempted, is thus seriously wrong. For the same reasons, the Carriers' contention that a Planning Board should not even be permitted to request and obtain RF data, and therefore should not be entitled to hire an outside expert at the applicant's expense to conduct RF data review and analysis, or to review and verify an applicant's claims that an actual gap in coverage exists, is likewise dead wrong.  <u>Compare</u> Pls. Reply Mem. of L. at 27 (contending that "The Town cannot make Plaintiffs pay for studies that are themselves outside of the Town's authority to require or consider").  In short, the Town most certainly and legally can request and review data, including RF data, as can its wireless consultants such as Mr. Musso.

**POINT III**

**THE CARRIERS MISSTATE AND MISAPPLY THE LAW**

**A.    The Carriers Directly Misstate The Law By Contending That The Preservation Of Local Authority Under §332(c)(7) Is "Narrow."**

The Carriers' assertion that local zoning authority which is expressly preserved under Section 332(c)(7) "has been narrowly construed" (Pls. Mem. of L. in Opp. to Cross-Mot. at 22) is <u>directly</u> contradicted by the Second Circuit's holding in <u>Sprint Spectrum L.P. v. Mills</u>, 283 F.3d 404, 420 (2d Cir. 2002) ("***Congress meant preemption to be narrow and preservation of local governmental rights to be broad***") (emphasis added).  <u>Compare</u> Pls. Mem. of L. in Opp. to

13

Cross-Mot. at 22 (citing only <u>Freeman v. Burlington Broadcasters, Inc.</u>, 204 F.3d 311 (2d Cir.

2000), where the Second Circuit merely held that a local violation issued to a <u>radio</u> tower

improperly imposed radio interference standards <u>beyond</u> those required by the FCC).

Nevertheless, the Carriers continue to grasp at straws.  Thus, they now falsely contend[4]

that when the Second Circuit expressly stated in <u>Mills</u> that "***Congress meant preemption to be***

***narrow and preservation of local governmental rights to be broad***" (<u>Mills</u>, 283 F.3d at 404), the

Second Circuit somehow meant to confine its analysis to individual "decisions" <u>denying</u>

individual wireless applications.  The Carriers directly misread the <u>Mills</u> decision, and ignore the

fact that <u>Mills</u> specifically distinguished <u>Freeman</u> on the ground that <u>Freeman</u> did not concern

<u>wireless</u> equipment, as to which the FCC's broad regulatory preemption is "'somewhat' more

'circumscribed'".  <u>Mills</u>, 283 F.3d at 416.

<u>Mills</u> is the Second Circuit's most extensive analysis to date of the limited preemption

which the FCC's RF regulations impose regarding wireless facilities.  The case includes an

extensive analysis of preemption principles in general and specifically regarding RF's, TCA

Section 332, and the "broad" meaning of "decision" as opposed to the meaning of "regulation"

as used therein.  Even though this extensive statutory analysis was made in the context of

whether enforcement of a contractual right amounts to "regulation," that does not render the

Second Circuit's extensive interpretation of the "broad" preservation of local authority – i.e., as

compared to the "narrow" preemption by the FCC – meaningless or non-binding.  The following

extensive discussion by the Second Circuit in <u>Mills</u> thus squarely establishes that: (a) preemption

is limited when it comes to wireless siting; (b) general zoning-related matters not aimed at

---

[4] Pls. Mem. of L. in Opp. to Cross-Mot. at 23.

"regulating" RF's do not constitute impermissible regulation and are not preempted; and (c) as

further shown in Point V below, the "decision" verses "regulations" distinction espoused by the

Carriers is untenable, since "decisions" is a "broad" term encompassing "regulations":

> In the present case, these principles lead us to the conclusion that the School
> District's stance with respect to its Lease with Sprint is not preempted. First, we
> see nothing in the TCA to suggest that Congress meant to preempt a
> governmental entity's conduct that does not amount to regulation; and the
> structure and language of the TCA suggest precisely the contrary intent. To begin
> with, the structure of § 332(c)'s paragraph (7) indicates that Congress meant
> preemption to be narrow and preservation of local governmental rights to be
> broad, for subparagraph (A) states that "nothing " in the FCA is to "limit or
> affect" local governmental decisions "*[e]xcept as provided in this paragraph.*" 47
> U.S.C. § 332(c)(7)(A) (emphases added). Thus, unless a limitation is provided in
> § 332(c)(7), we must infer that Congress's intent to preempt did not extend so far.[5]
>
> Further, the language of paragraph (7) suggests that Congress did not mean to
> eliminate the distinction between acts that are regulatory and those that are
> proprietary, for the language in subparagraph (7)(A), preserving to local
> governmental entities authority except as limited in paragraph (7), refers broadly
> to governmental "decisions," whereas the prohibition set out in subparagraph
> (B)(iv) refers only to regulations. The latter states the limitation that, to the extent
> that a facility complies with FCC standards governing RF emissions, "[n]o State
> or local government or instrumentality thereof may regulate " facility
> construction, placement, or modification. 47 U.S.C. § 332(c)(7)(B)(iv) (emphasis
> added). The contrasting terms used in (A) and (B)(iv) reveal that the preemption
> provision with respect to RF emissions expressly provided by Congress in (B)(iv)
> carves out of subparagraph (A) only such decisions as constitute "regulat[ion]." [6]
>
> Thus, the language and structure of the TCA implicitly recognize that some
> governmental decisions are not regulatory and reveal that Congress meant

---

[5] The Second Circuit thus conducted a statutory analysis of what 332(c)(7)'s "broad" preservation of local authority entails, and how any alleged preemption which does not appear in 332(c)(7) is "narrow." The Court's discussion and reasoning also is not limited to individual decisions regarding contractual rights.

[6] Notably, the Second Circuit ruled that "decisions" "refers broadly to governmental 'decisions'" of any kind, not merely the denial of an individual application, as the Carriers espouse. Indeed, Mills did not even involve a denial of a wireless siting application at all, and the Court nevertheless ruled that a governmental "decision" invoking section 332(c)(7)'s broad preservation of local authority was squarely at issue.

"nothing" in the FCA to limit or affect the authority of a governmental entity "over decisions" as to the construction, placement, or modification of personal wireless service facilities on the basis of RF emissions "[e]xcept" to the extent that those decisions constitute "regulat[ion]." (emphasis supplied).

The last above-quoted paragraph directly dispels the Carriers' contention that <u>Mills</u> was referring only to denial of individual wireless siting application "decisions" as defining the "narrow" scope of federal preemption in this area. The Second Circuit expressly interpreted and applied "decisions" as a broad term encompassing any kind of "governmental decision" and applied preservation of local authority protections not just to the TCA, but to the FCC's RF regulations under <u>the FCA</u> as well (i.e., the Federal Communications Act of 1934).

Not only do the Carriers attempt to construct an artificial distinction without a difference, but the fact remains that Section 332 must be read *in para materia* with the rest of the TCA. The entire "regulation" versus "decisions" distinction which the Carriers espouse, and the Carriers' entire argument that Section 332(c)(7) is somehow irrelevant and should be disregarded when it comes to assessing the legality of a local wireless ordinance, is an artificial construct, and cannot withstand scrutiny. <u>See</u> <u>also</u> Points IV and V below.

**B.      The Carriers Erroneously Contend That A Municipality May Not Prefer Less Intrusive Applications Or Alternative Technologies.**

In their undue reliance on the FCC's regulation of the technical standards for RF emissions, the Carriers actually go so far as to contend that any "preferences" set forth in the Wireless Law for types of towers or types of technologies which have less impact on the landscape – e.g., preferring a small antenna on a building to a large antenna on a 10 story high tower to be constructed next to a single-family residential house, or preferring less antennas to more antennas, or necessary antennas to unnecessary antennas – is somehow preempted.

16

<u>See</u> Pls. Mem. of L. in Opp. to Cross-Mot. at 13-14.  The Carriers' contention is borderline frivolous.

      As we previously detailed in the Town's initial brief, nearly all of the Circuits, including the Second Circuit, have <u>expressly</u> held that preferring less invasive structures and technologies is entirely lawful.  <u>See</u> Town's Mem. of L. in Supp. of Cross-Mot. at 43-46.  This is especially true given that Section 332(c)(7)(B)(i)(I) expressly allows "[]reasonable discrimination" between wireless providers, and because, as the Second Circuit has squarely pointed out, the TCA only prohibits "unreasonable discrimination." <u>See</u> <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630, 639 (2d Cir. 1999); <u>Omnipoint Communications v. City of White Plains</u>, 430 F.3d 529 (2d Cir. 2005); <u>see</u> <u>also</u> <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, 99 F.Supp.2d 381, 389 (S.D.N.Y. 2000).

      For the Carriers to nevertheless contend that such preferences are illegal because the FCC has preempted the entire field, is beyond the realm of legitimate argument, particularly given that the same lead plaintiff herein was a party to a prior lawsuit against the Town of Clarkstown involving a prior version of the Town's Wireless Law (which likewise contained a statutory preference for co-location), wherein this Court ruled that such preference is entirely legitimate and lawful.  <u>See</u> <u>New York SMSA Ltd. Partnership v. Town of Clarkstown</u>, <u>supra</u>, 99 F.Supp.2d at 389.

    C.    **The Carriers Erroneously Contend The Town Cannot**
            **<u>Regulate The Placement Of Towers Near A Playground Or School</u>**.

      This is a facial challenge.  The Carriers do not purport to claim they have a gap in any particular location which cannot be filled except by placing a cell phone tower in a playground, a school, or other area where the Town Board has determined may attract children to climb or

tamper with a potentially high voltage electrical device.  The Carriers are entitled to coverage, not a cell tower on every block.  In short, the Carriers' continuing objection in this respect is unripe, and ignores that the legitimate protection of children in the community – so long as it is consistent with applicable FCC regulations and not otherwise preempted – falls squarely within the legitimate sphere of local zoning regulation.  See American Tower LP v. City of Huntsville, 295 F.3d 1203, 1208-1209 (11th Cir. 2002) (a *"tower's unusual proximity to two schools and several soccer fields used by children,"* along with other evidence, itself constituted "*substantial evidence*" pursuant to §332(c)(7) to support zoning board's denial of application to erect a wireless tower).

> **D.     The Carriers Speciously Contend That A Local Wireless Ordinance Cannot Inquire Into Whether A Legitimate "Gap" In Coverage Exists By Requiring The Submission Of Actual Coverage Data And Maps.**

In the same misguided vain, the Carriers actually go so far as to argue that a local municipality has no authority to inquire or determine whether a carrier has a genuine "gap" in coverage as part of the initial application process, or to make initial inquiries into a carrier's existing and planned coverage as part of the application process.  According to the Carriers, such efforts amount to unlawfully "regulating" radio frequencies.  See Pls. Mem. of L. in Opp. to Cross-Mot. at 14.  The Carriers posit that the only "preserved" zoning authority a locality has under Section 332 is concerning "issues such as height, setback requirements, and similar matters."  Id. at 21.  It is not apparent just how such a claim can be made in the face of hundreds of federal cases, including in the Second Circuit, holding that the actual existence of a genuine "gap" is a central factor which a municipality may (indeed must) consider in determining whether a siting application should be granted so as not to violate to TCA's proscription against

the "prohibiting" of service, and in connection with a local board's review and analysis of whether an application is "the least restrictive means" of filling a gap or "more feasible than other options."[7]  What is apparent is that the Carriers, in derogation of well-established law, espouse that the FCC's field regulation is so pervasive that it has negated Section 332 and binding Second Circuit authority.

Contrary to the Carriers' contentions in this regard, the Town – indeed all state and local municipalities – are most definitely and legally empowered to investigate, to require the submission of data and information to establish, and to require a carrier-applicant to prove, whether an actual and non-*de minimis* gap in coverage exists, including as part of the application process.[8]

Moreover, as previously noted, while the Town of Clarkstown's Wireless Law does not set pre-defined levels of adequate dBm coverage, numerous other municipalities have gone one step further than the Town of Clarkstown, and have in fact done so.[9]  It does not appear that any of those wireless ordinances have been invalidated for this reason.  With all of their citations

---

[7] See, e.g., Willoth (the applicant submitted limited "propagation" maps, and the Town obtain in-vehicle propagation maps); Omnipoint (as shown in the District Court's decision, reported at 175 F.Supp.2d 697, coverage maps were presented to the zoning board to establish a "gap"); U.S. Cellular Telephone of Greater Tulsa L.L.C. v. City of Broken Arrow, Oklahoma, 340 F.3d 1122 (10th Cir. 2003) (pursuant to wireless siting law, coverage maps were used to show need and unavailability of co-location or alternative siting); Metropcs Inc. v. City and County of San Francisco, 2006 WL 1699580 (N.D.Cal. 2006) (whether actual gap existed at location was shown by "propagation maps, drive test data, switch data"); Nextel Communications of Mid-Atlantic, Inc. v. Town of Hanson, 311 F.Supp.2d 142 (D.Mass. 2004) (gap was shown through propagation maps and testimony from a radio frequency engineer); Omnipoint Communications v. Village of Tarrytown, 302 F.Supp.2d 205 (S.D.N.Y. 2004) (existence of gap was proved by propagation analysis, coverage maps, RF engineering reports, and testimony of RF expert).

[8] See n. 7 supra.

[9] See n. 2 supra.

to obscure FCC administrative rulings have nothing to do with wireless facilities siting or local wireless laws, the Carriers fail to cite to a single case invalidating a local law because the local legislature looked at its local topography and wireless coverage and determined that a particular dBm level is sufficient to provide adequate coverage.

In any event, more to the point, the Town of Clarkstown's Wireless Law does <u>not</u> even require a predefined dBm level as constituting adequate coverage, and the Carriers' argument to the contrary is unfounded at best.  Even in reply, the Carriers continue to erroneously contend that the Town's Wireless Law defines "adequate coverage" (quotation marks used in Pls. Reply Mem. of L. at 10; <u>see</u> <u>also</u> <u>id.</u> at 13, claiming that the Wireless Law "*dictate[s] what constitutes adequate radio signal strength (equal to or below '-84 dBm') in the functioning of the Wireless Carriers' networks*", and at 15, claiming the Wireless Law defines "adequate" coverage).

But in fact, the Town's Wireless Law specifically does <u>not</u> fix the point at which "adequate coverage" is defined (the term does not even appear in the statute), and the Wireless Law sections to which the Carriers cite (<u>id.</u> at 10 and 13, citing only §§ 251-13(A)(12) and 251-19(F)(27)), only require that a coverage <u>map</u> be submitted at a particular dBm level, to allow for meaningful comparison of claims of a "gap" by carriers in different applications, and to enable the Planning Board to engage in meaningful inquiries and review as to whether a carrier is fixing the numbers by claiming in one application that it needs a particular dBm level in the area, while claiming in a different application that it needs a different dBm level, often in the same area.  <u>See</u> Mele Decl., ¶18; Simoes Decl., ¶¶6-15; Musso Decl., ¶¶13-16.  The map, required as part of the initial submission, is not determinative, and it is certainly rational for a Planning Board to ask for it.

20

**E.    The Carriers' Contention That the Wireless Law Contains Unfettered "Procedural Discretion" Is Both Legally and Factually Unavailing.**

In espousing that the Wireless Law allows the Planning Board unfettered "procedural discretion" (Pls. Mem. in Opp. to Cross-Mot. at 26), the Carriers ignore that the Wireless Law contains <u>detailed</u> and <u>specific</u> criteria for the Planning Board to exercise its discretion (§§ 251-17- 251-19), <u>all</u> of its determinations are subject to administrative challenge and review at all relevant stages (§§251-13(B)(2); §251-17; N.Y. CPLR, Article 78), and there is <u>nothing</u> wrong or unlawful in a Planning Board exercising its discretion so long as such discretion is based upon "substantial evidence" (<u>Omnipoint</u>, 430 F.3d 529 (2d Cir. 2005)).

Under Section 332, federal courts are obligated to defer to the local board's discretionary rulings with respect to siting applications so long as the ruling is based upon something more than a mere "scintilla of evidence." <u>See</u> <u>Omnipoint</u>, 430 F.3d at 532. The Second Circuit in <u>Willoth</u> has in fact endorsed the imposition of differing procedural requirements depending on the nature of an application. <u>See</u> <u>Willoth</u>, 176 F.3d at 639 ("local governments may reasonably take the location of the telecommunications tower into consideration when deciding whether [] <u>to require a more probing inquiry</u>").

Under these circumstances, the Carriers' contention that an applicant conceivably could submit a complete application, but the Planning Board conceivably could violate the Wireless Law and claim that the application is incomplete, is unripe, to say the least, not to mention that such a contention is not based or well-founded upon any provision in the Wireless Law itself.

Further, as detailed at length in Point III of the Town's initial brief, the Wireless Law <u>identifies</u> the limited and <u>pre-defined</u> items which must be included with the pre-application (very little) and the application itself. Any claim by the Planning Board that these were not

21

provided <u>must</u> be made within 30 days, and is subject to immediate Article 78 review. Indeed, it is only <u>after</u> the application is submitted, and the Planning Board's review is conducted, that the Planning Board can request additional information, and any such request does <u>not</u> extend the very short and strict deadlines for setting a hearing and issuing a decision on the application. <u>See</u> <u>generally</u> §251-17(B) and (D). Moreover, a requirement of case-specific evidence is plainly lawful, and must be upheld by federal courts so long as the requirements generally concern "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Nextel Partners of Upstate New York, Inc. v. Town of Canaan</u>, 62 F.Supp.2d 691 (N.D.N.Y. 1999) (because under <u>Willoth</u> a board's determination must be based upon substantial evidence, it is fully proper for the board to review and ask for such relevant evidence as a "reasonable mind" may believe may lead to such substantial evidence).

The Carriers' alternate contention that the provision in the Wireless Law which allows the Planning Board to "exempt" an applicant from particular requirements (§ 251-18), amounts to unfettered or unbridled discretion, flies in the face of: (1) New York law, which contains the very <u>same</u> discretionary factors and provisions inherent to New York zoning law respecting <u>all</u> special permits (N.Y. TOWN LAW §274-b(5)); (2) the summary judgment record, which reveals that this specific provision was in fact <u>added</u> to the Wireless Law <u>at the request of the Carriers themselves</u> (<u>see</u> Mele Decl., ¶32; Simoes Decl., ¶18; Musso Decl., ¶7); and (3) a similar provision in the Wireless Law (§ 251-32(B)) – again in full accordance with New York zoning law and preemption principles, and again added at the behest of the Carriers themselves – which allows for a potential waiver of a specific requirement to be granted if a waiver is necessary on an as applied basis, so as not to form the basis for any claim that any of the specific provisions

22

"prohibit" wireless service under either Sections 253 or 332 in any particular case on an as applied basis.  See id.

In addition, even the specific waiver provisions, and any determinations made thereunder, are subject to prompt and immediate judicial review, and as a matter of course, such waiver decisions are often the subject of Article 78 challenges by persons opposing the application.  See, e.g., Committee to Preserve Brighton Beach v. Council of City of New York, 214 A.D.2d 335, 625 N.Y.S.2d 134 (1st Dept. 1995) (nearby residents challenged issuance of waiver to special permit applicant).

The Carriers' citation to and reliance on First Amendment cases holding that a generalized statement in a statute that "if a provision is unconstitutional it should not apply" is not always enough to protect the statute from a constitutional challenge, is misplaced.  The cases cited by the Carriers from the Fifth Circuit Court of Appeals, and from two district courts in other circuits, were applying the heightened protections applicable to free speech and other highly protected constitutional rights, and the statutory provisions in those cases were too general.  In contrast, that is simply not the case here, inasmuch as the Town's Wireless Law at issue (§§ 251-18 and 251-32(B)) specifically recognizes that individual carrier-applicants are entitled to present evidence and make a record to establish that the TCA mandates issuance of a permit even if a specific requirement is not met in a particular case, whether under the TCA's anti-discrimination provisions or the "prohibition" of wireless services provisions – again, on an as applied basis.   And, in the case of the Town's Wireless Law, the waiver provision specifically tracks the very same specific standards borrowed from the New York Town Law, applicable to a potential "waiver" in respect of all "special permits" and special permit requirements in general.

<u>See</u> N.Y. Town L. §274-b(5).  Indeed, such a specific waiver provision, even in the First Amendment context, has been found to be not only lawful and immune from challenge on undue discretion grounds, but a "laudable" effort to comply with federal law which only reinforces the statute's legality.  <u>See</u> <u>Schleifer v. City of Charlottesville</u>, 159 F.3d 843, 853 (4th Cir. 1988).

The Carriers' argument in this respect is incredibly reckless and disingenuous, because the Carriers themselves recognized that the Planning Board should be entitled and empowered to grant waivers and relaxation of any specific provision if warranted so as not to run afoul of the TCA on an as applied basis.  In seeking the inclusion of precisely such a waiver provision in the Town's Wireless Law, the Carriers properly and plainly recognized that its inclusion in the law only serves to help the Carriers.  Their turnabout argument that it should now be stricken serves only to discredit and harm the Carriers themselves.

<b>F.     The Carriers' Claim That The Wireless Law Is Not<br>A "Zoning" Law Is Perplexing And Unavailing.</b>

The Wireless Law expressly indicates that Congress authorized and preserved a town's authority to promulgate zoning laws respecting wireless siting, and that the Town of Clarkstown was doing so by enactment of the Wireless Law.  § 251-10(H); (I); and (N).  The Carriers' argument that the Town's Wireless Law is not a "zoning" law because it is contained in Chapter 251 of the Town's Code, instead of Chapter 250, is specious.

This is especially true because the very body authorized to issue the special permits under the Wireless Law is a zoning body – the Planning Board; and because the statute itself applies the very <u>same</u> criteria which the Second Circuit has ruled applies and has indeed applied in connection with the preservation of local zoning authority embodied in TCA Section 332(c)(7).

<b><u>POINT IV</u></b>

24

**THIS COURT SHOULD NOT BE MISLED BY THE CARRIERS' FALSE AND
SPURIOUS CONTENTION THAT "THE TOWN ALL BUT CONCEDES THAT,
IF SECTION 253 OF THE COMMUNICATIONS ACT APPLIES TO CHAPTER 251
OF THE CLARKSTOWN TOWN CODE, NUMEROUS PROVISIONS OF CHAPTER
251 MUST BE STRUCK DOWN AS PREEMPTED BY FEDERAL LAW"**

The Town does not remotely contend, let alone "concede," that if Section 253 of the TCA

applies then portions of its Wireless Law are preempted by federal law.  To the contrary, as

extensively stated and demonstrated in the Town's initial brief, Section 253 must be read *in para

materia* with Section 332.

The Town previously and, we contend, aptly pointed out that the Carriers utterly failed to

cite to the controlling case law under Section 332 – which, again, must be read *in para

materia* with Section 253.  We also reasonably and aptly pointed out that the inapposite case law

and standards regarding <u>franchises</u> are <u>not</u> particularly relevant, let alone determinative, given

the unassailable distinctions and differences between local franchise laws and local wireless

facilities siting laws.  Indeed, numerous differences are identified in the Town's initial brief, not

one of which is dispelled by the Carriers, and not the least of which are that denial of a franchise

can often bar the telephone service provider from the <u>entire</u> market, coupled with the undeniable

fact that franchise laws are in the nature of commercial activity which involves a local

municipality's entry into a lucrative commercial franchise contract with a telephone service

provider, whereas a wireless siting law is a zoning regulation applying local zoning concerns,

based on the <u>preserved</u> local zoning authority as <u>expressly</u> set forth in Section 332 of the TCA.

It should therefore not be overlooked that <u>TCG New York, Inc. v. City of White Plains</u>,

305 F.3d 67, 81 (2d Cir. 2002), and the case newly cited by the Carriers – i.e., <u>NextG Networks

of NY, Inc. v. City of New York</u>, 513 F.3d 49 (2d Cir. 2008) – like most of the other cases relied

upon by the Carriers (e.g. Qwest Corp. v. City of Sante Fe, 380 F.3d 1258 (10th Cir. 2004) and

PECO Energy Co. v. Township of Haverford, No. 99-V766, 1999 WL 1240941 (E.D. Pa. Dec.

20, 1999)), are franchise cases, not cases regarding wireless siting determinations or wireless

siting laws.  This distinction is indeed significant, because Congress did not determine or resolve

to strike a balance in the franchise arena, only in the context of wireless communications

facilities and the preservation of local authority in connection therewith.  See TCA, Section

332(c)(7).  In other words, the point is not whether Section 253 should apply, it is whether

inapposite franchise case law should apply and should be read in a vacuum, in complete and

utter derogation of Section 332 of the TCA, and in complete and utter derogation of the ample

case law specifically analyzing whether wireless siting rulings constitute a "prohibition" or

effective prohibition under either section of the TCA.

      In their latest submissions, the Carriers make no serious effort to explain why case law

regarding franchise agreements – i.e., as to which other specific provisions of Section 253

impose additional and specific requirements not applicable to wireless siting rulings (e.g., that

the franchises must be "competitively neutral"... etc.) – should apply to wireless siting laws.

      The Carriers admit, as they must, that Section 332 would certainly apply if their

challenge were to the denial of an actual application.  The Carriers likewise admit, again as they

must, that the Second Circuit's case law in Willoth and Omnipoint would apply to such a

challenge.  Yet, they fail to explain why the purportedly broad FCC regulatory preemption, and

the franchise analysis which they claim is mandated pursuant to Section 253, would not apply to

such challenges.  Thus, to credit the Carriers' central thesis in this case would mean that the

Second Circuit in Willoth and Omnipoint, and the hundreds of other sister circuits and lower

courts who applied their analysis, erroneously permitted the local municipality at issue to request

and analyze RF and coverage data, erroneously permitted the local municipality to require the

applicant to show a genuine "gap" in coverage, erroneously permitted the local municipality to

prefer (or even impose) co-location or other purportedly "discriminatory" and "burdensome"

requirements, and erroneously permitted the local municipality to exercise its "undue

discretion."  The Carriers' position – i.e., picking up the mantle of Section 253 franchise case

law, and putting blinders on to Section 332 – is irrational, nonsensical, and utterly fails to

explain why the supposedly "broad" and complete "field" preemption nevertheless allowed these

courts to reach the conclusions they reached.

Additionally, as further shown in Point VI below, because <u>both</u> Section 253 and Section

332 contain the <u>same</u> provisions regarding the "prohibit[ing]" or "effective[ly]" prohibiting of

wireless service, even if Section 332 somehow does not apply to an attack on a wireless siting

law, the extensive interpretation of what those terms mean when applied to wireless siting in

<u>Willoth</u> and <u>Omnipoint</u> nevertheless applies with equal force under Section 253.

### <u>POINT V</u>

### <u>THE ARTIFICIAL DISTINCTION BETWEEN "DECISIONS" AND "REGULATIONS" ESPOUSED BY THE CARRIERS IS UNTENABLE</u>

The Carriers now argue that a "decision" based upon the <u>same</u> criteria imposed by the

Planning Board receives the full protections of Section 332's preservation of local authority over

wireless facilities siting, but a local law which applies the <u>same</u> criteria as to how that decision is

arrived at receives no protection from Section 332.  The Carriers thereby espouse, in direct

contravention of their <u>own</u> Complaint in this lawsuit,[10] that Section 332's preservation of local authority, and the Second Circuits rulings in <u>Willoth</u> and <u>Omnipoint</u>, do not apply here because they are not challenging a "decision" and are instead challenging a wireless law governing how siting decisions are made.

The Carriers' position is untenable. Why would Congress protect a final denial decision, along with its rationale and its burdens placed on the carrier-applicant with respect to actual gaps in coverage and the like, as falling within the express preservation and protections afforded state and local governments, but not intend or afford the same protection to a local law regarding the exact same things? Plainly, if it is lawful to "decide" a wireless application on a number of well-established and court-approved criteria, it cannot be unlawful to write those same criteria down on paper in the form of a local wireless law.

The Carriers' argument thus does not survive logical scrutiny, even though two district courts across the country were misled into accepting it. <u>See</u> this Court's Individual Rules of Practice, Rule 2(C) ("This Court is not bound by the cases decided in other circuits or by other district judges"). In any event, the Carriers' position is untenable. For one, the Carriers ignore the <u>plain language</u> of Section 332(c)(7) itself, which <u>specifically</u> and <u>expressly</u> includes the term "regulation."

Moreover, as shown in Point III above and in the Town's initial brief herein, in this Circuit, there is no legitimate room for claiming that Section 332(c)(7) only applies to individual

---

[10] <u>See</u> the Carriers' own Complaint herein, which pleads that Section 332 applies to its lawsuit herein: ¶79 through ¶87, under the heading "*CHAPTER 251 IS PREEMPTED BY SECTION 332(c)(3) OF THE COMMUNICATIONS ACT*"; ¶95 through ¶107, under the heading "*CHAPTER 251 IS PREEMPTED BY SECTION 332(c)(7) OF THE COMMUNICATIONS ACT*"; Second Cause of Action, entitled "*Preemption Under 47 § 332(c)(3) and the Supremacy Clause*"; and Fourth Cause of Action, entitled "*Preemption Under 47 § 332(c)(7) and the Supremacy Clause*."

denials.  Nor is there any room to claim that an individual denial decision, rendered after applying all of the exact <u>same</u> criteria set forth in the Wireless Law, would be entirely lawful (because supposedly only then Section 332(c)(7) would apply), but writing those exact <u>same</u> criteria into the Wireless Law is unlawful (because then, according to the Carriers, Section 332(c)(7) would not apply).

Enactment of a wireless siting law is plainly an exercise of "<u>authority ... over decisions</u>" regarding wireless siting under §332(c)(7).  As shown, the Second Circuit held in <u>Sprint Spectrum L.P. v. Mills</u>, 283 F.3d 404, 420 (2d Cir. 2002), that both the preservation of local "authority" to make wireless siting "decisions," and the term "decisions" itself, contained in §332(c)(7), are to be accorded a "broad" meaning.  It expressly held that the broad term "decisions" <u>encompasses and includes</u> "regulations," such that Section 332(c)(7) applies to and protects all "governmental decisions" (of any kind) relating to wireless siting, and only those "decisions" which amount to impermissible "regulation" of RF standards are preempted.  Indeed, <u>Mills</u> did not involve a wireless siting application decision at all.  Instead, it involved a school district lease and a local determination to enforce a contractual right respecting wireless siting contained in the lease, and the Court nevertheless broadly held that even that amounts to a "decision" deserving of the broad protections of Section 332(c)(7).

Based on the plain language of Section 332(c)(7), it is manifest that the TCA preserves local "<u>authority</u>" over wireless facilities siting, and that its use of the term "decisions" is not limited to just the outcome of an individual siting application, but to the entire decision-making process, including the local laws and "<u>regulations</u>" which are used to determine the outcome of that process.  Section 332(c)(7)(A) does not merely preserve local "decisions," it preserves local

"authority" over zoning decisions, as reflected in both its caption (which preserves the

"authority" over "zoning" in general and does not even mention "decisions"), and in its text,

which also preserves local "authority . . . over decisions":

> 47 U.S.C. § 332(c)
>
> (7) Preservation of **local zoning authority**
>
> (A) General **authority**
>
> Except as provided in this paragraph, nothing in this chapter shall limit or affect the **authority** of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities. (emphasis added)

Moreover, as the Mills Court pointed out, the very next subparagraph thereof,

subparagraph (B), which like (A) is under the paragraph (7) heading of "Preservation of local

zoning authority," indicates (by way of limiting it) that such "authority" specifically

encompasses "regulation":

> 47 U.S.C. § 332(c)
>
> (7) Preservation of **local zoning authority**
>
> (A) General **authority**
>
> [Quoted above]
>
> (B) Limitations
>
> (i) The **regulation** of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
>
>> (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>>
>> (II) shall not prohibit or have the effect of prohibiting the provision of

personal wireless services. (emphasis added)

In addition to the plain language and legislative history behind Section 332 to preserve the local zoning authority and regulation over wireless siting issues, provided such regulation does not prohibit or unduly discriminate against wireless services, it is notable that Section 332(c)(7)(B)(II) applies to any "decisions," "authority" or "regulation" which has the "effect" of prohibiting wireless service.  Thus, from an interpretive and practical standpoint, this further defines and enlarges the scope of what is included in "decisions," "authority" and "regulation" under the TCA, since "effect[ive]" prohibition does not require any actual denial or any individual decision at all, only a "regulation" which has the "effect" of prohibiting service. There is indeed nothing in the statute which indicates that such an act or decision or regulation cannot take the form of a local wireless law, and in fact cases have applied Section 332(c)(7) to local wireless laws imposing unduly lengthy moratoriums, where it is clear and obvious that no individual siting "decision" is rendered because of the moratorium.  E.g., Nextel Partners of Upstate New York, Inc. v. Town of  Town of Canaan, 62 F.Supp.2d 691 (N.D.N.Y. 1999); see also Pls.' Compl., ¶129 (claiming that the Wireless Law has the "effect" of prohibiting wireless service).

31

## POINT VI

## THE NINTH CIRCUIT'S RULING IN <u>SPRINT TELEPHONY PCS V. CO. OF SAN DIEGO</u>, 490 F.3d 700 (9th Cir. 2007), *EN BANC* REHEARING APPLICATION PENDING, IS NOT BINDING ON THIS COURT AND SHOULD BE REJECTED

As noted above, the Carriers do not explain why inapposite case law derived from the franchise area, and having nothing to do with wireless siting issues let alone the express preservation of local zoning authority codified at Section 332 of the TCA, should be determinative of a wireless siting statute.

Section 253 <u>and</u> Section 332 contain the same restriction against the "prohibition" or "effective" prohibition of service.  The Ninth Circuit's ruling in <u>Sprint Telephony PCS v. County of San Diego</u>, 490 F.3d 700 (9th Cir. 2007), rendered in June 2007 and after nearly a year is <u>still</u> reportedly under consideration by the Ninth Circuit for *en banc* reconsideration (as reflected on its PACER docket under docket numbers 05-56435 and 05-56076), was wrongly decided, is not binding on this Court, and should be soundly rejected insofar as it wholesale imported, without discussion, inapposite franchise case law to the wireless siting context.  The subsequent California and the two other 2007 district court rulings which rely on the Ninth Circuit's erroneous ruling cited by the Carriers, all of them outside of this Circuit, should be rejected for the same reason.

The Second Circuit has already set forth how to determine whether wireless service is "prohibit[ed]" or "effective[ly]" prohibited in the context of local wireless siting rulings.   <u>Sprint Spectrum L.P. v. Willoth</u>, 176 F.3d 630, 639 (2d Cir. 1999); <u>Omnipoint Communications v. City of White Plains</u>, 430 F.3d 529 (2d Cir. 2005).  There is nothing to suggest that the <u>same</u> exact terms used in <u>both</u> Section 253 and Section 332 mean different things, and the Carriers offer no

32

meaningful reason to suggest that Section 332 does not apply.  Even the Ninth Circuit's ruling in

the pending County of San Diego case acknowledged that the terms in both sections have the

same meaning.  490 F.3d at 715.  It thus follows that the same requirements, criteria, and

analysis allowed and approved by the Second Circuit in Willoth and Omnipoint apply with equal

force to a facial challenge which seeks to invalidate a Town's wireless law governing the

submission and processing of applications for a wireless telecommunications facility.  See also

Nextel Partners of Upstate New York, Inc. v. Town of  Town of Canaan, 62 F.Supp.2d 691

(N.D.N.Y. 1999) (when a challenge is made not to a denial decision, but to a requirement that an

applicant present information in support of a wireless siting application, the federal court's

inquiry is limited to asking whether the requirements generally concern "relevant evidence as a

reasonable mind might accept as adequate to support a conclusion").

      The Ninth Circuit was simply wrong in allowing a facial challenge to a siting statute to

result in an end-run around and negate what Section 332 expressly allows municipalities to do.

Thus, while the Ninth Circuit contended it was giving effect to both Section 253 and Section

332, it in fact did not do so.  The controlling case law is and should be Sprint Spectrum L.P. v.

Willoth, 176 F.3d 630, 639 (2d Cir. 1999) and Omnipoint Communications v. City of White

Plains, 430 F.3d 529 (2d Cir. 2005), not cases analyzing franchise agreements.[11]

---

[11] Another distinguishing feather between this lawsuit and the County of San Diego lawsuit, is
that the Town of Clarkstown, unlike the County of San Diego, has not asserted that a "final" denial
decision is a prerequisite under Section 332 to any and all facial challenges to a state or local wireless
law.  In other words, before the Ninth Circuit, the County of San Diego argued that Section 332 requires
an application and a decision before any challenge to a wireless siting law can be made, and that no facial
challenge can ever be brought under Section 332.  The County's argument in this regard explains why the
Ninth Circuit discussed whether the same facial challenge may alternatively and still be brought under
Section 253, and concluded that it can.  In doing so, the Ninth Circuit correctly noted that both Section
253 and Section 332 contain the same restrictions against "prohibit[ing]" or "effect[ively]" prohibiting
service.  However, where the Ninth Circuit erred was in applying case law derived solely from franchise

Finally, because Sections 253 and 352 each contains the same "prohibition" and near

prohibition terms, and they are accorded the same meaning, even if Section 332 somehow does

not apply to an attack on a wireless siting law, the extensive interpretation of what those terms

mean when applied to wireless siting in Willoth and Omnipoint applies with equal force under

Section 253.

## POINT VII

### THE CARRIERS' COMPARISON OF THE TOWN'S WIRELESS LAW TO OTHER WIRELESS SITING LAWS IS PERPLEXING AND UNAVAILING

The Carriers would have this Court believe that the Town's Wireless Law is the first of

its kind, and this is the first time the Carriers have banded together to challenge a local law. The

claim is hard to swallow when we have identified a large number of local laws which include

highly restrictive provisions – e.g., mandatory RF and dBm levels not found in the Town's

Wireless Law, and much larger application and review fees, including some which go so far as to

fix what dBm levels constitute adequate coverage, in contrast to the Town's Wireless Law at

issue, which merely sets forth the dBm levels to be shown on a map, so that the Town can make

an "apples to apples" comparison of coverage maps, including to make a useful and meaningful

---

law, because such case law derived from other provisions of Section 253 which either relate exclusively to franchise agreements (e.g., that franchise fees charged by municipalities and other requirements must be "competitively neutral," and which applies solely to franchise agreements), or which address matters peculiar to franchise agreements (e.g., that a municipality's refusal of a franchise contract for any reason could constitute "unbridled discretion" or impose burdensome roadblocks as a means of protecting lucrative existing franchises from competing new entrants). These franchise-related concerns have little or no significance or relevancy in the more specific area of wireless siting statutes, and the Ninth Circuit's failure to read Section 332 in para materia with Section 253 (i.e., most likely resulting from the fact that the County of San Diego, unlike the Town here, argued that Section 332 did not apply to the carrier's facial challenge) was erroneous. See also Vertical Broadcasting, Inc. v. Town of Southampton, 84 F.Supp.2d 379, 388-389 (E.D.N.Y. 2000) ("the more typical case brought under Section 253 is one in which a provider complains that it is being assessed a license or franchise fee that is neither competitively neutral nor nondiscriminatory. E.g., GST Tucson Lightwave, Inc., 950 F.Supp. at 969. Here, the issue is solely one of tower location, not the assessment of any alleged discriminatory fee.").

comparison with prior coverage maps submitted by the same carrier.  <u>See</u> Musso Decl., ¶¶10-14; Simoes Decl., ¶15.  Moreover, this is certainly not the first time several wireless carriers have banded together to challenge a local wireless ruling.

## **POINT VIII**

### **ALTERNATIVELY, IF ANY PORTION OF THE WIRELESS LAW IS FOUND UNLAWFUL, THEN THIS COURT SHOULD ENFORCE THE SAVINGS CLAUSE**

Finally, and alternatively, contrary to the Carriers' suggestion, if any discrete provision of the Town's Wireless Law is deemed unlawful – <u>but</u> <u>see</u> Points I through VII above; <u>see</u> <u>also</u> Town's Mem. of L. in Supp. of Cross-Mot.; <u>see</u> <u>also</u> Mele Decl., Simoes Decl., Musso Decl. and Musso Reply Decl. – it should be severed and the remainder of the law upheld as lawful.  <u>See</u> <u>Cox Communications PCS, L.P. v. City of San Marcos</u>, 204 F.Supp.2d 1260 (S.D. Cal. 2002).

35

<u>CONCLUSION</u>

For these reasons, and for the reasons set forth in the Town's prior papers herein, it is respectfully submitted that the Court should deny the Carriers' motion for summary judgment, and should grant the Town's cross-motion for summary judgment.

Dated: Garden City, New York
       May 9, 2008

                                            Respectfully Submitted,

                                            ROSENBERG CALICA & BIRNEY LLP


                                            By: _____/s/_____
                                                   Edward M. Ross (EMR-1700)
                                                   Judah Serfaty (JS-1833)
                                            *Attorneys for Defendants*
                                            100 Garden City Plaza - Suite 408
                                            Garden City, New York 11530
                                            (516) 747-7400

36